**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**CANADA BANCSHARES, INC.**                                                 **PLAINTIFF**


**v.**                              **Case No. 4:26-cv-00267-KGB**


**BOARD OF GOVERNORS OF THE**
**FEDERAL RESERVE SYSTEM;**
**JEROME H. POWELL, in his Official**
Capacity as Chair of the Board of Governors;
**TRAVIS HILL, in his Official Capacity as Chair**
of the Federal Deposit Insurance Corporation; and
**SUSANNAH MARSHALL, in her Official Capacity**
as Commissioner of the Arkansas State Bank Department          **DEFENDANTS**

---

**SERVICE AFFIDAVIT OF COUNSEL**

---

I, Tyler D. Mlakar, Associate of Rose Law Firm, a Professional Association, do hereby state that the matters set forth herein are true and correct to the best of my personal knowledge, information, and belief:

1.      I am over 21 years of age and competent to make this affidavit.

2.      On March 16, 2026, I caused to be sent, via certified mail, (i) Canada Bancshares, Inc.'s ("CBI") Verified Complaint, (ii) a Summons to the Board of Governors of the Federal Reserve System, (iii) CBI's Motion for Preliminary Injunction, and (iv) CBI's Brief in Support of its Motion for Preliminary Injunction to United States Attorney General Pamela Bondi (the "U.S. Attorney General"). A true and correct copy of the entire mailing, including a certified-mail receipt, is attached hereto as **Exhibit I**.

3.      On March 16, 2026, I caused to be sent, via certified mail, (i) CBI's Verified Complaint, (ii) a Summons to Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors of the Federal Reserve System, (iii) CBI's Motion for Preliminary Injunction, and (iv) CBI's Brief in Support of its Motion for Preliminary Injunction to the U.S. Attorney General. A true and correct copy of the entire mailing, including a certified-mail receipt, is attached hereto as **Exhibit II**.

4.      On March 16, 2026, I caused to be sent, via certified mail, (i) CBI's Verified Complaint, (ii) a Summons to Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, (iii) CBI's Motion for Preliminary Injunction, and (iv) CBI's Brief in Support of its Motion for Preliminary Injunction to the U.S. Attorney General. A true and correct copy of the entire mailing, including a certified-mail receipt, is attached hereto as **Exhibit III**.

5.      On March 16, 2026, I caused to be sent, via certified mail, (i) CBI's Verified Complaint, (ii) a Summons to the Board of Governors of the Federal Reserve System, (iii) CBI's Motion for Preliminary Injunction, and (iv) CBI's Brief in Support of its Motion for Preliminary Injunction to The Honorable Jerome Powell, Chair of the Board of Governors of the Federal Reserve System. A true and correct copy of the entire mailing, including a certified-mail receipt, is attached hereto as **Exhibit IV**.

6.      On March 16, 2026, I caused to be sent, via certified mail, (i) CBI's Verified Complaint, (ii) a Summons to Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors of the Federal Reserve System, (iii) CBI's Motion for Preliminary Injunction, and (iv) CBI's Brief in Support of its Motion for Preliminary Injunction to The Honorable Jerome Powell, Chair of the Board of Governors of the Federal Reserve System. A true and correct copy of the entire mailing, including a certified-mail receipt, is attached hereto as **Exhibit V**.

2

7.      On March 16, 2026, I caused to be sent, via certified mail, (i) CBI's Verified Complaint, (ii) a Summons to Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, (iii) CBI's Motion for Preliminary Injunction, and (iv) CBI's Brief in Support of its Motion for Preliminary Injunction to The Honorable Travis Hill, Chair of the Federal Deposit Insurance Corporation. A true and correct copy of the entire mailing, including a certified-mail receipt, is attached hereto as **Exhibit VI**.

8.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 24, 2026.


_____

Tyler D. Mlakar

Dated <u>March</u> <u>24th</u>, 2026

3



**EXHIBIT**

**I**

_____

exhibitsticker.com

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

U.S. Attorney General Pamela Bondi
950 Pennsylvania Avenue, NW
Washington, DC 20530l-0001

9590 9402 7936 2305 5851 31

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                     ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
   ☐ Insured Mail
   ☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number (Transfer from service label)

9589 0710 5270 0162 0924 69

PS Form **3811**, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees *(check box, add fee as appropriate)*
☑ Return Receipt (hardcopy)         $ _____
☑ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____
Postage
$
**Total Postage and Fees**
$

Postmark
Here

Sent To  U.S. Attorney General Pamela Bondi
Street and Apt. No., or PO Box No.  950 Pennsylvania Avenue, NW
City, State, ZIP+4®  Washington, D.C. 20530l-0001

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

USPS TRACKING #

9590 9402 7936 2305 5851 31

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

**R**

**ROSELAWFIRM**

**A Professional Association**

**120 E. Fourth Street  Little Rock AR 72201-2893**



## ROSE LAW FIRM

March 16, 2026

**VIA CERTIFIED MAIL**
U.S. Attorney General Pamela Bondi
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
<u>Tracking #</u>: 9589 0710 5270 0162 0924 69

> **Re:**   *Canada Bancshares, Inc. v. Board of Governors of Federal Reserve System, et al.*
> U.S. District Court for the Eastern District of Arkansas
> Case No. 4:26-cv-00267-KGB
> **Service of Process Pursuant to Fed. R. Civ. P. 4(i)(1)(B)**

Dear Attorney General Bondi:

I represent the Plaintiff, Canada Bancshares, Inc. ("CBI") in connection with the above-referenced litigation against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department. In accordance with Federal Rule of Civil Procedure 4(i)(1)(B), please find accompanying this letter (i) CBI's Verified Complaint and its associated exhibits, and (ii) a Summons to the Board of Governors of the Federal Reserve System.

Additionally, CBI filed a Motion for Preliminary Injunction and Brief in Support. I have enclosed copies of those documents as well. CBI intends to pursue the relief requested therein with all deliberate haste. Please do not hesitate to reach out to my office in connection with this matter should you deem that necessary.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*
David S. Mitchell, Jr.

**A Professional Association**
120 E. Fourth St., Little Rock, AR 72201 | roselawfirm.com | (501) 375-9131 | (501) 375-1309 (fax)
dmitchell@roselawfirm.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of Arkansas  ▼

| | |
|---|---|
| CANADA BANCSHARES, INC. | ) <br> ) <br> ) <br> ) <br> ) |
| *Plaintiff(s)* | ) |
| v | )    Civil Action No. 4:26-cv-267-KGB |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; <br> JEROME H. POWELL, in his Official Capacity as Chair of the Board of <br> Governors; TRAVIS HILL, in his Official Capacity as Chair of the Federal <br> Deposit Insurance Corporation; and SUSANNAH MARSHALL, in her <br> Official Capacity as Commissioner of the Arkansas State Bank Department | ) <br> ) <br> ) <br> ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David S. Mitchell, Jr., 120 East Fourth Street, Little Rock, Arkansas 72201

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**TAMMY H. DOWNS**
*CLERK OF COURT*

Date: 03/13/2026

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 85 (Rev. 01/09) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
for the
Eastern District of Arkansas

| | | |
|---|---|---|
| Canada Bancshares Inc<br>*Plaintiff* | ) ) | |
| v. | ) | Civil Action No.  4:26-cv-267-KGB |
| Board of Governors of the Federal Reserve System et al<br>*Defendant* | ) ) ) | |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____       _____
                                                        *District Judge's signature*

                                                        _____
                                                        *Printed name and title*

Note:   Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.

Case 4:26-cv-00267-KGB    Document 1    Filed 03/13/26    Page 1 of 66

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

CANADA BANCSHARES, INC.

PLAINTIFF

v.                              Case No. **4:26-cv-267-KGB**

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department

This case assigned to District Judge ___Baker___
and to Magistrate Judge ___Ervin___

DEFENDANTS

## VERIFIED COMPLAINT

Plaintiff, Canada Bancshares, Inc., for its Verified Complaint against the Board of Governors of the Federal Reserve System; Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation; and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, states:

### PARTIES

1.      Canada Bancshares, Inc., ("CBI") is an Arkansas corporation with its principal place of business in England, Arkansas. CBI is the sole holding company of the Bank of England, an Arkansas state-chartered bank (the "Bank"). CBI owns all issued and outstanding shares of the Bank's stock.

2.      The Board of Governors of the Federal Reserve System (the "Board") is a federal agency established by the Federal Reserve Act, 12 U.S.C. §§ 221 *et seq.*, charged with the administration

and enforcement of the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* Among other responsibilities, the Board determines whether an entity qualifies as a bank holding company, and the Board engages in a variety of oversight activities.

3.    Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, oversees the Board's actions and is responsible for, among other things, ensuring the Board's compliance with its statutory duties.

4.    Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, oversees the Federal Deposit Insurance Corporation (alone, the "FDIC," and, together with the Board, Mr. Powell, and Mr. Hill, the "Federal Regulators") and ensures the FDIC's compliance with its statutory duties. The FDIC exercises certain regulatory authority over bank holding companies under the Federal Deposit Insurance Act. *See* 12 U.S.C. §§ 1811 *et seq.*

5.    Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, oversees the Arkansas State Bank Department (alone, the "State Regulator," and, together with the Federal Regulators, the "Agencies"), an entity charged with regulating state-chartered commercial banks and their holding companies. *See, e.g.,* Ark. Code Ann. § 23-46-205.

6.    The State Regulator's duties include review and approval processes that overlap significantly with the Federal Regulators'.

<div align="center">

**JURISDICTION AND VENUE**

</div>

7.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 in that it is a civil action or proceeding arising under the laws of the United States. More specifically, this is a civil action or proceeding arising under Acts of Congress regulating commerce, namely, the Bank Holding Company Act and the Federal Deposit Insurance Act.

8. This Court has supplemental jurisdiction over CBI's claims against the State Regulator because they are "so related to [CBI's] claims" against the Federal Regulators that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

9. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) as this is "a civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity[,]" and the Central Division of the Eastern District of Arkansas is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred . . . ."

<div align="center"><u>BACKGROUND</u></div>

10. Founded in 1898 with a capital stock of just $10,000, the Bank has survived two world wars, the Great Depression, and even the Great Recession.

11. For most of its existence, the Bank has been a family-run operation, as the same family has controlled the Bank for more than a half century.

12. Seth Boles—the progenitor of the Bank family—started working at the Bank as a cashier as long ago as 1946. Slowly but surely, Mr. Boles worked his way up to the Bank's presidency in the early 1960s. He maintained that position until 1989 when his son-in-law, Gary Canada, Sr., took the helm as the Bank's new president.

13. Over the decades, the Bank's ownership structure has shifted a handful of times.

14. This lawsuit is about the most recent shift in the Bank's ownership structure and the Agencies' reaction to it.

**The Partnership.**

15. In the late 1990s, several members of the Bank family formed MHBC Investments Limited Partnership I as a holding company for the Bank.

16. At that time, Mary Hanna Boles Canada was MHBC Investments Limited Partnership I's only General Partner.

17.     Mrs. Canada, Mr. Canada, Sr., Gary Canada, Jr. (as trustee), Bradley Canada (as trustee), and Hanna Nicole Canada Luebke (as trustee) were MHBC Investments Limited Partnership I's Limited Partners.

18.     In the early 2000s, MHBC Investments Limited Partnership I's partners voted to convert the entity to an Arkansas limited liability limited partnership, thereby creating MHBC Investments Limited Partnership I, LLLP (the "Partnership"), an entity governed by an April 1, 2004 Partnership Agreement[1] and the Uniform Limited Partnership Act (2001), Ark. Code Ann. §§ 4-47-101 *et seq.*

19.     Pursuant to Section 3.1 of the Partnership Agreement, one of the entity's core purposes was to "operate as a one bank holding company owning a controlling interest in the common stock of Bank of England, a state-chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies."

20.     As before, upon its conversion, the Partnership had only one General Partner: Mrs. Canada.

21.     Mrs. Canada has always been the Partnership's only legally recognized General Partner.

**Formation of CBI.**

22.     In the mid-2010s, the Bank family also established CBI as a holding company of the Bank.

23.     Over time, through a handful of transactions, CBI became the Bank's sole shareholder.

24.     Several months after the formation of CBI, its shareholders entered into a Shareholders Agreement.[2]

---

[1] A true and correct copy of the Partnership Agreement is attached as **Exhibit 1.**

[2] A true and correct copy of the Shareholders Agreement is attached hereto as **Exhibit 2.**

25.     The Shareholders Agreement restricts CBI's shareholders, officers, directors, and other agents from effecting any change to the Bank's Board of Directors without the Partnership's prior written authorization. **Ex. 2** § 12(c).

26.     Since CBI's original issuance of shares of its stock, the Partnership has always owned well in excess of a majority of the total issued and outstanding shares of CBI stock.

27.     As long as CBI has been the sole shareholder of the Bank, it has served as the intermediate holding company situated between the Bank and the Partnership, the Bank has served as the operating company, and the Partnership (until its recent dissolution) has served as the ultimate parent entity and holding company with supreme authority and control over the Bank.

### The Partnership's Dissolution.

28.     After serving as the Partnership's General Partner for decades, Mrs. Canada was sadly diagnosed with Alzheimer's disease at the Mayo Clinic in Rochester, Minnesota in 2020.

29.     Since that time, Mrs. Canada's cognitive abilities have deteriorated steadily.

30.     More recently, third-parties began taking advantage of Mrs. Canada's cognitive decline to their benefit and to Mrs. Canada's detriment.

31.     Seeking to protect his wife's well-being, Mr. Canada, Sr. initiated a guardianship action on September 12, 2025, in the Circuit Court of Lonoke County, Arkansas.

32.     On September 12, 2025, the Lonoke County Circuit Court appointed Mr. Canada, Sr. as Mrs. Canada's emergency guardian. A true and correct copy of the Lonoke County Circuit Court's Order appointing Mr. Canada, Sr. as his wife's emergency guardian is attached hereto as **Exhibit 3**.[3]

---

[3] Exhibit 3 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Order. Accordingly, CBI will file a Motion for Leave to File Exhibit 3 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

33.     A month later, the Lonoke County Circuit Court issued Letters of Temporary Guardianship to Mr. Canada, Sr. and Mrs. Canada Luebke, as co-guardians of Mrs. Canada's person and estate (the "Letters"). A true and correct copy of the Letters is attached hereto as **Exhibit 4**.[4]

34.     The Letters operated as an extension of Mrs. Canada's guardianship. Stated differently, although the terms of Mrs. Canada's guardianship have changed, there has been no interruption in Mrs. Canada's guardianship since September 12, 2025.

35.     As of the date and time of this filing, Mr. Canada, Sr. and Mrs. Canada Luebke are still serving as co-guardians of Mrs. Canada's person and estate.

36.     Arkansas's Limited Partnership Act provides that a general partner is dissociated automatically by operation of law upon the appointment of a guardian for such general partner:

> A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.

Ark. Code Ann. § 4-47-603(7)(B).

37.     Accordingly, Mrs. Canada was dissociated as General Partner of the Partnership by operation of law upon the Lonoke County Circuit Court's appointment of Mr. Canada, Sr. as her guardian on September 12, 2025.

38.     Arkansas's Limited Partnership Act further provides that a limited partnership is automatically dissolved by operation of law after the dissociation of a general partner if the partnership does not have a remaining general partner and the limited partners fail to admit a general partner within 90 days:

> A limited partnership is *dissolved*, and its activities *must be* wound up, only upon the occurrence of any of the following:
>
> . . .
>
> (3) after the dissociation of a person as general partner:

---

[4] Exhibit 4 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Letters. Accordingly, CBI will file a Motion for Leave to File Exhibit 4 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

(B) if the limited partnership does not have a remaining general partner, the passage of 90 days after the dissociation, unless before the end of the period:

(i) consent to continue the activities of the limited partnership and admit at least one general partner is given by the limited partners owning a majority of the rights to receive distributions as limited partners at the time the consent is to be effective; and

(ii) at least one person is admitted as a general partner in accordance with the consent . . . .

Ark. Code Ann. § 4-47-801(3)(B) (emphasis added).

39.    The Partnership Agreement, too, requires immediate dissolution of the Partnership following the dissociation of all general partners if a successor general partner is not admitted within 90 days:

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners.  In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be.

. . .

Section 10.1    Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:

(c) Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.

Ex. 1, §§ 6.9, 10.1(c) (emphasis added).

40.    The Partnership's Limited Partners did not admit a General Partner to replace Mrs. Canada within 90 days of her dissociation on September 12, 2025.

41.     The Limited Partners did not consent to continue the activities of the Partnership at any time following Mrs. Canada's dissociation on September 12, 2025, at least up until the date and time of this filing.

42.     Both the Partnership Agreement and Arkansas's Limited Partnership Act require the dissolution of the Partnership following the dissociation of all general partners if one or more substitute general partners are not appointed within ninety (90) days. **Ex. 1,** §§ 6.9 and 10.1(c); Ark. Code Ann. § 4-47-801(3)(B).

43.     The Partnership was without a General Partner for the 90-day period that ended on December 11, 2025.

44.     Thus, on December 12, 2025, the Partnership dissolved immediately and automatically by operation of law and the Partnership Agreement.

45.     Accordingly, the Arkansas Secretary of State certified the Partnership's dissolution, effective December 12, 2025. A true and correct copy of the Secretary of State's certification is attached hereto as **Exhibit 5**.

**CBI Takes Over.**

46.     Following the Partnership's dissolution, the Partnership's control over the Bank terminated, and CBI became the Bank's sole holding company.

47.     Accordingly, CBI no longer defers to the Partnership in the election or removal of directors of the Bank.

48.     As the Bank's sole holding company, CBI is entitled to, among other things, set strategy and governance (i.e., by appointing Bank leadership and board members as well as setting growth plans and direction), manage capital and funding, and interact directly with the Agencies.

**The Agencies Abdicate.**

49.    Federal law grants the Federal Regulators tremendous regulatory oversight over bank holding companies, largely through the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.*, and the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*

50.    Bank holding companies' actions and omissions are meticulously scrutinized by the Federal Regulators, and bank holding companies must frequently seek Federal Regulators' approval to take certain actions. *See, e.g.,* 12 U.S.C. § 1842(a) (requiring the Board's approval for a litany of transactions involving bank holding companies); 12 C.F.R. § 225.72 (requiring certain regulated institutions to provide the Board with written notice of changes in leadership or board membership); 12 U.S.C. § 1831i (requiring certain regulated institutions to provide the FDIC with written notice of changes in leadership or board membership and an opportunity to disapprove them).

51.    If the holding company owns a state-chartered bank, like the Bank here, then the holding company must also contend with government entities like the State Regulator.

52.    Often, the Agencies' regulatory duties overlap significantly. *See, e.g.,* 12 U.S.C. § 1842(b)(1) (requiring the Board to solicit and consider the "views and recommendations" of the State Regulator in certain transaction-approval decisions); *see also* Ark. Code Ann. § 23-46-205 ("The Bank Commissioner shall be charged with the general supervision of financial institutions, the execution of all laws passed by the State of Arkansas relating to the organization, operations, inspection, supervision, control, liquidation, and dissolution of banks, bank holding companies, subsidiary trust companies, and the general commercial banking business of Arkansas, and such other duties as prescribed by law.").

53.    Part and parcel of the Agencies' duties is (i) recognizing the proper owner of a regulated institution, and (ii) interacting with that owner to ensure regulatory compliance.

54.    Although (i) CBI owns all issued and outstanding shares of the Bank's stock, and (ii) the Partnership is dissolved, the Agencies refuse to recognize CBI's status as the Bank's owner.

9

55.   Worse yet, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among members of the Bank family over the winding up of the Partnership's business.

56.   The Agencies refusal to recognize CBI as the Bank's owner has caused and will cause catastrophic consequences, among others: (i) governance paralysis—the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises—if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption—vendors, other banks, and market participants will freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

57.   In short, the Agencies' conduct has caused CBI (and the Bank) to suffer irreparable harm and the Agencies' continued refusal to recognize CBI's status will perpetuate irreparable harm on CBI (and the Bank).

## CAUSES OF ACTION

### Count 1: Declaratory Judgment

58.   CBI realleges and reasserts the allegations contained in the preceding paragraphs of this Verified Complaint.

59. Pursuant to the United States Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, CBI seeks this Court's declaration that (i) the Partnership is dissolved, (ii) CBI owns the Bank.

60. This is an active and justiciable controversy because CBI has sought to act as the Bank's owner before the Agencies and the Agencies have refused to recognize CBI's status.

61. Worse yet, the Agencies have refused to recognize anyone's status as the Bank's owner.

62. The FDIC and the State Regulator asserted, in writing, that the Bank's ownership ***"remains a private legal issue that [they] have no jurisdiction over."***

63. Although the Board has not put it in writing, the Board has expressed the same opinion verbally during meetings over the Bank's ownership.

64. There is uncertainty regarding the parties' legal relations in this instance.

### NATURE OF RELIEF SOUGHT

65. CBI requests that this Court award it the following relief:

    a. Declare that (i) the Partnership is dissolved, and (ii) CBI is the sole holding company with control over the Bank;

    b. Pursuant to Fed. R. Civ. P. 65, preliminarily and permanently enjoin the Agencies to recognize CBI's status as the Bank's owner;

    c. All other relief that this Court deems just and proper.

WHEREFORE, Plaintiff Canada Bancshares, Inc. respectfully requests that this Court enter judgment in its favor against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department; enjoin the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation,

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department as requested herein; and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

12

## VERIFICATION

I, Gary Canada, Sr., state on oath that the foregoing facts set forth in this Verified Complaint are true and correct to the best of my knowledge, information, and belief.

_Gary Canada Sr._
Gary Canada, Sr.

Dated ___3-9-26___, 2026

STATE OF _Arkansas_        )

                          ) ss.

COUNTY OF _____    )

SUBSCRIBED and SWORN to before me, the undersigned duly commissioned, qualified, and acting Notary Public this _09_ day of _March_ 2026.

In witness whereof I hereunto set my hand and official seal

_____
Notary Public

My Commission Expires: _12-19-2034_



13

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

EXHIBIT

1

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
# AGREEMENT OF LIMITED PARTNERSHIP
## (As Amended and Restated)

**ARTICLE I**
**FORMATION AND ORGANIZATION** .............................. -1-
Section 1.1    Formation of Partnership ........................... -1-
Section 1.2    Organization Certificates; Filings ..................... -2-
Section 1.3    Partnership Name ................................ -2-
Section 1.4    Principal Office and Agent ........................ -2-
Section 1.5    Term of Partnership .............................. -2-
Section 1.6    Copies to Partners .............................. -2-

**ARTICLE II**
**DEFINITIONS** ............................................. -3-

**ARTICLE III**
**PURPOSES AND POWERS** ..................................... -5-
Section 3.1    Purposes of the Partnership ........................ -5-
Section 3.2    Powers of the Partnership ......................... -5-

**ARTICLE IV**
**ADMISSION OF LIMITED PARTNERS** ............................ -6-
Section 4.1    Admission of Limited Partners ...................... -6-
Section 4.2    Completion of Admission .......................... -6-

**ARTICLE V**
**CONTRIBUTIONS OF THE PARTNERS** ........................... -7-

**ARTICLE VI**
**RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS**
.......................................................... -7-
Section 6.1    Rights and Powers of the General Partners as Managers .......... -7-
Section 6.2    Limitations on General Partners' Authority .................. -7-
Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance ....... -8-
Section 6.4    Third Parties .................................. -8-

Section 6.5   Duties of the General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.6   Obligations not Exclusive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.7   Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .-9-
Section 6.8   Admission of Additional General Partner . . . . . . . . . . . . . . . . . . -10-
Section 6.9   Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General
       Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
Section 6.10  Indemnification of the General Partners . . . . . . . . . . . . . . . . . . . -10-
Section 6.11. Limited Liability of the General Partners . . . . . . . . . . . . . . . . . . . -11-

ARTICLE VII
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS . . . . . . . . . . . . . . -11-
Section 7.1   Rights of a Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
Section 7.2   Assignments of Limited Partnership Interests . . . . . . . . . . . . . . . -12-
Section 7.3   Assignments of Distributive Rights . . . . . . . . . . . . . . . . . . . . . . -12-
Section 7.4   Partnership Option to Purchase a Limited Partner's Interest . . . . . -13-
Section 7.5   Limited Partner's Status Upon Death or Incompetency . . . . . . . . . -14-
Section 7.6   Limited Put Option of Certain Permitted Transferees . . . . . . . . . . -14-

ARTICLE VIII
COMPENSATION OF THE GENERAL PARTNERS . . . . . . . . . . . . . . . . . . -15-
Section 8.1   Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 8.2   Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

ARTICLE IX
DISTRIBUTIONS AND
ALLOCATIONS OF INCOME AND LOSS . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.1   Distributions of Distributable Cash . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.2   Allocation of Certain Income and Losses for Tax Purposes . . . . . -15-
Section 9.3   Allocations Upon Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

ARTICLE X
DISSOLUTION AND PRIORITY ON DISTRIBUTION . . . . . . . . . . . . . . . . -16-
Section 10.1  Dissolution and Termination of the Partnership . . . . . . . . . . . . . . -16-
Section 10.2  Liquidation and Priorities on Distribution . . . . . . . . . . . . . . . . . . -16-

**ARTICLE XI**

**ACCOUNTING AND BUSINESS MATTERS** . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.1    Books of Accounts and Records . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.2    Accounting Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.3    Financial Statements and Reports . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.4    Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 11.5    Bank Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-


**ARTICLE XII**

**ELECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.1    Adjustment Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.2    Depreciation Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.3    Election with Respect to Taxation as Partnership . . . . . . . . . . . . -18-

Section 12.4    Other Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-


**ARTICLE XIII**

**AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-


**ARTICLE XIV**

**MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.1    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.2    Further Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.3    Paragraph Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.4    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.5    Application of Arkansas Law . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.6    Survival of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.7    Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.8    Execution in Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.9    Waiver of Action for Partition . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.10    Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.11    Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.12    Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.13    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (hereinafter referred to as the "Agreement"), is entered into effective as of the __1__ day of __April__, 2004, by and among MARY HANNA BOLES CANADA, and any other parties who may be admitted to the Partnership as General Partners pursuant to the provisions of Section 6.8 herein (hereinafter collectively referred to as the "General Partners" or individually as "General Partner"), and MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR., Trustee of the GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA, Trustee of the BRADLEY SETH CANADA TRUST I, and HANNA NICOLE CANADA, Trustee of the HANNA NICOLE CANADA STEWART TRUST I, and any other parties who may be admitted to the Partnership as Limited Partners pursuant to the provisions of Sections 4.1 and 7.2 herein below (hereinafter referred to collectively as the "Limited Partners" and individually as "Limited Partner").

WHEREAS, on July 21, 1997, MARY HANNA BOLES CANADA, the General Partner and the Limited Partners entered into the Agreement of Limited Partnership pursuant to which the Partnership was formed under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I.

WHEREAS, effective as of the date aforesaid, the Agreement of Limited Partnership was amended and restated as a limited liability limited partnership (as defined in Section 1.1 hereinbelow) under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinbelow contained, the adequacy of which consideration is hereby acknowledged, the parties agree as follows:

## ARTICLE I
### FORMATION AND ORGANIZATION

Section 1.1    Formation of Partnership.    Pursuant to the Arkansas Revised Limited Partnership Act of 1991, A.C.A. § 4-43-101 *et seq.*, as from time to time amended, including Act 912 of the 1997 Acts of Arkansas, hereinafter collectively referred to as the "Act," the parties hereto hereby form a registered limited liability limited partnership, which organization is hereinafter referred to as the "Partnership." The rights and liabilities of the Partners (as "Partners" is defined in Article II hereinbelow) shall, except as hereinafter expressly stated to the contrary, be as provided for in the Act.

Section 1.2   Organization Certificates; Filings.   The General Partners hereto shall immediately execute, file, record and/or publish the Application and the Certificate (as "Application" and "Certificate" are defined in Article II hereinbelow) and other documents conforming hereto, and take all other appropriate action to comply with all legal requirements for the formation of a registered limited liability limited partnership under the Act and its operation in the State of Arkansas.  The General Partners shall file and publish any other notices, certificates, statements or other instruments required or permitted by any provision of any law in the United States or any state or other jurisdiction which may govern the formation of this Partnership or the conduct of its business from time to time.  The General Partners shall cause the Partnership to file any further amendments to the Application and/or Certificate or such other documents as shall be required by A.C.A. §§ 4-43-202, 4-43-1110 and 4-42-703 in order to preserve the valid existence of the Partnership as a registered limited liability limited partnership and the limited liability of the Partners.

Section 1.3   Partnership Name.  The business of the Partnership shall be conducted under the name of the MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP, an Arkansas registered limited liability limited partnership, and under such name or variations thereof in the other jurisdictions as the General Partners deem appropriate.

Section 1.4   Principal Office and Agent.  The principal place of business and physical address of the Partnership shall be located at: 105 Cherry St., England, AR 72046, and the mailing address of the Partnership shall be: 105 Cherry St., England, AR 72046.  The agent for service of process shall be MARY HANNA BOLES CANADA at the above business address.

Section 1.5   Term of Partnership.  The Partnership shall become effective upon the filing of the Application and the Certificate and the payment of the filing fee therefor, in the office of the Arkansas Secretary of State, Little Rock, Arkansas, as required by the Act and shall remain effective until the earlier to occur of:

(a)   December 31, 2046; or

(b)   The date the Partnership is dissolved pursuant to the Act or any provisions of this Agreement.

The period of time between the date the Partnership becomes effective and the date it ceases to be effective shall be referred to herein as "Partnership Term."

Section 1.6   Copies to Partners.  The General Partners shall promptly deliver or mail a filed copy of the Certificate and any amendment thereto to each of the Limited Partners.

## ARTICLE II
## DEFINITIONS

Whenever used in this Agreement the terms set forth below shall be defined as follows:

(a)    The "Application" shall mean the Application for Registration of a Limited Liability Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-1110, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(b)    The "Certificate" shall mean the Certificate of Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-206, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(c)    "Code" shall mean the Internal Revenue Code of 1986, as amended.

(d)    "Distributable Cash" shall mean, at the time of determination for any period (on the cash receipts and disbursements method of accounting), the net cash derived from the conduct of the Partnership's business and operations, from its investments (including distributions from entities owned by the Partnership) and (except as limited below) cash proceeds from the sale or other disposition of Partnership Properties, but only after reasonable reserves of cash have been set aside by the General Partners for working capital, capital improvements and replacements, debt service, current and reasonably projected expenses, and other cash requirements, including current and reasonably projected investment opportunities, all in keeping with the Partnership purposes. For purposes of this subsection, all capital contributions, any borrowed funds, and cash proceeds attributable to the sale or other disposition of any of the Partnership Properties which were contributed to the Partnership or which were purchased with borrowed funds, shall be considered necessary for business and investment purposes and shall be excluded from Distributable Cash. In determining Distributable Cash the General Partners shall be subject to the duties imposed by Section 6.5 and shall have the duty to take into account the cash needs of the Partnership in its business, the funds necessary in the operation of its business until the income from further operations is available, the amounts of its debts, the necessity or advisability of paying its debts, or at least reducing them within the limits of the Partnership's credit, and the character of its surplus cash.

(e)    "Fair Market Value" shall be the price at which a willing seller and willing buyer, neither under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, would pay and accept in an arm's length transaction for such interest in the Partnership or any Partnership Property. The Fair Market Value of an interest in the Partnership shall be determined taking into account all factors relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held partnership interests having the rights and restrictions provided

under this Agreement and applicable Arkansas law including, but not limited to, the restrictions upon withdrawal before the end of the term of the Partnership. In the event it becomes necessary to value any interest in the Partnership or any Partnership Property, the Fair Market Value of the property shall be determined by agreement of the parties involved, or in the absence of such agreement, by an individual appraiser or appraisal firm mutually acceptable to such parties. In the event the parties involved are unable to agree on the individual appraiser or firm to perform the valuation, each party shall select an appraiser, and such appraisers shall first attempt to jointly determine the Fair Market Value of the Partnership interest or Partnership Property by mutual agreement, but if they are unable to agree on such valuation, such appraisers shall select a third appraiser, and the fair market value shall be determined by the average of the two (2) closest appraisals. Any valuation so determined shall be binding and conclusive on the parties absent manifest error. The cost of any such appraisal(s) shall be borne, in the case of a valuation of a Partnership interest, equally by the seller and the purchaser, and in the case of a valuation of any Partnership Property, equally by each individual Partner or group of Partners having conflicting interests in such appraisal.

(f)    "General Partners" shall mean MARY HANNA BOLES CANADA, and/or any other person or entity appointed in accordance with the provisions of this Agreement to replace, or in addition to, the aforesaid persons. "General Partner" shall mean, and refer to, any of the General Partners individually.

(g)    "Limited Partners" shall mean MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA TRUST I and HANNA NICOLE CANADA STEWART TRUST I, and any other person or entity who or which shall be admitted to the Partnership, pursuant to Section 4.1 or Section 7.2, and thereby becomes an owner of an interest in the Partnership. "Limited Partner" shall mean, and refer to, any of the Limited Partners individually.

(h)    "Partners" shall mean the General Partners and all Limited Partners.

(i)    "Partnership Properties" shall mean all properties (real, personal and mixed), and all rights, titles, interests and estates of every nature whatsoever incident thereto, owned by the Partnership. "Partnership Property" shall mean any one of the Partnership Properties.

(j)    The "Sharing Ratio" of a Partner shall be the ratio of the Partner's Units to the total Units outstanding.

(k)    A "Unit" shall represent a 0.1 percent interest of capital and profits in the Partnership, and the Partnership shall be authorized to issue one thousand (1,000) Units. Each Partner shall be entitled to cast one (1) vote per Unit on all matters in which all Partners are herein given the right to vote.

(l)    "Permitted Transferee" shall mean the initial Limited Partners named above, all of their lineal descendants, and trusts for the exclusive benefit of any of them.

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd    -4-

## ARTICLE III
## PURPOSES AND POWERS

Section 3.1    Purposes of the Partnership. The Partnership shall not be deemed to exist for a specific purpose; rather, the purpose of the Partnership is to manage the Partnership Properties by conducting any business which lawfully may be conducted in limited partnership form. Some of the more particular purposes of the Partnership are as follows:

(a)    To operate as a one bank holding company owning a controlling interest in the common stock of the Bank of England, a state chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies;

(b)    To provide flexibility in the management of Partnership Properties not available through the use of trusts, corporations and business entities; and

(c)    To identify the nature of the partners's partnership interests as separate property rather than marital property or community property.

(d)    To avoid the fractionalization of the ownership of certain Partnership Properties of various family members in order to receive a higher price in the event of a sale of any of the Partnership Properties.

Section 3.2    Powers of the Partnership. The specific purposes of the Partnership may, in instances where the Partners deem such action appropriate and to the extent Partnership funds are available therefor, be accomplished by:

(a)    Acquiring and disposing of Partnership Properties for cash, securities, other property, or any combination thereof upon such terms and conditions as the General Partners may from time to time determine (including, in instances where the property is encumbered, on either an assumption or a "subject to" basis);

(b)    Acquiring, owning, holding, improving, managing and leasing properties used in investment operations, and reinvesting the income and proceeds thereof, either alone or in conjunction with others, through partnerships, limited partnerships (or other partnerships in which certain partners have limited liability), joint ventures, or other business associations or entities;

(c)    Investing and reinvesting any of the Partnership Property or income of the Partnership, whether or not the original purpose for the investment has been accomplished, it being understood by the Partners that the investment objectives of the Partnership are to continue until the end of the Partnership Term and until the Partnership is dissolved and its affairs wound up.

(d)    Financing its activities by commercially reasonable methods on such terms and conditions as the General Partners deem appropriate. In instances where money is borrowed for Partnership purposes, the General Partners shall be and hereby are authorized to pledge, mortgage, encumber and grant security interests in Partnership Properties for the repayment of such loans;

(e)     Employing, retaining or otherwise securing, or entering into other contracts with persons or firms to assist in the acquisition, developing, improving, managing, and general operation of the Partnership Properties, all on such terms and for such consideration as the General Partners deem reasonably advisable;

(f)     Depositing Partnership funds in an account or accounts to be established at such time or times in such financial institutions (including any state or federally chartered bank or savings and loan association) and authorizing withdrawals of such funds by such persons at such times, and in such amount, as the General Partners may designate;

(g)     As to those Partnership funds which are not then required for Partnership purposes yet which the General Partners deem untimely to be distributed to the Partners, purchasing U. S. Treasury Bills, certificates of deposit, bonds, other certificates or evidences of indebtedness, stocks, real property, or other investment securities or property as the General Partners reasonably deem appropriate;

(h)     Taking any and all other action which is permitted under the Act and which is customary or reasonably related to the real, personal or mixed property incidental thereto; and

(i)     Taking any other action which is legally permissible.

## ARTICLE IV
## ADMISSION OF LIMITED PARTNERS

Section 4.1     Admission of Limited Partners.  No additional Limited Partners shall be admitted except by affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.  As distinguished from the admission of additional Limited Partners, no assignee of all or part of a Limited Partner's Units shall be substituted as a Limited Partner except under the conditions and restrictions and upon completion of all of the requirements of Article VII of this Agreement.

Section 4.2     Completion of Admission.  Subject to the other terms of this Agreement, a person shall become a Limited Partner when he or she shall have completed all of the following:

(a)     Executed a counterpart of this Agreement; and

(b)     Executed any other document, certificate or instrument, and taken such other action as the General Partners may reasonably request to evidence and perfect such person's admission as a Limited Partner.

## ARTICLE V
## CONTRIBUTIONS OF THE PARTNERS

The Partners shall initially contribute to the Partnership the property described on Exhibit A attached hereto in exchange for all of the outstanding Units. The general partnership interests of each General Partner shall be maintained separately from any limited partnership interests of the General Partners. The number of Units owned by each of the Partners is reflected on Exhibit B attached hereto. The Partners may make additional contributions to the Partnership, provided that the Sharing Ratios of all the General Partners, taken together, shall be equal to at least one percent (1%) at all times during the Partnership Term. No Partner shall be entitled to interest on capital contributions to the Partnership, or to withdraw any part of such Partner's capital account, except as specifically provided herein.

## ARTICLE VI
## RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS

Section 6.1    Rights and Powers of the General Partners as Managers. Each General Partner shall be entitled to cast one (1) vote per Unit of general partnership interest in all matters in which the General Partners are herein given the right to vote as a class or individually as a Partner. A majority vote shall be required to take any action by the General Partners. Subject to the limitations of this Agreement, and to the limitations imposed upon them by law, the General Partners shall have full, exclusive and complete discretion to manage and control, and shall make all decisions affecting, the Partnership business. The General Partners shall have full authority to take any action described by Article III hereof and to exercise all rights and powers generally conferred by law in connection therewith. The rights and powers of the General Partners described in this Section 6.1 shall be in addition to and not in limitation of any other rights and powers of the General Partners described in this Agreement or provided by law.

Section 6.2    Limitations on General Partners' Authority. The General Partners shall not have authority to:

(a)    Do any act in contravention of this Agreement without the written consent of all the Partners.

(b)    Do any act which would make it impossible to carry on the ordinary business of the Partnership, or which may make it impossible to carry on the ordinary business of the Partnership, without the written consent of all the Partners.

(c)    Admit a person as a General Partner, except as provided in this Agreement and the Act.

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -7-

(d)    Admit a person as a Limited Partner, except as provided in this Agreement and the Act.

(e)    Cause the Partnership to make any loan to any of the General Partners or any of their affiliates without the written consent of the Partners owning a majority-in-interest of the outstanding Partnership Units.

(f)    Commingle the Partnership's funds with those of any other person, except with respect to (1) joint ventures or other joint investments permitted by this Agreement and (2) general disbursement accounts controlled by the General Partners, without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(g)    Knowingly perform any act that would subject any Limited Partner to liability as a general partner in any jurisdiction.

(h)    Sell, assign, exchange, lease, or otherwise dispose of, or mortgage, pledge, or otherwise encumber all or substantially all of the real or personal property of the Partnership without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(i)    Enter into agreements with a General Partner or any affiliate of a General Partner without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(j)    Terminate a contract, agreement, or compensation to a Partner, or an affiliate of a Partner, without the approval of Partners owning a majority-in-interest of the outstanding Partnership Units.

(k)    For purposes of this Section 6.2 the term "affiliate" of a General Partner shall mean any person that directly or indirectly controls, or is controlled by or is under common control with, the General Partner, and shall include the family members of the General Partner and any officer or director of the General Partner and the family members of any such officer or director.

Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance. Any provision of this Agreement to the contrary notwithstanding, if at any time the Partnership possesses any incidents of ownership (as that term is defined under § 2042 of the Code and the Treasury Regulations thereunder) in any policy or policies of life insurance upon the life of any General Partner (the "Insured General Partner"), then the Insured General Partner shall be prohibited and excluded from voting upon or otherwise participating in the exercise of any such rights with respect to any policies of insurance upon the life of that Insured General Partner, including without limitation, the right to borrow from the cash value of the policy and the right to control the application of policy dividends.

Section 6.4    Third Parties. Any Person dealing with the Partnership or the General Partners may rely upon a certificate signed by the General Partners, or any of them, as to the accuracy

F:\HOME\HARRIS\MHBC-and-rest.agr.wpd                    -8-

of the statements therein or as to the authority of the General Partners to make any commitment or undertaking on behalf of the Partnership, including certificates as to (1) the identity of any General Partner or Limited Partner hereof, (2) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the General Partners or in any other manner are germane to the affairs of the Partnership, (3) the persons who are authorized to execute and deliver any instrument or document of the Partnership, or (4) any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

Section 6.5    Duties of the General Partners. The General Partners shall discharge their duties to the Partners and the Partnership, and shall exercise their powers under the Act and under this Agreement, consistent with the duty of loyalty and the duty of care set forth in A.C.A. §4-46-404 and consistent with the obligation of good faith and fair dealing therein. The General Partners do not guarantee the return of any Partner's capital contributions. Under no circumstances shall the General Partners be personally liable to a Limited Partner for any deficit in a Limited Partner's capital account.

Section 6.6    Obligations not Exclusive. The General Partners shall be responsible for the management of the Partnership's business, it being understood that the General Partners may be fairly compensated for services rendered. The General Partners may delegate such portion of the managerial responsibilities as is reasonably deemed necessary to any other party at the Partnership's expense.

Section 6.7    Power of Attorney. By the execution of this Agreement, or a counterpart hereof, a Limited Partner does irrevocably constitute and appoint the General Partners (or any successor General Partner) his or her true and lawful attorneys-in-fact and agents to effectuate, with full power and authority to act in the name, place and stead in effectuating, the purposes of the Partnership, including the execution, acknowledgment, delivering, filing and recording of all Certificates, documents, deeds, bills of sale, assignments and other instruments of conveyance, leases, contracts, loan documents and/or counterparts hereof, and all other documents which the General Partners may deem necessary or reasonably appropriate:

    (a)    To qualify or continue the Partnership as a limited partnership (or a partnership in which certain partners have limited liability) in all jurisdictions in which the Partnership conducts business;

    (b)    To reflect a modification of the Partnership, or an amendment of this Agreement and/or the Certificate;

    (c)    To accomplish the purposes and carry out the powers of the Partnership as set forth in Article III and in this Article VI; or

    (d)    To reflect the dissolution and termination of the Partnership.

The power of attorney granted herein:

(1)    Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, incompetency or legal disability of any Limited Partner;

(2)    May be exercised by the General Partners, or any of them, for each Limited Partner (or any of them) by listing all (or any) of the Limited Partners required to execute any such instrument and executing such instrument in such manner as the General Partners may reasonably deem appropriate; and

(3)    Shall be binding on any assignee or vendee of a Limited Partnership interest hereunder or any portion thereof, including an assignee of only the distributive rights relating thereto.

Section 6.8    Admission of Additional General Partner. The General Partners shall not, without the written consent of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, admit any additional or substitute General Partner to the Partnership.

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be; provided, however, the death, withdrawal, adjudication of bankruptcy, incompetency or removal with respect to one (1) General Partner, but not all General Partners, shall not cause the Partnership to be dissolved. In the event the Partnership is continued, the Agreement of Limited Partnership shall be properly amended and the new General Partner(s) shall succeed to all rights, duties and responsibilities of the General Partners. By affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, a General Partner may be removed for breach of any fiduciary duty and for any breach of this Agreement in any material respect. Furthermore, in the event of a General Partner's death, resignation, removal, or adjudication of bankruptcy or incompetency, then the General Partner shall become a Limited Partner and a successor General Partner may then be appointed pursuant to the terms set forth herein.

Section 6.10    Indemnification of the General Partners. The General Partners shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, arising out of or incidental to the General Partners' management of the Partnership affairs while the General Partners were in the course of managing the Partnership affairs; provided, however, a General Partner shall not be entitled to indemnification hereunder where the claim at issue is based upon:

(a)    The proven gross negligence or willful misconduct of the General Partner; or,

(b)    The proven breach by the General Partner of any provision of this Agreement.

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the General Partners shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 6.11. Limited Liability of the General Partners. The General Partners' liability for the obligations of the Partnership and certain acts of other Partners, employees, agents, or representatives of the Partnership is limited to the extent provided in A.C.A. §§ 4-43-1110 and 4-42-307.

<center>

## ARTICLE VII
### RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

</center>

Section 7.1   Rights of a Limited Partner. Each Limited Partner shall be entitled to cast one (1) vote per Unit of ownership on all matters in which the Limited Partners are herein given the right to vote as a class or individually as a Partner.  A Limited Partner shall not be:

(a)   Personally liable for any of the debts or other liabilities of the Partnership (except to the extent expressly set forth in A.C.A. § 4-43-303);

(b)   Personally liable, merely because of his or her interest in the Partnership, for any losses or liabilities of any other Limited Partner;

(c)   Allowed to take part in the management or control of the Partnership business, or to sign for or to bind the Partnership, such power to remain vested solely and exclusively in the General Partners; or

(d)   Entitled to be paid any salary or to have a Partnership drawing account; provided, however, the General Partners have the power to employ one or more Limited Partners at a salary commensurate with services actually rendered to the Partnership.

No Limited Partner shall have the right to withdraw from the Partnership or to receive a return of any of his or her contributions to the Partnership until the Partnership is terminated and its affairs wound up in accordance with § 801, et seq. of the Act and this Agreement.  A Limited Partner shall be in breach of this Agreement if the Limited Partner (1) attempts to withdraw from the Partnership, (2) interferes in the management of the Partnership affairs, (3) engages in conduct which could result in the Partnership losing its tax status as a partnership, (4) engages in conduct that tends to bring the Partnership into disrepute, (5) owns Partnership Units which become subject to a charging order, attachment, garnishment, or similar legal proceeding, (6) breaches any confidentiality provisions of this Agreement, (7) fails to meet any legally binding commitment to the Partnership, or (8) otherwise breaches any other term or condition contained herein.  A Limited Partner who is in breach of this Agreement shall be liable to the Partnership for damages caused by the breach.  The Partnership may offset any such damages against any distributions or return of capital to the Limited

Partner who has breached this Agreement. No Limited Partner shall have the right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise.

Section 7.2    Assignments of Limited Partnership Interests. A Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner (as defined in A.C.A. § 4-43-101(6)) only after all of the following steps have first been completed:

(a)    The written approval of the General Partners and of the Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall have been given to the specific person or entity proposed to be substituted;

(b)    The vendee(s) or assignee(s) to be substituted, the General Partners, and all Limited Partners (either individually or by virtue of the General Partners' powers of attorney set forth in this Agreement) shall have executed an appropriate amendment to all certificates, instruments and documents, and taken all such additional action as the General Partners may deem appropriate to the completion of such sale or assignment; and

(c)    If requested by the General Partners, legal counsel for the Partnership has rendered an opinion that the transfer is not in violation of any provisions of this Agreement or any other representations made by the Limited Partner to the Partnership regarding the Limited Partner's investment intent.

Within thirty (30) days after the completion of the above required steps, the General Partners shall forward documents to the substituted Limited Partner indicating such Partner's participation in the Partnership, on such form as the General Partners may adopt and, from time to time, revise or amend. Any purported sale or assignment consummated without first complying with Section 7.2 shall, as between the General Partners, on the one hand, and the assignor/vendor and assignee/vendee, on the other hand, be null and void.

The foregoing provisions of Section 7.2 to the contrary notwithstanding, a Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner without the consent of the Partners if the transferee is a Permitted Transferee.

Section 7.3    Assignments of Distributive Rights. A Limited Partner may not assign all or any portion (in whole or fractional Units) of his or her right to receive distributions hereunder without the prior written consent of the General Partners and of Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units. In addition, no such assignment shall be effective as to the General Partners until the General Partners have first received a copy of the instrument of assignment, executed by both the assignor and the assignee of such distributive right. Once the assignment has been received by the General Partners, the General Partners may (but shall not be obligated to), without requesting further documentation from either the assignor or the

assignee, remit directly to the named assignee all distributions to which the assignee may be entitled pursuant to the provisions of this Agreement and the assignment. So long as the party to whom such distributive share was remitted was either the assignor Limited Partner or the assignee named in the instrument of assignment, the General Partners shall be free from liability to any person if such distribution is received by a person not entitled thereto.

Section 7.4    Partnership Option to Purchase a Limited Partner's Interest. Notwithstanding any of the foregoing provisions of this Agreement to the contrary, in the event a Limited Partner desires to transfer or sell any part of his or her interest in the Partnership (other than to a Permitted Transferee), the Limited Partner shall first offer to sell such interest to the other Partners. The other Partners who desire to purchase said interest shall have the right for a period of thirty (30) days after written notice of such offer to purchase such Limited Partner's interest in the Partnership at Fair Market Value on a pro rata basis. In addition, the Partnership, by vote of a majority of the General Partners, or failing such vote, each of the other Partners desiring to purchase, on a pro rata basis, shall have the option to purchase, at Fair Market Value, all or part of a Limited Partner's Units in the Partnership upon the occurrence of any of the following events:

(a)    The Limited Partner dies;

(b)    The Limited Partner files for protection under any federal or state bankruptcy laws, makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for such Limited Partner or for substantially all of such Limited Partner's properties or assets, or bankruptcy, reorganization arrangement or similar proceedings are instituted by or against such Limited Partner under federal or state law and the same are not dismissed within forty-five (45) days after filing; or,

(c)    The Limited Partner is divorced and in connection therewith all or any portion of such Limited Partner's Units are to be awarded to such Limited Partner's former spouse (in such event the purchase option shall apply only to those Units which are to be so awarded).

Such option shall be exercisable at any time following the happening of any of the foregoing events and shall expire ninety (90) days following receipt by any General Partner of written notice of the happening of such events. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option. With respect to any exercise of an option under this Section, the purchaser(s) shall have the right to pay for such interest in cash or by delivery of a promissory note in ordinary and customary form, payable with interest at the rate of the lesser of (i) eight percent (8%) per annum, or (ii) the maximum rate allowed by Arkansas law, payable in sixty (60) equal monthly installments of principal and interest. Such promissory note may be prepaid at any time without consent or penalty and shall be secured by the Partnership interest so acquired. The holder of any such promissory note shall have all of the rights and remedies of a secured creditor under the Arkansas Uniform Commercial Code. If the Partnership and the Partners do not fully exercise their option, and any portion of such Limited

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -13-

Partner's Units are assigned to a beneficiary, a creditor, or a spouse, then the assignee shall have the right only as an assignee to receive distributions to which such Partnership interest is entitled to receive hereunder, subject to the terms and conditions contained herein, and such assignee shall only become a Limited Partner upon the satisfaction of the conditions set forth in Section 7.2 of this Agreement.

The foregoing provisions of Section 7.4 to the contrary notwithstanding, a deceased Limited Partner, or such deceased Limited Partner's personal representative, may transfer to one or more Permitted Transferees, by legacy, devise, bequest, or other testamentary transfer, without consideration, all or part of his or her interest in the Partnership and thereby constitute his or her transferee a Limited Partner without the consent of the General Partners or of the Partners.

Section 7.5    Limited Partner's Status Upon Death or Incompetency. If a court of competent jurisdiction adjudges a Limited Partner to be incompetent to manage his or her person or his or her property, then in accordance with § 705 of the Act and this Agreement, the guardian, conservator, or other legal representative may exercise all the incompetent Limited Partner's rights for the purpose of administering his or her property, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement. If a Limited Partner dies and the Partnership and Partners do not fully exercise any option arising under Section 7.4 of this Agreement to purchase all of the deceased Limited Partner's Units, then in accordance with § 705 of the Act and this Agreement, the executor, administrator, or other legal representative may exercise all the deceased Limited Partner's rights for the purpose of settling his or her estate, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement.

Section 7.6    Limited Put Option of Certain Permitted Transferees. In the case of a transfer during the lifetime of a Partner, for less than full and adequate consideration, of a Unit or Units, or portion thereof (that portion of such transfer for less than full and adequate consideration shall be a "Donative Transfer" and the Partner making such a transfer shall be the "Transferor"), to a Permitted Transferee (the "Donee"), for a period of sixty (60) days after the date of the Donative Transfer, the Donee shall have the right to require the Partnership to purchase from the Donee that number of whole Units which has a Fair Market Value closest to the Option Amount (defined below) as follows:

(a)    The Donee desiring to exercise this put option shall provide written notice thereof to the General Partners within sixty (60) days of the date of the Donative Transfer.

(b)    Upon exercise of any such option, the Partnership shall purchase the Units subject to the option for a price equal to their Fair Market Value, and the payment of the purchase

price shall be made in cash or in kind, as determined by the General Partners, provided that any Partnership Properties distributed to the Donee in payment of the purchase price shall be valued at Fair Market Value for the purposes hereof. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option.

(c)   The "Option Amount" shall be equal to the lesser of: (1) the Fair Market Value of the Donative Transfer; or (2) the total amount allowable with respect to such Donative Transfer to the Donee as an annual exclusion for federal gift tax purposes under §2503(b) of the Code, taking into account the annual exclusion available to the Transferor and the Transferor's spouse, if any, at the time of the Donative Transfer; provided, however, if the Transferor's spouse made no independent transfer to such Donee on the same date as the Donative Transfer, then such annual exclusion of the Transferor's spouse shall not be taken into account unless the Transferor's spouse consents thereto by a signed written statement at the time of the Donative Transfer.

(d)   To be consistent with the hypothetical willing buyer-willing seller standard, Fair Market Value shall be determined without regard to this limited put option.

## ARTICLE VIII
## COMPENSATION OF THE GENERAL PARTNERS

Section 8.1   Compensation. With the approval of Partners owning a majority-in-interest of the Partnership Units, the General Partners may receive reasonable compensation for serving as the General Partners and for managing the Partnership Properties.

Section 8.2   Expenses. Any costs and expenses incurred by the General Partners for the Partnership's benefit shall be billed directly to the Partnership, and the General Partners shall be entitled to be paid, as reimbursement, for all costs and expenses billed to and paid by the General Partners.

## ARTICLE IX
## DISTRIBUTIONS AND
## ALLOCATIONS OF INCOME AND LOSS

Section 9.1   Distributions of Distributable Cash. From time to time during each fiscal year the General Partners may distribute all or any part of the Distributable Cash, and the General Partners shall distribute all remaining Distributable Cash not later than April 15 following the end of each fiscal year. All such distributions shall be made in accordance with this Agreement and the Sharing Ratios of the Partners.

Section 9.2   Allocation of Certain Income and Losses for Tax Purposes. For federal

income tax purposes, the net income and net losses of the Partnership for any taxable year (or portion thereof) shall be allocated (subject to the requirements of § 704(c) of the Code) to the Partners in proportion to their Sharing Ratios.

Section 9.3    Allocations Upon Liquidation.  For federal income tax purposes, income (including gain) or loss of the Partnership resulting from the sale or disposition of all or substantially all of the Partnership Properties, or the dissolution of the Partnership pursuant to Article X without an election to continue the Partnership in accordance with Section 10.1, shall be allocated to the Partners in proportion to their Sharing Ratios.

## ARTICLE X
## DISSOLUTION AND PRIORITY ON DISTRIBUTION

Section 10.1    Dissolution and Termination of the Partnership.  The Partnership shall be immediately dissolved:

(a)    Upon the expiration of the term set forth in Section 1.5 hereinabove;

(b)    Upon a unanimous vote of all the Partners;

(c)    Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units;

(d)    Within a reasonable period of time after the sale, condemnation, foreclosure or other similar disposition of all or substantially all of the Partnership Properties; provided, however, the Partnership may be continued by any or all of the Partners wishing to reinvest the sales proceeds; or

(e)    Upon the occurrence of any other circumstances which, by law, would require the Partnership to be dissolved.

The death, legal disability, or dissolution of any Limited Partner shall not result in the dissolution of the Partnership.  Upon the death or legal disability of a Limited Partner, the legal representative of such Limited Partner or of his or her estate shall have the status described in Section 7.5 of this Agreement and the rights and liabilities as set forth in the Act.

Section 10.2    Liquidation and Priorities on Distribution.  Upon the occurrence of any event which causes the dissolution of the Partnership, as set forth in Section 10.1 hereinabove, the General Partners or, if there is no General Partner, such person as may be designated by the Partners owning a majority-in-interest of the outstanding Partnership Units to act as liquidating trustee (the "Trustee")

shall immediately proceed to terminate the business of the Partnership. The General Partners or Trustee shall first determine the Fair Market Value of each Partnership Property (except cash) and then attempt to sell such portion (or all) of the Partnership Properties (except cash) at such prices and on such terms as the General Partners or Trustee, in the exercise of the General Partners' or Trustee's best business judgment under the circumstances then presented, deems to be necessary to provide for the liquidation priorities described below and to be in the best interests of all the Partners. The proceeds of any such sale, all Partnership cash, and undivided interests in Partnership Properties, shall be distributed in the following manner:

   (a) To creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of debts and liabilities of the Partnership, other than liabilities for distributions to Partners under A.C.A. § 4-43-601 or § 4-43-604;

   (b) To the creation of any reserves which the General Partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partners, arising out of or in connection with the Partnership;

   (c) To Partners and former Partners in satisfaction of liabilities for distributions under A.C.A. § 4-43-601 or § 4-43-604;

   (d) To Partners for the return of their capital account balances; and

   (e) The remainder, if any, shall be distributed to the Partners in accordance with their Sharing Ratios.

## ARTICLE XI
## ACCOUNTING AND BUSINESS MATTERS

  <u>Section 11.1</u> <u>Books of Accounts and Records</u>. The Partnership's books and records, this Agreement and any other records required by law to be maintained by the Partnership shall be maintained at the principal office of the Partnership. The books and records shall reflect all transactions and be appropriate and adequate for the business of the Partnership. Each Partner shall have access to and the right to copy at his or her own expense the Partnership's books and records at all reasonable times.

  <u>Section 11.2</u> <u>Accounting Method</u>. The Partnership books shall be kept on an accounting basis determined by the General Partners in accordance with usual and customary accounting practices.

  <u>Section 11.3</u> <u>Financial Statements and Reports</u>. Upon request by any Limited Partner, the General Partners shall cause the Partnership to provide the following reports and financial statements to the Partners:

   (a) <u>Annual Report</u>. Within one hundred twenty (120) days after the end of each

fiscal year, the Partnership shall provide to the Partners (1) financial statements prepared by an independent certified public accountant, including a balance sheet as of the end of such fiscal year, together with statements of income, Partners' equity, changes in financial position and funds from operations for such year; the balance sheet and such statements (other than the funds from operations statement) shall be prepared in accordance with generally accepted accounting principles and shall be accompanied by a report of the activities of the Partnership for such year; and (2) a report on distributions to the Limited Partners for such period.

(b)      Tax Information. No later than March 15 of each year, the Partnership shall provide to each Partner all information relating to the Partnership necessary for the preparation of the Partners' federal income tax returns.

(c)      Other Federal and State Reporting Requirements. The General Partners shall cause to be delivered to the Limited Partners all other reports and information as may be required by law to be delivered to such Limited Partners.

Section 11.4    Fiscal Year. The fiscal year of the Limited Partnership shall be the calendar year.

Section 11.5    Bank Accounts. Except as may be otherwise specifically provided herein, all funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partners.  Such account or accounts shall be in the name of the Partnership. All withdrawals therefrom shall be made upon checks signed by the General Partners, or any person authorized to do so by the General Partners.

## ARTICLE XII
## ELECTIONS

Section 12.1    Adjustment Election. In the event of the transfer of a Partner's Units or upon the death of any individual Partner, or in the event of the distribution of Partnership Property to any person, the General Partners, in their sole discretion, may, but shall not be obligated to, file an election as provided by Code § 754 and the Treasury regulations thereunder, to cause the Partner's basis in the Partnership Property to be adjusted for federal income tax purposes as provided by Code Sections 734 and 743.  Any cost incurred in making such elections shall be charged to the Partner or Partners benefitting therefrom.

Section 12.2    Depreciation Elections.   With respect to all depreciable assets of the Partnership, the General Partners may elect to use, to the extent allowed by the Code, accelerated depreciation methods; however, the General Partners may change or elect some other method which is, in their opinion, most advantageous to the Partners.

Section 12.3    Election with Respect to Taxation as Partnership. No election shall be made

by the Partnership, the General Partners or any Limited Partner to exclude the Partnership from the application of any of the provisions of Subchapter K, chapter 1 of subtitle A of the Code, or from any similar provisions of any state tax laws. The foregoing shall not prohibit such an election by the Partnership and any person other than in the capacity of a Partner hereunder.

Section 12.4    Other Elections. In addition to the elections stated in this Article XII, the General Partners shall make all other elections which in their reasonable sole discretion are necessary for the proper operation and accounting of the Partnership.

## ARTICLE XIII
## AMENDMENTS

Subject to the provisions of the laws of the State of Arkansas, amendments to this Agreement which do not substantially affect the rights of the Limited Partners, or which are required or contemplated by this Agreement, may be made by the General Partners through use of the powers of attorney herein and hereby granted. Any other amendment must be agreed to in writing by all of the Partners.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1    Notices. All notices under this Agreement shall be in writing and shall be given to the Partners at each Partner's last known address and to the Partnership at its principal office or at such other address as any of the parties may hereafter specify in the same manner.

Section 14.2    Further Acts. Each Partner hereby agrees to execute and deliver to the General Partners, within fifteen (15) days after receipt of the General Partners' written request therefor, such other and further statements of interest and holdings, designations, powers of attorney or other instruments as the General Partners reasonably deem necessary.

Section 14.3    Paragraph Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provisions hereof.

Section 14.4    Severability. Every portion of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 14.5    Application of Arkansas Law. This Agreement, and the application or interpretation thereof, shall be governed by its terms and by the laws of the state of Arkansas.

Section 14.6    Survival of Rights. This Agreement and all of the terms, provisions, and

agreements herein contained shall be binding upon and inure to the benefit of the Partners and their respective legal representatives, heirs, successors and assigns.

Section 14.7     Interpretation. As used herein, the masculine includes the feminine and the neuter and the singular includes the plural, as the context may require.

Section 14.8     Execution in Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had all signed the same document. All counterparts shall be construed together and shall constitute one (1) agreement.

Section 14.9     Waiver of Action for Partition. Each of the parties irrevocably waives during the term of the Partnership any right that he or she may have to maintain any action for partition with respect to the Partnership Properties.

Section 14.10     Tax Matters Partner. Pursuant to Code § 6231, the Partners hereby designate MARY HANNA BOLES CANADA as the tax matters partner ("TMP") for the Partnership. The TMP shall have all of the power and responsibilities imposed by the Code. Notwithstanding the designation, the Partners may participate in any inquiry by the Internal Revenue Service to the extent not inconsistent with this provision or the provisions contained in the Code relating to treatment of Partnership items at the Partnership level, at the Partner's sole expense.

Section 14.11     Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

Section 14.12     Arbitration. Any dispute or controversy arising out of or relating to this Agreement or any document or instrument delivered in connection with this Agreement shall be settled by arbitration to be held in England, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the parties irrevocably consent to the jurisdiction of the state courts of Arkansas for this purpose. The losing party in such arbitration shall pay all the costs and expenses of such arbitration and all the reasonable attorneys' fees and expenses of the other party thereto.

Section 14.13     Confidentiality. Each of the Partners, and any other person who shall become a Partner, agrees to keep confidential all information pertaining to the Partnership, its business, its management, and the arbitration of any dispute among the Partners, and agrees to refrain from disclosing such information to anyone who is not a Partner or a Partner's attorney or agent.

IN WITNESS WHEREOF, this Amended and Restated Agreement of Limited Partnership has been duly executed by the parties effective on the __1__ day of __April__, 2004.

GENERAL PARTNERS:

_____
MARY HANNA BOLES CANADA

LIMITED PARTNERS:

_____
MARY HANNA BOLES CANADA

_____
GARY RECTOR CANADA

GARY RECTOR CANADA, JR. TRUST I

BY: _____
GARY RECTOR CANADA, JR., Trustee

BRADLEY SETH CANADA TRUST I

BY: _____
BRADLEY SETH CANADA, Trustee

HANNA NICOLE CANADA STEWART TRUST I

BY: _____
HANNA NICOLE CANADA, Trustee

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -21-

## EXHIBIT A
### (As Amended and Restated)

## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
### PARTNERSHIP PROPERTY

**[insert description]**

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd

**EXHIBIT B**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**OWNERSHIP OF PARTNERSHIP UNITS**

| GENERAL PARTNERS: | UNITS: |
|---|---|
| Mary Hanna Boles Canada | 10 |

| LIMITED PARTNERS: | |
|---|---|
| Mary Hanna Boles Canada | 409 |
| Gary Rector Canada | 419 |
| Gary Rector Canada, Jr. Trust I | 54 |
| Bradley Seth Canada Trust I | 54 |
| Hanna Nicole Canada Stewart Trust I | 54 |

| | |
|---|---|
| TOTAL: | 1,000 |

<div align="center">

**EXHIBIT**

**2**

</div>

<div align="center">

## SHAREHOLDERS AGREEMENT

### *Canada Bancshares, Inc.*

</div>

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is executed effective as of the date set forth below (the "Effective Date"), by and among Canada Bancshares, Inc., an Arkansas corporation (the "Corporation"), and the undersigned Shareholders of the Corporation (all hereinafter collectively referred to as the "Shareholders" and individually as the "Shareholder").

<div align="center">

### RECITALS:

</div>

WHEREAS, the Shareholders and the Corporation desire to promote their mutual interests by imposing certain restrictions and obligations upon the shares of capital stock of the Corporation in order to preserve and maintain a continuity of shareholder relationships and in order to promote sound and harmonious management of the Corporation; and

WHEREAS, it is the intention of the parties to place such restrictions on the sale, transfer, pledge, encumbrance or other disposition of all shares of the capital stock of the Corporation.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.   **REGULATORY REQUIREMENTS**. Notwithstanding any other provision herein, no transfer pursuant to Section 2 or Section 3, below, no pledge pursuant to Section 4, below, nor any other Disposition (as defined below) of shares of capital stock of the Corporation including, without limitation, any Disposition involving a redemption of shares, shall occur except in compliance with all applicable legal and regulatory requirements. This shall include, without limitation, (a) the submission of all required applications and notices to the Board of Governors of the Federal Reserve, the Arkansas State Bank Department and any other applicable governmental entity (collectively, the "Governmental Entity(ies)"), (b) all required approvals from applicable Governmental Entities having been obtained in such form as is satisfactory to the Board of Directors of the Corporation in its sole discretion, and (c) any Disposition being completed in compliance with the requirements of all applicable approvals granted by the Governmental Entities. The terms of any Disposition shall comply with the requirements of all applicable approvals given by the Governmental Entities. All time periods relating to any exercise and/or closing of any purchase option hereunder shall be extended as necessary to accommodate the requirements of this Section 1.

2.   **FAMILY TRANSFERS**. Any Shareholder may transfer all or part of the Shareholder's shares of capital stock in the Corporation by sale or gift (including by testamentary transfer upon death) to one or more trusts established for the benefit of such Shareholder, his/her spouse and/or lineal descendants (collectively, "Family Member(s)"), and/or to an entity wholly-owned by such persons (referred to as a "Family Entity"), (collectively referred to as a "Family

<div align="center">

1

</div>

Transferee"). In such cases, the transferee shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors, in its sole discretion.

3. TRANSFERS BY ENTITY SHAREHOLDERS. Any Shareholder that is a corporation, partnership or limited liability company (collectively, an "Entity") may, upon notice to the Corporation, transfer all or part of the Entity's shares of capital stock in the Corporation to (i) the shareholders, partners or members, respectively, of that Entity, or (ii) any other corporation, partnership or limited liability company wholly-owned by that Entity. In such cases, the transferee(s) shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the other terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors.

4. PLEDGE OR OTHER ENCUMBRANCE. No Shareholder shall pledge, encumber, grant a security interest in, or otherwise cause or permit any lien to be placed upon all or any part of the shares of capital stock of the Corporation owned by such Shareholder, without first providing written notice thereof to the Corporation; and provided further, as a condition thereto, the Shareholder shall require the lender, secured party, or other lienholder to execute an estoppel agreement (as approved by the Board of Directors) for the benefit of the Corporation and the other Shareholders which provides that any foreclosure, sale, transfer, or other disposition of the stock so pledged or encumbered shall be subject to the terms and conditions of this Agreement.

5. RESTRICTIONS ON TRANSFER.

(a) Except as provided in Sections 2, 3 and 4, no Shareholder shall sell, contract to sell, convey, hypothecate, assign, pledge, encumber, or otherwise transfer (collectively, a "Disposition") any or all of its shares of capital stock of the Corporation, now owned or hereinafter acquired, or any interest or right therein, without the prior written consent of all the other Shareholders, or in the absence of said written consent, without first providing the Corporation and each of the other Shareholders the right of first refusal option to purchase such stock as provided herein.

(b) Except as otherwise provided in Sections 2, 3, and 4, a Shareholder proposing a Disposition (the "Transferor") shall provide written notice of the intended Disposition to the Corporation's Board of Directors (the "Disposition Notice"). The Disposition Notice shall set forth all of the terms of the proposed Disposition, including price and payment terms for any sale, the name and address of the proposed transferee, the number of shares involved in the proposed Disposition, and the date on which the transaction is to occur, which date shall not be less than thirty (30) days from the date on which said notice is given.

2

(c)     For a period of fifteen (15) days after the date on which the Disposition Notice is given, the Corporation shall have the right of first refusal option to purchase the stock of the Transferor identified in the notice, which option shall lapse and expire if not exercised in writing within said 15-day period by majority vote of the Board of Directors of the Corporation (without participation by the Transferor). The Corporation's option to purchase may be exercised in whole or in part. In the event said option is exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(d)     In the event that all of the shares of the Transferor subject to the foregoing option are not redeemed and purchased by the Corporation as provided above, then (i) the Corporation shall delivery a copy of the Disposition Notice to each Shareholder, and (ii) the shares not so purchased and redeemed by the Corporation shall become subject to a second option on the part of each of the other Shareholders to purchase a "proportionate share" of such stock, which option shall lapse and expire if not exercised in writing by notice to the Transferor within thirty (30) days after the date on which the Disposition Notice is mailed to each Shareholder by the Corporation. The Shareholders' option may also be exercised in whole or in part. In the event any or all of said options are exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(e)     The term "proportionate share" shall mean the ratio expressed as a percentage of (i) the number of shares of the Corporation's capital stock owned by the Shareholder to (ii) the total number of shares of capital stock of the Corporation owned by all Shareholders other than the Transferor. In addition, if any stock of the Corporation offered for sale is not purchased by the Shareholder first entitled thereto, the term "proportionate share" shall include that portion of the stock of the Corporation not purchased by the Shareholder first entitled thereto which the number of shares of capital stock of the Corporation owned by a Shareholder bears to the total number of shares of capital stock of the Corporation owned by Shareholders electing to exercise this option to purchase the Transferor's stock.

(f)     In the event the Corporation and the other Shareholders do not exercise their respective options as hereinbefore provided, the Transferor may make a bona fide Disposition to the prospective purchaser, or other transferee, of any remaining stock not so purchased by the Corporation or other Shareholders. The Disposition shall be made only to the transferee identified in the Disposition Notice and shall be made only in strict accordance with the terms stated in such notice. However, if the Transferor shall fail to make such Disposition within one hundred twenty (120) days following the date on which the Disposition Notice is given, such shares shall again become subject to all of the restrictions contained in this agreement. Any purchaser or other transferee acquiring the offered shares shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, and deliver a counterpart of this Agreement as a condition to the issuance of a stock certificate in such person's name.

(g)     During any period in which the Corporation is a "small business corporation," as defined in sections 1361(a) and (b) of the Internal Revenue Code of 1986, as

5203889.4

amended (the "Code") (referred to herein as an "S Corporation") then, in the case of shares held by a trust, any change in the status or circumstances of the trust or its beneficiaries that either (i) causes or will reasonably be expected to cause the trust to cease to be a trust that is permitted to hold shares in an S Corporation, or (ii) results in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any trustee or beneficiary of the trust in question, if such person is also serving as a director).

(h)     With respect to any Family Entity that was a transferee under Section 2, any event resulting in that Family Entity having any owner, officer or director (or any similar positions) that is not a Family Member of the original transferor, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any person affiliated with the Family Entity in question, if such person is also serving as a director).

(i)     Notwithstanding any other provision herein, unless first approved by the Board of Directors in writing, in its sole exercise of discretion, no Shareholder shall complete a Disposition of any shares of the Corporation's capital stock to any of the following (each referred to as a "Competitor"): (1) any other state or federally chartered financial institution or financial institution holding company, (2) any individual(s) or entities that in the aggregate own ten percent (10.00%) or more of any other state or federally chartered financial institution or financial institution holding company, or (3) any other individual or entity that the Board of Directors of the Corporation has, in its sole discretion, designated as a "Competitor" for purposes of this Section 5(i).

(j)     In the event the options specified herein are exercised, the purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

(k)     For all purposes of this Section 5, the date on which the Disposition Notice is given shall be the date such notice is deemed made pursuant to Section 24(d).

6.     DIVORCE. If an individual Shareholder shall become a party to a divorce proceeding and pursuant to the final decree in that proceeding all or any portion of the Shareholder's stock in the Corporation is awarded to the Shareholder's former spouse (who is not also then a shareholder), the stock so awarded shall immediately become subject to an option to purchase on the part of the Corporation first, and the other Shareholders second for a period of ninety (90) days after written notice of such award as provided to the Corporation and each of the other Shareholders, in the manner provided in Section 5 as in the case of a proposed Disposition except that for purposes of Section 5, the date on which the notice is made to the Corporation and the other Shareholders of the final divorce decree shall be deemed the date of the Disposition Notice. If all of the shares of stock so awarded are not purchased by the Corporation, the Shareholders (other than the divorced Shareholder and his or her spouse) shall

<div align="center">4</div>

have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

7. BANKRUPTCY OR INSOLVENCY. If any Shareholder makes an assignment for the benefit of creditors, or if any petition shall be filed in any federal or state court alleging that a Shareholder is insolvent, or requesting the appointment of a receiver for all or substantially all of a Shareholder's property, or if any petition in bankruptcy is filed by or against a Shareholder in a court of competent jurisdiction and if such petition or petitions are not dismissed within ninety (90) days from the date of filing, all of such Shareholder's shares of stock in the Corporation (including any shares transferred pursuant to Section 2) shall immediately become subject to an option to purchase such stock in favor of the Corporation first and the other Shareholders second, for a period of one hundred twenty (120) days after written notice of such event. If all of the shares of stock in the Corporation owned by such Shareholder are not purchased by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and term of payment shall be determined pursuant to Sections 10 and 11.

8. DEATH. Subject to a Shareholder's ability to transfer shares of stock to a Family Transferee at such Shareholder's death as provided in Section 2, upon the death of an individual Shareholder (the "Decedent") all of the shares of stock in the Corporation owned by the Decedent (including shares transferred pursuant to Section 2) or to which the Decedent or his or her personal representative shall be entitled, shall become subject to an option to purchase on the part of the Corporation, first and the other Shareholders, second for a period of one hundred twenty (120) days following the date of the Decedent's death. If all of the Decedent's shares of stock in the Corporation are not purchased and redeemed by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11. Notwithstanding the provisions of Section 11 to the contrary, if the Corporation shall receive any proceeds from any policy of insurance on the life of the Decedent, such proceeds shall be paid by the Corporation to the Decedent's personal representative to the extent of the purchase price of the Decedent's stock, and such payment shall be deemed to have been made on account of such purchase price. The balance of the purchase price remaining after credit for such insurance proceeds shall be paid pursuant to Section 11.

9. S CORPORATION PURCHASE OPTION.

(a) In the event that the holders of a majority of the outstanding shares of capital stock of the Corporation provide written notice to the Board of Directors of the Corporation that they desire to cause the Corporation to make an election to be treated as an S Corporation (defined herein) for federal and state income tax purposes (the "Election Notice"), then the Board shall take the following actions:

(i) the Board shall promptly provide the Election Notice to each Shareholder;

(ii) the communication containing the Election Notice shall inform

5

each Shareholder that it has a period of not less than 45-days as established by the Board (the "Notice Period") in which to:

> (A)   deliver to the Corporation a signed consent (in a form approved by the Board) to the S Corporation election pursuant to which such Shareholder consents to the Corporation making an S Corporation election, along with such other documents as the Board may require; and

> (B)   if applicable, with respect to any Shareholder that is not eligible to own shares of stock in an S Corporation, to take such actions as may be necessary to cause the Shareholder to become eligible (including any Disposition of shares permitted by and completed in accordance with Section 2 and/or Section 3 herein).

(b)   Any Disposition of shares proposed by a Shareholder in order for the Shareholder (or its transferee(s)) to be an eligible S Corporation shareholder shall (i) be subject to the review and approval of the Board of Directors of the Corporation, and (ii) if approved by the Board, be subject only to those restrictions and requirements imposed by the Board and permitted to occur without any requirement of compliance with the provisions of Section 5, if applicable.

(c)   In the event a Shareholder fails to provide the consent (and other required documentation) described in Section 9(a)(ii)(A), above, within the Notice Period, or is otherwise not an eligible S Corporation shareholder as of the expiration of the Notice Period (as determined by the Board), then, without any additional action, all of such Shareholder's shares of stock in the Corporation shall be subject to a purchase option in favor of the Corporation to repurchase and redeem such shares. The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

10.   PURCHASE PRICE. The purchase price for each share of stock purchased pursuant to this Agreement shall be equal to the purchase price contained in any bona fide offer to purchase such shares which the Transferor proposes to accept (in the case of any proposed Disposition by sale or exchange), or in the absence of such bona fide offer or in situations other than proposed Dispositions involving a sale or exchange, the purchase price for such stock shall equal the Book Value of such shares of stock. "Book Value", as used in this Agreement, shall be the net book value of the Corporation as of the end of the month preceding the date of occurrence of the event giving rise to any right to purchase shares hereunder, computed in accordance with generally accepted accounting principles applied in a consistent manner with prior periods, by a Certified Public Accountant selected by the Board of Directors. The determination by such accountant shall, for purposes of this Agreement, be final, conclusive and binding upon each of the parties hereto. The purchase price per share shall equal the Book Value divided by the number of shares of capital stock outstanding.

11.   PAYMENT OF PURCHASE PRICE. The purchase price for any shares of stock purchased pursuant to this Agreement, in situations involving proposed dispositions by sale or exchange, shall be paid upon the same terms and conditions (including, as near as possible, security terms) as contained in the bona fide offer to purchase such shares received by the

6

Transferor; or in the absence of any such bona fide offer, or in situations other than proposed Dispositions involving a sale or exchange, the purchase price shall be paid in sixty (60) equal monthly installments of principal and interest at a rate equal to the lesser of (1) the prime rate at Bank of England, in England, Arkansas, or its successor, on the date of the closing, or (2) 5.00% per annum (provided that any purchaser may elect to pay the purchase price in cash at any time). The first such payment shall be due and payable thirty (30) days from the closing date of such sale and purchase. Such obligation shall be represented by a promissory note in customary form as approved by the Board of Directors.

12.    <u>CORPORATE GOVERNANCE MATTERS</u>.    Neither the Board, nor any Shareholder, officer or agent of the Corporation, shall take or permit to be taken any of the following actions by or on behalf of the Corporation, without the prior written authorization of MHBC Investments Limited Partnership I, LLLP (or its successor), in each case:

(a)    the amendment, modification, or restatement of this Agreement, the Corporation's Articles of Incorporation or Bylaws;

(b)    the amendment, modification, or restatement of the charter, bylaws or other governing documents of any entity in which the Corporation owns an interest, or any entity owned by any entity in which the Corporation owns an interest, (each, referred to as a "Subsidiary") including, without limitation, Bank of England (the "Bank"), or any successor thereof;

(c)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect the election or appointment of any person to, and/or removal of any person from, the Board of Directors (or similar position) of the Bank or any other Subsidiary;

(d)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect (i) any merger, consolidation or similar transaction involving a Subsidiary, (ii) the sale of all or substantially all of a Subsidiary's assets, (iii) the liquidation or dissolution of a Subsidiary (or entering into any license, pledge, encumbrance or other transaction with similar economic effect), or (iv) the liquidation, dissolution or other termination of the existence and/or business of any Subsidiary;

(e)    causing a reclassification, reorganization, or recapitalization of any shares of the outstanding capital stock (or other equity interests) of any Subsidiary.

7

5203889.4

13.   SECURITY FOR PAYMENT OF THE PURCHASE PRICE.   Whenever the Corporation redeems, or remaining Shareholders purchase, stock pursuant to this Agreement, and the purchase price is to be paid in installments, the shares of stock so purchased or redeemed shall be pledged to the selling Shareholder as security for the payment of the purchase price and all certificates representing such stock shall be delivered to the selling Shareholder, or his or her personal representative, as the case may be, to hold as such security.   The selling Shareholder and/or his or her personal representative, as the case may be, shall have all the rights and remedies of a secured creditor under the Uniform Commercial Code as adopted under the laws of the State of Arkansas.

14.   INSUFFICIENT SURPLUS.   If the Corporation elects to purchase a Shareholder's stock but does not have sufficient surplus to permit it to lawfully purchase all of the shares of stock to be purchased, the Shareholders shall promptly take such measures to vote their respective shares to reduce the capital of the Corporation or to take such other and further steps as may be appropriate or necessary (excluding making additional capital contributions) in order to enable the Corporation to lawfully purchase all of the shares of stock to be purchased, including without limitation, an up-to-date appraisal of the assets of the Corporation, or a recapitalization of the Corporation so as to reduce its stated capital and increase its surplus.

15.   ADDITIONAL ACTION.   Whenever the Corporation or other Shareholders shall, pursuant to this Agreement, redeem or purchase shares of the Corporation's stock from the Transferor, the Transferor shall do all things necessary to execute, deliver, and endorse all papers and certificates as may be required to consummate said purchase and transfer of stock.

16.   RESTRICTIVE LEGEND.   Each certificate representing shares of stock in the Corporation shall be stamped or otherwise imprinted with the following restrictive legend:

RESTRICTIVE LEGEND FOR COMMON STOCK
OF CANADA BANCSHARES, INC.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE ARKANSAS SECURITIES ACT, AS AMENDED.  THE SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF REGISTRATION OR THE AVAILABILITY OF EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND THE ARKANSAS SECURITIES ACT.  NO RESALE, PLEDGE, HYPOTHECATION, OR OTHER TRANSFER OR DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL OCCUR EXCEPT IN COMPLIANCE WITH THE PROVISIONS OF A SHAREHOLDERS AGREEMENT BY AND AMONG THE CORPORATION AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION.  AT ANY TIME DURING WHICH THE CORPORATION IS AN ELECTING SMALL BUSINESS CORPORATION UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS CERTIFICATE SHALL NOT BE

8

TRANSFERABLE IF SUCH TRANSFER WOULD CAUSE REVOCATION OF THE CORPORATION'S "S" CORPORATION ELECTION.  ANY TRANSFER CONTRARY TO THE ABOVE INSTRUCTIONS IS VOID.

17.     ADDITIONAL STOCK OR SECURITIES; TRANSFEREE TO BE MADE A PARTY.  Before any additional shares of stock or any other securities convertible into stock of the Corporation are issued in the future to shareholder or other security holder (other than a signatory to this Agreement), such person or entity shall be required to become a party to and execute and deliver a counterpart of this Agreement prior to the issuance of such shares or other securities and the certificates therefor shall be legended as provided in Section 16.  Further, whenever any Shareholder acquires any additional shares of stock of the Corporation or any other securities of the Corporation convertible into stock other than the shares of stock owned at the time of the execution of this Agreement, such shares of stock or such other securities so acquired shall be subject to all of the terms of this Agreement, and the certificates therefor shall be stamped with the legend described in Section 16.  In addition, each Disposition (of any type) to any transferee is hereby expressly conditioned upon such transferee first being made a party to and bound by the terms of this Agreement.

18.     TERMINATION.  This Agreement shall terminate and all rights and obligations of the parties hereto shall cease (i) upon the written agreement of all Shareholders, (ii) upon the voluntary dissolution of the Corporation, or (iii) in the event there shall be only one (1) owner of the issued and outstanding shares of common stock of the Corporation.

19.     PRESERVING "S CORPORATION" STATUS.  Notwithstanding anything herein to the contrary, at any time during which the Corporation is an S Corporation, (i) no shares of stock of the Corporation shall be transferable to any transferee if such transfer would cause a revocation of the Corporation's S Corporation status, and (ii) unless approved by the Board of Directors in writing, no shares of stock of the Corporation shall be transferable if the proposed transfer would result in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on the number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code.  Any purported Disposition in violation of this Agreement shall be null and void and the purported transferee shall have no interest in any of the shares of stock of the Corporation purported to be transferred.

20.     SHAREHOLDERS' REPRESENTATIONS AND WARRANTIES.  Each of the Shareholders represent and warrant that (i) it is the sole owner of the number of shares of common stock set forth opposite its signature hereto, (ii) except as approved in writing by the Corporation, that all of such shares are free and clear of all liens, claims, charges, security interests, or encumbrances of any kind, and (iii) that it has the right and lawful authority to enter into this Agreement.

21.     DRAG-ALONG SALE.

(a)     If the holder(s) of a majority of the outstanding shares of capital stock of the Corporation (collectively, the "Drag Initiating Shareholder(s)"), acting individually or together, receive a bona fide offer, or otherwise agree, to make a transfer, sale or disposition of

9

all of their shares of stock in the Corporation in a single transaction or series of related transactions (a "Drag Along Sale"), then the Drag Initiating Shareholders shall have the right to require that each other Shareholder of the Corporation sell all of its shares of stock in the Corporation in the same transaction. In the event a conflict shall exist between a Drag Along Sale and any other option or purchase right in this Agreement, the provisions of this Section 20 shall control.

(b)     Not less than 30-days prior to the proposed closing date of the Drag Along Sale, the Drag Initiating Shareholders shall provide to each Director and each Shareholder (i) a written notice identifying the proposed transferee, the consideration to be paid, and all other material terms and conditions of a Drag Along Sale (the "Drag Along Notice"), and a copy of the written agreements and documents pursuant to which a Drag Along Sale will be conducted and closed (the "Drag Along Agreement"). Each other Shareholder shall be required to participate in the Drag Along Sale on the terms and conditions set forth in the Drag Along Notice and in accordance with the Drag Along Agreement. Within 15-days following the date the Drag Along Notice is given (the "Drag Along Notice Period"), each Shareholder of the Corporation shall execute and deliver in escrow to the Chairman of the Corporation all documents reasonably required to be executed in connection with the closing of such Drag Along Sale. The Chairman shall be authorized to release such documents upon the closing of the Drag Along Sale.

(c)     If the Drag Along Sale has not been completed within 120-days following expiration of the Drag Along Notice Period, then the Chairman shall return to each Shareholder any documents in his possession executed by such Shareholders in connection with the proposed Drag Along Sale, and all restrictions on transfer contained in this Agreement or otherwise applicable at such time shall again be in effect. Notwithstanding anything contained in this Section 20, there shall be no liability on the part of any Drag Initiating Shareholder to any other Shareholder if a proposed Drag Along Sale is not consummated for whatever reason. Any decision as to whether to consummate a transfer of any portion of its Shares shall be at the sole discretion of each Drag Initiating Shareholder.

22.     GRANT OF PROXY. To insure the performance by each Shareholder with the agreements set forth herein, each Shareholder hereby appoints the Chairman of the Corporation or its designee (the "Proxy Holder"), as his, her or its true and lawful proxy and attorney in fact, with full power of substitution and resubstitution, to vote all Shares owned or held by such Shareholder, subject to the provisions of this Agreement, upon any matter presented to the Shareholders of the Corporation, if (and only if) such Shareholder fails to comply with such provisions within 5-days following written request. The proxies and powers granted by each Shareholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Shareholder's commitments under this Agreement. Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Shareholder.

23.     TERM. The term of this Agreement shall be 24-years and 364-days following the Effective Date, unless extended by the vote or written consent of the holders of a majority of the Corporation's issued and outstanding shares of voting common stock. Each Shareholder hereby irrevocably supports and authorizes each person who may from time to time serve as President,

10

Chief Executive Officer or Treasurer of the Corporation to act as his attorney-in-fact with specific authority to execute, acknowledge, swear to, file, and deliver, an amendment to this Agreement which extends the term of this Agreement for any length of time provided that the Corporation's Board of Directors makes a determination that the extension of such term of this Agreement will not be treated as a separate Bank Holding Company under the rules and regulations of the Board of Governors of the Federal Reserve and any other applicable law, rule or regulations.

24.    MISCELLANEOUS.

(a)    Governing Law. This Agreement shall be subject to and governed by the laws of the State of Arkansas.

(b)    Partial Invalidation. In the event that one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(c)    Specific Performance. The parties hereto recognize that the Corporation's stock is a unique asset. Accordingly, in the event of a breach of this Agreement, any non-breaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached their contractual obligations described herein. Each party hereto agrees that he will make no objection to the form of action in any such proceeding for specific performance of this Agreement. Anything contained herein to the contrary notwithstanding, this Section shall not be construed to limit in any manner whatsoever any other rights and remedies an aggrieved party may have by virtue of any breach of this Agreement.

(d)    Notices. Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing either in person or by registered, certified or private express mail, which shall be addressed, in the case of the Corporation, to its principal office to the attention of the President and Secretary, and in the case of any Shareholder, to the address appearing by the Shareholder's signature hereto, or such other address as may be designated by a Shareholder in writing to all parties to this Agreement. If mailed, such notice or other communication shall be deemed made when properly deposited in the mail addressed as provided herein, with postage prepaid.

(e)    Fees of Legal Counsel. In the event any party to this Agreement shall employ legal counsel to protect his rights hereunder or to enforce any term or provision herein, then the party prevailing in any such action shall have the right to recover from the other party all of his reasonable attorneys' fees and expenses incurred in relation to such claims.

(f)    Further Assurances. The parties agree that from time to time hereafter, and upon request, each of them will execute, acknowledge and deliver such other instruments and documents and take such further action as may be reasonably necessary to carry out the intent of this Agreement.

11

5203889.4

(g)     Modification. No provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

(h)     Binding Effect and Benefit. This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto, their heirs, executors, administrators, personal representatives, successors and permitted assigns.

(i)     Headings and Captions. Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Agreement.

(j)     Waiver. No waiver of a breach or violation of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or limit or restrict any right or remedy otherwise available.

(k)     Rights and Remedies Cumulative. The rights and remedies expressed herein are cumulative and not exclusive of any rights and remedies otherwise available.

(l)     Gender and Pronouns. Throughout this Agreement, the masculine shall include the feminine and neuter and the singular shall include the plural and vice versa as the context requires.

(m)     Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

(n)     Time for Performance. Time is of the essence in this Agreement.

(o)     Counterparts. This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart. Copies of signatures shall be accepted as originals. Additional signature pages shall be attached hereto as necessary.

(p)     Tax Matters. The initial signatories to this Agreement acknowledge and confirm their mutual intention and expectation that (i) all current shareholders of the Bank shall transfer their respective shares of the Bank's common stock in exchange for shares of stock of the Corporation and that each such transfer is made in connection with the formation and initial capitalization of the Corporation following its qualification as a "bank holding company" pursuant to the Bank Holding Company Act of 1956, as amended, and applicable provisions of Arkansas law, and (ii) each transferor shall be treated as part of the same control group pursuant to Section 351 of the Internal Revenue Code of 1986, as amended.

*[Signature page(s) to follow.]*

12

5203889.4

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement of Canada Bancshares, Inc. effective as of the Effective Date set forth below.

**Effective Date:**     April 1, 2017

CORPORATION:

CANADA BANCSHARES, INC.

By: *Gary R. Canada*

Gary R. Canada, Sr., Chairman

*[Shareholder signature page(s) to be attached.]*

13

5203889 4

IN WITNESS WHEREOF, the undersigned has executed this Shareholders Agreement of Canada Bancshares, Inc. effective as to the undersigned as of the date set forth below.

*Effective Date:* April 1, 2017

MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

By: _____
Mary Hanna Boles Canada,
General Partner

_____
Bradley S. Canada

_____
Gary R. Canada, Jr.

_____
Hanna Nicole Luebke

*[Shareholder Signature Page]*

*Canada Bancshares, Inc.*

14



EXHIBIT

3









**EXHIBIT**

4







# STATE OF ARKANSAS



SECRETARY OF STATE

**Cole Jester**

ARKANSAS SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Cole Jester, Arkansas Secretary of State, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

## Dissociation/Dissolution of LLLP

of

## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

effective this day
December 12, 2025.

**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 5th day of February, 2026.



Arkansas Secretary of State

**EXHIBIT**

5

 FILED - Arkansas Secretary of State - Cole Jester - Doc#: 20524565001 - Filing#: 800031290 - Filed On: 12/12/2025 - Page(s): 3

## AMENDEDMENT TO
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

Pursuant to the Arkansas Uniform Limited Partnership Act (2001), more specifically stated as Ark. Code Ann. § 4-47-101, *et seq.*, and Act 15 of the 2007 Acts of Arkansas, the undersigned does hereby certify that the following information is true and correct:

### RECITALS

WHEREAS, a guardian of the person and estate of Mary Hanna Boles Canada ("Mrs. Canada"), the sole general partner of MHBC Investments Limited Partnership I, LLLP (the "Partnership"), was appointed on September 12, 2025 by the Circuit Court of Lonoke County, Arkansas, causing the immediate and automatic dissociation of Mrs. Canada pursuant to Ark. Code Ann. § 4-47-603(7)(B);

WHEREAS, the limited partners of the Partnership did not admit another general partner within 90 days of Mrs. Canada's dissociation, as required to avoid dissolution of the Partnership pursuant to Ark. Code Ann. § 4-47-801(3) and Sections 6.9 and 10.1(c) of the Amended and Restated Limited Partnership Agreement of the Partnership (the "Partnership Agreement"); and

WHEREAS, pursuant to Section 10.2 of the Partnership Agreement, and consistent with Ark. Code Ann. § 4-47-803(c), limited partners owning a majority-in-interest of the outstanding Partnership Units designated Gary Rector Canada, Sr. as "Liquidating Trustee."

NOW, THEREFORE, the Certificate of Limited Partnership of MHBC Investments Limited Partnership I, LLLP is hereby amended as follows:

### AMENDMENT

1.    Name.  The name of the registered limited liability limited partnership is MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

2.    Original Filing Date.  The original certificate of limited partnership for the Partnership was filed in this office on July 21, 1997. The Partnership converted to a limited liability limited partnership on April 6, 2004.

3.    Amendment.  The Certificate of Limited Partnership of the Partnership is hereby amended as follows:

(a)    Dissociation of Mrs. Canada.  Pursuant to Ark. Code Ann. § 4-47-603(7)(B), Mary Hanna Boles Canada ("Mrs. Canada"), the sole General Partner of the Partnership, disassociated on September 12, 2025. The Partnership does not have a general partner.

(b)    Dissolution of the Partnership. The Partnership dissolved, effective December 12, 2025, pursuant to Section 10.1(c) of the Partnership Agreement and Ark. Code Ann. § 4-47-801(1) & (3)(B).

(c)    Liquidating Trustee. Gary R. Canada was duly appointed by the partners as Liquidating Trustee, to conduct the winding up and termination of the Partnership's business in accordance with Section 10.2 of the Partnership Agreement. The street and mailing address of Gary R. Canada, Sr. is 123 S. Main Street, England, Arkansas 72046.

*[Signature Page Follows]*

**Error! Unknown document property name.**

2

IN WITNESS WHEREOF, this Amendment to Certificate of Limited Partnership has been duly executed by the liquidating trustee of the Partnership this _5ᵗʰ_ day of February, 2026.

**LIQUIDATING TRUSTEE:**

GARY R. CANADA, Sr.

3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
DEP CLERK

CANADA BANCSHARES, INC.

PLAINTIFF

v.

Case No. ___4:26-cv-267-KGB___

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department

DEFENDANTS

---

## MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Motion for Preliminary Injunction against

the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official

Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the

Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill,

and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as

Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the

Federal Regulators, the "Agencies"), states:

1.      CBI recently became the sole holding company of the Bank of England (the "Bank")

upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I,

LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of ownership, including, for

example, (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's

strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

2.      The Agencies, however, refuse to recognize CBI's status as the Bank's owner— or *anyone's* status as the Bank's owner— simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business.

3.      Specifically, the Agencies have asserted that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."**

4.      Without this Court's entering immediate injunctive relief ordering the Agencies to recognize CBI as the Bank's owner, the Bank will operate like a headless hydra— no clear managerial oversight, no ability to respond to crises, and no strategic direction whatsoever.

5.      For the reasons set forth in the accompanying Brief in Support, (i) CBI is likely to succeed on the merits of its claim that it is the sole holding company of the Bank, thereby entitling it to the accoutrements of Bank ownership, (ii) CBI, the Bank, and the Bank's customers are likely to suffer continued irreparable harm absent a preliminary injunction, and (iii) the balance of the equities and the public interest favor injunctive relief as the Agencies are uninterested in who owns the Bank, they simply need this Court's direction as to who that person is.

6.      CBI respectfully requests that this Court waive the security requirement in Rule 65(c) as there is no risk that the Agencies will suffer financial harm.

WHEREFORE, CBI respectfully requests that this Court (i) grant its Motion for Preliminary Injunction, (ii) order the Agencies to recognize CBI's status as the Bank's owner, and (iii) grant it all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201

2

Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.                                                PLAINTIFF

v.                              Case No. _4:26-cv-267-KGB_

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

---

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Brief in Support of its Motion for

Preliminary Injunction against the Board of Governors of the Federal Reserve System (the "Board");

Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his

Official Capacity as Chair of the Federal Deposit Insurance Corporation (the "FDIC") (collectively,

the Board, Mr. Powell, Mr. Hill, and the FDIC are the "Federal Regulators"); and Susannah Marshall,

in her Official Capacity as Commissioner of the Arkansas State Bank Department (the "State

Regulator" and, together with the Federal Regulators, the "Agencies"), states:

### INTRODUCTION

CBI recently became the sole holding company of the Bank of England (the "Bank") upon

the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I, LLLP

(the "Partnership"). As such, CBI is entitled to the accoutrements of Bank ownership, including, for

example, setting the Bank's strategy and governance, managing the Bank's capital and funding, and

interacting directly with the Agencies. But the Agencies are preventing CBI from doing so. More specifically, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business. Indeed, the FDIC and the State Regulator have asserted in writing that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** The Board has expressed the same opinion verbally during meetings over the Bank's ownership.

Without a preliminary injunction from this Court ordering the Agencies to immediately recognize CBI as the Bank's owner, the Bank will suffer governance paralysis, capital and liquidity crises, and severe operational disruption. Worse yet, the Agencies' continued refusal to recognize CBI as the Bank's owner interferes with CBI's due-process rights. To preserve the status quo, to ensure CBI's and the Bank's survival, and to protect the Bank's customers, this Court should enter a preliminary injunction ordering the Agencies to recognize CBI's status as the Bank's owner.

## BACKGROUND

CBI hereby incorporates the factual allegations contained in its Verified Complaint by reference pursuant to Federal Rule of Civil Procedure 10(c).

## ARGUMENT

A preliminary injunction is warranted when (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities favors the movant; and (4) an injunction is in the public interest. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam). Though no single factor is "dispositive," *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), likelihood of success is "the most significant" factor, *Missouri*, 112 F.4th at 536. When the federal government is the party opposing a preliminary injunction, the balance of the equities and the public interest "merge" into a single factor. *See, e.g., Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Here, each factor supports a preliminary injunction.

2

### I. CBI is likely to succeed on the merits because CBI is the Bank's sole holding company.

As for this initial, most crucial factor, CBI is likely to succeed on the merits because, following the Partnership's dissolution, CBI became the Bank's sole holding company. More specifically, Mary Hanna Boles Canada has always been the Partnership's only legally recognized General Partner. Immediately upon the Lonoke County Circuit Court's appointing Gary Canada, Sr. as Mrs. Canada's emergency guardian on September 12, 2025, Mrs. Canada was dissociated from the Partnership by operation of law. Ark. Code Ann. § 4-47-603(7)(B) ("A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.").

As such, the Partnership had 90 days— up and until December 12, 2025[1]— to either (i) admit a new General Partner, or (ii) consent to continue the activities of the limited partnership and admit a new General Partner in accordance with that consent. Ark. Code Ann. § 4-47-801(3)(B); **Ex. 1** to Compl., at §§ 6.9, 10.1(c). However, the Partnership failed to do either, and the Arkansas Secretary of State accordingly certified the Partnership's dissolution. **Ex. 5** to Compl. Upon the Partnership's dissolution, CBI became the Bank's sole holding company. As the Bank's sole holding company, CBI is entitled to, among other things: (i) the Agencies' recognition, (ii) the right to set the Bank's strategy and governance, and (iii) the ability to manage the Bank's capital and funding. Therefore, CBI is likely to succeed on the merits, and this most important factor weighs heavily in CBI's favor.

### II. CBI, the Bank, and the Bank's customers have suffered and will suffer irreparable harm absent injunctive relief.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). For this requirement, a plaintiff need not prove with absolute certainty

---

[1] The Lonoke County Circuit Court later appointed Nicole Canada Luebke and Mr. Canada, Sr. as Mrs. Canada's co-guardians, but Mrs. Canada's guardianship has continued uninterrupted from September 12, 2025, to the date and time of this filing.

that injury will occur, but, instead, need merely show that irreparable harm is "likely" absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Here, the Agencies' refusal to recognize CBI as the Bank's owner has caused and will continue to cause CBI, the Bank, and the Bank's customers to suffer irreparable harm because such a refusal produces: (i) governance paralysis— the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption— vendors, other banks, and market participants could freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

Indeed, the Agencies' unlawful refusal to recognize CBI as the Bank's owner is substantially likely to result in (i) CBI's and the Bank's terminations as ongoing business enterprises, and (ii) loss of customer goodwill, both of which constitute irreparable harm under Eighth Circuit precedent. *See, e.g., Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (explaining that "[i]rreparable harm has been found when one's allegedly unlawful actions . . . will cause another's ongoing business to terminate absent an injunction"); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[T]he petitioners' potential loss of consumer goodwill qualifies as irreparable harm.").

Worse yet, as the Bank's sole holding company, CBI has a recognized property interest in its ownership of the Bank. *Cf. FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("[A]ppellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."); *Kaufman v. Societe Internationale Pour Participations Industrielles Et Commerciales, S.A.*, 343 U.S. 156, 159–60 (1952) (holding that "the rights of innocent stockholders . . . must be fully protected"). The Agencies' unlawful refusal to recognize that interest or give it any meaningful legal effect without due process of law or adequate compensation threatens violations of CBI's constitutional rights, independently constituting irreparable harm warranting injunctive relief. *See, e.g.*, *Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 935 (E.D. Ark. 2021) ("The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, CBI has suffered and will continue to suffer irreparable harm absent immediate injunctive relief.

III.   **The balance of the equities and the public interest support a preliminary injunction both because (i) the Agencies are uninterested in who owns the Bank, they simply need Court direction, and (ii) customers' interests and the public's faith in the banking regulatory regime are in peril absent injunctive relief.**

The balance of the equities and public interest, which "merge" in suits against the government, also decisively favor preliminary relief. *Missouri*, 128 F.4th at 996–97. At the outset, the Agencies have no interest in this case warranting protection because they are uninterested in which entity ultimately owns the Bank. After all, their stated position is that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** Stated differently, the Agencies will treat whomever this Court determines to be the Bank's owner as such.

Moreover, "it is always in the public interest to protect constitutional rights" like CBI's due-process entitlements. *Phelps-Roper v. Nixon*, 59 F.3d 480, 485 (8th Cir. 2007). And, even better, entering a preliminary injunction in CBI's favor would mean that the Bank once again has stable management

5

and oversight— thereby protecting customers' interests and the public's faith in the regulatory regime underlying the banking system. Thus, this final factor weighs heavily in CBI's favor, too.

## CONCLUSION

Following the Partnership's dissolution, CBI became the Bank's sole holding company. As such, it is constitutionally entitled to the accoutrements of ownership, including but not limited to: (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

Because CBI is (i) likely to succeed on the merits, (ii) has suffered and will continue to suffer irreparable harm absent immediate injunctive relief, and (iii) the balance of the equities and the public interest favor such relief, this Court should enter a preliminary injunction ordering the Agencies to immediately recognize CBI's status as the Bank's owner. Doing so preserves the status quo, ensures CBI's and the Bank's survival, and protects the Bank's customers from peril. Accordingly, CBI respectfully requests that this Court grant its Motion for Preliminary Injunction and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association

6

809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

**EXHIBIT**

**11**

exhibitsticker.com

---

## U.S. Postal Service™ CERTIFIED MAIL® RECEIPT

Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

| Certified Mail Fee | $ | |
| Extra Services & Fees (check box, add fee as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ | |
| ☑ Return Receipt (electronic) | $ | |
| ☐ Certified Mail Restricted Delivery | $ | Postmark |
| ☐ Adult Signature Required | $ | Here |
| ☐ Adult Signature Restricted Delivery | $ | |
| Postage | | |
| $ | | |
| Total Postage and Fees | | 93/14/58 |
| $ | | |

Sent To: U.S. Attorney General Pamela Bondi

Street and Apt. No., or PO Box No. 950 Pennsylvania Avenue, NW

City, State, ZIP+4® Washington, DC 20530-0001

9589 0710 5270 0162 0924 76

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

CERTIFIED MAIL®

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

---

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. <br> ■ Print your name and address on the reverse so that we can return the card to you. <br> ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature <br> X ☐ Agent ☐ Addressee <br> B. Received by (Printed Name)    C. Date of Delivery |
| 1. Article Addressed to: <br> U.S. Attorney General Pamela Bondi <br> 950 Pennsylvania Avenue, NW <br> Washington, DC 20530-001 | D. Is delivery address different from item 1? ☐ Yes <br> If YES, enter delivery address below: ☐ No |
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ <br> 9590 9402 7936 2305 5851 48 | 3. Service Type <br> ☐ Adult Signature <br> ☐ Adult Signature Restricted Delivery <br> ☑ Certified Mail® <br> ☐ Certified Mail Restricted Delivery <br> ☐ Collect on Delivery <br> ☐ Collect on Delivery Restricted Delivery <br> ☐ Insured Mail <br> ☐ Insured Mail Restricted Delivery ($500) <br> ☐ Priority Mail Express® <br> ☐ Registered Mail™ <br> ☐ Registered Mail Restricted Delivery <br> ☐ Signature Confirmation™ <br> ☐ Signature Confirmation Restricted Delivery |
| 2. Article Number (Transfer from service label) <br> 9589 0710 5270 0162 0924 76 | |
| PS Form 3811, July 2020 PSN 7530-02-000-9053 | Domestic Return Receipt |



United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

ROSELAWFIRM
A Professional Association
120 E. Fourth Street Little Rock AR 72201-2893

DSW/SB

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

USPS TRACKING #

9590 9402 7936 2305 5852 48



## U.S. Postal Service™
## CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

| Certified Mail Fee | |
|---|---|
| $ | |

Extra Services & Fees *(check box, add fee as appropriate)*
☑ Return Receipt (hardcopy) $ _____
☑ Return Receipt (electronic) $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$

DSW/SB

Sent To U.S. Attorney General Pamela Bondi
Street and Apt. No., or PO Box No. 950 Pennsylvania Avenue, NW
City, State, ZIP+4® Washington, DC 20530-0001

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

9589 0710 5270 0192 0924 76



## ROSE LAW FIRM

March 16, 2026

**VIA CERTIFIED MAIL**
U.S. Attorney General Pamela Bondi
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
<u>Tracking #</u>: 9589 0710 5270 0162 0924 76

      **Re:**    *Canada Bancshares, Inc. v. Board of Governors of Federal Reserve System, et al.*
               U.S. District Court for the Eastern District of Arkansas
               Case No. 4:26-cv-00267-KGB
               **Service of Process Pursuant to Fed. R. Civ. P. 4(i)(1)(B)**

Dear Attorney General Bondi:

      I represent the Plaintiff, Canada Bancshares, Inc. ("CBI") in connection with the above-referenced litigation against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department. In accordance with Federal Rule of Civil Procedure 4(i)(1)(B), please find accompanying this letter (i) CBI's Verified Complaint and its associated exhibits, and (ii) a Summons to Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors of the Federal Reserve System.

      Additionally, CBI filed a Motion for Preliminary Injunction and Brief in Support. I have enclosed copies of those documents as well. CBI intends to pursue the relief requested therein with all deliberate haste. Please do not hesitate to reach out to my office in connection with this matter should you deem that necessary.

                             Respectfully submitted,

                             */s/ David S. Mitchell, Jr.*
                             David S. Mitchell, Jr.

**A Professional Association**
120 E. Fourth St., Little Rock, AR 72201 | roselawfirm.com | (501) 375-9131 | (501) 375-1309 (fax)
dmitchell@roselawfirm.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Arkansas  [▼]

CANADA BANCSHARES, INC.

)
)
)
)
)

_Plaintiff(s)_

)
)

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors; TRAVIS HILL, in his Official
Capacity as Chair of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department

_Defendant(s)_

)
)
)
)
)
)
)

Civil Action No.  4:26-cv-267-KGB

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_ Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors of the
Federal Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David S. Mitchell, Jr., 120 East Fourth Street, Little Rock, Arkansas 72201

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**TAMMY H. DOWNS**
_CLERK OF COURT_

Date:        03/13/2026

_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____        _____
                                         *Server's signature*

                               _____
                                         *Printed name and title*


                               _____
                                         *Server's address*

Additional information regarding attempted service, etc:

AO 85 (Rev. 01/09) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Arkansas

| | | |
|---|---|---|
| Canada Bancshares Inc | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  4:26-cv-267-KGB |
| Board of Governors of the Federal Reserve System et al | ) | |
| *Defendant* | ) | |

### NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____          _____
                                                    *District Judge's signature*


                                                    _____
                                                    *Printed name and title*

Note:    Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.

Case 4:26-cv-00267-KGB        Document 1      Filed 03/13/26      Page 1 of 66

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____

DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.                                                      PLAINTIFF

v.                          Case No. __4:26-cv-267-KGB__

BOARD OF GOVERNORS OF THE                    This case assigned to District Judge __Baker__
FEDERAL RESERVE SYSTEM;                      and to Magistrate Judge __Ervin__
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department        DEFENDANTS

---

## VERIFIED COMPLAINT

---

Plaintiff, Canada Bancshares, Inc., for its Verified Complaint against the Board of Governors

of the Federal Reserve System; Jerome H. Powell, in his Official Capacity as Chair of the Board of

Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation;

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department, states:

### PARTIES

1.      Canada Bancshares, Inc., ("CBI") is an Arkansas corporation with its principal place

of business in England, Arkansas. CBI is the sole holding company of the Bank of England, an

Arkansas state-chartered bank (the "Bank"). CBI owns all issued and outstanding shares of the Bank's

stock.

2.      The Board of Governors of the Federal Reserve System (the "Board") is a federal

agency established by the Federal Reserve Act, 12 U.S.C. §§ 221 *et seq.*, charged with the administration

and enforcement of the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* Among other responsibilities, the Board determines whether an entity qualifies as a bank holding company, and the Board engages in a variety of oversight activities.

3.     Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, oversees the Board's actions and is responsible for, among other things, ensuring the Board's compliance with its statutory duties.

4.     Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, oversees the Federal Deposit Insurance Corporation (alone, the "FDIC," and, together with the Board, Mr. Powell, and Mr. Hill, the "Federal Regulators") and ensures the FDIC's compliance with its statutory duties. The FDIC exercises certain regulatory authority over bank holding companies under the Federal Deposit Insurance Act. *See* 12 U.S.C. §§ 1811 *et seq.*

5.     Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, oversees the Arkansas State Bank Department (alone, the "State Regulator," and, together with the Federal Regulators, the "Agencies"), an entity charged with regulating state-chartered commercial banks and their holding companies. *See, e.g.*, Ark. Code Ann. § 23-46-205.

6.     The State Regulator's duties include review and approval processes that overlap significantly with the Federal Regulators'.

### JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 in that it is a civil action or proceeding arising under the laws of the United States. More specifically, this is a civil action or proceeding arising under Acts of Congress regulating commerce, namely, the Bank Holding Company Act and the Federal Deposit Insurance Act.

8.      This Court has supplemental jurisdiction over CBI's claims against the State Regulator because they are "so related to [CBI's] claims" against the Federal Regulators that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) as this is "a civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity[,]" and the Central Division of the Eastern District of Arkansas is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred . . . ."

<u>BACKGROUND</u>

10.      Founded in 1898 with a capital stock of just $10,000, the Bank has survived two world wars, the Great Depression, and even the Great Recession.

11.      For most of its existence, the Bank has been a family-run operation, as the same family has controlled the Bank for more than a half century.

12.      Seth Boles—the progenitor of the Bank family—started working at the Bank as a cashier as long ago as 1946. Slowly but surely, Mr. Boles worked his way up to the Bank's presidency in the early 1960s. He maintained that position until 1989 when his son-in-law, Gary Canada, Sr., took the helm as the Bank's new president.

13.      Over the decades, the Bank's ownership structure has shifted a handful of times.

14.      This lawsuit is about the most recent shift in the Bank's ownership structure and the Agencies' reaction to it.

**The Partnership.**

15.      In the late 1990s, several members of the Bank family formed MHBC Investments Limited Partnership I as a holding company for the Bank.

16.      At that time, Mary Hanna Boles Canada was MHBC Investments Limited Partnership I's only General Partner.

3

17.     Mrs. Canada, Mr. Canada, Sr., Gary Canada, Jr. (as trustee), Bradley Canada (as trustee), and Hanna Nicole Canada Luebke (as trustee) were MHBC Investments Limited Partnership I's Limited Partners.

18.     In the early 2000s, MHBC Investments Limited Partnership I's partners voted to convert the entity to an Arkansas limited liability limited partnership, thereby creating MHBC Investments Limited Partnership I, LLLP (the "Partnership"), an entity governed by an April 1, 2004 Partnership Agreement[1] and the Uniform Limited Partnership Act (2001), Ark. Code Ann. §§ 4-47-101 *et seq.*

19.     Pursuant to Section 3.1 of the Partnership Agreement, one of the entity's core purposes was to "operate as a one bank holding company owning a controlling interest in the common stock of Bank of England, a state-chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies."

20.     As before, upon its conversion, the Partnership had only one General Partner: Mrs. Canada.

21.     Mrs. Canada has always been the Partnership's only legally recognized General Partner.

**Formation of CBI.**

22.     In the mid-2010s, the Bank family also established CBI as a holding company of the Bank.

23.     Over time, through a handful of transactions, CBI became the Bank's sole shareholder.

24.     Several months after the formation of CBI, its shareholders entered into a Shareholders Agreement.[2]

---

[1] A true and correct copy of the Partnership Agreement is attached as **Exhibit 1**.

[2] A true and correct copy of the Shareholders Agreement is attached hereto as **Exhibit 2**.

25.    The Shareholders Agreement restricts CBI's shareholders, officers, directors, and other agents from effecting any change to the Bank's Board of Directors without the Partnership's prior written authorization. **Ex. 2** § 12(c).

26.    Since CBI's original issuance of shares of its stock, the Partnership has always owned well in excess of a majority of the total issued and outstanding shares of CBI stock.

27.    As long as CBI has been the sole shareholder of the Bank, it has served as the intermediate holding company situated between the Bank and the Partnership, the Bank has served as the operating company, and the Partnership (until its recent dissolution) has served as the ultimate parent entity and holding company with supreme authority and control over the Bank.

### The Partnership's Dissolution.

28.    After serving as the Partnership's General Partner for decades, Mrs. Canada was sadly diagnosed with Alzheimer's disease at the Mayo Clinic in Rochester, Minnesota in 2020.

29.    Since that time, Mrs. Canada's cognitive abilities have deteriorated steadily.

30.    More recently, third-parties began taking advantage of Mrs. Canada's cognitive decline to their benefit and to Mrs. Canada's detriment.

31.    Seeking to protect his wife's well-being, Mr. Canada, Sr. initiated a guardianship action on September 12, 2025, in the Circuit Court of Lonoke County, Arkansas.

32.    On September 12, 2025, the Lonoke County Circuit Court appointed Mr. Canada, Sr. as Mrs. Canada's emergency guardian. A true and correct copy of the Lonoke County Circuit Court's Order appointing Mr. Canada, Sr. as his wife's emergency guardian is attached hereto as **Exhibit 3**.[3]

---

[3] Exhibit 3 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Order. Accordingly, CBI will file a Motion for Leave to File Exhibit 3 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

33.    A month later, the Lonoke County Circuit Court issued Letters of Temporary Guardianship to Mr. Canada, Sr. and Mrs. Canada Luebke, as co-guardians of Mrs. Canada's person and estate (the "Letters"). A true and correct copy of the Letters is attached hereto as **Exhibit 4.**[4]

34.    The Letters operated as an extension of Mrs. Canada's guardianship. Stated differently, although the terms of Mrs. Canada's guardianship have changed, there has been no interruption in Mrs. Canada's guardianship since September 12, 2025.

35.    As of the date and time of this filing, Mr. Canada, Sr. and Mrs. Canada Luebke are still serving as co-guardians of Mrs. Canada's person and estate.

36.    Arkansas's Limited Partnership Act provides that a general partner is dissociated automatically by operation of law upon the appointment of a guardian for such general partner:

> A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.

Ark. Code Ann. § 4-47-603(7)(B).

37.    Accordingly, Mrs. Canada was dissociated as General Partner of the Partnership by operation of law upon the Lonoke County Circuit Court's appointment of Mr. Canada, Sr. as her guardian on September 12, 2025.

38.    Arkansas's Limited Partnership Act further provides that a limited partnership is automatically dissolved by operation of law after the dissociation of a general partner if the partnership does not have a remaining general partner and the limited partners fail to admit a general partner within 90 days:

> A limited partnership is *dissolved*, and its activities *must be* wound up, only upon the occurrence of any of the following:
>
> . . .
>
>     (3) after the dissociation of a person as general partner:

---

[4] Exhibit 4 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Letters. Accordingly, CBI will file a Motion for Leave to File Exhibit 4 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

(B) if the limited partnership does not have a remaining general partner, the passage of 90 days after the dissociation, unless before the end of the period:

(i) consent to continue the activities of the limited partnership and admit at least one general partner is given by the limited partners owning a majority of the rights to receive distributions as limited partners at the time the consent is to be effective; and

(ii) at least one person is admitted as a general partner in accordance with the consent . . . .

Ark. Code Ann. § 4-47-801(3)(B) (emphasis added).

39.     The Partnership Agreement, too, requires immediate dissolution of the Partnership following the dissociation of all general partners if a successor general partner is not admitted within 90 days:

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be.

. . .

Section 10.1    Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:

(c) Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.

Ex. 1, §§ 6.9, 10.1(c) (emphasis added).

40.     The Partnership's Limited Partners did not admit a General Partner to replace Mrs. Canada within 90 days of her dissociation on September 12, 2025.

7

41.    The Limited Partners did not consent to continue the activities of the Partnership at any time following Mrs. Canada's dissociation on September 12, 2025, at least up until the date and time of this filing.

42.    Both the Partnership Agreement and Arkansas's Limited Partnership Act require the dissolution of the Partnership following the dissociation of all general partners if one or more substitute general partners are not appointed within ninety (90) days. **Ex. 1,** §§ 6.9 and 10.1(c); Ark. Code Ann. § 4-47-801(3)(B).

43.    The Partnership was without a General Partner for the 90-day period that ended on December 11, 2025.

44.    Thus, on December 12, 2025, the Partnership dissolved immediately and automatically by operation of law and the Partnership Agreement.

45.    Accordingly, the Arkansas Secretary of State certified the Partnership's dissolution, effective December 12, 2025. A true and correct copy of the Secretary of State's certification is attached hereto as **Exhibit 5**.

### CBI Takes Over.

46.    Following the Partnership's dissolution, the Partnership's control over the Bank terminated, and CBI became the Bank's sole holding company.

47.    Accordingly, CBI no longer defers to the Partnership in the election or removal of directors of the Bank.

48.    As the Bank's sole holding company, CBI is entitled to, among other things, set strategy and governance (i.e., by appointing Bank leadership and board members as well as setting growth plans and direction), manage capital and funding, and interact directly with the Agencies.

### The Agencies Abdicate.

49.     Federal law grants the Federal Regulators tremendous regulatory oversight over bank holding companies, largely through the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.*, and the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*

50.     Bank holding companies' actions and omissions are meticulously scrutinized by the Federal Regulators, and bank holding companies must frequently seek Federal Regulators' approval to take certain actions. *See, e.g.*, 12 U.S.C. § 1842(a) (requiring the Board's approval for a litany of transactions involving bank holding companies); 12 C.F.R. § 225.72 (requiring certain regulated institutions to provide the Board with written notice of changes in leadership or board membership); 12 U.S.C. § 1831i (requiring certain regulated institutions to provide the FDIC with written notice of changes in leadership or board membership and an opportunity to disapprove them).

51.     If the holding company owns a state-chartered bank, like the Bank here, then the holding company must also contend with government entities like the State Regulator.

52.     Often, the Agencies' regulatory duties overlap significantly. *See, e.g.*, 12 U.S.C. § 1842(b)(1) (requiring the Board to solicit and consider the "views and recommendations" of the State Regulator in certain transaction-approval decisions); *see also* Ark. Code Ann. § 23-46-205 ("The Bank Commissioner shall be charged with the general supervision of financial institutions, the execution of all laws passed by the State of Arkansas relating to the organization, operations, inspection, supervision, control, liquidation, and dissolution of banks, bank holding companies, subsidiary trust companies, and the general commercial banking business of Arkansas, and such other duties as prescribed by law.").

53.     Part and parcel of the Agencies' duties is (i) recognizing the proper owner of a regulated institution, and (ii) interacting with that owner to ensure regulatory compliance.

54.     Although (i) CBI owns all issued and outstanding shares of the Bank's stock, and (ii) the Partnership is dissolved, the Agencies refuse to recognize CBI's status as the Bank's owner.

9

55.     Worse yet, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among members of the Bank family over the winding up of the Partnership's business.

56.     The Agencies refusal to recognize CBI as the Bank's owner has caused and will cause catastrophic consequences, among others: (i) governance paralysis—the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption—vendors, other banks, and market participants will freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

57.     In short, the Agencies' conduct has caused CBI (and the Bank) to suffer irreparable harm and the Agencies' continued refusal to recognize CBI's status will perpetuate irreparable harm on CBI (and the Bank).

## CAUSES OF ACTION

### Count 1: Declaratory Judgment

58.     CBI realleges and reasserts the allegations contained in the preceding paragraphs of this Verified Complaint.

59. Pursuant to the United States Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, CBI seeks this Court's declaration that (i) the Partnership is dissolved, (ii) CBI owns the Bank.

60. This is an active and justiciable controversy because CBI has sought to act as the Bank's owner before the Agencies and the Agencies have refused to recognize CBI's status.

61. Worse yet, the Agencies have refused to recognize anyone's status as the Bank's owner.

62. The FDIC and the State Regulator asserted, in writing, that the Bank's ownership *"remains a private legal issue that [they] have no jurisdiction over."*

63. Although the Board has not put it in writing, the Board has expressed the same opinion verbally during meetings over the Bank's ownership.

64. There is uncertainty regarding the parties' legal relations in this instance.

### NATURE OF RELIEF SOUGHT

65. CBI requests that this Court award it the following relief:

a. Declare that (i) the Partnership is dissolved, and (ii) CBI is the sole holding company with control over the Bank;

b. Pursuant to Fed. R. Civ. P. 65, preliminarily and permanently enjoin the Agencies to recognize CBI's status as the Bank's owner;

c. All other relief that this Court deems just and proper.

WHEREFORE, Plaintiff Canada Bancshares, Inc. respectfully requests that this Court enter judgment in its favor against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department; enjoin the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation,

11

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department as requested herein; and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

12

## VERIFICATION

I, Gary Canada, Sr., state on oath that the foregoing facts set forth in this Verified Complaint are true and correct to the best of my knowledge, information, and belief.

_Gary Canada Sr._
Gary Canada, Sr.

Dated ___3-9-26___, 2026

STATE OF _Arkansas_ )

) ss.

COUNTY OF _____ )

SUBSCRIBED and SWORN to before me, the undersigned duly commissioned, qualified, and acting Notary Public this _09_ day of _March_ 2026.

In witness whereof I hereunto set my hand and official seal

_Sharon Marn_
Notary Public

My Commission Expires: _12-19-2034_



SHARNA BRODERICK
COMM. EXP.
12-19-2034
No. 00004395
PULASKI COUNTY
NOTARY PUBLIC - ARKANSAS

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

**EXHIBIT**

___1___

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
# AGREEMENT OF LIMITED PARTNERSHIP
## (As Amended and Restated)

**ARTICLE I**
**FORMATION AND ORGANIZATION** ............................. -1-
Section 1.1    Formation of Partnership .......................... -1-
Section 1.2    Organization Certificates; Filings ................. -2-
Section 1.3    Partnership Name ................................ -2-
Section 1.4    Principal Office and Agent ....................... -2-
Section 1.5    Term of Partnership ............................. -2-
Section 1.6    Copies to Partners .............................. -2-

**ARTICLE II**
**DEFINITIONS** ................................................ -3-

**ARTICLE III**
**PURPOSES AND POWERS** ..................................... -5-
Section 3.1    Purposes of the Partnership ...................... -5-
Section 3.2    Powers of the Partnership ........................ -5-

**ARTICLE IV**
**ADMISSION OF LIMITED PARTNERS** ........................... -6-
Section 4.1    Admission of Limited Partners .................... -6-
Section 4.2    Completion of Admission ......................... -6-

**ARTICLE V**
**CONTRIBUTIONS OF THE PARTNERS** ........................... -7-

**ARTICLE VI**
**RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS**
................................................................ -7-
Section 6.1    Rights and Powers of the General Partners as Managers .......... -7-
Section 6.2    Limitations on General Partners' Authority .................. -7-
Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance ....... -8-
Section 6.4    Third Parties .................................. -8-

Section 6.5    Duties of the General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.6    Obligations not Exclusive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.7    Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.8    Admission of Additional General Partner . . . . . . . . . . . . . . . . . . . -10-
Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General
        Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
Section 6.10    Indemnification of the General Partners . . . . . . . . . . . . . . . . . . . -10-
Section 6.11.    Limited Liability of the General Partners . . . . . . . . . . . . . . . . . . . -11-

ARTICLE VII
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS . . . . . . . . . . . . . -11-
Section 7.1    Rights of a Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
Section 7.2    Assignments of Limited Partnership Interests . . . . . . . . . . . . . . . -12-
Section 7.3    Assignments of Distributive Rights . . . . . . . . . . . . . . . . . . . . . . . -12-
Section 7.4    Partnership Option to Purchase a Limited Partner's Interest . . . . . -13-
Section 7.5    Limited Partner's Status Upon Death or Incompetency . . . . . . . . . -14-
Section 7.6    Limited Put Option of Certain Permitted Transferees . . . . . . . . . . -14-

ARTICLE VIII
COMPENSATION OF THE GENERAL PARTNERS . . . . . . . . . . . . . . . . . . -15-
Section 8.1    Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 8.2    Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

ARTICLE IX
DISTRIBUTIONS AND
ALLOCATIONS OF INCOME AND LOSS . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.1    Distributions of Distributable Cash . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.2    Allocation of Certain Income and Losses for Tax Purposes . . . . . -15-
Section 9.3    Allocations Upon Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

ARTICLE X
DISSOLUTION AND PRIORITY ON DISTRIBUTION . . . . . . . . . . . . . . . . -16-
Section 10.1    Dissolution and Termination of the Partnership . . . . . . . . . . . . . . -16-
Section 10.2    Liquidation and Priorities on Distribution . . . . . . . . . . . . . . . . . . -16-

**ARTICLE XI**

**ACCOUNTING AND BUSINESS MATTERS** . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.1    Books of Accounts and Records . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.2    Accounting Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.3    Financial Statements and Reports . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.4    Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 11.5    Bank Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-


**ARTICLE XII**

**ELECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.1    Adjustment Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.2    Depreciation Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.3    Election with Respect to Taxation as Partnership . . . . . . . . . . . . . -18-

Section 12.4    Other Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-


**ARTICLE XIII**

**AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-


**ARTICLE XIV**

**MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.1    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.2    Further Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.3    Paragraph Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.4    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.5    Application of Arkansas Law . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.6    Survival of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.7    Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.8    Execution in Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.9    Waiver of Action for Partition . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.10   Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.11   Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.12   Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.13   Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (hereinafter referred to as the "Agreement"), is entered into effective as of the __1__ day of ___April___, 2004, by and among MARY HANNA BOLES CANADA, and any other parties who may be admitted to the Partnership as General Partners pursuant to the provisions of Section 6.8 herein (hereinafter collectively referred to as the "General Partners" or individually as "General Partner"), and MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR., Trustee of the GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA, Trustee of the BRADLEY SETH CANADA TRUST I, and HANNA NICOLE CANADA, Trustee of the HANNA NICOLE CANADA STEWART TRUST I, and any other parties who may be admitted to the Partnership as Limited Partners pursuant to the provisions of Sections 4.1 and 7.2 herein below (hereinafter referred to collectively as the "Limited Partners" and individually as "Limited Partner").

WHEREAS, on July 21, 1997, MARY HANNA BOLES CANADA, the General Partner and the Limited Partners entered into the Agreement of Limited Partnership pursuant to which the Partnership was formed under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I.

WHEREAS, effective as of the date aforesaid, the Agreement of Limited Partnership was amended and restated as a limited liability limited partnership (as defined in Section 1.1 hereinbelow) under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinbelow contained, the adequacy of which consideration is hereby acknowledged, the parties agree as follows:

## ARTICLE I
## FORMATION AND ORGANIZATION

Section 1.1    Formation of Partnership.  Pursuant to the Arkansas Revised Limited Partnership Act of 1991, A.C.A. § 4-43-101 *et seq.*, as from time to time amended, including Act 912 of the 1997 Acts of Arkansas, hereinafter collectively referred to as the "Act," the parties hereto hereby form a registered limited liability limited partnership, which organization is hereinafter referred to as the "Partnership." The rights and liabilities of the Partners (as "Partners" is defined in Article II hereinbelow) shall, except as hereinafter expressly stated to the contrary, be as provided for in the Act.

Section 1.2    Organization Certificates; Filings.  The General Partners hereto shall immediately execute, file, record and/or publish the Application and the Certificate (as "Application" and "Certificate" are defined in Article II hereinbelow) and other documents conforming hereto, and take all other appropriate action to comply with all legal requirements for the formation of a registered limited liability limited partnership under the Act and its operation in the State of Arkansas.  The General Partners shall file and publish any other notices, certificates, statements or other instruments required or permitted by any provision of any law in the United States or any state or other jurisdiction which may govern the formation of this Partnership or the conduct of its business from time to time.  The General Partners shall cause the Partnership to file any further amendments to the Application and/or Certificate or such other documents as shall be required by A.C.A. §§ 4-43-202, 4-43-1110 and 4-42-703 in order to preserve the valid existence of the Partnership as a registered limited liability limited partnership and the limited liability of the Partners.

Section 1.3    Partnership Name.  The business of the Partnership shall be conducted under the name of the MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP, an Arkansas registered limited liability limited partnership, and under such name or variations thereof in the other jurisdictions as the General Partners deem appropriate.

Section 1.4    Principal Office and Agent.  The principal place of business and physical address of the Partnership shall be located at: 105 Cherry St., England, AR 72046, and the mailing address of the Partnership shall be: 105 Cherry St., England, AR 72046.  The agent for service of process shall be MARY HANNA BOLES CANADA at the above business address.

Section 1.5    Term of Partnership.  The Partnership shall become effective upon the filing of the Application and the Certificate and the payment of the filing fee therefor, in the office of the Arkansas Secretary of State, Little Rock, Arkansas, as required by the Act and shall remain effective until the earlier to occur of:

(a)    December 31, 2046; or

(b)    The date the Partnership is dissolved pursuant to the Act or any provisions of this Agreement.

The period of time between the date the Partnership becomes effective and the date it ceases to be effective shall be referred to herein as "Partnership Term."

Section 1.6    Copies to Partners.  The General Partners shall promptly deliver or mail a filed copy of the Certificate and any amendment thereto to each of the Limited Partners.

## ARTICLE II
## DEFINITIONS

Whenever used in this Agreement the terms set forth below shall be defined as follows:

(a)    The "Application" shall mean the Application for Registration of a Limited Liability Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-1110, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(b)    The "Certificate" shall mean the Certificate of Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-206, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(c)    "Code" shall mean the Internal Revenue Code of 1986, as amended.

(d)    "Distributable Cash" shall mean, at the time of determination for any period (on the cash receipts and disbursements method of accounting), the net cash derived from the conduct of the Partnership's business and operations, from its investments (including distributions from entities owned by the Partnership) and (except as limited below) cash proceeds from the sale or other disposition of Partnership Properties, but only after reasonable reserves of cash have been set aside by the General Partners for working capital, capital improvements and replacements, debt service, current and reasonably projected expenses, and other cash requirements, including current and reasonably projected investment opportunities, all in keeping with the Partnership purposes. For purposes of this subsection, all capital contributions, any borrowed funds, and cash proceeds attributable to the sale or other disposition of any of the Partnership Properties which were contributed to the Partnership or which were purchased with borrowed funds, shall be considered necessary for business and investment purposes and shall be excluded from Distributable Cash. In determining Distributable Cash the General Partners shall be subject to the duties imposed by Section 6.5 and shall have the duty to take into account the cash needs of the Partnership in its business, the funds necessary in the operation of its business until the income from further operations is available, the amounts of its debts, the necessity or advisability of paying its debts, or at least reducing them within the limits of the Partnership's credit, and the character of its surplus cash.

(e)    "Fair Market Value" shall be the price at which a willing seller and willing buyer, neither under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, would pay and accept in an arm's length transaction for such interest in the Partnership or any Partnership Property. The Fair Market Value of an interest in the Partnership shall be determined taking into account all factors relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held partnership interests having the rights and restrictions provided

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                          -3-

under this Agreement and applicable Arkansas law including, but not limited to, the restrictions upon withdrawal before the end of the term of the Partnership. In the event it becomes necessary to value any interest in the Partnership or any Partnership Property, the Fair Market Value of the property shall be determined by agreement of the parties involved, or in the absence of such agreement, by an individual appraiser or appraisal firm mutually acceptable to such parties. In the event the parties involved are unable to agree on the individual appraiser or firm to perform the valuation, each party shall select an appraiser, and such appraisers shall first attempt to jointly determine the Fair Market Value of the Partnership interest or Partnership Property by mutual agreement, but if they are unable to agree on such valuation, such appraisers shall select a third appraiser, and the fair market value shall be determined by the average of the two (2) closest appraisals. Any valuation so determined shall be binding and conclusive on the parties absent manifest error. The cost of any such appraisal(s) shall be borne, in the case of a valuation of a Partnership interest, equally by the seller and the purchaser, and in the case of a valuation of any Partnership Property, equally by each individual Partner or group of Partners having conflicting interests in such appraisal.

        (f)     "General Partners" shall mean MARY HANNA BOLES CANADA, and/or any other person or entity appointed in accordance with the provisions of this Agreement to replace, or in addition to, the aforesaid persons. "General Partner" shall mean, and refer to, any of the General Partners individually.

        (g)     "Limited Partners" shall mean MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA TRUST I and HANNA NICOLE CANADA STEWART TRUST I, and any other person or entity who or which shall be admitted to the Partnership, pursuant to Section 4.1 or Section 7.2, and thereby becomes an owner of an interest in the Partnership. "Limited Partner" shall mean, and refer to, any of the Limited Partners individually.

        (h)     "Partners" shall mean the General Partners and all Limited Partners.

        (i)     "Partnership Properties" shall mean all properties (real, personal and mixed), and all rights, titles, interests and estates of every nature whatsoever incident thereto, owned by the Partnership. "Partnership Property" shall mean any one of the Partnership Properties.

        (j)     The "Sharing Ratio" of a Partner shall be the ratio of the Partner's Units to the total Units outstanding.

        (k)     A "Unit" shall represent a 0.1 percent interest of capital and profits in the Partnership, and the Partnership shall be authorized to issue one thousand (1,000) Units. Each Partner shall be entitled to cast one (1) vote per Unit on all matters in which all Partners are herein given the right to vote.

        (l)     "Permitted Transferee" shall mean the initial Limited Partners named above, all of their lineal descendants, and trusts for the exclusive benefit of any of them.

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    **-4-**

## ARTICLE III
## PURPOSES AND POWERS

Section 3.1    Purposes of the Partnership. The Partnership shall not be deemed to exist for a specific purpose; rather, the purpose of the Partnership is to manage the Partnership Properties by conducting any business which lawfully may be conducted in limited partnership form. Some of the more particular purposes of the Partnership are as follows:

(a)    To operate as a one bank holding company owning a controlling interest in the common stock of the Bank of England, a state chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies;

(b)    To provide flexibility in the management of Partnership Properties not available through the use of trusts, corporations and business entities; and

(c)    To identify the nature of the partners's partnership interests as separate property rather than marital property or community property.

(d)    To avoid the fractionalization of the ownership of certain Partnership Properties of various family members in order to receive a higher price in the event of a sale of any of the Partnership Properties.

Section 3.2    Powers of the Partnership. The specific purposes of the Partnership may, in instances where the Partners deem such action appropriate and to the extent Partnership funds are available therefor, be accomplished by:

(a)    Acquiring and disposing of Partnership Properties for cash, securities, other property, or any combination thereof upon such terms and conditions as the General Partners may from time to time determine (including, in instances where the property is encumbered, on either an assumption or a "subject to" basis);

(b)    Acquiring, owning, holding, improving, managing and leasing properties used in investment operations, and reinvesting the income and proceeds thereof, either alone or in conjunction with others, through partnerships, limited partnerships (or other partnerships in which certain partners have limited liability), joint ventures, or other business associations or entities;

(c)    Investing and reinvesting any of the Partnership Property or income of the Partnership, whether or not the original purpose for the investment has been accomplished, it being understood by the Partners that the investment objectives of the Partnership are to continue until the end of the Partnership Term and until the Partnership is dissolved and its affairs wound up.

(d)    Financing its activities by commercially reasonable methods on such terms and conditions as the General Partners deem appropriate. In instances where money is borrowed for Partnership purposes, the General Partners shall be and hereby are authorized to pledge, mortgage, encumber and grant security interests in Partnership Properties for the repayment of such loans;

(e)      Employing, retaining or otherwise securing, or entering into other contracts with persons or firms to assist in the acquisition, developing, improving, managing, and general operation of the Partnership Properties, all on such terms and for such consideration as the General Partners deem reasonably advisable;

(f)      Depositing Partnership funds in an account or accounts to be established at such time or times in such financial institutions (including any state or federally chartered bank or savings and loan association) and authorizing withdrawals of such funds by such persons at such times, and in such amount, as the General Partners may designate;

(g)      As to those Partnership funds which are not then required for Partnership purposes yet which the General Partners deem untimely to be distributed to the Partners, purchasing U. S. Treasury Bills, certificates of deposit, bonds, other certificates or evidences of indebtedness, stocks, real property, or other investment securities or property as the General Partners reasonably deem appropriate;

(h)      Taking any and all other action which is permitted under the Act and which is customary or reasonably related to the real, personal or mixed property incidental thereto; and

(i)      Taking any other action which is legally permissible.

## ARTICLE IV
## ADMISSION OF LIMITED PARTNERS

Section 4.1      Admission of Limited Partners.  No additional Limited Partners shall be admitted except by affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.  As distinguished from the admission of additional Limited Partners, no assignee of all or part of a Limited Partner's Units shall be substituted as a Limited Partner except under the conditions and restrictions and upon completion of all of the requirements of Article VII of this Agreement.

Section 4.2      Completion of Admission.  Subject to the other terms of this Agreement, a person shall become a Limited Partner when he or she shall have completed all of the following:

(a)      Executed a counterpart of this Agreement; and

(b)      Executed any other document, certificate or instrument, and taken such other action as the General Partners may reasonably request to evidence and perfect such person's admission as a Limited Partner.

## ARTICLE V
## CONTRIBUTIONS OF THE PARTNERS

The Partners shall initially contribute to the Partnership the property described on Exhibit A attached hereto in exchange for all of the outstanding Units. The general partnership interests of each General Partner shall be maintained separately from any limited partnership interests of the General Partners. The number of Units owned by each of the Partners is reflected on Exhibit B attached hereto. The Partners may make additional contributions to the Partnership, provided that the Sharing Ratios of all the General Partners, taken together, shall be equal to at least one percent (1%) at all times during the Partnership Term. No Partner shall be entitled to interest on capital contributions to the Partnership, or to withdraw any part of such Partner's capital account, except as specifically provided herein.

## ARTICLE VI
## RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS

Section 6.1    Rights and Powers of the General Partners as Managers. Each General Partner shall be entitled to cast one (1) vote per Unit of general partnership interest in all matters in which the General Partners are herein given the right to vote as a class or individually as a Partner. A majority vote shall be required to take any action by the General Partners. Subject to the limitations of this Agreement, and to the limitations imposed upon them by law, the General Partners shall have full, exclusive and complete discretion to manage and control, and shall make all decisions affecting, the Partnership business. The General Partners shall have full authority to take any action described by Article III hereof and to exercise all rights and powers generally conferred by law in connection therewith. The rights and powers of the General Partners described in this Section 6.1 shall be in addition to and not in limitation of any other rights and powers of the General Partners described in this Agreement or provided by law.

Section 6.2    Limitations on General Partners' Authority. The General Partners shall not have authority to:

(a)    Do any act in contravention of this Agreement without the written consent of all the Partners.

(b)    Do any act which would make it impossible to carry on the ordinary business of the Partnership, or which may make it impossible to carry on the ordinary business of the Partnership, without the written consent of all the Partners.

(c)    Admit a person as a General Partner, except as provided in this Agreement and the Act.

(d)     Admit a person as a Limited Partner, except as provided in this Agreement and the Act.

(e)     Cause the Partnership to make any loan to any of the General Partners or any of their affiliates without the written consent of the Partners owning a majority-in-interest of the outstanding Partnership Units.

(f)     Commingle the Partnership's funds with those of any other person, except with respect to (1) joint ventures or other joint investments permitted by this Agreement and (2) general disbursement accounts controlled by the General Partners, without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(g)     Knowingly perform any act that would subject any Limited Partner to liability as a general partner in any jurisdiction.

(h)     Sell, assign, exchange, lease, or otherwise dispose of, or mortgage, pledge, or otherwise encumber all or substantially all of the real or personal property of the Partnership without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(i)     Enter into agreements with a General Partner or any affiliate of a General Partner without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(j)     Terminate a contract, agreement, or compensation to a Partner, or an affiliate of a Partner, without the approval of Partners owning a majority-in-interest of the outstanding Partnership Units.

(k)     For purposes of this Section 6.2 the term "affiliate" of a General Partner shall mean any person that directly or indirectly controls, or is controlled by or is under common control with, the General Partner, and shall include the family members of the General Partner and any officer or director of the General Partner and the family members of any such officer or director.

Section 6.3     Limitation on Exercise of Rights Regarding Life Insurance. Any provision of this Agreement to the contrary notwithstanding, if at any time the Partnership possesses any incidents of ownership (as that term is defined under § 2042 of the Code and the Treasury Regulations thereunder) in any policy or policies of life insurance upon the life of any General Partner (the "Insured General Partner"), then the Insured General Partner shall be prohibited and excluded from voting upon or otherwise participating in the exercise of any such rights with respect to any policies of insurance upon the life of that Insured General Partner, including without limitation, the right to borrow from the cash value of the policy and the right to control the application of policy dividends.

Section 6.4     Third Parties. Any Person dealing with the Partnership or the General Partners may rely upon a certificate signed by the General Partners, or any of them, as to the accuracy

of the statements therein or as to the authority of the General Partners to make any commitment or undertaking on behalf of the Partnership, including certificates as to (1) the identity of any General Partner or Limited Partner hereof, (2) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the General Partners or in any other manner are germane to the affairs of the Partnership, (3) the persons who are authorized to execute and deliver any instrument or document of the Partnership, or (4) any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

Section 6.5    Duties of the General Partners. The General Partners shall discharge their duties to the Partners and the Partnership, and shall exercise their powers under the Act and under this Agreement, consistent with the duty of loyalty and the duty of care set forth in A.C.A. §4-46-404 and consistent with the obligation of good faith and fair dealing therein. The General Partners do not guarantee the return of any Partner's capital contributions. Under no circumstances shall the General Partners be personally liable to a Limited Partner for any deficit in a Limited Partner's capital account.

Section 6.6    Obligations not Exclusive. The General Partners shall be responsible for the management of the Partnership's business, it being understood that the General Partners may be fairly compensated for services rendered. The General Partners may delegate such portion of the managerial responsibilities as is reasonably deemed necessary to any other party at the Partnership's expense.

Section 6.7    Power of Attorney. By the execution of this Agreement, or a counterpart hereof, a Limited Partner does irrevocably constitute and appoint the General Partners (or any successor General Partner) his or her true and lawful attorneys-in-fact and agents to effectuate, with full power and authority to act in the name, place and stead in effectuating, the purposes of the Partnership, including the execution, acknowledgment, delivering, filing and recording of all Certificates, documents, deeds, bills of sale, assignments and other instruments of conveyance, leases, contracts, loan documents and/or counterparts hereof, and all other documents which the General Partners may deem necessary or reasonably appropriate:

(a)    To qualify or continue the Partnership as a limited partnership (or a partnership in which certain partners have limited liability) in all jurisdictions in which the Partnership conducts business;

(b)    To reflect a modification of the Partnership, or an amendment of this Agreement and/or the Certificate;

(c)    To accomplish the purposes and carry out the powers of the Partnership as set forth in Article III and in this Article VI; or

(d)    To reflect the dissolution and termination of the Partnership.

The power of attorney granted herein:

(1)     Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, incompetency or legal disability of any Limited Partner;

(2)     May be exercised by the General Partners, or any of them, for each Limited Partner (or any of them) by listing all (or any) of the Limited Partners required to execute any such instrument and executing such instrument in such manner as the General Partners may reasonably deem appropriate; and

(3)     Shall be binding on any assignee or vendee of a Limited Partnership interest hereunder or any portion thereof, including an assignee of only the distributive rights relating thereto.

Section 6.8    Admission of Additional General Partner. The General Partners shall not, without the written consent of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, admit any additional or substitute General Partner to the Partnership.

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be; provided, however, the death, withdrawal, adjudication of bankruptcy, incompetency or removal with respect to one (1) General Partner, but not all General Partners, shall not cause the Partnership to be dissolved. In the event the Partnership is continued, the Agreement of Limited Partnership shall be properly amended and the new General Partner(s) shall succeed to all rights, duties and responsibilities of the General Partners. By affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, a General Partner may be removed for breach of any fiduciary duty and for any breach of this Agreement in any material respect. Furthermore, in the event of a General Partner's death, resignation, removal, or adjudication of bankruptcy or incompetency, then the General Partner shall become a Limited Partner and a successor General Partner may then be appointed pursuant to the terms set forth herein.

Section 6.10    Indemnification of the General Partners. The General Partners shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, arising out of or incidental to the General Partners' management of the Partnership affairs while the General Partners were in the course of managing the Partnership affairs; provided, however, a General Partner shall not be entitled to indemnification hereunder where the claim at issue is based upon:

(a)     The proven gross negligence or willful misconduct of the General Partner; or,

(b)     The proven breach by the General Partner of any provision of this Agreement.

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the General Partners shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 6.11. Limited Liability of the General Partners. The General Partners' liability for the obligations of the Partnership and certain acts of other Partners, employees, agents, or representatives of the Partnership is limited to the extent provided in A.C.A. §§ 4-43-1110 and 4-42-307.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 7.1    Rights of a Limited Partner. Each Limited Partner shall be entitled to cast one (1) vote per Unit of ownership on all matters in which the Limited Partners are herein given the right to vote as a class or individually as a Partner. A Limited Partner shall not be:

(a)    Personally liable for any of the debts or other liabilities of the Partnership (except to the extent expressly set forth in A.C.A. § 4-43-303);

(b)    Personally liable, merely because of his or her interest in the Partnership, for any losses or liabilities of any other Limited Partner;

(c)    Allowed to take part in the management or control of the Partnership business, or to sign for or to bind the Partnership, such power to remain vested solely and exclusively in the General Partners; or

(d)    Entitled to be paid any salary or to have a Partnership drawing account; provided, however, the General Partners have the power to employ one or more Limited Partners at a salary commensurate with services actually rendered to the Partnership.

No Limited Partner shall have the right to withdraw from the Partnership or to receive a return of any of his or her contributions to the Partnership until the Partnership is terminated and its affairs wound up in accordance with § 801, et seq. of the Act and this Agreement. A Limited Partner shall be in breach of this Agreement if the Limited Partner (1) attempts to withdraw from the Partnership, (2) interferes in the management of the Partnership affairs, (3) engages in conduct which could result in the Partnership losing its tax status as a partnership, (4) engages in conduct that tends to bring the Partnership into disrepute, (5) owns Partnership Units which become subject to a charging order, attachment, garnishment, or similar legal proceeding, (6) breaches any confidentiality provisions of this Agreement, (7) fails to meet any legally binding commitment to the Partnership, or (8) otherwise breaches any other term or condition contained herein. A Limited Partner who is in breach of this Agreement shall be liable to the Partnership for damages caused by the breach. The Partnership may offset any such damages against any distributions or return of capital to the Limited

Partner who has breached this Agreement. No Limited Partner shall have the right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise.

Section 7.2    Assignments of Limited Partnership Interests. A Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner (as defined in A.C.A. § 4-43-101(6)) only after all of the following steps have first been completed:

(a)    The written approval of the General Partners and of the Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall have been given to the specific person or entity proposed to be substituted;

(b)    The vendee(s) or assignee(s) to be substituted, the General Partners, and all Limited Partners (either individually or by virtue of the General Partners' powers of attorney set forth in this Agreement) shall have executed an appropriate amendment to all certificates, instruments and documents, and taken all such additional action as the General Partners may deem appropriate to the completion of such sale or assignment; and

(c)    If requested by the General Partners, legal counsel for the Partnership has rendered an opinion that the transfer is not in violation of any provisions of this Agreement or any other representations made by the Limited Partner to the Partnership regarding the Limited Partner's investment intent.

Within thirty (30) days after the completion of the above required steps, the General Partners shall forward documents to the substituted Limited Partner indicating such Partner's participation in the Partnership, on such form as the General Partners may adopt and, from time to time, revise or amend. Any purported sale or assignment consummated without first complying with Section 7.2 shall, as between the General Partners, on the one hand, and the assignor/vendor and assignee/vendee, on the other hand, be null and void.

The foregoing provisions of Section 7.2 to the contrary notwithstanding, a Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner without the consent of the Partners if the transferee is a Permitted Transferee.

Section 7.3    Assignments of Distributive Rights. A Limited Partner may not assign all or any portion (in whole or fractional Units) of his or her right to receive distributions hereunder without the prior written consent of the General Partners and of Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units. In addition, no such assignment shall be effective as to the General Partners until the General Partners have first received a copy of the instrument of assignment, executed by both the assignor and the assignee of such distributive right. Once the assignment has been received by the General Partners, the General Partners may (but shall not be obligated to), without requesting further documentation from either the assignor or the

assignee, remit directly to the named assignee all distributions to which the assignee may be entitled pursuant to the provisions of this Agreement and the assignment. So long as the party to whom such distributive share was remitted was either the assignor Limited Partner or the assignee named in the instrument of assignment, the General Partners shall be free from liability to any person if such distribution is received by a person not entitled thereto.

Section 7.4    Partnership Option to Purchase a Limited Partner's Interest. Notwithstanding any of the foregoing provisions of this Agreement to the contrary, in the event a Limited Partner desires to transfer or sell any part of his or her interest in the Partnership (other than to a Permitted Transferee), the Limited Partner shall first offer to sell such interest to the other Partners. The other Partners who desire to purchase said interest shall have the right for a period of thirty (30) days after written notice of such offer to purchase such Limited Partner's interest in the Partnership at Fair Market Value on a pro rata basis. In addition, the Partnership, by vote of a majority of the General Partners, or failing such vote, each of the other Partners desiring to purchase, on a pro rata basis, shall have the option to purchase, at Fair Market Value, all or part of a Limited Partner's Units in the Partnership upon the occurrence of any of the following events:

(a)    The Limited Partner dies;

(b)    The Limited Partner files for protection under any federal or state bankruptcy laws, makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for such Limited Partner or for substantially all of such Limited Partner's properties or assets, or bankruptcy, reorganization arrangement or similar proceedings are instituted by or against such Limited Partner under federal or state law and the same are not dismissed within forty-five (45) days after filing; or,

(c)    The Limited Partner is divorced and in connection therewith all or any portion of such Limited Partner's Units are to be awarded to such Limited Partner's former spouse (in such event the purchase option shall apply only to those Units which are to be so awarded).

Such option shall be exercisable at any time following the happening of any of the foregoing events and shall expire ninety (90) days following receipt by any General Partner of written notice of the happening of such events. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option. With respect to any exercise of an option under this Section, the purchaser(s) shall have the right to pay for such interest in cash or by delivery of a promissory note in ordinary and customary form, payable with interest at the rate of the lesser of (i) eight percent (8%) per annum, or (ii) the maximum rate allowed by Arkansas law, payable in sixty (60) equal monthly installments of principal and interest. Such promissory note may be prepaid at any time without consent or penalty and shall be secured by the Partnership interest so acquired. The holder of any such promissory note shall have all of the rights and remedies of a secured creditor under the Arkansas Uniform Commercial Code. If the Partnership and the Partners do not fully exercise their option, and any portion of such Limited

Partner's Units are assigned to a beneficiary, a creditor, or a spouse, then the assignee shall have the right only as an assignee to receive distributions to which such Partnership interest is entitled to receive hereunder, subject to the terms and conditions contained herein, and such assignee shall only become a Limited Partner upon the satisfaction of the conditions set forth in Section 7.2 of this Agreement.

The foregoing provisions of Section 7.4 to the contrary notwithstanding, a deceased Limited Partner, or such deceased Limited Partner's personal representative, may transfer to one or more Permitted Transferees, by legacy, devise, bequest, or other testamentary transfer, without consideration, all or part of his or her interest in the Partnership and thereby constitute his or her transferee a Limited Partner without the consent of the General Partners or of the Partners.

Section 7.5    Limited Partner's Status Upon Death or Incompetency. If a court of competent jurisdiction adjudges a Limited Partner to be incompetent to manage his or her person or his or her property, then in accordance with § 705 of the Act and this Agreement, the guardian, conservator, or other legal representative may exercise all the incompetent Limited Partner's rights for the purpose of administering his or her property, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement. If a Limited Partner dies and the Partnership and Partners do not fully exercise any option arising under Section 7.4 of this Agreement to purchase all of the deceased Limited Partner's Units, then in accordance with § 705 of the Act and this Agreement, the executor, administrator, or other legal representative may exercise all the deceased Limited Partner's rights for the purpose of settling his or her estate, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement.

Section 7.6    Limited Put Option of Certain Permitted Transferees. In the case of a transfer during the lifetime of a Partner, for less than full and adequate consideration, of a Unit or Units, or portion thereof (that portion of such transfer for less than full and adequate consideration shall be a "Donative Transfer" and the Partner making such a transfer shall be the "Transferor"), to a Permitted Transferee (the "Donee"), for a period of sixty (60) days after the date of the Donative Transfer, the Donee shall have the right to require the Partnership to purchase from the Donee that number of whole Units which has a Fair Market Value closest to the Option Amount (defined below) as follows:

(a)    The Donee desiring to exercise this put option shall provide written notice thereof to the General Partners within sixty (60) days of the date of the Donative Transfer.

(b)    Upon exercise of any such option, the Partnership shall purchase the Units subject to the option for a price equal to their Fair Market Value, and the payment of the purchase

price shall be made in cash or in kind, as determined by the General Partners, provided that any Partnership Properties distributed to the Donee in payment of the purchase price shall be valued at Fair Market Value for the purposes hereof. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option.

(c)     The "Option Amount" shall be equal to the lesser of: (1) the Fair Market Value of the Donative Transfer; or (2) the total amount allowable with respect to such Donative Transfer to the Donee as an annual exclusion for federal gift tax purposes under §2503(b) of the Code, taking into account the annual exclusion available to the Transferor and the Transferor's spouse, if any, at the time of the Donative Transfer; provided, however, if the Transferor's spouse made no independent transfer to such Donee on the same date as the Donative Transfer, then such annual exclusion of the Transferor's spouse shall not be taken into account unless the Transferor's spouse consents thereto by a signed written statement at the time of the Donative Transfer.

(d)     To be consistent with the hypothetical willing buyer-willing seller standard, Fair Market Value shall be determined without regard to this limited put option.

## ARTICLE VIII
## COMPENSATION OF THE GENERAL PARTNERS

Section 8.1     Compensation. With the approval of Partners owning a majority-in-interest of the Partnership Units, the General Partners may receive reasonable compensation for serving as the General Partners and for managing the Partnership Properties.

Section 8.2     Expenses. Any costs and expenses incurred by the General Partners for the Partnership's benefit shall be billed directly to the Partnership, and the General Partners shall be entitled to be paid, as reimbursement, for all costs and expenses billed to and paid by the General Partners.

## ARTICLE IX
## DISTRIBUTIONS AND
## ALLOCATIONS OF INCOME AND LOSS

Section 9.1     Distributions of Distributable Cash. From time to time during each fiscal year the General Partners may distribute all or any part of the Distributable Cash, and the General Partners shall distribute all remaining Distributable Cash not later than April 15 following the end of each fiscal year. All such distributions shall be made in accordance with this Agreement and the Sharing Ratios of the Partners.

Section 9.2     Allocation of Certain Income and Losses for Tax Purposes. For federal

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -15-

income tax purposes, the net income and net losses of the Partnership for any taxable year (or portion thereof) shall be allocated (subject to the requirements of § 704(c) of the Code) to the Partners in proportion to their Sharing Ratios.

Section 9.3    Allocations Upon Liquidation. For federal income tax purposes, income (including gain) or loss of the Partnership resulting from the sale or disposition of all or substantially all of the Partnership Properties, or the dissolution of the Partnership pursuant to Article X without an election to continue the Partnership in accordance with Section 10.1, shall be allocated to the Partners in proportion to their Sharing Ratios.

## ARTICLE X
## DISSOLUTION AND PRIORITY ON DISTRIBUTION

Section 10.1    Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:

(a)    Upon the expiration of the term set forth in Section 1.5 hereinabove;

(b)    Upon a unanimous vote of all the Partners;

(c)    Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units;

(d)    Within a reasonable period of time after the sale, condemnation, foreclosure or other similar disposition of all or substantially all of the Partnership Properties; provided, however, the Partnership may be continued by any or all of the Partners wishing to reinvest the sales proceeds; or

(e)    Upon the occurrence of any other circumstances which, by law, would require the Partnership to be dissolved.

The death, legal disability, or dissolution of any Limited Partner shall not result in the dissolution of the Partnership. Upon the death or legal disability of a Limited Partner, the legal representative of such Limited Partner or of his or her estate shall have the status described in Section 7.5 of this Agreement and the rights and liabilities as set forth in the Act.

Section 10.2    Liquidation and Priorities on Distribution. Upon the occurrence of any event which causes the dissolution of the Partnership, as set forth in Section 10.1 hereinabove, the General Partners or, if there is no General Partner, such person as may be designated by the Partners owning a majority-in-interest of the outstanding Partnership Units to act as liquidating trustee (the "Trustee")

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                -16-

shall immediately proceed to terminate the business of the Partnership. The General Partners or Trustee shall first determine the Fair Market Value of each Partnership Property (except cash) and then attempt to sell such portion (or all) of the Partnership Properties (except cash) at such prices and on such terms as the General Partners or Trustee, in the exercise of the General Partners' or Trustee's best business judgment under the circumstances then presented, deems to be necessary to provide for the liquidation priorities described below and to be in the best interests of all the Partners. The proceeds of any such sale, all Partnership cash, and undivided interests in Partnership Properties, shall be distributed in the following manner:

(a)     To creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of debts and liabilities of the Partnership, other than liabilities for distributions to Partners under A.C.A. § 4-43-601 or § 4-43-604;

(b)     To the creation of any reserves which the General Partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partners, arising out of or in connection with the Partnership;

(c)     To Partners and former Partners in satisfaction of liabilities for distributions under A.C.A. § 4-43-601 or § 4-43-604;

(d)     To Partners for the return of their capital account balances; and

(e)     The remainder, if any, shall be distributed to the Partners in accordance with their Sharing Ratios.

## ARTICLE XI
## ACCOUNTING AND BUSINESS MATTERS

Section 11.1   Books of Accounts and Records. The Partnership's books and records, this Agreement and any other records required by law to be maintained by the Partnership shall be maintained at the principal office of the Partnership. The books and records shall reflect all transactions and be appropriate and adequate for the business of the Partnership. Each Partner shall have access to and the right to copy at his or her own expense the Partnership's books and records at all reasonable times.

Section 11.2   Accounting Method. The Partnership books shall be kept on an accounting basis determined by the General Partners in accordance with usual and customary accounting practices.

Section 11.3   Financial Statements and Reports. Upon request by any Limited Partner, the General Partners shall cause the Partnership to provide the following reports and financial statements to the Partners:

(a)     Annual Report. Within one hundred twenty (120) days after the end of each

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -17-

fiscal year, the Partnership shall provide to the Partners (1) financial statements prepared by an independent certified public accountant, including a balance sheet as of the end of such fiscal year, together with statements of income, Partners' equity, changes in financial position and funds from operations for such year; the balance sheet and such statements (other than the funds from operations statement) shall be prepared in accordance with generally accepted accounting principles and shall be accompanied by a report of the activities of the Partnership for such year; and (2) a report on distributions to the Limited Partners for such period.

(b)    Tax Information. No later than March 15 of each year, the Partnership shall provide to each Partner all information relating to the Partnership necessary for the preparation of the Partners' federal income tax returns.

(c)    Other Federal and State Reporting Requirements. The General Partners shall cause to be delivered to the Limited Partners all other reports and information as may be required by law to be delivered to such Limited Partners.

Section 11.4    Fiscal Year. The fiscal year of the Limited Partnership shall be the calendar year.

Section 11.5    Bank Accounts. Except as may be otherwise specifically provided herein, all funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partners. Such account or accounts shall be in the name of the Partnership. All withdrawals therefrom shall be made upon checks signed by the General Partners, or any person authorized to do so by the General Partners.

## ARTICLE XII
## ELECTIONS

Section 12.1    Adjustment Election. In the event of the transfer of a Partner's Units or upon the death of any individual Partner, or in the event of the distribution of Partnership Property to any person, the General Partners, in their sole discretion, may, but shall not be obligated to, file an election as provided by Code § 754 and the Treasury regulations thereunder, to cause the Partner's basis in the Partnership Property to be adjusted for federal income tax purposes as provided by Code Sections 734 and 743. Any cost incurred in making such elections shall be charged to the Partner or Partners benefitting therefrom.

Section 12.2    Depreciation Elections. With respect to all depreciable assets of the Partnership, the General Partners may elect to use, to the extent allowed by the Code, accelerated depreciation methods; however, the General Partners may change or elect some other method which is, in their opinion, most advantageous to the Partners.

Section 12.3    Election with Respect to Taxation as Partnership. No election shall be made

by the Partnership, the General Partners or any Limited Partner to exclude the Partnership from the application of any of the provisions of Subchapter K, chapter 1 of subtitle A of the Code, or from any similar provisions of any state tax laws. The foregoing shall not prohibit such an election by the Partnership and any person other than in the capacity of a Partner hereunder.

Section 12.4    Other Elections. In addition to the elections stated in this Article XII, the General Partners shall make all other elections which in their reasonable sole discretion are necessary for the proper operation and accounting of the Partnership.

<div align="center">

**ARTICLE XIII**
**AMENDMENTS**

</div>

Subject to the provisions of the laws of the State of Arkansas, amendments to this Agreement which do not substantially affect the rights of the Limited Partners, or which are required or contemplated by this Agreement, may be made by the General Partners through use of the powers of attorney herein and hereby granted. Any other amendment must be agreed to in writing by all of the Partners.

<div align="center">

**ARTICLE XIV**
**MISCELLANEOUS**

</div>

Section 14.1    Notices. All notices under this Agreement shall be in writing and shall be given to the Partners at each Partner's last known address and to the Partnership at its principal office or at such other address as any of the parties may hereafter specify in the same manner.

Section 14.2    Further Acts. Each Partner hereby agrees to execute and deliver to the General Partners, within fifteen (15) days after receipt of the General Partners' written request therefor, such other and further statements of interest and holdings, designations, powers of attorney or other instruments as the General Partners reasonably deem necessary.

Section 14.3    Paragraph Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provisions hereof.

Section 14.4    Severability. Every portion of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 14.5    Application of Arkansas Law. This Agreement, and the application or interpretation thereof, shall be governed by its terms and by the laws of the state of Arkansas.

Section 14.6    Survival of Rights. This Agreement and all of the terms, provisions, and

agreements herein contained shall be binding upon and inure to the benefit of the Partners and their respective legal representatives, heirs, successors and assigns.

Section 14.7    Interpretation. As used herein, the masculine includes the feminine and the neuter and the singular includes the plural, as the context may require.

Section 14.8    Execution in Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had all signed the same document. All counterparts shall be construed together and shall constitute one (1) agreement.

Section 14.9    Waiver of Action for Partition. Each of the parties irrevocably waives during the term of the Partnership any right that he or she may have to maintain any action for partition with respect to the Partnership Properties.

Section 14.10    Tax Matters Partner. Pursuant to Code § 6231, the Partners hereby designate MARY HANNA BOLES CANADA as the tax matters partner ("TMP") for the Partnership. The TMP shall have all of the power and responsibilities imposed by the Code. Notwithstanding the designation, the Partners may participate in any inquiry by the Internal Revenue Service to the extent not inconsistent with this provision or the provisions contained in the Code relating to treatment of Partnership items at the Partnership level, at the Partner's sole expense.

Section 14.11    Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

Section 14.12    Arbitration. Any dispute or controversy arising out of or relating to this Agreement or any document or instrument delivered in connection with this Agreement shall be settled by arbitration to be held in England, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the parties irrevocably consent to the jurisdiction of the state courts of Arkansas for this purpose. The losing party in such arbitration shall pay all the costs and expenses of such arbitration and all the reasonable attorneys' fees and expenses of the other party thereto.

Section 14.13    Confidentiality. Each of the Partners, and any other person who shall become a Partner, agrees to keep confidential all information pertaining to the Partnership, its business, its management, and the arbitration of any dispute among the Partners, and agrees to refrain from disclosing such information to anyone who is not a Partner or a Partner's attorney or agent.

IN WITNESS WHEREOF, this Amended and Restated Agreement of Limited Partnership has been duly executed by the parties effective on the ___1___ day of ___April___, 2004.

**GENERAL PARTNERS:**

_Mary Hanna Boles Canada_
MARY HANNA BOLES CANADA

**LIMITED PARTNERS:**

_Mary Hanna Boles Canada_
MARY HANNA BOLES CANADA

_Gary Canada_
GARY RECTOR CANADA

GARY RECTOR CANADA, JR. TRUST I

BY: _Gary Canada_
GARY RECTOR CANADA, JR., Trustee

BRADLEY SETH CANADA TRUST I

BY: _Bradley Seth Canada_
BRADLEY SETH CANADA, Trustee

HANNA NICOLE CANADA STEWART TRUST I

BY: _Hanna Nicole Canada_
HANNA NICOLE CANADA, Trustee

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -21-

**EXHIBIT A**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**PARTNERSHIP PROPERTY**

**[insert description]**

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd

**EXHIBIT B**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**OWNERSHIP OF PARTNERSHIP UNITS**

| GENERAL PARTNERS: | UNITS: |
|---|---|
| Mary Hanna Boles Canada | 10 |

| LIMITED PARTNERS: | |
|---|---|
| Mary Hanna Boles Canada | 409 |
| Gary Rector Canada | 419 |
| Gary Rector Canada, Jr. Trust I | 54 |
| Bradley Seth Canada Trust I | 54 |
| Hanna Nicole Canada Stewart Trust I | 54 |

| TOTAL: | 1,000 |
|---|---|

<u>SHAREHOLDERS AGREEMENT</u>

*<u>Canada Bancshares, Inc.</u>*

> **EXHIBIT**
>
> **2**

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is executed effective as of the date set forth below (the "Effective Date"), by and among Canada Bancshares, Inc., an Arkansas corporation (the "Corporation"), and the undersigned Shareholders of the Corporation (all hereinafter collectively referred to as the "Shareholders" and individually as the "Shareholder").

<u>RECITALS</u>:

WHEREAS, the Shareholders and the Corporation desire to promote their mutual interests by imposing certain restrictions and obligations upon the shares of capital stock of the Corporation in order to preserve and maintain a continuity of shareholder relationships and in order to promote sound and harmonious management of the Corporation; and

WHEREAS, it is the intention of the parties to place such restrictions on the sale, transfer, pledge, encumbrance or other disposition of all shares of the capital stock of the Corporation.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.      <u>REGULATORY REQUIREMENTS</u>.  Notwithstanding any other provision herein, no transfer pursuant to Section 2 or Section 3, below, no pledge pursuant to Section 4, below, nor any other Disposition (as defined below) of shares of capital stock of the Corporation including, without limitation, any Disposition involving a redemption of shares, shall occur except in compliance with all applicable legal and regulatory requirements.  This shall include, without limitation, (a) the submission of all required applications and notices to the Board of Governors of the Federal Reserve, the Arkansas State Bank Department and any other applicable governmental entity (collectively, the "Governmental Entity(ies)"), (b) all required approvals from applicable Governmental Entities having been obtained in such form as is satisfactory to the Board of Directors of the Corporation in its sole discretion, and (c) any Disposition being completed in compliance with the requirements of all applicable approvals granted by the Governmental Entities. The terms of any Disposition shall comply with the requirements of all applicable approvals given by the Governmental Entities. All time periods relating to any exercise and/or closing of any purchase option hereunder shall be extended as necessary to accommodate the requirements of this Section 1.

2.      <u>FAMILY TRANSFERS</u>.  Any Shareholder may transfer all or part of the Shareholder's shares of capital stock in the Corporation by sale or gift (including by testamentary transfer upon death) to one or more trusts established for the benefit of such Shareholder, his/her spouse and/or lineal descendants (collectively, "Family Member(s)"), and/or to an entity wholly-owned by such persons (referred to as a "Family Entity"), (collectively referred to as a "Family

1

5203889.4

Transferee"). In such cases, the transferee shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors, in its sole discretion.

3.   TRANSFERS BY ENTITY SHAREHOLDERS.  Any Shareholder that is a corporation, partnership or limited liability company (collectively, an "Entity") may, upon notice to the Corporation, transfer all or part of the Entity's shares of capital stock in the Corporation to (i) the shareholders, partners or members, respectively, of that Entity, or (ii) any other corporation, partnership or limited liability company wholly-owned by that Entity.  In such cases, the transferee(s) shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the other terms of this Agreement.  No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors.

4.   PLEDGE OR OTHER ENCUMBRANCE.   No Shareholder shall pledge, encumber, grant a security interest in, or otherwise cause or permit any lien to be placed upon all or any part of the shares of capital stock of the Corporation owned by such Shareholder, without first providing written notice thereof to the Corporation; and provided further, as a condition thereto, the Shareholder shall require the lender, secured party, or other lienholder to execute an estoppel agreement (as approved by the Board of Directors) for the benefit of the Corporation and the other Shareholders which provides that any foreclosure, sale, transfer, or other disposition of the stock so pledged or encumbered shall be subject to the terms and conditions of this Agreement.

5.   RESTRICTIONS ON TRANSFER.

(a)   Except as provided in Sections 2, 3 and 4, no Shareholder shall sell, contract to sell, convey, hypothecate, assign, pledge, encumber, or otherwise transfer (collectively, a "Disposition") any or all of its shares of capital stock of the Corporation, now owned or hereinafter acquired, or any interest or right therein, without the prior written consent of all the other Shareholders, or in the absence of said written consent, without first providing the Corporation and each of the other Shareholders the right of first refusal option to purchase such stock as provided herein.

(b)   Except as otherwise provided in Sections 2, 3, and 4, a Shareholder proposing a Disposition (the "Transferor") shall provide written notice of the intended Disposition to the Corporation's Board of Directors (the "Disposition Notice"). The Disposition Notice shall set forth all of the terms of the proposed Disposition, including price and payment terms for any sale, the name and address of the proposed transferee, the number of shares involved in the proposed Disposition, and the date on which the transaction is to occur, which date shall not be less than thirty (30) days from the date on which said notice is given.

2

5203889.4

(c)    For a period of fifteen (15) days after the date on which the Disposition Notice is given, the Corporation shall have the right of first refusal option to purchase the stock of the Transferor identified in the notice, which option shall lapse and expire if not exercised in writing within said 15-day period by majority vote of the Board of Directors of the Corporation (without participation by the Transferor). The Corporation's option to purchase may be exercised in whole or in part. In the event said option is exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(d)    In the event that all of the shares of the Transferor subject to the foregoing option are not redeemed and purchased by the Corporation as provided above, then (i) the Corporation shall delivery a copy of the Disposition Notice to each Shareholder, and (ii) the shares not so purchased and redeemed by the Corporation shall become subject to a second option on the part of each of the other Shareholders to purchase a "proportionate share" of such stock, which option shall lapse and expire if not exercised in writing by notice to the Transferor within thirty (30) days after the date on which the Disposition Notice is mailed to each Shareholder by the Corporation. The Shareholders' option may also be exercised in whole or in part. In the event any or all of said options are exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(e)    The term "proportionate share" shall mean the ratio expressed as a percentage of (i) the number of shares of the Corporation's capital stock owned by the Shareholder to (ii) the total number of shares of capital stock of the Corporation owned by all Shareholders other than the Transferor. In addition, if any stock of the Corporation offered for sale is not purchased by the Shareholder first entitled thereto, the term "proportionate share" shall include that portion of the stock of the Corporation not purchased by the Shareholder first entitled thereto which the number of shares of capital stock of the Corporation owned by a Shareholder bears to the total number of shares of capital stock of the Corporation owned by Shareholders electing to exercise this option to purchase the Transferor's stock.

(f)    In the event the Corporation and the other Shareholders do not exercise their respective options as hereinbefore provided, the Transferor may make a bona fide Disposition to the prospective purchaser, or other transferee, of any remaining stock not so purchased by the Corporation or other Shareholders. The Disposition shall be made only to the transferee identified in the Disposition Notice and shall be made only in strict accordance with the terms stated in such notice. However, if the Transferor shall fail to make such Disposition within one hundred twenty (120) days following the date on which the Disposition Notice is given, such shares shall again become subject to all of the restrictions contained in this agreement. Any purchaser or other transferee acquiring the offered shares shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, and deliver a counterpart of this Agreement as a condition to the issuance of a stock certificate in such person's name.

(g)    During any period in which the Corporation is a "small business corporation," as defined in sections 1361(a) and (b) of the Internal Revenue Code of 1986, as

3

amended (the "Code") (referred to herein as an "S Corporation") then, in the case of shares held by a trust, any change in the status or circumstances of the trust or its beneficiaries that either (i) causes or will reasonably be expected to cause the trust to cease to be a trust that is permitted to hold shares in an S Corporation, or (ii) results in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any trustee or beneficiary of the trust in question, if such person is also serving as a director).

(h)     With respect to any Family Entity that was a transferee under Section 2, any event resulting in that Family Entity having any owner, officer or director (or any similar positions) that is not a Family Member of the original transferor, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any person affiliated with the Family Entity in question, if such person is also serving as a director).

(i)     Notwithstanding any other provision herein, unless first approved by the Board of Directors in writing, in its sole exercise of discretion, no Shareholder shall complete a Disposition of any shares of the Corporation's capital stock to any of the following (each referred to as a "Competitor"): (1) any other state or federally chartered financial institution or financial institution holding company, (2) any individual(s) or entities that in the aggregate own ten percent (10.00%) or more of any other state or federally chartered financial institution or financial institution holding company, or (3) any other individual or entity that the Board of Directors of the Corporation has, in its sole discretion, designated as a "Competitor" for purposes of this Section 5(i).

(j)     In the event the options specified herein are exercised, the purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

(k)     For all purposes of this Section 5, the date on which the Disposition Notice is given shall be the date such notice is deemed made pursuant to Section 24(d).

6.     DIVORCE. If an individual Shareholder shall become a party to a divorce proceeding and pursuant to the final decree in that proceeding all or any portion of the Shareholder's stock in the Corporation is awarded to the Shareholder's former spouse (who is not also then a shareholder), the stock so awarded shall immediately become subject to an option to purchase on the part of the Corporation first, and the other Shareholders second for a period of ninety (90) days after written notice of such award as provided to the Corporation and each of the other Shareholders, in the manner provided in Section 5 as in the case of a proposed Disposition except that for purposes of Section 5, the date on which the notice is made to the Corporation and the other Shareholders of the final divorce decree shall be deemed the date of the Disposition Notice. If all of the shares of stock so awarded are not purchased by the Corporation, the Shareholders (other than the divorced Shareholder and his or her spouse) shall

4

5203889.4

have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

7.    BANKRUPTCY OR INSOLVENCY.  If any Shareholder makes an assignment for the benefit of creditors, or if any petition shall be filed in any federal or state court alleging that a Shareholder is insolvent, or requesting the appointment of a receiver for all or substantially all of a Shareholder's property, or if any petition in bankruptcy is filed by or against a Shareholder in a court of competent jurisdiction and if such petition or petitions are not dismissed within ninety (90) days from the date of filing, all of such Shareholder's shares of stock in the Corporation (including any shares transferred pursuant to Section 2) shall immediately become subject to an option to purchase such stock in favor of the Corporation first and the other Shareholders second, for a period of one hundred twenty (120) days after written notice of such event.  If all of the shares of stock in the Corporation owned by such Shareholder are not purchased by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and term of payment shall be determined pursuant to Sections 10 and 11.

8.    DEATH.  Subject to a Shareholder's ability to transfer shares of stock to a Family Transferee at such Shareholder's death as provided in Section 2, upon the death of an individual Shareholder (the "Decedent") all of the shares of stock in the Corporation owned by the Decedent (including shares transferred pursuant to Section 2) or to which the Decedent or his or her personal representative shall be entitled, shall become subject to an option to purchase on the part of the Corporation, first and the other Shareholders, second for a period of one hundred twenty (120) days following the date of the Decedent's death.  If all of the Decedent's shares of stock in the Corporation are not purchased and redeemed by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)).  The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11. Notwithstanding the provisions of Section 11 to the contrary, if the Corporation shall receive any proceeds from any policy of insurance on the life of the Decedent, such proceeds shall be paid by the Corporation to the Decedent's personal representative to the extent of the purchase price of the Decedent's stock, and such payment shall be deemed to have been made on account of such purchase price.  The balance of the purchase price remaining after credit for such insurance proceeds shall be paid pursuant to Section 11.

9.    S CORPORATION PURCHASE OPTION.

(a)    In the event that the holders of a majority of the outstanding shares of capital stock of the Corporation provide written notice to the Board of Directors of the Corporation that they desire to cause the Corporation to make an election to be treated as an S Corporation (defined herein) for federal and state income tax purposes (the "Election Notice"), then the Board shall take the following actions:

(i)    the Board shall promptly provide the Election Notice to each Shareholder;

(ii)    the communication containing the Election Notice shall inform

5

5203889.4

each Shareholder that it has a period of not less than 45-days as established by the Board (the "Notice Period") in which to:

(A)    deliver to the Corporation a signed consent (in a form approved by the Board) to the S Corporation election pursuant to which such Shareholder consents to the Corporation making an S Corporation election, along with such other documents as the Board may require; and

(B)    if applicable, with respect to any Shareholder that is not eligible to own shares of stock in an S Corporation, to take such actions as may be necessary to cause the Shareholder to become eligible (including any Disposition of shares permitted by and completed in accordance with Section 2 and/or Section 3 herein).

(b)    Any Disposition of shares proposed by a Shareholder in order for the Shareholder (or its transferee(s)) to be an eligible S Corporation shareholder shall (i) be subject to the review and approval of the Board of Directors of the Corporation, and (ii) if approved by the Board, be subject only to those restrictions and requirements imposed by the Board and permitted to occur without any requirement of compliance with the provisions of Section 5, if applicable.

(c)    In the event a Shareholder fails to provide the consent (and other required documentation) described in Section 9(a)(ii)(A), above, within the Notice Period, or is otherwise not an eligible S Corporation shareholder as of the expiration of the Notice Period (as determined by the Board), then, without any additional action, all of such Shareholder's shares of stock in the Corporation shall be subject to a purchase option in favor of the Corporation to repurchase and redeem such shares. The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

10.    PURCHASE PRICE. The purchase price for each share of stock purchased pursuant to this Agreement shall be equal to the purchase price contained in any bona fide offer to purchase such shares which the Transferor proposes to accept (in the case of any proposed Disposition by sale or exchange), or in the absence of such bona fide offer or in situations other than proposed Dispositions involving a sale or exchange, the purchase price for such stock shall equal the Book Value of such shares of stock. "Book Value", as used in this Agreement, shall be the net book value of the Corporation as of the end of the month preceding the date of occurrence of the event giving rise to any right to purchase shares hereunder, computed in accordance with generally accepted accounting principles applied in a consistent manner with prior periods, by a Certified Public Accountant selected by the Board of Directors. The determination by such accountant shall, for purposes of this Agreement, be final, conclusive and binding upon each of the parties hereto. The purchase price per share shall equal the Book Value divided by the number of shares of capital stock outstanding.

11.    PAYMENT OF PURCHASE PRICE. The purchase price for any shares of stock purchased pursuant to this Agreement, in situations involving proposed dispositions by sale or exchange, shall be paid upon the same terms and conditions (including, as near as possible, security terms) as contained in the bona fide offer to purchase such shares received by the

6

5203889.4

Transferor; or in the absence of any such bona fide offer, or in situations other than proposed Dispositions involving a sale or exchange, the purchase price shall be paid in sixty (60) equal monthly installments of principal and interest at a rate equal to the lesser of (1) the prime rate at Bank of England, in England, Arkansas, or its successor, on the date of the closing, or (2) 5.00% per annum (provided that any purchaser may elect to pay the purchase price in cash at any time). The first such payment shall be due and payable thirty (30) days from the closing date of such sale and purchase. Such obligation shall be represented by a promissory note in customary form as approved by the Board of Directors.

12.    CORPORATE GOVERNANCE MATTERS.    Neither the Board, nor any Shareholder, officer or agent of the Corporation, shall take or permit to be taken any of the following actions by or on behalf of the Corporation, without the prior written authorization of MHBC Investments Limited Partnership I, LLLP (or its successor), in each case:

(a)    the amendment, modification, or restatement of this Agreement, the Corporation's Articles of Incorporation or Bylaws;

(b)    the amendment, modification, or restatement of the charter, bylaws or other governing documents of any entity in which the Corporation owns an interest, or any entity owned by any entity in which the Corporation owns an interest, (each, referred to as a "Subsidiary") including, without limitation, Bank of England (the "Bank"), or any successor thereof;

(c)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect the election or appointment of any person to, and/or removal of any person from, the Board of Directors (or similar position) of the Bank or any other Subsidiary;

(d)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect (i) any merger, consolidation or similar transaction involving a Subsidiary, (ii) the sale of all or substantially all of a Subsidiary's assets, (iii) the liquidation or dissolution of a Subsidiary (or entering into any license, pledge, encumbrance or other transaction with similar economic effect), or (iv) the liquidation, dissolution or other termination of the existence and/or business of any Subsidiary;

(e)    causing a reclassification, reorganization, or recapitalization of any shares of the outstanding capital stock (or other equity interests) of any Subsidiary.

5203889.4

13.   SECURITY FOR PAYMENT OF THE PURCHASE PRICE.  Whenever the Corporation redeems, or remaining Shareholders purchase, stock pursuant to this Agreement, and the purchase price is to be paid in installments, the shares of stock so purchased or redeemed shall be pledged to the selling Shareholder as security for the payment of the purchase price and all certificates representing such stock shall be delivered to the selling Shareholder, or his or her personal representative, as the case may be, to hold as such security.  The selling Shareholder and/or his or her personal representative, as the case may be, shall have all the rights and remedies of a secured creditor under the Uniform Commercial Code as adopted under the laws of the State of Arkansas.

14.   INSUFFICIENT SURPLUS.   If the Corporation elects to purchase a Shareholder's stock but does not have sufficient surplus to permit it to lawfully purchase all of the shares of stock to be purchased, the Shareholders shall promptly take such measures to vote their respective shares to reduce the capital of the Corporation or to take such other and further steps as may be appropriate or necessary (excluding making additional capital contributions) in order to enable the Corporation to lawfully purchase all of the shares of stock to be purchased, including without limitation, an up-to-date appraisal of the assets of the Corporation, or a recapitalization of the Corporation so as to reduce its stated capital and increase its surplus.

15.   ADDITIONAL ACTION.  Whenever the Corporation or other Shareholders shall, pursuant to this Agreement, redeem or purchase shares of the Corporation's stock from the Transferor, the Transferor shall do all things necessary to execute, deliver, and endorse all papers and certificates as may be required to consummate said purchase and transfer of stock.

16.   RESTRICTIVE LEGEND.  Each certificate representing shares of stock in the Corporation shall be stamped or otherwise imprinted with the following restrictive legend:

RESTRICTIVE LEGEND FOR COMMON STOCK
OF CANADA BANCSHARES, INC.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE ARKANSAS SECURITIES ACT, AS AMENDED.  THE SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF REGISTRATION OR THE AVAILABILITY OF EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND THE ARKANSAS SECURITIES ACT.  NO RESALE, PLEDGE, HYPOTHECATION, OR OTHER TRANSFER OR DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL OCCUR EXCEPT IN COMPLIANCE WITH THE PROVISIONS OF A SHAREHOLDERS AGREEMENT BY AND AMONG THE CORPORATION AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION.  AT ANY TIME DURING WHICH THE CORPORATION IS AN ELECTING SMALL BUSINESS CORPORATION UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS CERTIFICATE SHALL NOT BE

8

TRANSFERABLE IF SUCH TRANSFER WOULD CAUSE REVOCATION OF THE CORPORATION'S "S" CORPORATION ELECTION. ANY TRANSFER CONTRARY TO THE ABOVE INSTRUCTIONS IS VOID.

17. **ADDITIONAL STOCK OR SECURITIES; TRANSFEREE TO BE MADE A PARTY**. Before any additional shares of stock or any other securities convertible into stock of the Corporation are issued in the future to shareholder or other security holder (other than a signatory to this Agreement), such person or entity shall be required to become a party to and execute and deliver a counterpart of this Agreement prior to the issuance of such shares or other securities and the certificates therefor shall be legended as provided in Section 16. Further, whenever any Shareholder acquires any additional shares of stock of the Corporation or any other securities of the Corporation convertible into stock other than the shares of stock owned at the time of the execution of this Agreement, such shares of stock or such other securities so acquired shall be subject to all of the terms of this Agreement, and the certificates therefor shall be stamped with the legend described in Section 16. In addition, each Disposition (of any type) to any transferee is hereby expressly conditioned upon such transferee first being made a party to and bound by the terms of this Agreement.

18. **TERMINATION**. This Agreement shall terminate and all rights and obligations of the parties hereto shall cease (i) upon the written agreement of all Shareholders, (ii) upon the voluntary dissolution of the Corporation, or (iii) in the event there shall be only one (1) owner of the issued and outstanding shares of common stock of the Corporation.

19. **PRESERVING "S CORPORATION" STATUS**. Notwithstanding anything herein to the contrary, at any time during which the Corporation is an S Corporation, (i) no shares of stock of the Corporation shall be transferable to any transferee if such transfer would cause a revocation of the Corporation's S Corporation status, and (ii) unless approved by the Board of Directors in writing, no shares of stock of the Corporation shall be transferable if the proposed transfer would result in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on the number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code. Any purported Disposition in violation of this Agreement shall be null and void and the purported transferee shall have no interest in any of the shares of stock of the Corporation purported to be transferred.

20. **SHAREHOLDERS' REPRESENTATIONS AND WARRANTIES**. Each of the Shareholders represent and warrant that (i) it is the sole owner of the number of shares of common stock set forth opposite its signature hereto, (ii) except as approved in writing by the Corporation, that all of such shares are free and clear of all liens, claims, charges, security interests, or encumbrances of any kind, and (iii) that it has the right and lawful authority to enter into this Agreement.

21. **DRAG-ALONG SALE**.

(a) If the holder(s) of a majority of the outstanding shares of capital stock of the Corporation (collectively, the "Drag Initiating Shareholder(s)"), acting individually or together, receive a bona fide offer, or otherwise agree, to make a transfer, sale or disposition of

9

5203889.4

all of their shares of stock in the Corporation in a single transaction or series of related transactions (a "Drag Along Sale"), then the Drag Initiating Shareholders shall have the right to require that each other Shareholder of the Corporation sell all of its shares of stock in the Corporation in the same transaction. In the event a conflict shall exist between a Drag Along Sale and any other option or purchase right in this Agreement, the provisions of this Section 20 shall control.

(b)     Not less than 30-days prior to the proposed closing date of the Drag Along Sale, the Drag Initiating Shareholders shall provide to each Director and each Shareholder (i) a written notice identifying the proposed transferee, the consideration to be paid, and all other material terms and conditions of a Drag Along Sale (the "Drag Along Notice"), and a copy of the written agreements and documents pursuant to which a Drag Along Sale will be conducted and closed (the "Drag Along Agreement"). Each other Shareholder shall be required to participate in the Drag Along Sale on the terms and conditions set forth in the Drag Along Notice and in accordance with the Drag Along Agreement. Within 15-days following the date the Drag Along Notice is given (the "Drag Along Notice Period"), each Shareholder of the Corporation shall execute and deliver in escrow to the Chairman of the Corporation all documents reasonably required to be executed in connection with the closing of such Drag Along Sale. The Chairman shall be authorized to release such documents upon the closing of the Drag Along Sale.

(c)     If the Drag Along Sale has not been completed within 120-days following expiration of the Drag Along Notice Period, then the Chairman shall return to each Shareholder any documents in his possession executed by such Shareholders in connection with the proposed Drag Along Sale, and all restrictions on transfer contained in this Agreement or otherwise applicable at such time shall again be in effect. Notwithstanding anything contained in this Section 20, there shall be no liability on the part of any Drag Initiating Shareholder to any other Shareholder if a proposed Drag Along Sale is not consummated for whatever reason. Any decision as to whether to consummate a transfer of any portion of its Shares shall be at the sole discretion of each Drag Initiating Shareholder.

22.     GRANT OF PROXY. To insure the performance by each Shareholder with the agreements set forth herein, each Shareholder hereby appoints the Chairman of the Corporation or its designee (the "Proxy Holder"), as his, her or its true and lawful proxy and attorney in fact, with full power of substitution and resubstitution, to vote all Shares owned or held by such Shareholder, subject to the provisions of this Agreement, upon any matter presented to the Shareholders of the Corporation, if (and only if) such Shareholder fails to comply with such provisions within 5-days following written request. The proxies and powers granted by each Shareholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Shareholder's commitments under this Agreement. Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Shareholder.

23.     TERM. The term of this Agreement shall be 24-years and 364-days following the Effective Date, unless extended by the vote or written consent of the holders of a majority of the Corporation's issued and outstanding shares of voting common stock. Each Shareholder hereby irrevocably supports and authorizes each person who may from time to time serve as President,

5203889.4

Chief Executive Officer or Treasurer of the Corporation to act as his attorney-in-fact with specific authority to execute, acknowledge, swear to, file, and deliver, an amendment to this Agreement which extends the term of this Agreement for any length of time provided that the Corporation's Board of Directors makes a determination that the extension of such term of this Agreement will not be treated as a separate Bank Holding Company under the rules and regulations of the Board of Governors of the Federal Reserve and any other applicable law, rule or regulations.

24.    MISCELLANEOUS.

(a)    Governing Law. This Agreement shall be subject to and governed by the laws of the State of Arkansas.

(b)    Partial Invalidation. In the event that one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(c)    Specific Performance. The parties hereto recognize that the Corporation's stock is a unique asset. Accordingly, in the event of a breach of this Agreement, any non-breaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached their contractual obligations described herein. Each party hereto agrees that he will make no objection to the form of action in any such proceeding for specific performance of this Agreement. Anything contained herein to the contrary notwithstanding, this Section shall not be construed to limit in any manner whatsoever any other rights and remedies an aggrieved party may have by virtue of any breach of this Agreement.

(d)    Notices. Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing either in person or by registered, certified or private express mail, which shall be addressed, in the case of the Corporation, to its principal office to the attention of the President and Secretary, and in the case of any Shareholder, to the address appearing by the Shareholder's signature hereto, or such other address as may be designated by a Shareholder in writing to all parties to this Agreement. If mailed, such notice or other communication shall be deemed made when properly deposited in the mail addressed as provided herein, with postage prepaid.

(e)    Fees of Legal Counsel. In the event any party to this Agreement shall employ legal counsel to protect his rights hereunder or to enforce any term or provision herein, then the party prevailing in any such action shall have the right to recover from the other party all of his reasonable attorneys' fees and expenses incurred in relation to such claims.

(f)    Further Assurances. The parties agree that from time to time hereafter, and upon request, each of them will execute, acknowledge and deliver such other instruments and documents and take such further action as may be reasonably necessary to carry out the intent of this Agreement.

11

(g)    Modification.  No provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

(h)    Binding Effect and Benefit.  This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto, their heirs, executors, administrators, personal representatives, successors and permitted assigns.

(i)    Headings and Captions.  Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Agreement.

(j)    Waiver.  No waiver of a breach or violation of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or limit or restrict any right or remedy otherwise available.

(k)    Rights and Remedies Cumulative.  The rights and remedies expressed herein are cumulative and not exclusive of any rights and remedies otherwise available.

(l)    Gender and Pronouns.  Throughout this Agreement, the masculine shall include the feminine and neuter and the singular shall include the plural and vice versa as the context requires.

(m)    Entire Agreement.  This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

(n)    Time for Performance.  Time is of the essence in this Agreement.

(o)    Counterparts.  This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart. Copies of signatures shall be accepted as originals. Additional signature pages shall be attached hereto as necessary.

(p)    Tax Matters.  The initial signatories to this Agreement acknowledge and confirm their mutual intention and expectation that (i) all current shareholders of the Bank shall transfer their respective shares of the Bank's common stock in exchange for shares of stock of the Corporation and that each such transfer is made in connection with the formation and initial capitalization of the Corporation following its qualification as a "bank holding company" pursuant to the Bank Holding Company Act of 1956, as amended, and applicable provisions of Arkansas law, and (ii) each transferor shall be treated as part of the same control group pursuant to Section 351 of the Internal Revenue Code of 1986, as amended.

*[Signature page(s) to follow.]*

5203889.4

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement of Canada Bancshares, Inc. effective as of the Effective Date set forth below.

<u>Effective Date</u>:   April 1, 2017

CORPORATION:

CANADA BANCSHARES, INC.

By: _____

Gary R. Canada, Sr., Chairman

*[Shareholder signature page(s) to be attached.]*

13

52038894

IN WITNESS WHEREOF, the undersigned has executed this Shareholders Agreement of Canada Bancshares, Inc. effective as to the undersigned as of the date set forth below.

*Effective Date:* April 1, 2017

MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

By: _____
Mary Hanna Boles Canada,
General Partner

_____
Bradley S. Canada

_____
Gary R. Canada, Jr.

_____
Hanna Nicole Luebke

*[Shareholder Signature Page]*

*Canada Bancshares, Inc.*

14

5203889.4



**EXHIBIT**

3











**EXHIBIT**

4







# STATE OF ARKANSAS

## SECRETARY OF STATE

**Cole Jester**
ARKANSAS SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Cole Jester, Arkansas Secretary of State, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

## Dissociation/Dissolution of LLLP

of

## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

effective this day
December 12, 2025.



**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 5th day of February, 2026.

Arkansas Secretary of State

**EXHIBIT**

**5**

 FILED - Arkansas Secretary of State - Cole Jester - Doc#: 20524565001 - Filing#: 800031290 - Filed On: 12/12/2025 - Page(s): 3

## AMENDEDMENT TO
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

Pursuant to the Arkansas Uniform Limited Partnership Act (2001), more specifically stated as Ark. Code Ann. § 4-47-101, *et seq.*, and Act 15 of the 2007 Acts of Arkansas, the undersigned does hereby certify that the following information is true and correct:

## RECITALS

WHEREAS, a guardian of the person and estate of Mary Hanna Boles Canada ("Mrs. Canada"), the sole general partner of MHBC Investments Limited Partnership I, LLLP (the "Partnership"), was appointed on September 12, 2025 by the Circuit Court of Lonoke County, Arkansas, causing the immediate and automatic dissociation of Mrs. Canada pursuant to Ark. Code Ann. § 4-47-603(7)(B);

WHEREAS, the limited partners of the Partnership did not admit another general partner within 90 days of Mrs. Canada's dissociation, as required to avoid dissolution of the Partnership pursuant to Ark. Code Ann. § 4-47-801(3) and Sections 6.9 and 10.1(c) of the Amended and Restated Limited Partnership Agreement of the Partnership (the "Partnership Agreement"); and

WHEREAS, pursuant to Section 10.2 of the Partnership Agreement, and consistent with Ark. Code Ann. § 4-47-803(c), limited partners owning a majority-in-interest of the outstanding Partnership Units designated Gary Rector Canada, Sr. as "Liquidating Trustee."

NOW, THEREFORE, the Certificate of Limited Partnership of MHBC Investments Limited Partnership I, LLLP is hereby amended as follows:

## AMENDMENT

1.      Name. The name of the registered limited liability limited partnership is MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

2.      Original Filing Date. The original certificate of limited partnership for the Partnership was filed in this office on July 21, 1997. The Partnership converted to a limited liability limited partnership on April 6, 2004.

3.      Amendment. The Certificate of Limited Partnership of the Partnership is hereby amended as follows:

(a)      Dissociation of Mrs. Canada. Pursuant to Ark. Code Ann. § 4-47-603(7)(B), Mary Hanna Boles Canada ("Mrs. Canada"), the sole General Partner of the Partnership, disassociated on September 12, 2025. The Partnership does not have a general partner.

Error! Unknown document property name.

(b)     Dissolution of the Partnership. The Partnership dissolved, effective December 12, 2025, pursuant to Section 10.1(c) of the Partnership Agreement and Ark. Code Ann. § 4-47-801(1) & (3)(B).

(c)     Liquidating Trustee. Gary R. Canada was duly appointed by the partners as Liquidating Trustee, to conduct the winding up and termination of the Partnership's business in accordance with Section 10.2 of the Partnership Agreement. The street and mailing address of Gary R. Canada, Sr. is 123 S. Main Street, England, Arkansas 72046.

[*Signature Page Follows*]

Error! Unknown document property name.

IN WITNESS WHEREOF, this Amendment to Certificate of Limited Partnership has been duly executed by the liquidating trustee of the Partnership this _5th_ day of February, 2026.

**LIQUIDATING TRUSTEE:**

GARY R. CANADA, Sr.

3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
DEP CLERK

CANADA BANCSHARES, INC.

PLAINTIFF

v.                     Case No. __4:26-cv-267-KGB__

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

---

## MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Motion for Preliminary Injunction against

the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official

Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the

Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill,

and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as

Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the

Federal Regulators, the "Agencies"), states:

1.      CBI recently became the sole holding company of the Bank of England (the "Bank")

upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I,

LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of ownership, including, for

example, (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's

strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

2.      The Agencies, however, refuse to recognize CBI's status as the Bank's owner— or *anyone's* status as the Bank's owner— simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business.

3.      Specifically, the Agencies have asserted that the Bank's ownership "**remains a private legal issue that [they] have no jurisdiction over.**"

4.      Without this Court's entering immediate injunctive relief ordering the Agencies to recognize CBI as the Bank's owner, the Bank will operate like a headless hydra— no clear managerial oversight, no ability to respond to crises, and no strategic direction whatsoever.

5.      For the reasons set forth in the accompanying Brief in Support, (i) CBI is likely to succeed on the merits of its claim that it is the sole holding company of the Bank, thereby entitling it to the accoutrements of Bank ownership, (ii) CBI, the Bank, and the Bank's customers are likely to suffer continued irreparable harm absent a preliminary injunction, and (iii) the balance of the equities and the public interest favor injunctive relief as the Agencies are uninterested in who owns the Bank, they simply need this Court's direction as to who that person is.

6.      CBI respectfully requests that this Court waive the security requirement in Rule 65(c) as there is no risk that the Agencies will suffer financial harm.

WHEREFORE, CBI respectfully requests that this Court (i) grant its Motion for Preliminary Injunction, (ii) order the Agencies to recognize CBI's status as the Bank's owner, and (iii) grant it all other relief that this Court deems just and proper.

> Respectfully submitted,
>
> Rose Law Firm,
> a Professional Association
> 120 East Fourth Street
> Little Rock, Arkansas 72201

2

Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
                         DEP CLERK

**CANADA BANCSHARES, INC.**                                          PLAINTIFF

v.                              Case No. ___4:26-cv-267-KGB___

**BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department**        **DEFENDANTS**

---

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Brief in Support of its Motion for Preliminary Injunction against the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill, and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the Federal Regulators, the "Agencies"), states:

### INTRODUCTION

CBI recently became the sole holding company of the Bank of England (the "Bank") upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I, LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of Bank ownership, including, for example, setting the Bank's strategy and governance, managing the Bank's capital and funding, and

interacting directly with the Agencies. But the Agencies are preventing CBI from doing so. More specifically, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business. Indeed, the FDIC and the State Regulator have asserted in writing that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** The Board has expressed the same opinion verbally during meetings over the Bank's ownership.

Without a preliminary injunction from this Court ordering the Agencies to immediately recognize CBI as the Bank's owner, the Bank will suffer governance paralysis, capital and liquidity crises, and severe operational disruption. Worse yet, the Agencies' continued refusal to recognize CBI as the Bank's owner interferes with CBI's due-process rights. To preserve the status quo, to ensure CBI's and the Bank's survival, and to protect the Bank's customers, this Court should enter a preliminary injunction ordering the Agencies to recognize CBI's status as the Bank's owner.

### BACKGROUND

CBI hereby incorporates the factual allegations contained in its Verified Complaint by reference pursuant to Federal Rule of Civil Procedure 10(c).

### ARGUMENT

A preliminary injunction is warranted when (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities favors the movant; and (4) an injunction is in the public interest. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam). Though no single factor is "dispositive," *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), likelihood of success is "the most significant" factor, *Missouri*, 112 F.4th at 536. When the federal government is the party opposing a preliminary injunction, the balance of the equities and the public interest "merge" into a single factor. *See, e.g., Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Here, each factor supports a preliminary injunction.

I.    **CBI is likely to succeed on the merits because CBI is the Bank's sole holding company.**

As for this initial, most crucial factor, CBI is likely to succeed on the merits because, following the Partnership's dissolution, CBI became the Bank's sole holding company. More specifically, Mary Hanna Boles Canada has always been the Partnership's only legally recognized General Partner. Immediately upon the Lonoke County Circuit Court's appointing Gary Canada, Sr. as Mrs. Canada's emergency guardian on September 12, 2025, Mrs. Canada was dissociated from the Partnership by operation of law. Ark. Code Ann. § 4-47-603(7)(B) ("A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.").

As such, the Partnership had 90 days— up and until December 12, 2025[1]— to either (i) admit a new General Partner, or (ii) consent to continue the activities of the limited partnership and admit a new General Partner in accordance with that consent. Ark. Code Ann. § 4-47-801(3)(B); **Ex. 1** to Compl., at §§ 6.9, 10.1(c). However, the Partnership failed to do either, and the Arkansas Secretary of State accordingly certified the Partnership's dissolution. **Ex. 5** to Compl. Upon the Partnership's dissolution, CBI became the Bank's sole holding company. As the Bank's sole holding company, CBI is entitled to, among other things: (i) the Agencies' recognition, (ii) the right to set the Bank's strategy and governance, and (iii) the ability to manage the Bank's capital and funding. Therefore, CBI is likely to succeed on the merits, and this most important factor weighs heavily in CBI's favor.

II.   **CBI, the Bank, and the Bank's customers have suffered and will suffer irreparable harm absent injunctive relief.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). For this requirement, a plaintiff need not prove with absolute certainty

---

[1] The Lonoke County Circuit Court later appointed Nicole Canada Luebke and Mr. Canada, Sr. as Mrs. Canada's co-guardians, but Mrs. Canada's guardianship has continued uninterrupted from September 12, 2025, to the date and time of this filing.

3

that injury will occur, but, instead, need merely show that irreparable harm is "likely" absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Here, the Agencies' refusal to recognize CBI as the Bank's owner has caused and will continue to cause CBI, the Bank, and the Bank's customers to suffer irreparable harm because such a refusal produces: (i) governance paralysis— the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption— vendors, other banks, and market participants could freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

Indeed, the Agencies' unlawful refusal to recognize CBI as the Bank's owner is substantially likely to result in (i) CBI's and the Bank's terminations as ongoing business enterprises, and (ii) loss of customer goodwill, both of which constitute irreparable harm under Eighth Circuit precedent. *See, e.g.*, *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (explaining that "[i]rreparable harm has been found when one's allegedly unlawful actions . . . will cause another's ongoing business to terminate absent an injunction"); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[T]he petitioners' potential loss of consumer goodwill qualifies as irreparable harm.").

4

Worse yet, as the Bank's sole holding company, CBI has a recognized property interest in its ownership of the Bank. *Cf. FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("[A]ppellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."); *Kaufman v. Societe Internationale Pour Participations Industrielles Et Commerciales, S.A.*, 343 U.S. 156, 159–60 (1952) (holding that "the rights of innocent stockholders . . . must be fully protected"). The Agencies' unlawful refusal to recognize that interest or give it any meaningful legal effect without due process of law or adequate compensation threatens violations of CBI's constitutional rights, independently constituting irreparable harm warranting injunctive relief. *See, e.g., Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 935 (E.D. Ark. 2021) ("The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, CBI has suffered and will continue to suffer irreparable harm absent immediate injunctive relief.

III.    **The balance of the equities and the public interest support a preliminary injunction both because (i) the Agencies are uninterested in who owns the Bank, they simply need Court direction, and (ii) customers' interests and the public's faith in the banking regulatory regime are in peril absent injunctive relief.**

The balance of the equities and public interest, which "merge" in suits against the government, also decisively favor preliminary relief. *Missouri*, 128 F.4th at 996–97. At the outset, the Agencies have no interest in this case warranting protection because they are uninterested in which entity ultimately owns the Bank. After all, their stated position is that the Bank's ownership "**remains a private legal issue that [they] have no jurisdiction over.**" Stated differently, the Agencies will treat whomever this Court determines to be the Bank's owner as such.

Moreover, "it is always in the public interest to protect constitutional rights" like CBI's due-process entitlements. *Phelps-Roper v. Nixon*, 59 F.3d 480, 485 (8th Cir. 2007). And, even better, entering a preliminary injunction in CBI's favor would mean that the Bank once again has stable management

5

and oversight— thereby protecting customers' interests and the public's faith in the regulatory regime underlying the banking system. Thus, this final factor weighs heavily in CBI's favor, too.

## CONCLUSION

Following the Partnership's dissolution, CBI became the Bank's sole holding company. As such, it is constitutionally entitled to the accoutrements of ownership, including but not limited to: (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

Because CBI is (i) likely to succeed on the merits, (ii) has suffered and will continue to suffer irreparable harm absent immediate injunctive relief, and (iii) the balance of the equities and the public interest favor such relief, this Court should enter a preliminary injunction ordering the Agencies to immediately recognize CBI's status as the Bank's owner. Doing so preserves the status quo, ensures CBI's and the Bank's survival, and protects the Bank's customers from peril. Accordingly, CBI respectfully requests that this Court grant its Motion for Preliminary Injunction and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association

6

809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

**U.S. Postal Service**

**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

9589 0710 5270 0162 0924 83

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
- ☑ Return Receipt (hardcopy)     $ _____
- ☑ Return Receipt (electronic)   $ _____
- ☐ Certified Mail Restricted Delivery  $ _____
- ☐ Adult Signature Required      $ _____
- ☐ Adult Signature Restricted Delivery  $ _____

Postmark
Here

Postage

$

Total Postage and Fees

$                                    DSm/SB

Sent To  *U.S. Attorney General Pamela Bondi*

Street and Apt. No., or PO Box No.  *950 Pennsylvania Avenue, NW*

City, State, ZIP+4®  *Washington, DC 20530-0001*

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*U.S. Attorney General Pamela Bondi*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530-001*

9590 9402 7936 2305 5851 55

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X                                    ☐ Agent
                                     ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☑ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- Insured Mail Restricted Delivery (over $500)
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

2. Article Number *(Transfer from service label)*

9589 0710 5270 0162 0924 83

PS Form 3811, July 2020 PSN 7530-02-000-9053                Domestic Return Receipt

EXHIBIT

III



**CERTIFIED MAIL**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

9589 0710 5270 0162 0924 83
9589 0710 5270 0162 0924 83

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☑ Return Receipt (hardcopy)          $ _____
☑ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

DSm/SB

Total Postage and Fees
$

Sent To   U.S. Attorney General Pamela Bondi
Street and Apt. No., or PO Box No.
950 Pennsylvania Avenue, NW
City, State, ZIP+4®
Washington, DC 20530-0001

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

**USPS TRACKING #**

9590 9402 7936 2305 5851 55

**United States**
**Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

**R**
**ROSE LAW FIRM**
**A Professional Association**
**120 E. Fourth Street  Little Rock AR  72201-2893**

DSm/SB



## ROSE LAW FIRM

March 16, 2026

**VIA CERTIFIED MAIL**
U.S. Attorney General Pamela Bondi
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
<u>**Tracking #**</u>: 9589 0710 5270 0162 0924 83

> **Re:** *Canada Bancshares, Inc. v. Board of Governors of Federal Reserve System, et al.*
> U.S. District Court for the Eastern District of Arkansas
> Case No. 4:26-cv-00267-KGB
> **Service of Process Pursuant to Fed. R. Civ. P. 4(i)(1)(B)**

Dear Attorney General Bondi:

I represent the Plaintiff, Canada Bancshares, Inc. ("CBI") in connection with the above-referenced litigation against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department. In accordance with Federal Rule of Civil Procedure 4(i)(1)(B), please find accompanying this letter (i) CBI's Verified Complaint and its associated exhibits, and (ii) a Summons to Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation.

Additionally, CBI filed a Motion for Preliminary Injunction and Brief in Support. I have enclosed copies of those documents as well. CBI intends to pursue the relief requested therein with all deliberate haste. Please do not hesitate to reach out to my office in connection with this matter should you deem that necessary.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*
David S. Mitchell, Jr.

**A Professional Association**
120 E. Fourth St., Little Rock, AR 72201 | roselawfirm.com | (501) 375-9131 | (501) 375-1309 (fax)
dmitchell@roselawfirm.com

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.                                                PLAINTIFF

v.                              Case No. 4:26-cv-267-KGB

BOARD OF GOVERNORS OF THE                This case assigned to District Judge __Baker__
FEDERAL RESERVE SYSTEM;                  and to Magistrate Judge __Ervin__
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department        DEFENDANTS

---

## VERIFIED COMPLAINT

---

Plaintiff, Canada Bancshares, Inc., for its Verified Complaint against the Board of Governors

of the Federal Reserve System; Jerome H. Powell, in his Official Capacity as Chair of the Board of

Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation;

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department, states:

### PARTIES

1.      Canada Bancshares, Inc., ("CBI") is an Arkansas corporation with its principal place

of business in England, Arkansas. CBI is the sole holding company of the Bank of England, an

Arkansas state-chartered bank (the "Bank"). CBI owns all issued and outstanding shares of the Bank's

stock.

2.      The Board of Governors of the Federal Reserve System (the "Board") is a federal

agency established by the Federal Reserve Act, 12 U.S.C. §§ 221 *et seq.*, charged with the administration

and enforcement of the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* Among other responsibilities, the Board determines whether an entity qualifies as a bank holding company, and the Board engages in a variety of oversight activities.

3.     Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, oversees the Board's actions and is responsible for, among other things, ensuring the Board's compliance with its statutory duties.

4.     Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, oversees the Federal Deposit Insurance Corporation (alone, the "FDIC," and, together with the Board, Mr. Powell, and Mr. Hill, the "Federal Regulators") and ensures the FDIC's compliance with its statutory duties. The FDIC exercises certain regulatory authority over bank holding companies under the Federal Deposit Insurance Act. *See* 12 U.S.C. §§ 1811 *et seq.*

5.     Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, oversees the Arkansas State Bank Department (alone, the "State Regulator," and, together with the Federal Regulators, the "Agencies"), an entity charged with regulating state-chartered commercial banks and their holding companies. *See, e.g.,* Ark. Code Ann. § 23-46-205.

6.     The State Regulator's duties include review and approval processes that overlap significantly with the Federal Regulators'.

### JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 in that it is a civil action or proceeding arising under the laws of the United States. More specifically, this is a civil action or proceeding arising under Acts of Congress regulating commerce, namely, the Bank Holding Company Act and the Federal Deposit Insurance Act.

8.     This Court has supplemental jurisdiction over CBI's claims against the State Regulator because they are "so related to [CBI's] claims" against the Federal Regulators that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) as this is "a civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity[,]" and the Central Division of the Eastern District of Arkansas is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred . . . ."

### BACKGROUND

10.     Founded in 1898 with a capital stock of just $10,000, the Bank has survived two world wars, the Great Depression, and even the Great Recession.

11.     For most of its existence, the Bank has been a family-run operation, as the same family has controlled the Bank for more than a half century.

12.     Seth Boles—the progenitor of the Bank family—started working at the Bank as a cashier as long ago as 1946. Slowly but surely, Mr. Boles worked his way up to the Bank's presidency in the early 1960s. He maintained that position until 1989 when his son-in-law, Gary Canada, Sr., took the helm as the Bank's new president.

13.     Over the decades, the Bank's ownership structure has shifted a handful of times.

14.     This lawsuit is about the most recent shift in the Bank's ownership structure and the Agencies' reaction to it.

### The Partnership.

15.     In the late 1990s, several members of the Bank family formed MHBC Investments Limited Partnership I as a holding company for the Bank.

16.     At that time, Mary Hanna Boles Canada was MHBC Investments Limited Partnership I's only General Partner.

3

17.   Mrs. Canada, Mr. Canada, Sr., Gary Canada, Jr. (as trustee), Bradley Canada (as trustee), and Hanna Nicole Canada Luebke (as trustee) were MHBC Investments Limited Partnership I's Limited Partners.

18.   In the early 2000s, MHBC Investments Limited Partnership I's partners voted to convert the entity to an Arkansas limited liability limited partnership, thereby creating MHBC Investments Limited Partnership I, LLLP (the "Partnership"), an entity governed by an April 1, 2004 Partnership Agreement[1] and the Uniform Limited Partnership Act (2001), Ark. Code Ann. §§ 4-47-101 *et seq.*

19.   Pursuant to Section 3.1 of the Partnership Agreement, one of the entity's core purposes was to "operate as a one bank holding company owning a controlling interest in the common stock of Bank of England, a state-chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies."

20.   As before, upon its conversion, the Partnership had only one General Partner: Mrs. Canada.

21.   Mrs. Canada has always been the Partnership's only legally recognized General Partner.

**Formation of CBI.**

22.   In the mid-2010s, the Bank family also established CBI as a holding company of the Bank.

23.   Over time, through a handful of transactions, CBI became the Bank's sole shareholder.

24.   Several months after the formation of CBI, its shareholders entered into a Shareholders Agreement.[2]

---

[1] A true and correct copy of the Partnership Agreement is attached as **Exhibit 1.**

[2] A true and correct copy of the Shareholders Agreement is attached hereto as **Exhibit 2.**

25.    The Shareholders Agreement restricts CBI's shareholders, officers, directors, and other agents from effecting any change to the Bank's Board of Directors without the Partnership's prior written authorization. **Ex. 2** § 12(c).

26.    Since CBI's original issuance of shares of its stock, the Partnership has always owned well in excess of a majority of the total issued and outstanding shares of CBI stock.

27.    As long as CBI has been the sole shareholder of the Bank, it has served as the intermediate holding company situated between the Bank and the Partnership, the Bank has served as the operating company, and the Partnership (until its recent dissolution) has served as the ultimate parent entity and holding company with supreme authority and control over the Bank.

### The Partnership's Dissolution.

28.    After serving as the Partnership's General Partner for decades, Mrs. Canada was sadly diagnosed with Alzheimer's disease at the Mayo Clinic in Rochester, Minnesota in 2020.

29.    Since that time, Mrs. Canada's cognitive abilities have deteriorated steadily.

30.    More recently, third-parties began taking advantage of Mrs. Canada's cognitive decline to their benefit and to Mrs. Canada's detriment.

31.    Seeking to protect his wife's well-being, Mr. Canada, Sr. initiated a guardianship action on September 12, 2025, in the Circuit Court of Lonoke County, Arkansas.

32.    On September 12, 2025, the Lonoke County Circuit Court appointed Mr. Canada, Sr. as Mrs. Canada's emergency guardian. A true and correct copy of the Lonoke County Circuit Court's Order appointing Mr. Canada, Sr. as his wife's emergency guardian is attached hereto as **Exhibit 3.**[3]

---

[3] Exhibit 3 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Order. Accordingly, CBI will file a Motion for Leave to File Exhibit 3 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

33.     A month later, the Lonoke County Circuit Court issued Letters of Temporary Guardianship to Mr. Canada, Sr. and Mrs. Canada Luebke, as co-guardians of Mrs. Canada's person and estate (the "Letters"). A true and correct copy of the Letters is attached hereto as **Exhibit 4.**[4]

34.     The Letters operated as an extension of Mrs. Canada's guardianship. Stated differently, although the terms of Mrs. Canada's guardianship have changed, there has been no interruption in Mrs. Canada's guardianship since September 12, 2025.

35.     As of the date and time of this filing, Mr. Canada, Sr. and Mrs. Canada Luebke are still serving as co-guardians of Mrs. Canada's person and estate.

36.     Arkansas's Limited Partnership Act provides that a general partner is dissociated automatically by operation of law upon the appointment of a guardian for such general partner:

> A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.

Ark. Code Ann. § 4-47-603(7)(B).

37.     Accordingly, Mrs. Canada was dissociated as General Partner of the Partnership by operation of law upon the Lonoke County Circuit Court's appointment of Mr. Canada, Sr. as her guardian on September 12, 2025.

38.     Arkansas's Limited Partnership Act further provides that a limited partnership is automatically dissolved by operation of law after the dissociation of a general partner if the partnership does not have a remaining general partner and the limited partners fail to admit a general partner within 90 days:

> A limited partnership is *dissolved*, and its activities *must be* wound up, only upon the occurrence of any of the following:
>
> . . .
>
> (3) after the dissociation of a person as general partner:

---

[4] Exhibit 4 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Letters. Accordingly, CBI will file a Motion for Leave to File Exhibit 4 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

6

(B) if the limited partnership does not have a remaining general partner, the passage of 90 days after the dissociation, unless before the end of the period:

(i) consent to continue the activities of the limited partnership and admit at least one general partner is given by the limited partners owning a majority of the rights to receive distributions as limited partners at the time the consent is to be effective; and

(ii) at least one person is admitted as a general partner in accordance with the consent . . . .

Ark. Code Ann. § 4-47-801(3)(B) (emphasis added).

39.    The Partnership Agreement, too, requires immediate dissolution of the Partnership following the dissociation of all general partners if a successor general partner is not admitted within 90 days:

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners.    In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be.

. . .

Section 10.1    Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:

(c) Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.

Ex. 1, §§ 6.9, 10.1(c) (emphasis added).

40.    The Partnership's Limited Partners did not admit a General Partner to replace Mrs. Canada within 90 days of her dissociation on September 12, 2025.

7

41.    The Limited Partners did not consent to continue the activities of the Partnership at any time following Mrs. Canada's dissociation on September 12, 2025, at least up until the date and time of this filing.

42.    Both the Partnership Agreement and Arkansas's Limited Partnership Act require the dissolution of the Partnership following the dissociation of all general partners if one or more substitute general partners are not appointed within ninety (90) days. **Ex. 1**, §§ 6.9 and 10.1(c); Ark. Code Ann. § 4-47-801(3)(B).

43.    The Partnership was without a General Partner for the 90-day period that ended on December 11, 2025.

44.    Thus, on December 12, 2025, the Partnership dissolved immediately and automatically by operation of law and the Partnership Agreement.

45.    Accordingly, the Arkansas Secretary of State certified the Partnership's dissolution, effective December 12, 2025. A true and correct copy of the Secretary of State's certification is attached hereto as **Exhibit 5**.

### CBI Takes Over.

46.    Following the Partnership's dissolution, the Partnership's control over the Bank terminated, and CBI became the Bank's sole holding company.

47.    Accordingly, CBI no longer defers to the Partnership in the election or removal of directors of the Bank.

48.    As the Bank's sole holding company, CBI is entitled to, among other things, set strategy and governance (i.e., by appointing Bank leadership and board members as well as setting growth plans and direction), manage capital and funding, and interact directly with the Agencies.

### The Agencies Abdicate.

49.     Federal law grants the Federal Regulators tremendous regulatory oversight over bank holding companies, largely through the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.*, and the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*

50.     Bank holding companies' actions and omissions are meticulously scrutinized by the Federal Regulators, and bank holding companies must frequently seek Federal Regulators' approval to take certain actions. *See, e.g.*, 12 U.S.C. § 1842(a) (requiring the Board's approval for a litany of transactions involving bank holding companies); 12 C.F.R. § 225.72 (requiring certain regulated institutions to provide the Board with written notice of changes in leadership or board membership); 12 U.S.C. § 1831i (requiring certain regulated institutions to provide the FDIC with written notice of changes in leadership or board membership and an opportunity to disapprove them).

51.     If the holding company owns a state-chartered bank, like the Bank here, then the holding company must also contend with government entities like the State Regulator.

52.     Often, the Agencies' regulatory duties overlap significantly. *See, e.g.*, 12 U.S.C. § 1842(b)(1) (requiring the Board to solicit and consider the "views and recommendations" of the State Regulator in certain transaction-approval decisions); *see also* Ark. Code Ann. § 23-46-205 ("The Bank Commissioner shall be charged with the general supervision of financial institutions, the execution of all laws passed by the State of Arkansas relating to the organization, operations, inspection, supervision, control, liquidation, and dissolution of banks, bank holding companies, subsidiary trust companies, and the general commercial banking business of Arkansas, and such other duties as prescribed by law.").

53.     Part and parcel of the Agencies' duties is (i) recognizing the proper owner of a regulated institution, and (ii) interacting with that owner to ensure regulatory compliance.

54.     Although (i) CBI owns all issued and outstanding shares of the Bank's stock, and (ii) the Partnership is dissolved, the Agencies refuse to recognize CBI's status as the Bank's owner.

55.     Worse yet, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among members of the Bank family over the winding up of the Partnership's business.

56.     The Agencies refusal to recognize CBI as the Bank's owner has caused and will cause catastrophic consequences, among others: (i) governance paralysis—the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption—vendors, other banks, and market participants will freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

57.     In short, the Agencies' conduct has caused CBI (and the Bank) to suffer irreparable harm and the Agencies' continued refusal to recognize CBI's status will perpetuate irreparable harm on CBI (and the Bank).

## CAUSES OF ACTION

### Count 1: Declaratory Judgment

58.     CBI realleges and reasserts the allegations contained in the preceding paragraphs of this Verified Complaint.

10

59. Pursuant to the United States Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, CBI seeks this Court's declaration that (i) the Partnership is dissolved, (ii) CBI owns the Bank.

60. This is an active and justiciable controversy because CBI has sought to act as the Bank's owner before the Agencies and the Agencies have refused to recognize CBI's status.

61. Worse yet, the Agencies have refused to recognize anyone's status as the Bank's owner.

62. The FDIC and the State Regulator asserted, in writing, that the Bank's ownership ***"remains a private legal issue that [they] have no jurisdiction over."***

63. Although the Board has not put it in writing, the Board has expressed the same opinion verbally during meetings over the Bank's ownership.

64. There is uncertainty regarding the parties' legal relations in this instance.

### NATURE OF RELIEF SOUGHT

65. CBI requests that this Court award it the following relief:

    a. Declare that (i) the Partnership is dissolved, and (ii) CBI is the sole holding company with control over the Bank;

    b. Pursuant to Fed. R. Civ. P. 65, preliminarily and permanently enjoin the Agencies to recognize CBI's status as the Bank's owner;

    c. All other relief that this Court deems just and proper.

WHEREFORE, Plaintiff Canada Bancshares, Inc. respectfully requests that this Court enter judgment in its favor against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department; enjoin the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation,

11

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department as requested herein; and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

12

## VERIFICATION

I, Gary Canada, Sr., state on oath that the foregoing facts set forth in this Verified Complaint are true and correct to the best of my knowledge, information, and belief.

_Gary Canada Sr._
Gary Canada, Sr.

Dated _3-9-26_, 2026

STATE OF _Arkansas_        )

                          ) ss.

COUNTY OF _____  )

SUBSCRIBED and SWORN to before me, the undersigned duly commissioned, qualified, and acting Notary Public this _09_ day of _March_ 2026.

In witness whereof I hereunto set my hand and official seal

_Shaina Broderick_
Notary Public

My Commission Expires: _12-19-2034_



13

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

EXHIBIT

1

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
# AGREEMENT OF LIMITED PARTNERSHIP
## (As Amended and Restated)

**ARTICLE I**
**FORMATION AND ORGANIZATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
Section 1.1    Formation of Partnership . . . . . . . . . . . . . . . . . . . . . . . . . -1-
Section 1.2    Organization Certificates; Filings . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.3    Partnership Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.4    Principal Office and Agent . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.5    Term of Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.6    Copies to Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

**ARTICLE II**
**DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

**ARTICLE III**
**PURPOSES AND POWERS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
Section 3.1    Purposes of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . -5-
Section 3.2    Powers of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

**ARTICLE IV**
**ADMISSION OF LIMITED PARTNERS** . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
Section 4.1    Admission of Limited Partners . . . . . . . . . . . . . . . . . . . . . . . -6-
Section 4.2    Completion of Admission . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

**ARTICLE V**
**CONTRIBUTIONS OF THE PARTNERS** . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

**ARTICLE VI**
**RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
Section 6.1    Rights and Powers of the General Partners as Managers . . . . . . . . . -7-
Section 6.2    Limitations on General Partners' Authority . . . . . . . . . . . . . . . . . . -7-
Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance . . . . . . . -8-
Section 6.4    Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Section 6.5    Duties of the General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.6    Obligations not Exclusive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.7    Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.8    Admission of Additional General Partner . . . . . . . . . . . . . . . . . . -10-
Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General
         Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
Section 6.10   Indemnification of the General Partners . . . . . . . . . . . . . . . . . . . -10-
Section 6.11.  Limited Liability of the General Partners . . . . . . . . . . . . . . . . . . . -11-

ARTICLE VII
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS . . . . . . . . . . . . . -11-
Section 7.1    Rights of a Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
Section 7.2    Assignments of Limited Partnership Interests . . . . . . . . . . . . . . . -12-
Section 7.3    Assignments of Distributive Rights . . . . . . . . . . . . . . . . . . . . . . . -12-
Section 7.4    Partnership Option to Purchase a Limited Partner's Interest . . . . . -13-
Section 7.5    Limited Partner's Status Upon Death or Incompetency . . . . . . . . . -14-
Section 7.6    Limited Put Option of Certain Permitted Transferees . . . . . . . . . . -14-

ARTICLE VIII
COMPENSATION OF THE GENERAL PARTNERS . . . . . . . . . . . . . . . . . . -15-
Section 8.1    Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 8.2    Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

ARTICLE IX
DISTRIBUTIONS AND
ALLOCATIONS OF INCOME AND LOSS . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.1    Distributions of Distributable Cash . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.2    Allocation of Certain Income and Losses for Tax Purposes . . . . . -15-
Section 9.3    Allocations Upon Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

ARTICLE X
DISSOLUTION AND PRIORITY ON DISTRIBUTION . . . . . . . . . . . . . . . . -16-
Section 10.1   Dissolution and Termination of the Partnership . . . . . . . . . . . . . . -16-
Section 10.2   Liquidation and Priorities on Distribution . . . . . . . . . . . . . . . . . . -16-

**ARTICLE XI**

**ACCOUNTING AND BUSINESS MATTERS** . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.1 Books of Accounts and Records . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.2 Accounting Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.3 Financial Statements and Reports . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.4 Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 11.5 Bank Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

**ARTICLE XII**

**ELECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.1 Adjustment Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.2 Depreciation Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.3 Election with Respect to Taxation as Partnership . . . . . . . . . . . . . -18-

Section 12.4 Other Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

**ARTICLE XIII**

**AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

**ARTICLE XIV**

**MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.1 Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.2 Further Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.3 Paragraph Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.4 Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.5 Application of Arkansas Law . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.6 Survival of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.7 Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.8 Execution in Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.9 Waiver of Action for Partition . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.10 Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.11 Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.12 Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.13 Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (hereinafter referred to as the "Agreement"), is entered into effective as of the __1__ day of ___April___, 2004, by and among MARY HANNA BOLES CANADA, and any other parties who may be admitted to the Partnership as General Partners pursuant to the provisions of Section 6.8 herein (hereinafter collectively referred to as the "General Partners" or individually as "General Partner"), and MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR., Trustee of the GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA, Trustee of the BRADLEY SETH CANADA TRUST I, and HANNA NICOLE CANADA, Trustee of the HANNA NICOLE CANADA STEWART TRUST I, and any other parties who may be admitted to the Partnership as Limited Partners pursuant to the provisions of Sections 4.1 and 7.2 herein below (hereinafter referred to collectively as the "Limited Partners" and individually as "Limited Partner").

WHEREAS, on July 21, 1997, MARY HANNA BOLES CANADA, the General Partner and the Limited Partners entered into the Agreement of Limited Partnership pursuant to which the Partnership was formed under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I.

WHEREAS, effective as of the date aforesaid, the Agreement of Limited Partnership was amended and restated as a limited liability limited partnership (as defined in Section 1.1 hereinbelow) under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinbelow contained, the adequacy of which consideration is hereby acknowledged, the parties agree as follows:

## ARTICLE I
### FORMATION AND ORGANIZATION

Section 1.1    Formation of Partnership.    Pursuant to the Arkansas Revised Limited Partnership Act of 1991, A.C.A. § 4-43-101 *et seq.*, as from time to time amended, including Act 912 of the 1997 Acts of Arkansas, hereinafter collectively referred to as the "Act," the parties hereto hereby form a registered limited liability limited partnership, which organization is hereinafter referred to as the "Partnership." The rights and liabilities of the Partners (as "Partners" is defined in Article II hereinbelow) shall, except as hereinafter expressly stated to the contrary, be as provided for in the Act.

Section 1.2    Organization Certificates; Filings.   The General Partners hereto shall immediately execute, file, record and/or publish the Application and the Certificate (as "Application" and "Certificate" are defined in Article II hereinbelow) and other documents conforming hereto, and take all other appropriate action to comply with all legal requirements for the formation of a registered limited liability limited partnership under the Act and its operation in the State of Arkansas. The General Partners shall file and publish any other notices, certificates, statements or other instruments required or permitted by any provision of any law in the United States or any state or other jurisdiction which may govern the formation of this Partnership or the conduct of its business from time to time. The General Partners shall cause the Partnership to file any further amendments to the Application and/or Certificate or such other documents as shall be required by A.C.A. §§ 4-43-202, 4-43-1110 and 4-42-703 in order to preserve the valid existence of the Partnership as a registered limited liability limited partnership and the limited liability of the Partners.

Section 1.3    Partnership Name.   The business of the Partnership shall be conducted under the name of the MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP, an Arkansas registered limited liability limited partnership, and under such name or variations thereof in the other jurisdictions as the General Partners deem appropriate.

Section 1.4    Principal Office and Agent.   The principal place of business and physical address of the Partnership shall be located at: 105 Cherry St., England, AR 72046, and the mailing address of the Partnership shall be: 105 Cherry St., England, AR 72046. The agent for service of process shall be MARY HANNA BOLES CANADA at the above business address.

Section 1.5    Term of Partnership.   The Partnership shall become effective upon the filing of the Application and the Certificate and the payment of the filing fee therefor, in the office of the Arkansas Secretary of State, Little Rock, Arkansas, as required by the Act and shall remain effective until the earlier to occur of:

(a)    December 31, 2046; or

(b)    The date the Partnership is dissolved pursuant to the Act or any provisions of this Agreement.

The period of time between the date the Partnership becomes effective and the date it ceases to be effective shall be referred to herein as "Partnership Term."

Section 1.6    Copies to Partners.   The General Partners shall promptly deliver or mail a filed copy of the Certificate and any amendment thereto to each of the Limited Partners.

## ARTICLE II
## DEFINITIONS

Whenever used in this Agreement the terms set forth below shall be defined as follows:

(a)     The "Application" shall mean the Application for Registration of a Limited Liability Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-1110, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(b)     The "Certificate" shall mean the Certificate of Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-206, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(c)     "Code" shall mean the Internal Revenue Code of 1986, as amended.

(d)     "Distributable Cash" shall mean, at the time of determination for any period (on the cash receipts and disbursements method of accounting), the net cash derived from the conduct of the Partnership's business and operations, from its investments (including distributions from entities owned by the Partnership) and (except as limited below) cash proceeds from the sale or other disposition of Partnership Properties, but only after reasonable reserves of cash have been set aside by the General Partners for working capital, capital improvements and replacements, debt service, current and reasonably projected expenses, and other cash requirements, including current and reasonably projected investment opportunities, all in keeping with the Partnership purposes. For purposes of this subsection, all capital contributions, any borrowed funds, and cash proceeds attributable to the sale or other disposition of any of the Partnership Properties which were contributed to the Partnership or which were purchased with borrowed funds, shall be considered necessary for business and investment purposes and shall be excluded from Distributable Cash. In determining Distributable Cash the General Partners shall be subject to the duties imposed by Section 6.5 and shall have the duty to take into account the cash needs of the Partnership in its business, the funds necessary in the operation of its business until the income from further operations is available, the amounts of its debts, the necessity or advisability of paying its debts, or at least reducing them within the limits of the Partnership's credit, and the character of its surplus cash.

(e)     "Fair Market Value" shall be the price at which a willing seller and willing buyer, neither under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, would pay and accept in an arm's length transaction for such interest in the Partnership or any Partnership Property. The Fair Market Value of an interest in the Partnership shall be determined taking into account all factors relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held partnership interests having the rights and restrictions provided

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                     -3-

under this Agreement and applicable Arkansas law including, but not limited to, the restrictions upon withdrawal before the end of the term of the Partnership. In the event it becomes necessary to value any interest in the Partnership or any Partnership Property, the Fair Market Value of the property shall be determined by agreement of the parties involved, or in the absence of such agreement, by an individual appraiser or appraisal firm mutually acceptable to such parties. In the event the parties involved are unable to agree on the individual appraiser or firm to perform the valuation, each party shall select an appraiser, and such appraisers shall first attempt to jointly determine the Fair Market Value of the Partnership interest or Partnership Property by mutual agreement, but if they are unable to agree on such valuation, such appraisers shall select a third appraiser, and the fair market value shall be determined by the average of the two (2) closest appraisals. Any valuation so determined shall be binding and conclusive on the parties absent manifest error. The cost of any such appraisal(s) shall be borne, in the case of a valuation of a Partnership interest, equally by the seller and the purchaser, and in the case of a valuation of any Partnership Property, equally by each individual Partner or group of Partners having conflicting interests in such appraisal.

(f)     "General Partners" shall mean MARY HANNA BOLES CANADA, and/or any other person or entity appointed in accordance with the provisions of this Agreement to replace, or in addition to, the aforesaid persons. "General Partner" shall mean, and refer to, any of the General Partners individually.

(g)     "Limited Partners" shall mean MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA TRUST I and HANNA NICOLE CANADA STEWART TRUST I, and any other person or entity who or which shall be admitted to the Partnership, pursuant to Section 4.1 or Section 7.2, and thereby becomes an owner of an interest in the Partnership. "Limited Partner" shall mean, and refer to, any of the Limited Partners individually.

(h)     "Partners" shall mean the General Partners and all Limited Partners.

(i)     "Partnership Properties" shall mean all properties (real, personal and mixed), and all rights, titles, interests and estates of every nature whatsoever incident thereto, owned by the Partnership. "Partnership Property" shall mean any one of the Partnership Properties.

(j)     The "Sharing Ratio" of a Partner shall be the ratio of the Partner's Units to the total Units outstanding.

(k)     A "Unit" shall represent a 0.1 percent interest of capital and profits in the Partnership, and the Partnership shall be authorized to issue one thousand (1,000) Units. Each Partner shall be entitled to cast one (1) vote per Unit on all matters in which all Partners are herein given the right to vote.

(l)     "Permitted Transferee" shall mean the initial Limited Partners named above, all of their lineal descendants, and trusts for the exclusive benefit of any of them.

## ARTICLE III
## PURPOSES AND POWERS

Section 3.1    Purposes of the Partnership. The Partnership shall not be deemed to exist for a specific purpose; rather, the purpose of the Partnership is to manage the Partnership Properties by conducting any business which lawfully may be conducted in limited partnership form. Some of the more particular purposes of the Partnership are as follows:

(a)    To operate as a one bank holding company owning a controlling interest in the common stock of the Bank of England, a state chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies;

(b)    To provide flexibility in the management of Partnership Properties not available through the use of trusts, corporations and business entities; and

(c)    To identify the nature of the partners's partnership interests as separate property rather than marital property or community property.

(d)    To avoid the fractionalization of the ownership of certain Partnership Properties of various family members in order to receive a higher price in the event of a sale of any of the Partnership Properties.

Section 3.2    Powers of the Partnership. The specific purposes of the Partnership may, in instances where the Partners deem such action appropriate and to the extent Partnership funds are available therefor, be accomplished by:

(a)    Acquiring and disposing of Partnership Properties for cash, securities, other property, or any combination thereof upon such terms and conditions as the General Partners may from time to time determine (including, in instances where the property is encumbered, on either an assumption or a "subject to" basis);

(b)    Acquiring, owning, holding, improving, managing and leasing properties used in investment operations, and reinvesting the income and proceeds thereof, either alone or in conjunction with others, through partnerships, limited partnerships (or other partnerships in which certain partners have limited liability), joint ventures, or other business associations or entities;

(c)    Investing and reinvesting any of the Partnership Property or income of the Partnership, whether or not the original purpose for the investment has been accomplished, it being understood by the Partners that the investment objectives of the Partnership are to continue until the end of the Partnership Term and until the Partnership is dissolved and its affairs wound up.

(d)    Financing its activities by commercially reasonable methods on such terms and conditions as the General Partners deem appropriate. In instances where money is borrowed for Partnership purposes, the General Partners shall be and hereby are authorized to pledge, mortgage, encumber and grant security interests in Partnership Properties for the repayment of such loans;

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -5-

(e)      Employing, retaining or otherwise securing, or entering into other contracts with persons or firms to assist in the acquisition, developing, improving, managing, and general operation of the Partnership Properties, all on such terms and for such consideration as the General Partners deem reasonably advisable;

(f)      Depositing Partnership funds in an account or accounts to be established at such time or times in such financial institutions (including any state or federally chartered bank or savings and loan association) and authorizing withdrawals of such funds by such persons at such times, and in such amount, as the General Partners may designate;

(g)      As to those Partnership funds which are not then required for Partnership purposes yet which the General Partners deem untimely to be distributed to the Partners, purchasing U. S. Treasury Bills, certificates of deposit, bonds, other certificates or evidences of indebtedness, stocks, real property, or other investment securities or property as the General Partners reasonably deem appropriate;

(h)      Taking any and all other action which is permitted under the Act and which is customary or reasonably related to the real, personal or mixed property incidental thereto; and

(i)      Taking any other action which is legally permissible.

## ARTICLE IV
## ADMISSION OF LIMITED PARTNERS

Section 4.1      Admission of Limited Partners.  No additional Limited Partners shall be admitted except by affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.  As distinguished from the admission of additional Limited Partners, no assignee of all or part of a Limited Partner's Units shall be substituted as a Limited Partner except under the conditions and restrictions and upon completion of all of the requirements of Article VII of this Agreement.

Section 4.2      Completion of Admission.  Subject to the other terms of this Agreement, a person shall become a Limited Partner when he or she shall have completed all of the following:

(a)      Executed a counterpart of this Agreement; and

(b)      Executed any other document, certificate or instrument, and taken such other action as the General Partners may reasonably request to evidence and perfect such person's admission as a Limited Partner.

## ARTICLE V
## CONTRIBUTIONS OF THE PARTNERS

The Partners shall initially contribute to the Partnership the property described on Exhibit A attached hereto in exchange for all of the outstanding Units. The general partnership interests of each General Partner shall be maintained separately from any limited partnership interests of the General Partners. The number of Units owned by each of the Partners is reflected on Exhibit B attached hereto. The Partners may make additional contributions to the Partnership, provided that the Sharing Ratios of all the General Partners, taken together, shall be equal to at least one percent (1%) at all times during the Partnership Term. No Partner shall be entitled to interest on capital contributions to the Partnership, or to withdraw any part of such Partner's capital account, except as specifically provided herein.

## ARTICLE VI
## RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS

Section 6.1   Rights and Powers of the General Partners as Managers. Each General Partner shall be entitled to cast one (1) vote per Unit of general partnership interest in all matters in which the General Partners are herein given the right to vote as a class or individually as a Partner. A majority vote shall be required to take any action by the General Partners. Subject to the limitations of this Agreement, and to the limitations imposed upon them by law, the General Partners shall have full, exclusive and complete discretion to manage and control, and shall make all decisions affecting, the Partnership business. The General Partners shall have full authority to take any action described by Article III hereof and to exercise all rights and powers generally conferred by law in connection therewith. The rights and powers of the General Partners described in this Section 6.1 shall be in addition to and not in limitation of any other rights and powers of the General Partners described in this Agreement or provided by law.

Section 6.2   Limitations on General Partners' Authority. The General Partners shall not have authority to:

(a)   Do any act in contravention of this Agreement without the written consent of all the Partners.

(b)   Do any act which would make it impossible to carry on the ordinary business of the Partnership, or which may make it impossible to carry on the ordinary business of the Partnership, without the written consent of all the Partners.

(c)   Admit a person as a General Partner, except as provided in this Agreement and the Act.

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -7-

(d)     Admit a person as a Limited Partner, except as provided in this Agreement and the Act.

(e)     Cause the Partnership to make any loan to any of the General Partners or any of their affiliates without the written consent of the Partners owning a majority-in-interest of the outstanding Partnership Units.

(f)     Commingle the Partnership's funds with those of any other person, except with respect to (1) joint ventures or other joint investments permitted by this Agreement and (2) general disbursement accounts controlled by the General Partners, without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(g)     Knowingly perform any act that would subject any Limited Partner to liability as a general partner in any jurisdiction.

(h)     Sell, assign, exchange, lease, or otherwise dispose of, or mortgage, pledge, or otherwise encumber all or substantially all of the real or personal property of the Partnership without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(i)     Enter into agreements with a General Partner or any affiliate of a General Partner without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(j)     Terminate a contract, agreement, or compensation to a Partner, or an affiliate of a Partner, without the approval of Partners owning a majority-in-interest of the outstanding Partnership Units.

(k)     For purposes of this Section 6.2 the term "affiliate" of a General Partner shall mean any person that directly or indirectly controls, or is controlled by or is under common control with, the General Partner, and shall include the family members of the General Partner and any officer or director of the General Partner and the family members of any such officer or director.

Section 6.3     Limitation on Exercise of Rights Regarding Life Insurance.  Any provision of this Agreement to the contrary notwithstanding, if at any time the Partnership possesses any incidents of ownership (as that term is defined under § 2042 of the Code and the Treasury Regulations thereunder) in any policy or policies of life insurance upon the life of any General Partner (the "Insured General Partner"), then the Insured General Partner shall be prohibited and excluded from voting upon or otherwise participating in the exercise of any such rights with respect to any policies of insurance upon the life of that Insured General Partner, including without limitation, the right to borrow from the cash value of the policy and the right to control the application of policy dividends.

Section 6.4     Third Parties.  Any Person dealing with the Partnership or the General Partners may rely upon a certificate signed by the General Partners, or any of them, as to the accuracy

of the statements therein or as to the authority of the General Partners to make any commitment or undertaking on behalf of the Partnership, including certificates as to (1) the identity of any General Partner or Limited Partner hereof, (2) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the General Partners or in any other manner are germane to the affairs of the Partnership, (3) the persons who are authorized to execute and deliver any instrument or document of the Partnership, or (4) any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

Section 6.5    Duties of the General Partners. The General Partners shall discharge their duties to the Partners and the Partnership, and shall exercise their powers under the Act and under this Agreement, consistent with the duty of loyalty and the duty of care set forth in A.C.A. §4-46-404 and consistent with the obligation of good faith and fair dealing therein. The General Partners do not guarantee the return of any Partner's capital contributions. Under no circumstances shall the General Partners be personally liable to a Limited Partner for any deficit in a Limited Partner's capital account.

Section 6.6    Obligations not Exclusive. The General Partners shall be responsible for the management of the Partnership's business, it being understood that the General Partners may be fairly compensated for services rendered. The General Partners may delegate such portion of the managerial responsibilities as is reasonably deemed necessary to any other party at the Partnership's expense.

Section 6.7    Power of Attorney. By the execution of this Agreement, or a counterpart hereof, a Limited Partner does irrevocably constitute and appoint the General Partners (or any successor General Partner) his or her true and lawful attorneys-in-fact and agents to effectuate, with full power and authority to act in the name, place and stead in effectuating, the purposes of the Partnership, including the execution, acknowledgment, delivering, filing and recording of all Certificates, documents, deeds, bills of sale, assignments and other instruments of conveyance, leases, contracts, loan documents and/or counterparts hereof, and all other documents which the General Partners may deem necessary or reasonably appropriate:

(a)    To qualify or continue the Partnership as a limited partnership (or a partnership in which certain partners have limited liability) in all jurisdictions in which the Partnership conducts business;

(b)    To reflect a modification of the Partnership, or an amendment of this Agreement and/or the Certificate;

(c)    To accomplish the purposes and carry out the powers of the Partnership as set forth in Article III and in this Article VI; or

(d)    To reflect the dissolution and termination of the Partnership.

The power of attorney granted herein:

(1)    Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, incompetency or legal disability of any Limited Partner;

(2)    May be exercised by the General Partners, or any of them, for each Limited Partner (or any of them) by listing all (or any) of the Limited Partners required to execute any such instrument and executing such instrument in such manner as the General Partners may reasonably deem appropriate; and

(3)    Shall be binding on any assignee or vendee of a Limited Partnership interest hereunder or any portion thereof, including an assignee of only the distributive rights relating thereto.

Section 6.8    Admission of Additional General Partner. The General Partners shall not, without the written consent of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, admit any additional or substitute General Partner to the Partnership.

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be; provided, however, the death, withdrawal, adjudication of bankruptcy, incompetency or removal with respect to one (1) General Partner, but not all General Partners, shall not cause the Partnership to be dissolved. In the event the Partnership is continued, the Agreement of Limited Partnership shall be properly amended and the new General Partner(s) shall succeed to all rights, duties and responsibilities of the General Partners. By affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, a General Partner may be removed for breach of any fiduciary duty and for any breach of this Agreement in any material respect. Furthermore, in the event of a General Partner's death, resignation, removal, or adjudication of bankruptcy or incompetency, then the General Partner shall become a Limited Partner and a successor General Partner may then be appointed pursuant to the terms set forth herein.

Section 6.10    Indemnification of the General Partners. The General Partners shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, arising out of or incidental to the General Partners' management of the Partnership affairs while the General Partners were in the course of managing the Partnership affairs; provided, however, a General Partner shall not be entitled to indemnification hereunder where the claim at issue is based upon:

(a)    The proven gross negligence or willful misconduct of the General Partner; or,

(b)    The proven breach by the General Partner of any provision of this Agreement.

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the General Partners shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 6.11.  Limited Liability of the General Partners.  The General Partners' liability for the obligations of the Partnership and certain acts of other Partners, employees, agents, or representatives of the Partnership is limited to the extent provided in A.C.A. §§ 4-43-1110 and 4-42-307.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 7.1    Rights of a Limited Partner.  Each Limited Partner shall be entitled to cast one (1) vote per Unit of ownership on all matters in which the Limited Partners are herein given the right to vote as a class or individually as a Partner.  A Limited Partner shall not be:

(a)    Personally liable for any of the debts or other liabilities of the Partnership (except to the extent expressly set forth in A.C.A. § 4-43-303);

(b)    Personally liable, merely because of his or her interest in the Partnership, for any losses or liabilities of any other Limited Partner;

(c)    Allowed to take part in the management or control of the Partnership business, or to sign for or to bind the Partnership, such power to remain vested solely and exclusively in the General Partners; or

(d)    Entitled to be paid any salary or to have a Partnership drawing account; provided, however, the General Partners have the power to employ one or more Limited Partners at a salary commensurate with services actually rendered to the Partnership.

No Limited Partner shall have the right to withdraw from the Partnership or to receive a return of any of his or her contributions to the Partnership until the Partnership is terminated and its affairs wound up in accordance with § 801, et seq. of the Act and this Agreement.  A Limited Partner shall be in breach of this Agreement if the Limited Partner (1) attempts to withdraw from the Partnership, (2) interferes in the management of the Partnership affairs, (3) engages in conduct which could result in the Partnership losing its tax status as a partnership, (4) engages in conduct that tends to bring the Partnership into disrepute, (5) owns Partnership Units which become subject to a charging order, attachment, garnishment, or similar legal proceeding, (6) breaches any confidentiality provisions of this Agreement, (7) fails to meet any legally binding commitment to the Partnership, or (8) otherwise breaches any other term or condition contained herein.  A Limited Partner who is in breach of this Agreement shall be liable to the Partnership for damages caused by the breach.  The Partnership may offset any such damages against any distributions or return of capital to the Limited

Partner who has breached this Agreement. No Limited Partner shall have the right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise.

Section 7.2    Assignments of Limited Partnership Interests. A Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner (as defined in A.C.A. § 4-43-101(6)) only after all of the following steps have first been completed:

(a)    The written approval of the General Partners and of the Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall have been given to the specific person or entity proposed to be substituted;

(b)    The vendee(s) or assignee(s) to be substituted, the General Partners, and all Limited Partners (either individually or by virtue of the General Partners' powers of attorney set forth in this Agreement) shall have executed an appropriate amendment to all certificates, instruments and documents, and taken all such additional action as the General Partners may deem appropriate to the completion of such sale or assignment; and

(c)    If requested by the General Partners, legal counsel for the Partnership has rendered an opinion that the transfer is not in violation of any provisions of this Agreement or any other representations made by the Limited Partner to the Partnership regarding the Limited Partner's investment intent.

Within thirty (30) days after the completion of the above required steps, the General Partners shall forward documents to the substituted Limited Partner indicating such Partner's participation in the Partnership, on such form as the General Partners may adopt and, from time to time, revise or amend. Any purported sale or assignment consummated without first complying with Section 7.2 shall, as between the General Partners, on the one hand, and the assignor/vendor and assignee/vendee, on the other hand, be null and void.

The foregoing provisions of Section 7.2 to the contrary notwithstanding, a Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner without the consent of the Partners if the transferee is a Permitted Transferee.

Section 7.3    Assignments of Distributive Rights. A Limited Partner may not assign all or any portion (in whole or fractional Units) of his or her right to receive distributions hereunder without the prior written consent of the General Partners and of Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units. In addition, no such assignment shall be effective as to the General Partners until the General Partners have first received a copy of the instrument of assignment, executed by both the assignor and the assignee of such distributive right. Once the assignment has been received by the General Partners, the General Partners may (but shall not be obligated to), without requesting further documentation from either the assignor or the

assignee, remit directly to the named assignee all distributions to which the assignee may be entitled pursuant to the provisions of this Agreement and the assignment. So long as the party to whom such distributive share was remitted was either the assignor Limited Partner or the assignee named in the instrument of assignment, the General Partners shall be free from liability to any person if such distribution is received by a person not entitled thereto.

Section 7.4    Partnership Option to Purchase a Limited Partner's Interest. Notwithstanding any of the foregoing provisions of this Agreement to the contrary, in the event a Limited Partner desires to transfer or sell any part of his or her interest in the Partnership (other than to a Permitted Transferee), the Limited Partner shall first offer to sell such interest to the other Partners. The other Partners who desire to purchase said interest shall have the right for a period of thirty (30) days after written notice of such offer to purchase such Limited Partner's interest in the Partnership at Fair Market Value on a pro rata basis. In addition, the Partnership, by vote of a majority of the General Partners, or failing such vote, each of the other Partners desiring to purchase, on a pro rata basis, shall have the option to purchase, at Fair Market Value, all or part of a Limited Partner's Units in the Partnership upon the occurrence of any of the following events:

(a)    The Limited Partner dies;

(b)    The Limited Partner files for protection under any federal or state bankruptcy laws, makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for such Limited Partner or for substantially all of such Limited Partner's properties or assets, or bankruptcy, reorganization arrangement or similar proceedings are instituted by or against such Limited Partner under federal or state law and the same are not dismissed within forty-five (45) days after filing; or,

(c)    The Limited Partner is divorced and in connection therewith all or any portion of such Limited Partner's Units are to be awarded to such Limited Partner's former spouse (in such event the purchase option shall apply only to those Units which are to be so awarded).

Such option shall be exercisable at any time following the happening of any of the foregoing events and shall expire ninety (90) days following receipt by any General Partner of written notice of the happening of such events. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option. With respect to any exercise of an option under this Section, the purchaser(s) shall have the right to pay for such interest in cash or by delivery of a promissory note in ordinary and customary form, payable with interest at the rate of the lesser of (i) eight percent (8%) per annum, or (ii) the maximum rate allowed by Arkansas law, payable in sixty (60) equal monthly installments of principal and interest. Such promissory note may be prepaid at any time without consent or penalty and shall be secured by the Partnership interest so acquired. The holder of any such promissory note shall have all of the rights and remedies of a secured creditor under the Arkansas Uniform Commercial Code. If the Partnership and the Partners do not fully exercise their option, and any portion of such Limited

Partner's Units are assigned to a beneficiary, a creditor, or a spouse, then the assignee shall have the right only as an assignee to receive distributions to which such Partnership interest is entitled to receive hereunder, subject to the terms and conditions contained herein, and such assignee shall only become a Limited Partner upon the satisfaction of the conditions set forth in Section 7.2 of this Agreement.

The foregoing provisions of Section 7.4 to the contrary notwithstanding, a deceased Limited Partner, or such deceased Limited Partner's personal representative, may transfer to one or more Permitted Transferees,  by legacy, devise, bequest, or other testamentary transfer, without consideration, all or part of his or her interest in the Partnership and thereby constitute his or her transferee a Limited Partner without the consent of the General Partners or of the Partners.

Section 7.5    Limited Partner's Status Upon Death or Incompetency. If a court of competent jurisdiction adjudges a Limited Partner to be incompetent to manage his or her person or his or her property, then in accordance with § 705 of the Act and this Agreement, the guardian, conservator, or other legal representative may exercise all the incompetent Limited Partner's rights for the purpose of administering his or her property, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement. If a Limited Partner dies and the Partnership and Partners do not fully exercise any option arising under Section 7.4 of this Agreement to purchase all of the deceased Limited Partner's Units, then in accordance with § 705 of the Act and this Agreement, the executor, administrator, or other legal representative may exercise all the deceased Limited Partner's rights for the purpose of settling his or her estate, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement.

Section 7.6    Limited Put Option of Certain Permitted Transferees. In the case of a transfer during the lifetime of a Partner, for less than full and adequate consideration, of a Unit or Units, or portion thereof (that portion of such transfer for less than full and adequate consideration shall be a "Donative Transfer" and the Partner making such a transfer shall be the "Transferor"), to a Permitted Transferee (the "Donee"), for a period of sixty (60) days after the date of the Donative Transfer, the Donee shall have the right to require the Partnership to purchase from the Donee that number of whole Units which has a Fair Market Value closest to the Option Amount (defined below) as follows:

(a)    The Donee desiring to exercise this put option shall provide written notice thereof to the General Partners within sixty (60) days of the date of the Donative Transfer.

(b)    Upon exercise of any such option, the Partnership shall purchase the Units subject to the option for a price equal to their Fair Market Value, and the payment of the purchase

price shall be made in cash or in kind, as determined by the General Partners, provided that any Partnership Properties distributed to the Donee in payment of the purchase price shall be valued at Fair Market Value for the purposes hereof. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option.

(c)     The "Option Amount" shall be equal to the lesser of: (1) the Fair Market Value of the Donative Transfer; or (2) the total amount allowable with respect to such Donative Transfer to the Donee as an annual exclusion for federal gift tax purposes under §2503(b) of the Code, taking into account the annual exclusion available to the Transferor and the Transferor's spouse, if any, at the time of the Donative Transfer; provided, however, if the Transferor's spouse made no independent transfer to such Donee on the same date as the Donative Transfer, then such annual exclusion of the Transferor's spouse shall not be taken into account unless the Transferor's spouse consents thereto by a signed written statement at the time of the Donative Transfer.

(d)     To be consistent with the hypothetical willing buyer-willing seller standard, Fair Market Value shall be determined without regard to this limited put option.

## ARTICLE VIII
### COMPENSATION OF THE GENERAL PARTNERS

Section 8.1     Compensation. With the approval of Partners owning a majority-in-interest of the Partnership Units, the General Partners may receive reasonable compensation for serving as the General Partners and for managing the Partnership Properties.

Section 8.2     Expenses. Any costs and expenses incurred by the General Partners for the Partnership's benefit shall be billed directly to the Partnership, and the General Partners shall be entitled to be paid, as reimbursement, for all costs and expenses billed to and paid by the General Partners.

## ARTICLE IX
### DISTRIBUTIONS AND
### ALLOCATIONS OF INCOME AND LOSS

Section 9.1     Distributions of Distributable Cash. From time to time during each fiscal year the General Partners may distribute all or any part of the Distributable Cash, and the General Partners shall distribute all remaining Distributable Cash not later than April 15 following the end of each fiscal year. All such distributions shall be made in accordance with this Agreement and the Sharing Ratios of the Partners.

Section 9.2     Allocation of Certain Income and Losses for Tax Purposes. For federal

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                     -15-

income tax purposes, the net income and net losses of the Partnership for any taxable year (or portion thereof) shall be allocated (subject to the requirements of § 704(c) of the Code) to the Partners in proportion to their Sharing Ratios.

Section 9.3    Allocations Upon Liquidation.  For federal income tax purposes, income (including gain) or loss of the Partnership resulting from the sale or disposition of all or substantially all of the Partnership Properties, or the dissolution of the Partnership pursuant to Article X without an election to continue the Partnership in accordance with Section 10.1, shall be allocated to the Partners in proportion to their Sharing Ratios.

## ARTICLE X
## DISSOLUTION AND PRIORITY ON DISTRIBUTION

Section 10.1    Dissolution and Termination of the Partnership.  The Partnership shall be immediately dissolved:

(a)    Upon the expiration of the term set forth in Section 1.5 hereinabove;

(b)    Upon a unanimous vote of all the Partners;

(c)    Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units;

(d)    Within a reasonable period of time after the sale, condemnation, foreclosure or other similar disposition of all or substantially all of the Partnership Properties; provided, however, the Partnership may be continued by any or all of the Partners wishing to reinvest the sales proceeds; or

(e)    Upon the occurrence of any other circumstances which, by law, would require the Partnership to be dissolved.

The death, legal disability, or dissolution of any Limited Partner shall not result in the dissolution of the Partnership.  Upon the death or legal disability of a Limited Partner, the legal representative of such Limited Partner or of his or her estate shall have the status described in Section 7.5 of this Agreement and the rights and liabilities as set forth in the Act.

Section 10.2    Liquidation and Priorities on Distribution.  Upon the occurrence of any event which causes the dissolution of the Partnership, as set forth in Section 10.1 hereinabove, the General Partners or, if there is no General Partner, such person as may be designated by the Partners owning a majority-in-interest of the outstanding Partnership Units to act as liquidating trustee (the "Trustee")

shall immediately proceed to terminate the business of the Partnership. The General Partners or Trustee shall first determine the Fair Market Value of each Partnership Property (except cash) and then attempt to sell such portion (or all) of the Partnership Properties (except cash) at such prices and on such terms as the General Partners or Trustee, in the exercise of the General Partners' or Trustee's best business judgment under the circumstances then presented, deems to be necessary to provide for the liquidation priorities described below and to be in the best interests of all the Partners. The proceeds of any such sale, all Partnership cash, and undivided interests in Partnership Properties, shall be distributed in the following manner:

       (a)    To creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of debts and liabilities of the Partnership, other than liabilities for distributions to Partners under A.C.A. § 4-43-601 or § 4-43-604;

       (b)    To the creation of any reserves which the General Partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partners, arising out of or in connection with the Partnership;

       (c)    To Partners and former Partners in satisfaction of liabilities for distributions under A.C.A. § 4-43-601 or § 4-43-604;

       (d)    To Partners for the return of their capital account balances; and

       (e)    The remainder, if any, shall be distributed to the Partners in accordance with their Sharing Ratios.

## ARTICLE XI
## ACCOUNTING AND BUSINESS MATTERS

Section 11.1    Books of Accounts and Records. The Partnership's books and records, this Agreement and any other records required by law to be maintained by the Partnership shall be maintained at the principal office of the Partnership. The books and records shall reflect all transactions and be appropriate and adequate for the business of the Partnership. Each Partner shall have access to and the right to copy at his or her own expense the Partnership's books and records at all reasonable times.

Section 11.2    Accounting Method. The Partnership books shall be kept on an accounting basis determined by the General Partners in accordance with usual and customary accounting practices.

Section 11.3    Financial Statements and Reports. Upon request by any Limited Partner, the General Partners shall cause the Partnership to provide the following reports and financial statements to the Partners:

       (a)    Annual Report. Within one hundred twenty (120) days after the end of each

fiscal year, the Partnership shall provide to the Partners (1) financial statements prepared by an independent certified public accountant, including a balance sheet as of the end of such fiscal year, together with statements of income, Partners' equity, changes in financial position and funds from operations for such year; the balance sheet and such statements (other than the funds from operations statement) shall be prepared in accordance with generally accepted accounting principles and shall be accompanied by a report of the activities of the Partnership for such year; and (2) a report on distributions to the Limited Partners for such period.

(b)    Tax Information. No later than March 15 of each year, the Partnership shall provide to each Partner all information relating to the Partnership necessary for the preparation of the Partners' federal income tax returns.

(c)    Other Federal and State Reporting Requirements. The General Partners shall cause to be delivered to the Limited Partners all other reports and information as may be required by law to be delivered to such Limited Partners.

Section 11.4    Fiscal Year. The fiscal year of the Limited Partnership shall be the calendar year.

Section 11.5    Bank Accounts. Except as may be otherwise specifically provided herein, all funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partners. Such account or accounts shall be in the name of the Partnership. All withdrawals therefrom shall be made upon checks signed by the General Partners, or any person authorized to do so by the General Partners.

## ARTICLE XII
## ELECTIONS

Section 12.1    Adjustment Election. In the event of the transfer of a Partner's Units or upon the death of any individual Partner, or in the event of the distribution of Partnership Property to any person, the General Partners, in their sole discretion, may, but shall not be obligated to, file an election as provided by Code § 754 and the Treasury regulations thereunder, to cause the Partner's basis in the Partnership Property to be adjusted for federal income tax purposes as provided by Code Sections 734 and 743. Any cost incurred in making such elections shall be charged to the Partner or Partners benefitting therefrom.

Section 12.2    Depreciation Elections. With respect to all depreciable assets of the Partnership, the General Partners may elect to use, to the extent allowed by the Code, accelerated depreciation methods; however, the General Partners may change or elect some other method which is, in their opinion, most advantageous to the Partners.

Section 12.3    Election with Respect to Taxation as Partnership. No election shall be made

by the Partnership, the General Partners or any Limited Partner to exclude the Partnership from the application of any of the provisions of Subchapter K, chapter 1 of subtitle A of the Code, or from any similar provisions of any state tax laws. The foregoing shall not prohibit such an election by the Partnership and any person other than in the capacity of a Partner hereunder.

Section 12.4    Other Elections. In addition to the elections stated in this Article XII, the General Partners shall make all other elections which in their reasonable sole discretion are necessary for the proper operation and accounting of the Partnership.

## ARTICLE XIII
## AMENDMENTS

Subject to the provisions of the laws of the State of Arkansas, amendments to this Agreement which do not substantially affect the rights of the Limited Partners, or which are required or contemplated by this Agreement, may be made by the General Partners through use of the powers of attorney herein and hereby granted. Any other amendment must be agreed to in writing by all of the Partners.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1    Notices. All notices under this Agreement shall be in writing and shall be given to the Partners at each Partner's last known address and to the Partnership at its principal office or at such other address as any of the parties may hereafter specify in the same manner.

Section 14.2    Further Acts. Each Partner hereby agrees to execute and deliver to the General Partners, within fifteen (15) days after receipt of the General Partners' written request therefor, such other and further statements of interest and holdings, designations, powers of attorney or other instruments as the General Partners reasonably deem necessary.

Section 14.3    Paragraph Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provisions hereof.

Section 14.4    Severability. Every portion of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 14.5    Application of Arkansas Law. This Agreement, and the application or interpretation thereof, shall be governed by its terms and by the laws of the state of Arkansas.

Section 14.6    Survival of Rights. This Agreement and all of the terms, provisions, and

agreements herein contained shall be binding upon and inure to the benefit of the Partners and their respective legal representatives, heirs, successors and assigns.

Section 14.7    Interpretation. As used herein, the masculine includes the feminine and the neuter and the singular includes the plural, as the context may require.

Section 14.8    Execution in Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had all signed the same document. All counterparts shall be construed together and shall constitute one (1) agreement.

Section 14.9    Waiver of Action for Partition. Each of the parties irrevocably waives during the term of the Partnership any right that he or she may have to maintain any action for partition with respect to the Partnership Properties.

Section 14.10    Tax Matters Partner. Pursuant to Code § 6231, the Partners hereby designate MARY HANNA BOLES CANADA as the tax matters partner ("TMP") for the Partnership. The TMP shall have all of the power and responsibilities imposed by the Code. Notwithstanding the designation, the Partners may participate in any inquiry by the Internal Revenue Service to the extent not inconsistent with this provision or the provisions contained in the Code relating to treatment of Partnership items at the Partnership level, at the Partner's sole expense.

Section 14.11    Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

Section 14.12    Arbitration. Any dispute or controversy arising out of or relating to this Agreement or any document or instrument delivered in connection with this Agreement shall be settled by arbitration to be held in England, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the parties irrevocably consent to the jurisdiction of the state courts of Arkansas for this purpose. The losing party in such arbitration shall pay all the costs and expenses of such arbitration and all the reasonable attorneys' fees and expenses of the other party thereto.

Section 14.13    Confidentiality. Each of the Partners, and any other person who shall become a Partner, agrees to keep confidential all information pertaining to the Partnership, its business, its management, and the arbitration of any dispute among the Partners, and agrees to refrain from disclosing such information to anyone who is not a Partner or a Partner's attorney or agent.

IN WITNESS WHEREOF, this Amended and Restated Agreement of Limited Partnership has been duly executed by the parties effective on the ___1___ day of ___April___, 2004.

GENERAL PARTNERS:

_____
MARY HANNA BOLES CANADA

LIMITED PARTNERS:

_____
MARY HANNA BOLES CANADA

_____
GARY RECTOR CANADA

GARY RECTOR CANADA, JR. TRUST I

BY: _____
       GARY RECTOR CANADA, JR., Trustee

BRADLEY SETH CANADA TRUST I

BY: _____
       BRADLEY SETH CANADA, Trustee

HANNA NICOLE CANADA STEWART TRUST I

BY: _____
       HANNA NICOLE CANADA, Trustee

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -21-

# EXHIBIT A
## (As Amended and Restated)

## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## PARTNERSHIP PROPERTY

**[insert description]**

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd

**EXHIBIT B**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**OWNERSHIP OF PARTNERSHIP UNITS**

| GENERAL PARTNERS: | UNITS: |
|---|---|
| Mary Hanna Boles Canada | 10 |

| LIMITED PARTNERS: | |
|---|---|
| Mary Hanna Boles Canada | 409 |
| Gary Rector Canada | 419 |
| Gary Rector Canada, Jr. Trust I | 54 |
| Bradley Seth Canada Trust I | 54 |
| Hanna Nicole Canada Stewart Trust I | 54 |
| TOTAL: | 1,000 |

<div style="text-align:right">

┌─────────────┐
│  **EXHIBIT** │
│             │
│     2       │
│  ─────────  │
└─────────────┘

</div>

## SHAREHOLDERS AGREEMENT

### *Canada Bancshares, Inc.*

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is executed effective as of the date set forth below (the "Effective Date"), by and among Canada Bancshares, Inc., an Arkansas corporation (the "Corporation"), and the undersigned Shareholders of the Corporation (all hereinafter collectively referred to as the "Shareholders" and individually as the "Shareholder").

### RECITALS:

WHEREAS, the Shareholders and the Corporation desire to promote their mutual interests by imposing certain restrictions and obligations upon the shares of capital stock of the Corporation in order to preserve and maintain a continuity of shareholder relationships and in order to promote sound and harmonious management of the Corporation; and

WHEREAS, it is the intention of the parties to place such restrictions on the sale, transfer, pledge, encumbrance or other disposition of all shares of the capital stock of the Corporation.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.    REGULATORY REQUIREMENTS. Notwithstanding any other provision herein, no transfer pursuant to Section 2 or Section 3, below, no pledge pursuant to Section 4, below, nor any other Disposition (as defined below) of shares of capital stock of the Corporation including, without limitation, any Disposition involving a redemption of shares, shall occur except in compliance with all applicable legal and regulatory requirements. This shall include, without limitation, (a) the submission of all required applications and notices to the Board of Governors of the Federal Reserve, the Arkansas State Bank Department and any other applicable governmental entity (collectively, the "Governmental Entity(ies)"), (b) all required approvals from applicable Governmental Entities having been obtained in such form as is satisfactory to the Board of Directors of the Corporation in its sole discretion, and (c) any Disposition being completed in compliance with the requirements of all applicable approvals granted by the Governmental Entities. The terms of any Disposition shall comply with the requirements of all applicable approvals given by the Governmental Entities. All time periods relating to any exercise and/or closing of any purchase option hereunder shall be extended as necessary to accommodate the requirements of this Section 1.

2.    FAMILY TRANSFERS. Any Shareholder may transfer all or part of the Shareholder's shares of capital stock in the Corporation by sale or gift (including by testamentary transfer upon death) to one or more trusts established for the benefit of such Shareholder, his/her spouse and/or lineal descendants (collectively, "Family Member(s)"), and/or to an entity wholly-owned by such persons (referred to as a "Family Entity"), (collectively referred to as a "Family

1

5203889.4

Transferee"). In such cases, the transferee shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors, in its sole discretion.

3.    TRANSFERS BY ENTITY SHAREHOLDERS. Any Shareholder that is a corporation, partnership or limited liability company (collectively, an "Entity") may, upon notice to the Corporation, transfer all or part of the Entity's shares of capital stock in the Corporation to (i) the shareholders, partners or members, respectively, of that Entity, or (ii) any other corporation, partnership or limited liability company wholly-owned by that Entity. In such cases, the transferee(s) shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the other terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors.

4.    PLEDGE OR OTHER ENCUMBRANCE. No Shareholder shall pledge, encumber, grant a security interest in, or otherwise cause or permit any lien to be placed upon all or any part of the shares of capital stock of the Corporation owned by such Shareholder, without first providing written notice thereof to the Corporation; and provided further, as a condition thereto, the Shareholder shall require the lender, secured party, or other lienholder to execute an estoppel agreement (as approved by the Board of Directors) for the benefit of the Corporation and the other Shareholders which provides that any foreclosure, sale, transfer, or other disposition of the stock so pledged or encumbered shall be subject to the terms and conditions of this Agreement.

5.    RESTRICTIONS ON TRANSFER.

(a)    Except as provided in Sections 2, 3 and 4, no Shareholder shall sell, contract to sell, convey, hypothecate, assign, pledge, encumber, or otherwise transfer (collectively, a "Disposition") any or all of its shares of capital stock of the Corporation, now owned or hereinafter acquired, or any interest or right therein, without the prior written consent of all the other Shareholders, or in the absence of said written consent, without first providing the Corporation and each of the other Shareholders the right of first refusal option to purchase such stock as provided herein.

(b)    Except as otherwise provided in Sections 2, 3, and 4, a Shareholder proposing a Disposition (the "Transferor") shall provide written notice of the intended Disposition to the Corporation's Board of Directors (the "Disposition Notice"). The Disposition Notice shall set forth all of the terms of the proposed Disposition, including price and payment terms for any sale, the name and address of the proposed transferee, the number of shares involved in the proposed Disposition, and the date on which the transaction is to occur, which date shall not be less than thirty (30) days from the date on which said notice is given.

2

5203889.4

(c)　　For a period of fifteen (15) days after the date on which the Disposition Notice is given, the Corporation shall have the right of first refusal option to purchase the stock of the Transferor identified in the notice, which option shall lapse and expire if not exercised in writing within said 15-day period by majority vote of the Board of Directors of the Corporation (without participation by the Transferor). The Corporation's option to purchase may be exercised in whole or in part. In the event said option is exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(d)　　In the event that all of the shares of the Transferor subject to the foregoing option are not redeemed and purchased by the Corporation as provided above, then (i) the Corporation shall delivery a copy of the Disposition Notice to each Shareholder, and (ii) the shares not so purchased and redeemed by the Corporation shall become subject to a second option on the part of each of the other Shareholders to purchase a "proportionate share" of such stock, which option shall lapse and expire if not exercised in writing by notice to the Transferor within thirty (30) days after the date on which the Disposition Notice is mailed to each Shareholder by the Corporation. The Shareholders' option may also be exercised in whole or in part. In the event any or all of said options are exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(e)　　The term "proportionate share" shall mean the ratio expressed as a percentage of (i) the number of shares of the Corporation's capital stock owned by the Shareholder to (ii) the total number of shares of capital stock of the Corporation owned by all Shareholders other than the Transferor. In addition, if any stock of the Corporation offered for sale is not purchased by the Shareholder first entitled thereto, the term "proportionate share" shall include that portion of the stock of the Corporation not purchased by the Shareholder first entitled thereto which the number of shares of capital stock of the Corporation owned by a Shareholder bears to the total number of shares of capital stock of the Corporation owned by Shareholders electing to exercise this option to purchase the Transferor's stock.

(f)　　In the event the Corporation and the other Shareholders do not exercise their respective options as hereinbefore provided, the Transferor may make a bona fide Disposition to the prospective purchaser, or other transferee, of any remaining stock not so purchased by the Corporation or other Shareholders. The Disposition shall be made only to the transferee identified in the Disposition Notice and shall be made only in strict accordance with the terms stated in such notice. However, if the Transferor shall fail to make such Disposition within one hundred twenty (120) days following the date on which the Disposition Notice is given, such shares shall again become subject to all of the restrictions contained in this agreement. Any purchaser or other transferee acquiring the offered shares shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, and deliver a counterpart of this Agreement as a condition to the issuance of a stock certificate in such person's name.

(g)　　During any period in which the Corporation is a "small business corporation," as defined in sections 1361(a) and (b) of the Internal Revenue Code of 1986, as

3

amended (the "Code") (referred to herein as an "S Corporation") then, in the case of shares held by a trust, any change in the status or circumstances of the trust or its beneficiaries that either (i) causes or will reasonably be expected to cause the trust to cease to be a trust that is permitted to hold shares in an S Corporation, or (ii) results in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any trustee or beneficiary of the trust in question, if such person is also serving as a director).

(h)    With respect to any Family Entity that was a transferee under Section 2, any event resulting in that Family Entity having any owner, officer or director (or any similar positions) that is not a Family Member of the original transferor, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any person affiliated with the Family Entity in question, if such person is also serving as a director).

(i)    Notwithstanding any other provision herein, unless first approved by the Board of Directors in writing, in its sole exercise of discretion, no Shareholder shall complete a Disposition of any shares of the Corporation's capital stock to any of the following (each referred to as a "Competitor"): (1) any other state or federally chartered financial institution or financial institution holding company, (2) any individual(s) or entities that in the aggregate own ten percent (10.00%) or more of any other state or federally chartered financial institution or financial institution holding company, or (3) any other individual or entity that the Board of Directors of the Corporation has, in its sole discretion, designated as a "Competitor" for purposes of this Section 5(i).

(j)    In the event the options specified herein are exercised, the purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

(k)    For all purposes of this Section 5, the date on which the Disposition Notice is given shall be the date such notice is deemed made pursuant to Section 24(d).

6.    DIVORCE.  If an individual Shareholder shall become a party to a divorce proceeding and pursuant to the final decree in that proceeding all or any portion of the Shareholder's stock in the Corporation is awarded to the Shareholder's former spouse (who is not also then a shareholder), the stock so awarded shall immediately become subject to an option to purchase on the part of the Corporation first, and the other Shareholders second for a period of ninety (90) days after written notice of such award as provided to the Corporation and each of the other Shareholders, in the manner provided in Section 5 as in the case of a proposed Disposition except that for purposes of Section 5, the date on which the notice is made to the Corporation and the other Shareholders of the final divorce decree shall be deemed the date of the Disposition Notice.  If all of the shares of stock so awarded are not purchased by the Corporation, the Shareholders (other than the divorced Shareholder and his or her spouse) shall

4

5203889.4

have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

7.    BANKRUPTCY OR INSOLVENCY. If any Shareholder makes an assignment for the benefit of creditors, or if any petition shall be filed in any federal or state court alleging that a Shareholder is insolvent, or requesting the appointment of a receiver for all or substantially all of a Shareholder's property, or if any petition in bankruptcy is filed by or against a Shareholder in a court of competent jurisdiction and if such petition or petitions are not dismissed within ninety (90) days from the date of filing, all of such Shareholder's shares of stock in the Corporation (including any shares transferred pursuant to Section 2) shall immediately become subject to an option to purchase such stock in favor of the Corporation first and the other Shareholders second, for a period of one hundred twenty (120) days after written notice of such event. If all of the shares of stock in the Corporation owned by such Shareholder are not purchased by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and term of payment shall be determined pursuant to Sections 10 and 11.

8.    DEATH. Subject to a Shareholder's ability to transfer shares of stock to a Family Transferee at such Shareholder's death as provided in Section 2, upon the death of an individual Shareholder (the "Decedent") all of the shares of stock in the Corporation owned by the Decedent (including shares transferred pursuant to Section 2) or to which the Decedent or his or her personal representative shall be entitled, shall become subject to an option to purchase on the part of the Corporation, first and the other Shareholders, second for a period of one hundred twenty (120) days following the date of the Decedent's death. If all of the Decedent's shares of stock in the Corporation are not purchased and redeemed by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11. Notwithstanding the provisions of Section 11 to the contrary, if the Corporation shall receive any proceeds from any policy of insurance on the life of the Decedent, such proceeds shall be paid by the Corporation to the Decedent's personal representative to the extent of the purchase price of the Decedent's stock, and such payment shall be deemed to have been made on account of such purchase price. The balance of the purchase price remaining after credit for such insurance proceeds shall be paid pursuant to Section 11.

9.    S CORPORATION PURCHASE OPTION.

(a)    In the event that the holders of a majority of the outstanding shares of capital stock of the Corporation provide written notice to the Board of Directors of the Corporation that they desire to cause the Corporation to make an election to be treated as an S Corporation (defined herein) for federal and state income tax purposes (the "Election Notice"), then the Board shall take the following actions:

(i)    the Board shall promptly provide the Election Notice to each Shareholder;

(ii)    the communication containing the Election Notice shall inform

5

each Shareholder that it has a period of not less than 45-days as established by the Board (the "Notice Period") in which to:

(A)    deliver to the Corporation a signed consent (in a form approved by the Board) to the S Corporation election pursuant to which such Shareholder consents to the Corporation making an S Corporation election, along with such other documents as the Board may require; and

(B)    if applicable, with respect to any Shareholder that is not eligible to own shares of stock in an S Corporation, to take such actions as may be necessary to cause the Shareholder to become eligible (including any Disposition of shares permitted by and completed in accordance with Section 2 and/or Section 3 herein).

(b)    Any Disposition of shares proposed by a Shareholder in order for the Shareholder (or its transferee(s)) to be an eligible S Corporation shareholder shall (i) be subject to the review and approval of the Board of Directors of the Corporation, and (ii) if approved by the Board, be subject only to those restrictions and requirements imposed by the Board and permitted to occur without any requirement of compliance with the provisions of Section 5, if applicable.

(c)    In the event a Shareholder fails to provide the consent (and other required documentation) described in Section 9(a)(ii)(A), above, within the Notice Period, or is otherwise not an eligible S Corporation shareholder as of the expiration of the Notice Period (as determined by the Board), then, without any additional action, all of such Shareholder's shares of stock in the Corporation shall be subject to a purchase option in favor of the Corporation to repurchase and redeem such shares. The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

10.    PURCHASE PRICE. The purchase price for each share of stock purchased pursuant to this Agreement shall be equal to the purchase price contained in any bona fide offer to purchase such shares which the Transferor proposes to accept (in the case of any proposed Disposition by sale or exchange), or in the absence of such bona fide offer or in situations other than proposed Dispositions involving a sale or exchange, the purchase price for such stock shall equal the Book Value of such shares of stock. "Book Value", as used in this Agreement, shall be the net book value of the Corporation as of the end of the month preceding the date of occurrence of the event giving rise to any right to purchase shares hereunder, computed in accordance with generally accepted accounting principles applied in a consistent manner with prior periods, by a Certified Public Accountant selected by the Board of Directors. The determination by such accountant shall, for purposes of this Agreement, be final, conclusive and binding upon each of the parties hereto. The purchase price per share shall equal the Book Value divided by the number of shares of capital stock outstanding.

11.    PAYMENT OF PURCHASE PRICE. The purchase price for any shares of stock purchased pursuant to this Agreement, in situations involving proposed dispositions by sale or exchange, shall be paid upon the same terms and conditions (including, as near as possible, security terms) as contained in the bona fide offer to purchase such shares received by the

6

5203889.4

Transferor; or in the absence of any such bona fide offer, or in situations other than proposed Dispositions involving a sale or exchange, the purchase price shall be paid in sixty (60) equal monthly installments of principal and interest at a rate equal to the lesser of (1) the prime rate at Bank of England, in England, Arkansas, or its successor, on the date of the closing, or (2) 5.00% per annum (provided that any purchaser may elect to pay the purchase price in cash at any time). The first such payment shall be due and payable thirty (30) days from the closing date of such sale and purchase.  Such obligation shall be represented by a promissory note in customary form as approved by the Board of Directors.

12.    CORPORATE GOVERNANCE MATTERS.    Neither the Board, nor any Shareholder, officer or agent of the Corporation, shall take or permit to be taken any of the following actions by or on behalf of the Corporation, without the prior written authorization of MHBC Investments Limited Partnership I, LLLP (or its successor), in each case:

(a)    the amendment, modification, or restatement of this Agreement, the Corporation's Articles of Incorporation or Bylaws;

(b)    the amendment, modification, or restatement of the charter, bylaws or other governing documents of any entity in which the Corporation owns an interest, or any entity owned by any entity in which the Corporation owns an interest, (each, referred to as a "Subsidiary") including, without limitation, Bank of England (the "Bank"), or any successor thereof;

(c)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect the election or appointment of any person to, and/or removal of any person from, the Board of Directors (or similar position) of the Bank or any other Subsidiary;

(d)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect (i) any merger, consolidation or similar transaction involving a Subsidiary, (ii) the sale of all or substantially all of a Subsidiary's assets, (iii) the liquidation or dissolution of a Subsidiary (or entering into any license, pledge, encumbrance or other transaction with similar economic effect), or (iv) the liquidation, dissolution or other termination of the existence and/or business of any Subsidiary;

(e)    causing a reclassification, reorganization, or recapitalization of any shares of the outstanding capital stock (or other equity interests) of any Subsidiary.

7

5203889.4

13.   SECURITY FOR PAYMENT OF THE PURCHASE PRICE.   Whenever the Corporation redeems, or remaining Shareholders purchase, stock pursuant to this Agreement, and the purchase price is to be paid in installments, the shares of stock so purchased or redeemed shall be pledged to the selling Shareholder as security for the payment of the purchase price and all certificates representing such stock shall be delivered to the selling Shareholder, or his or her personal representative, as the case may be, to hold as such security.   The selling Shareholder and/or his or her personal representative, as the case may be, shall have all the rights and remedies of a secured creditor under the Uniform Commercial Code as adopted under the laws of the State of Arkansas.

14.   INSUFFICIENT SURPLUS.   If the Corporation elects to purchase a Shareholder's stock but does not have sufficient surplus to permit it to lawfully purchase all of the shares of stock to be purchased, the Shareholders shall promptly take such measures to vote their respective shares to reduce the capital of the Corporation or to take such other and further steps as may be appropriate or necessary (excluding making additional capital contributions) in order to enable the Corporation to lawfully purchase all of the shares of stock to be purchased, including without limitation, an up-to-date appraisal of the assets of the Corporation, or a recapitalization of the Corporation so as to reduce its stated capital and increase its surplus.

15.   ADDITIONAL ACTION.   Whenever the Corporation or other Shareholders shall, pursuant to this Agreement, redeem or purchase shares of the Corporation's stock from the Transferor, the Transferor shall do all things necessary to execute, deliver, and endorse all papers and certificates as may be required to consummate said purchase and transfer of stock.

16.   RESTRICTIVE LEGEND.   Each certificate representing shares of stock in the Corporation shall be stamped or otherwise imprinted with the following restrictive legend:

RESTRICTIVE LEGEND FOR COMMON STOCK
OF CANADA BANCSHARES, INC.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE ARKANSAS SECURITIES ACT, AS AMENDED. THE SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF REGISTRATION OR THE AVAILABILITY OF EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND THE ARKANSAS SECURITIES ACT. NO RESALE, PLEDGE, HYPOTHECATION, OR OTHER TRANSFER OR DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL OCCUR EXCEPT IN COMPLIANCE WITH THE PROVISIONS OF A SHAREHOLDERS AGREEMENT BY AND AMONG THE CORPORATION AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION. AT ANY TIME DURING WHICH THE CORPORATION IS AN ELECTING SMALL BUSINESS CORPORATION UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS CERTIFICATE SHALL NOT BE

8

5203889.4

TRANSFERABLE IF SUCH TRANSFER WOULD CAUSE REVOCATION OF THE CORPORATION'S "S" CORPORATION ELECTION. ANY TRANSFER CONTRARY TO THE ABOVE INSTRUCTIONS IS VOID.

17.  **ADDITIONAL STOCK OR SECURITIES; TRANSFEREE TO BE MADE A PARTY.** Before any additional shares of stock or any other securities convertible into stock of the Corporation are issued in the future to shareholder or other security holder (other than a signatory to this Agreement), such person or entity shall be required to become a party to and execute and deliver a counterpart of this Agreement prior to the issuance of such shares or other securities and the certificates therefor shall be legended as provided in Section 16. Further, whenever any Shareholder acquires any additional shares of stock of the Corporation or any other securities of the Corporation convertible into stock other than the shares of stock owned at the time of the execution of this Agreement, such shares of stock or such other securities so acquired shall be subject to all of the terms of this Agreement, and the certificates therefor shall be stamped with the legend described in Section 16. In addition, each Disposition (of any type) to any transferee is hereby expressly conditioned upon such transferee first being made a party to and bound by the terms of this Agreement.

18.  **TERMINATION.** This Agreement shall terminate and all rights and obligations of the parties hereto shall cease (i) upon the written agreement of all Shareholders, (ii) upon the voluntary dissolution of the Corporation, or (iii) in the event there shall be only one (1) owner of the issued and outstanding shares of common stock of the Corporation.

19.  **PRESERVING "S CORPORATION" STATUS.** Notwithstanding anything herein to the contrary, at any time during which the Corporation is an S Corporation, (i) no shares of stock of the Corporation shall be transferable to any transferee if such transfer would cause a revocation of the Corporation's S Corporation status, and (ii) unless approved by the Board of Directors in writing, no shares of stock of the Corporation shall be transferable if the proposed transfer would result in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on the number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code. Any purported Disposition in violation of this Agreement shall be null and void and the purported transferee shall have no interest in any of the shares of stock of the Corporation purported to be transferred.

20.  **SHAREHOLDERS' REPRESENTATIONS AND WARRANTIES.** Each of the Shareholders represent and warrant that (i) it is the sole owner of the number of shares of common stock set forth opposite its signature hereto, (ii) except as approved in writing by the Corporation, that all of such shares are free and clear of all liens, claims, charges, security interests, or encumbrances of any kind, and (iii) that it has the right and lawful authority to enter into this Agreement.

21.  **DRAG-ALONG SALE.**

(a)  If the holder(s) of a majority of the outstanding shares of capital stock of the Corporation (collectively, the "Drag Initiating Shareholder(s)"), acting individually or together, receive a bona fide offer, or otherwise agree, to make a transfer, sale or disposition of

9

all of their shares of stock in the Corporation in a single transaction or series of related transactions (a "Drag Along Sale"), then the Drag Initiating Shareholders shall have the right to require that each other Shareholder of the Corporation sell all of its shares of stock in the Corporation in the same transaction. In the event a conflict shall exist between a Drag Along Sale and any other option or purchase right in this Agreement, the provisions of this Section 20 shall control.

(b)     Not less than 30-days prior to the proposed closing date of the Drag Along Sale, the Drag Initiating Shareholders shall provide to each Director and each Shareholder (i) a written notice identifying the proposed transferee, the consideration to be paid, and all other material terms and conditions of a Drag Along Sale (the "Drag Along Notice"), and a copy of the written agreements and documents pursuant to which a Drag Along Sale will be conducted and closed (the "Drag Along Agreement"). Each other Shareholder shall be required to participate in the Drag Along Sale on the terms and conditions set forth in the Drag Along Notice and in accordance with the Drag Along Agreement. Within 15-days following the date the Drag Along Notice is given (the "Drag Along Notice Period"), each Shareholder of the Corporation shall execute and deliver in escrow to the Chairman of the Corporation all documents reasonably required to be executed in connection with the closing of such Drag Along Sale. The Chairman shall be authorized to release such documents upon the closing of the Drag Along Sale.

(c)     If the Drag Along Sale has not been completed within 120-days following expiration of the Drag Along Notice Period, then the Chairman shall return to each Shareholder any documents in his possession executed by such Shareholders in connection with the proposed Drag Along Sale, and all restrictions on transfer contained in this Agreement or otherwise applicable at such time shall again be in effect. Notwithstanding anything contained in this Section 20, there shall be no liability on the part of any Drag Initiating Shareholder to any other Shareholder if a proposed Drag Along Sale is not consummated for whatever reason. Any decision as to whether to consummate a transfer of any portion of its Shares shall be at the sole discretion of each Drag Initiating Shareholder.

22.     GRANT OF PROXY.  To insure the performance by each Shareholder with the agreements set forth herein, each Shareholder hereby appoints the Chairman of the Corporation or its designee (the "Proxy Holder"), as his, her or its true and lawful proxy and attorney in fact, with full power of substitution and resubstitution, to vote all Shares owned or held by such Shareholder, subject to the provisions of this Agreement, upon any matter presented to the Shareholders of the Corporation, if (and only if) such Shareholder fails to comply with such provisions within 5-days following written request. The proxies and powers granted by each Shareholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Shareholder's commitments under this Agreement. Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Shareholder.

23.     TERM.  The term of this Agreement shall be 24-years and 364-days following the Effective Date, unless extended by the vote or written consent of the holders of a majority of the Corporation's issued and outstanding shares of voting common stock. Each Shareholder hereby irrevocably supports and authorizes each person who may from time to time serve as President,

10

5203889.4

Chief Executive Officer or Treasurer of the Corporation to act as his attorney-in-fact with specific authority to execute, acknowledge, swear to, file, and deliver, an amendment to this Agreement which extends the term of this Agreement for any length of time provided that the Corporation's Board of Directors makes a determination that the extension of such term of this Agreement will not be treated as a separate Bank Holding Company under the rules and regulations of the Board of Governors of the Federal Reserve and any other applicable law, rule or regulations.

24.   MISCELLANEOUS.

(a)   Governing Law. This Agreement shall be subject to and governed by the laws of the State of Arkansas.

(b)   Partial Invalidation. In the event that one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(c)   Specific Performance. The parties hereto recognize that the Corporation's stock is a unique asset. Accordingly, in the event of a breach of this Agreement, any non-breaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached their contractual obligations described herein. Each party hereto agrees that he will make no objection to the form of action in any such proceeding for specific performance of this Agreement. Anything contained herein to the contrary notwithstanding, this Section shall not be construed to limit in any manner whatsoever any other rights and remedies an aggrieved party may have by virtue of any breach of this Agreement.

(d)   Notices. Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing either in person or by registered, certified or private express mail, which shall be addressed, in the case of the Corporation, to its principal office to the attention of the President and Secretary, and in the case of any Shareholder, to the address appearing by the Shareholder's signature hereto, or such other address as may be designated by a Shareholder in writing to all parties to this Agreement. If mailed, such notice or other communication shall be deemed made when properly deposited in the mail addressed as provided herein, with postage prepaid.

(e)   Fees of Legal Counsel. In the event any party to this Agreement shall employ legal counsel to protect his rights hereunder or to enforce any term or provision herein, then the party prevailing in any such action shall have the right to recover from the other party all of his reasonable attorneys' fees and expenses incurred in relation to such claims.

(f)   Further Assurances. The parties agree that from time to time hereafter, and upon request, each of them will execute, acknowledge and deliver such other instruments and documents and take such further action as may be reasonably necessary to carry out the intent of this Agreement.

11

5203889.4

(g)    Modification. No provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

(h)    Binding Effect and Benefit. This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto, their heirs, executors, administrators, personal representatives, successors and permitted assigns.

(i)    Headings and Captions. Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Agreement.

(j)    Waiver. No waiver of a breach or violation of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or limit or restrict any right or remedy otherwise available.

(k)    Rights and Remedies Cumulative. The rights and remedies expressed herein are cumulative and not exclusive of any rights and remedies otherwise available.

(l)    Gender and Pronouns. Throughout this Agreement, the masculine shall include the feminine and neuter and the singular shall include the plural and vice versa as the context requires.

(m)    Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

(n)    Time for Performance. Time is of the essence in this Agreement.

(o)    Counterparts. This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart. Copies of signatures shall be accepted as originals. Additional signature pages shall be attached hereto as necessary.

(p)    Tax Matters. The initial signatories to this Agreement acknowledge and confirm their mutual intention and expectation that (i) all current shareholders of the Bank shall transfer their respective shares of the Bank's common stock in exchange for shares of stock of the Corporation and that each such transfer is made in connection with the formation and initial capitalization of the Corporation following its qualification as a "bank holding company" pursuant to the Bank Holding Company Act of 1956, as amended, and applicable provisions of Arkansas law, and (ii) each transferor shall be treated as part of the same control group pursuant to Section 351 of the Internal Revenue Code of 1986, as amended.

*[Signature page(s) to follow.]*

12

5203889.4

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement of Canada Bancshares, Inc. effective as of the Effective Date set forth below.

**Effective Date:**  April 1, 2017

CORPORATION:

CANADA BANCSHARES, INC.

By: _Gary R. Canada_ _____

Gary R. Canada, Sr., Chairman

*[Shareholder signature page(s) to be attached.]*

13

52038894

IN WITNESS WHEREOF, the undersigned has executed this Shareholders Agreement of Canada Bancshares, Inc. effective as to the undersigned as of the date set forth below.

*Effective Date:* April 1, 2017

MHBC INVESTMENTS LIMITED
PARTNERSHIP I, LLLP

By: _____
Mary Hanna Boles Canada,
General Partner

_____
Bradley S. Canada

_____
Gary R. Canada, Jr.

_____
Hanna Nicole Luebke

*[Shareholder Signature Page]*

*Canada Bancshares, Inc.*

14

5203889.4



EXHIBIT

3











**EXHIBIT**

**4**







# STATE OF ARKANSAS



## SECRETARY OF STATE

**Cole Jester**
ARKANSAS SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Cole Jester, Arkansas Secretary of State, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

### Dissociation/Dissolution of LLLP

of

### MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

effective this day
December 12, 2025.



**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 5th day of February, 2026.

Arkansas Secretary of State

EXHIBIT

5

FILED - Arkansas Secretary of State - Cole Jester - Doc#: 20524565001 - Filing#: 800031290 - Filed On: 12/12/2025 - Page(s): 3

## AMENDEDMENT TO
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

Pursuant to the Arkansas Uniform Limited Partnership Act (2001), more specifically stated as Ark. Code Ann. § 4-47-101, *et seq.*, and Act 15 of the 2007 Acts of Arkansas, the undersigned does hereby certify that the following information is true and correct:

### RECITALS

WHEREAS, a guardian of the person and estate of Mary Hanna Boles Canada ("Mrs. Canada"), the sole general partner of MHBC Investments Limited Partnership I, LLLP (the "Partnership"), was appointed on September 12, 2025 by the Circuit Court of Lonoke County, Arkansas, causing the immediate and automatic dissociation of Mrs. Canada pursuant to Ark. Code Ann. § 4-47-603(7)(B);

WHEREAS, the limited partners of the Partnership did not admit another general partner within 90 days of Mrs. Canada's dissociation, as required to avoid dissolution of the Partnership pursuant to Ark. Code Ann. § 4-47-801(3) and Sections 6.9 and 10.1(c) of the Amended and Restated Limited Partnership Agreement of the Partnership (the "Partnership Agreement"); and

WHEREAS, pursuant to Section 10.2 of the Partnership Agreement, and consistent with Ark. Code Ann. § 4-47-803(c), limited partners owning a majority-in-interest of the outstanding Partnership Units designated Gary Rector Canada, Sr. as "Liquidating Trustee."

NOW, THEREFORE, the Certificate of Limited Partnership of MHBC Investments Limited Partnership I, LLLP is hereby amended as follows:

### AMENDMENT

1.    Name. The name of the registered limited liability limited partnership is MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

2.    Original Filing Date. The original certificate of limited partnership for the Partnership was filed in this office on July 21, 1997. The Partnership converted to a limited liability limited partnership on April 6, 2004.

3.    Amendment. The Certificate of Limited Partnership of the Partnership is hereby amended as follows:

(a)    Dissociation of Mrs. Canada. Pursuant to Ark. Code Ann. § 4-47-603(7)(B), Mary Hanna Boles Canada ("Mrs. Canada"), the sole General Partner of the Partnership, disassociated on September 12, 2025. The Partnership does not have a general partner.

Error! Unknown document property name.

(b)    Dissolution of the Partnership. The Partnership dissolved, effective December 12, 2025, pursuant to Section 10.1(c) of the Partnership Agreement and Ark. Code Ann. § 4-47-801(1) & (3)(B).

(c)    Liquidating Trustee. Gary R. Canada was duly appointed by the partners as Liquidating Trustee, to conduct the winding up and termination of the Partnership's business in accordance with Section 10.2 of the Partnership Agreement. The street and mailing address of Gary R. Canada, Sr. is 123 S. Main Street, England, Arkansas 72046.

[*Signature Page Follows*]

2

Error! Unknown document property name.

IN WITNESS WHEREOF, this Amendment to Certificate of Limited Partnership has been duly executed by the liquidating trustee of the Partnership this 5th day of February, 2026.

LIQUIDATING TRUSTEE:

_____
GARY R. CANADA, Sr.

Error! Unknown document property name.

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____ DEP CLERK

CANADA BANCSHARES, INC.

PLAINTIFF

v.                    Case No.  4:26-cv-267-KGB

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Motion for Preliminary Injunction against

the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official

Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the

Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill,

and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as

Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the

Federal Regulators, the "Agencies"), states:

1.      CBI recently became the sole holding company of the Bank of England (the "Bank")

upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I,

LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of ownership, including, for

example, (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's

strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

2.      The Agencies, however, refuse to recognize CBI's status as the Bank's owner— or *anyone's* status as the Bank's owner— simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business.

3.      Specifically, the Agencies have asserted that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."**

4.      Without this Court's entering immediate injunctive relief ordering the Agencies to recognize CBI as the Bank's owner, the Bank will operate like a headless hydra— no clear managerial oversight, no ability to respond to crises, and no strategic direction whatsoever.

5.      For the reasons set forth in the accompanying Brief in Support, (i) CBI is likely to succeed on the merits of its claim that it is the sole holding company of the Bank, thereby entitling it to the accoutrements of Bank ownership, (ii) CBI, the Bank, and the Bank's customers are likely to suffer continued irreparable harm absent a preliminary injunction, and (iii) the balance of the equities and the public interest favor injunctive relief as the Agencies are uninterested in who owns the Bank, they simply need this Court's direction as to who that person is.

6.      CBI respectfully requests that this Court waive the security requirement in Rule 65(c) as there is no risk that the Agencies will suffer financial harm.

WHEREFORE, CBI respectfully requests that this Court (i) grant its Motion for Preliminary Injunction, (ii) order the Agencies to recognize CBI's status as the Bank's owner, and (iii) grant it all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201

2

Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
                                    DEP CLERK

CANADA BANCSHARES, INC.

PLAINTIFF

v.                                    Case No. ___4:26-cv-267-KGB___

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          **DEFENDANTS**

---

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Brief in Support of its Motion for

Preliminary Injunction against the Board of Governors of the Federal Reserve System (the "Board");

Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his

Official Capacity as Chair of the Federal Deposit Insurance Corporation (the "FDIC") (collectively,

the Board, Mr. Powell, Mr. Hill, and the FDIC are the "Federal Regulators"); and Susannah Marshall,

in her Official Capacity as Commissioner of the Arkansas State Bank Department (the "State

Regulator" and, together with the Federal Regulators, the "Agencies"), states:

INTRODUCTION

CBI recently became the sole holding company of the Bank of England (the "Bank") upon

the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I, LLLP

(the "Partnership"). As such, CBI is entitled to the accoutrements of Bank ownership, including, for

example, setting the Bank's strategy and governance, managing the Bank's capital and funding, and

interacting directly with the Agencies. But the Agencies are preventing CBI from doing so. More specifically, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business. Indeed, the FDIC and the State Regulator have asserted in writing that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** The Board has expressed the same opinion verbally during meetings over the Bank's ownership.

Without a preliminary injunction from this Court ordering the Agencies to immediately recognize CBI as the Bank's owner, the Bank will suffer governance paralysis, capital and liquidity crises, and severe operational disruption. Worse yet, the Agencies' continued refusal to recognize CBI as the Bank's owner interferes with CBI's due-process rights. To preserve the status quo, to ensure CBI's and the Bank's survival, and to protect the Bank's customers, this Court should enter a preliminary injunction ordering the Agencies to recognize CBI's status as the Bank's owner.

## BACKGROUND

CBI hereby incorporates the factual allegations contained in its Verified Complaint by reference pursuant to Federal Rule of Civil Procedure 10(c).

## ARGUMENT

A preliminary injunction is warranted when (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities favors the movant; and (4) an injunction is in the public interest. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam). Though no single factor is "dispositive," *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), likelihood of success is "the most significant" factor, *Missouri*, 112 F.4th at 536. When the federal government is the party opposing a preliminary injunction, the balance of the equities and the public interest "merge" into a single factor. *See, e.g., Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Here, each factor supports a preliminary injunction.

2

I.      **CBI is likely to succeed on the merits because CBI is the Bank's sole holding company.**

As for this initial, most crucial factor, CBI is likely to succeed on the merits because, following the Partnership's dissolution, CBI became the Bank's sole holding company. More specifically, Mary Hanna Boles Canada has always been the Partnership's only legally recognized General Partner. Immediately upon the Lonoke County Circuit Court's appointing Gary Canada, Sr. as Mrs. Canada's emergency guardian on September 12, 2025, Mrs. Canada was dissociated from the Partnership by operation of law. Ark. Code Ann. § 4-47-603(7)(B) ("A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.").

As such, the Partnership had 90 days— up and until December 12, 2025[1]— to either (i) admit a new General Partner, or (ii) consent to continue the activities of the limited partnership and admit a new General Partner in accordance with that consent. Ark. Code Ann. § 4-47-801(3)(B); **Ex. 1** to Compl., at §§ 6.9, 10.1(c). However, the Partnership failed to do either, and the Arkansas Secretary of State accordingly certified the Partnership's dissolution. **Ex. 5** to Compl. Upon the Partnership's dissolution, CBI became the Bank's sole holding company. As the Bank's sole holding company, CBI is entitled to, among other things: (i) the Agencies' recognition, (ii) the right to set the Bank's strategy and governance, and (iii) the ability to manage the Bank's capital and funding. Therefore, CBI is likely to succeed on the merits, and this most important factor weighs heavily in CBI's favor.

II.      **CBI, the Bank, and the Bank's customers have suffered and will suffer irreparable harm absent injunctive relief.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). For this requirement, a plaintiff need not prove with absolute certainty

---

[1] The Lonoke County Circuit Court later appointed Nicole Canada Luebke and Mr. Canada, Sr. as Mrs. Canada's co-guardians, but Mrs. Canada's guardianship has continued uninterrupted from September 12, 2025, to the date and time of this filing.

that injury will occur, but, instead, need merely show that irreparable harm is "likely" absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Here, the Agencies' refusal to recognize CBI as the Bank's owner has caused and will continue to cause CBI, the Bank, and the Bank's customers to suffer irreparable harm because such a refusal produces: (i) governance paralysis— the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption— vendors, other banks, and market participants could freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

Indeed, the Agencies' unlawful refusal to recognize CBI as the Bank's owner is substantially likely to result in (i) CBI's and the Bank's terminations as ongoing business enterprises, and (ii) loss of customer goodwill, both of which constitute irreparable harm under Eighth Circuit precedent. *See, e.g.,* *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (explaining that "[i]rreparable harm has been found when one's allegedly unlawful actions . . . will cause another's ongoing business to terminate absent an injunction"); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[T]he petitioners' potential loss of consumer goodwill qualifies as irreparable harm.").

Worse yet, as the Bank's sole holding company, CBI has a recognized property interest in its ownership of the Bank. *Cf. FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("[A]ppellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."); *Kaufman v. Societe Internationale Pour Participations Industrielles Et Commerciales, S.A.*, 343 U.S. 156, 159–60 (1952) (holding that "the rights of innocent stockholders . . . must be fully protected"). The Agencies' unlawful refusal to recognize that interest or give it any meaningful legal effect without due process of law or adequate compensation threatens violations of CBI's constitutional rights, independently constituting irreparable harm warranting injunctive relief. *See, e.g., Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 935 (E.D. Ark. 2021) ("The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, CBI has suffered and will continue to suffer irreparable harm absent immediate injunctive relief.

III.    **The balance of the equities and the public interest support a preliminary injunction both because (i) the Agencies are uninterested in who owns the Bank, they simply need Court direction, and (ii) customers' interests and the public's faith in the banking regulatory regime are in peril absent injunctive relief.**

The balance of the equities and public interest, which "merge" in suits against the government, also decisively favor preliminary relief. *Missouri*, 128 F.4th at 996–97. At the outset, the Agencies have no interest in this case warranting protection because they are uninterested in which entity ultimately owns the Bank. After all, their stated position is that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** Stated differently, the Agencies will treat whomever this Court determines to be the Bank's owner as such.

Moreover, "it is always in the public interest to protect constitutional rights" like CBI's due-process entitlements. *Phelps-Roper v. Nixon*, 59 F.3d 480, 485 (8th Cir. 2007). And, even better, entering a preliminary injunction in CBI's favor would mean that the Bank once again has stable management

5

and oversight— thereby protecting customers' interests and the public's faith in the regulatory regime underlying the banking system. Thus, this final factor weighs heavily in CBI's favor, too.

## CONCLUSION

Following the Partnership's dissolution, CBI became the Bank's sole holding company. As such, it is constitutionally entitled to the accoutrements of ownership, including but not limited to: (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

Because CBI is (i) likely to succeed on the merits, (ii) has suffered and will continue to suffer irreparable harm absent immediate injunctive relief, and (iii) the balance of the equities and the public interest favor such relief, this Court should enter a preliminary injunction ordering the Agencies to immediately recognize CBI's status as the Bank's owner. Doing so preserves the status quo, ensures CBI's and the Bank's survival, and protects the Bank's customers from peril. Accordingly, CBI respectfully requests that this Court grant its Motion for Preliminary Injunction and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association

6

809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Arkansas ☑

CANADA BANCSHARES, INC. )
)
)
)
)
_____ )
*Plaintiff(s)* )
v )  Civil Action No. 4:26-cv-267-KGB
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; )
JEROME H. POWELL, in his Official Capacity as Chair of the Board of )
Governors; TRAVIS HILL, in his Official Capacity as Chair of the Federal )
Deposit Insurance Corporation; and SUSANNAH MARSHALL, in her )
Official Capacity as Commissioner of the Arkansas State Bank Department )
_____ )
)
*Defendant(s)* )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Travis Hill, in his Official Capacity as Chair of the Federal
Deposit Insurance Corporation
550 17th Street NW
Washington, DC 20429

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David S. Mitchell, Jr., 120 East Fourth Street, Little Rock, Arkansas 72201

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

TAMMY H. DOWNS
*CLERK OF COURT*

03/13/2026

Date: _____    _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ : or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*


_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 85 (Rev. 01/09) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
for the
Eastern District of Arkansas

| | |
|---|---|
| Canada Bancshares Inc<br>*Plaintiff*<br>v.<br>Board of Governors of the Federal Reserve System et al<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 4:26-cv-267-KGB

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| Parties' printed names | Signatures of parties or attorneys | Dates |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____          _____
                                                    *District Judge's signature*

                                         _____
                                                    *Printed name and title*

Note:    Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.

exhibitsticker.com

EXHIBIT

IV



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Honorable Jerome H. Powell
20th St. and Constitution Ave, NW
Washington, DC 20551

9590 9402 7936 2305 5851 79

2. Article Number (Transfer from service label)

9589 0710 5270 0162 0945 55

PS Form 3811, July 2020 PSN 7530-02-000-9053          Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Priority Mail Express®
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☑ Return Receipt (hardcopy)     $ _____
☑ Return Receipt (electronic)     $ _____
☐ Certified Mail Restricted Delivery     $ _____
☐ Adult Signature Required     $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$

DSM/SB

Sent To
The Honorable Jerome H. Powell
Street and Apt. No., or PO Box No.
20th St. and Constitution Ave, NW
City, State, ZIP+4®
Washington, DC 20551

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

9589 0710 5270 0162 0945 55

PS Form 3800, January 2023 PSN 7530-02-000-9047     See Reverse for Instructions

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

**CERTIFIED MAIL®**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

City, State, ZIP+4®
Washington, DC 20551

Street and Apt. No., or PO Box No.
20th St. and Constitution Ave., NW

Sent To
The Honorable Jerome H. Powell

Total Postage and Fees
$

Postage
$

☐ Adult Signature Restricted Delivery  $

☐ Adult Signature Required  $

☐ Certified Mail Restricted Delivery  $

☑ Return Receipt (hardcopy)  $

☑ Return Receipt (electronic)  $

Extra Services & Fees (check box, add fee as appropriate)

Certified Mail Fee
$

OFFICIAL USE

Postmark
Here

05M/53

For delivery information, visit our website at www.usps.com®.

Domestic Mail Only

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**

USPS TRACKING #

9590 9402 7936 2305 5851 79

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•



**R**
**ROSE LAW FIRM**
A Professional Association
120 E. Fourth Street  Little Rock AR  72201-2893

05M/SB



# ROSE LAW FIRM

March 16, 2026

**VIA CERTIFIED MAIL**
The Honorable Jerome H. Powell
Chair of the Board of Governors
of the Federal Reserve System
20th St. and Constitution Ave., NW
Washington, DC 20551
<u>Tracking #</u>: 9589 0710 5270 0162 0945 55

> **Re:**   *Canada Bancshares, Inc. v. Board of Governors of Federal Reserve System, et al.*
> U.S. District Court for the Eastern District of Arkansas
> Case No. 4:26-cv-00267-KGB
> **Service of Process Pursuant to Fed. R. Civ. P. 4(i)(2)**

Dear Chairman Powell:

I represent the Plaintiff, Canada Bancshares, Inc. ("CBI") in connection with the above-referenced litigation against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department. In accordance with Federal Rule of Civil Procedure 4(i)(2), please find accompanying this letter (i) CBI's Verified Complaint and its associated exhibits, and (ii) a Summons to the Board of Governors of the Federal Reserve System.

Additionally, CBI filed a Motion for Preliminary Injunction and Brief in Support. I have enclosed copies of those documents as well. CBI intends to pursue the relief requested therein with all deliberate haste. Please do not hesitate to reach out to my office in connection with this matter should you deem that necessary.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*
David S. Mitchell, Jr.

**A Professional Association**
120 E. Fourth St., Little Rock, AR 72201 | roselawfirm.com | (501) 375-9131 | (501) 375-1309 (fax)
dmitchell@roselawfirm.com

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

CANADA BANCSHARES, INC.

PLAINTIFF

v.                    Case No. 4:26-cv-267-KGB

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department

This case assigned to District Judge ___Baker___
and to Magistrate Judge ___Ervin___

DEFENDANTS

## VERIFIED COMPLAINT

Plaintiff, Canada Bancshares, Inc., for its Verified Complaint against the Board of Governors of the Federal Reserve System; Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation; and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, states:

### PARTIES

1.      Canada Bancshares, Inc., ("CBI") is an Arkansas corporation with its principal place of business in England, Arkansas. CBI is the sole holding company of the Bank of England, an Arkansas state-chartered bank (the "Bank"). CBI owns all issued and outstanding shares of the Bank's stock.

2.      The Board of Governors of the Federal Reserve System (the "Board") is a federal agency established by the Federal Reserve Act, 12 U.S.C. §§ 221 *et seq.*, charged with the administration

and enforcement of the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* Among other responsibilities, the Board determines whether an entity qualifies as a bank holding company, and the Board engages in a variety of oversight activities.

3.      Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, oversees the Board's actions and is responsible for, among other things, ensuring the Board's compliance with its statutory duties.

4.      Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, oversees the Federal Deposit Insurance Corporation (alone, the "FDIC," and, together with the Board, Mr. Powell, and Mr. Hill, the "Federal Regulators") and ensures the FDIC's compliance with its statutory duties. The FDIC exercises certain regulatory authority over bank holding companies under the Federal Deposit Insurance Act. *See* 12 U.S.C. §§ 1811 *et seq.*

5.      Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, oversees the Arkansas State Bank Department (alone, the "State Regulator," and, together with the Federal Regulators, the "Agencies"), an entity charged with regulating state-chartered commercial banks and their holding companies. *See, e.g.,* Ark. Code Ann. § 23-46-205.

6.      The State Regulator's duties include review and approval processes that overlap significantly with the Federal Regulators'.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 in that it is a civil action or proceeding arising under the laws of the United States. More specifically, this is a civil action or proceeding arising under Acts of Congress regulating commerce, namely, the Bank Holding Company Act and the Federal Deposit Insurance Act.

2

8. This Court has supplemental jurisdiction over CBI's claims against the State Regulator because they are "so related to [CBI's] claims" against the Federal Regulators that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

9. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) as this is "a civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity[,]" and the Central Division of the Eastern District of Arkansas is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred . . . ."

<div align="center">BACKGROUND</div>

10. Founded in 1898 with a capital stock of just $10,000, the Bank has survived two world wars, the Great Depression, and even the Great Recession.

11. For most of its existence, the Bank has been a family-run operation, as the same family has controlled the Bank for more than a half century.

12. Seth Boles—the progenitor of the Bank family—started working at the Bank as a cashier as long ago as 1946. Slowly but surely, Mr. Boles worked his way up to the Bank's presidency in the early 1960s. He maintained that position until 1989 when his son-in-law, Gary Canada, Sr., took the helm as the Bank's new president.

13. Over the decades, the Bank's ownership structure has shifted a handful of times.

14. This lawsuit is about the most recent shift in the Bank's ownership structure and the Agencies' reaction to it.

**The Partnership.**

15. In the late 1990s, several members of the Bank family formed MHBC Investments Limited Partnership I as a holding company for the Bank.

16. At that time, Mary Hanna Boles Canada was MHBC Investments Limited Partnership I's only General Partner.

17.     Mrs. Canada, Mr. Canada, Sr., Gary Canada, Jr. (as trustee), Bradley Canada (as trustee), and Hanna Nicole Canada Luebke (as trustee) were MHBC Investments Limited Partnership I's Limited Partners.

18.     In the early 2000s, MHBC Investments Limited Partnership I's partners voted to convert the entity to an Arkansas limited liability limited partnership, thereby creating MHBC Investments Limited Partnership I, LLLP (the "Partnership"), an entity governed by an April 1, 2004 Partnership Agreement[1] and the Uniform Limited Partnership Act (2001), Ark. Code Ann. §§ 4-47-101 *et seq.*

19.     Pursuant to Section 3.1 of the Partnership Agreement, one of the entity's core purposes was to "operate as a one bank holding company owning a controlling interest in the common stock of Bank of England, a state-chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies."

20.     As before, upon its conversion, the Partnership had only one General Partner: Mrs. Canada.

21.     Mrs. Canada has always been the Partnership's only legally recognized General Partner.

**Formation of CBI.**

22.     In the mid-2010s, the Bank family also established CBI as a holding company of the Bank.

23.     Over time, through a handful of transactions, CBI became the Bank's sole shareholder.

24.     Several months after the formation of CBI, its shareholders entered into a Shareholders Agreement.[2]

---

[1] A true and correct copy of the Partnership Agreement is attached as **Exhibit 1.**

[2] A true and correct copy of the Shareholders Agreement is attached hereto as **Exhibit 2.**

25.    The Shareholders Agreement restricts CBI's shareholders, officers, directors, and other agents from effecting any change to the Bank's Board of Directors without the Partnership's prior written authorization. **Ex. 2** § 12(c).

26.    Since CBI's original issuance of shares of its stock, the Partnership has always owned well in excess of a majority of the total issued and outstanding shares of CBI stock.

27.    As long as CBI has been the sole shareholder of the Bank, it has served as the intermediate holding company situated between the Bank and the Partnership, the Bank has served as the operating company, and the Partnership (until its recent dissolution) has served as the ultimate parent entity and holding company with supreme authority and control over the Bank.

### The Partnership's Dissolution.

28.    After serving as the Partnership's General Partner for decades, Mrs. Canada was sadly diagnosed with Alzheimer's disease at the Mayo Clinic in Rochester, Minnesota in 2020.

29.    Since that time, Mrs. Canada's cognitive abilities have deteriorated steadily.

30.    More recently, third-parties began taking advantage of Mrs. Canada's cognitive decline to their benefit and to Mrs. Canada's detriment.

31.    Seeking to protect his wife's well-being, Mr. Canada, Sr. initiated a guardianship action on September 12, 2025, in the Circuit Court of Lonoke County, Arkansas.

32.    On September 12, 2025, the Lonoke County Circuit Court appointed Mr. Canada, Sr. as Mrs. Canada's emergency guardian. A true and correct copy of the Lonoke County Circuit Court's Order appointing Mr. Canada, Sr. as his wife's emergency guardian is attached hereto as **Exhibit 3**.[3]

---

[3] Exhibit 3 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Order. Accordingly, CBI will file a Motion for Leave to File Exhibit 3 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

33. A month later, the Lonoke County Circuit Court issued Letters of Temporary Guardianship to Mr. Canada, Sr. and Mrs. Canada Luebke, as co-guardians of Mrs. Canada's person and estate (the "Letters"). A true and correct copy of the Letters is attached hereto as **Exhibit 4**.[4]

34. The Letters operated as an extension of Mrs. Canada's guardianship. Stated differently, although the terms of Mrs. Canada's guardianship have changed, there has been no interruption in Mrs. Canada's guardianship since September 12, 2025.

35. As of the date and time of this filing, Mr. Canada, Sr. and Mrs. Canada Luebke are still serving as co-guardians of Mrs. Canada's person and estate.

36. Arkansas's Limited Partnership Act provides that a general partner is dissociated automatically by operation of law upon the appointment of a guardian for such general partner:

> A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.

Ark. Code Ann. § 4-47-603(7)(B).

37. Accordingly, Mrs. Canada was dissociated as General Partner of the Partnership by operation of law upon the Lonoke County Circuit Court's appointment of Mr. Canada, Sr. as her guardian on September 12, 2025.

38. Arkansas's Limited Partnership Act further provides that a limited partnership is automatically dissolved by operation of law after the dissociation of a general partner if the partnership does not have a remaining general partner and the limited partners fail to admit a general partner within 90 days:

> A limited partnership is *dissolved*, and its activities *must be* wound up, only upon the occurrence of any of the following:
>
> . . .
>
> (3) after the dissociation of a person as general partner:

---

[4] Exhibit 4 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Letters. Accordingly, CBI will file a Motion for Leave to File Exhibit 4 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

> (B) if the limited partnership does not have a remaining general partner, the passage of 90 days after the dissociation, unless before the end of the period:
>
>> (i) consent to continue the activities of the limited partnership and admit at least one general partner is given by the limited partners owning a majority of the rights to receive distributions as limited partners at the time the consent is to be effective; and
>>
>> (ii) at least one person is admitted as a general partner in accordance with the consent . . . .

Ark. Code Ann. § 4-47-801(3)(B) (emphasis added).

39.    The Partnership Agreement, too, requires immediate dissolution of the Partnership following the dissociation of all general partners if a successor general partner is not admitted within 90 days:

> Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners.  In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be.
>
> . . .
>
> Section 10.1    Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:
>
> (c) Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.

Ex. 1, §§ 6.9, 10.1(c) (emphasis added).

40.    The Partnership's Limited Partners did not admit a General Partner to replace Mrs. Canada within 90 days of her dissociation on September 12, 2025.

41.     The Limited Partners did not consent to continue the activities of the Partnership at any time following Mrs. Canada's dissociation on September 12, 2025, at least up until the date and time of this filing.

42.     Both the Partnership Agreement and Arkansas's Limited Partnership Act require the dissolution of the Partnership following the dissociation of all general partners if one or more substitute general partners are not appointed within ninety (90) days. **Ex. 1**, §§ 6.9 and 10.1(c); Ark. Code Ann. § 4-47-801(3)(B).

43.     The Partnership was without a General Partner for the 90-day period that ended on December 11, 2025.

44.     Thus, on December 12, 2025, the Partnership dissolved immediately and automatically by operation of law and the Partnership Agreement.

45.     Accordingly, the Arkansas Secretary of State certified the Partnership's dissolution, effective December 12, 2025. A true and correct copy of the Secretary of State's certification is attached hereto as **Exhibit 5**.

**CBI Takes Over.**

46.     Following the Partnership's dissolution, the Partnership's control over the Bank terminated, and CBI became the Bank's sole holding company.

47.     Accordingly, CBI no longer defers to the Partnership in the election or removal of directors of the Bank.

48.     As the Bank's sole holding company, CBI is entitled to, among other things, set strategy and governance (i.e., by appointing Bank leadership and board members as well as setting growth plans and direction), manage capital and funding, and interact directly with the Agencies.

**The Agencies Abdicate.**

49.    Federal law grants the Federal Regulators tremendous regulatory oversight over bank holding companies, largely through the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.*, and the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*

50.    Bank holding companies' actions and omissions are meticulously scrutinized by the Federal Regulators, and bank holding companies must frequently seek Federal Regulators' approval to take certain actions. *See, e.g.*, 12 U.S.C. § 1842(a) (requiring the Board's approval for a litany of transactions involving bank holding companies); 12 C.F.R. § 225.72 (requiring certain regulated institutions to provide the Board with written notice of changes in leadership or board membership); 12 U.S.C. § 1831i (requiring certain regulated institutions to provide the FDIC with written notice of changes in leadership or board membership and an opportunity to disapprove them).

51.    If the holding company owns a state-chartered bank, like the Bank here, then the holding company must also contend with government entities like the State Regulator.

52.    Often, the Agencies' regulatory duties overlap significantly. *See, e.g.*, 12 U.S.C. § 1842(b)(1) (requiring the Board to solicit and consider the "views and recommendations" of the State Regulator in certain transaction-approval decisions); *see also* Ark. Code Ann. § 23-46-205 ("The Bank Commissioner shall be charged with the general supervision of financial institutions, the execution of all laws passed by the State of Arkansas relating to the organization, operations, inspection, supervision, control, liquidation, and dissolution of banks, bank holding companies, subsidiary trust companies, and the general commercial banking business of Arkansas, and such other duties as prescribed by law.").

53.    Part and parcel of the Agencies' duties is (i) recognizing the proper owner of a regulated institution, and (ii) interacting with that owner to ensure regulatory compliance.

54.    Although (i) CBI owns all issued and outstanding shares of the Bank's stock, and (ii) the Partnership is dissolved, the Agencies refuse to recognize CBI's status as the Bank's owner.

55.     Worse yet, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among members of the Bank family over the winding up of the Partnership's business.

56.     The Agencies refusal to recognize CBI as the Bank's owner has caused and will cause catastrophic consequences, among others: (i) governance paralysis—the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises—if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption—vendors, other banks, and market participants will freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

57.     In short, the Agencies' conduct has caused CBI (and the Bank) to suffer irreparable harm and the Agencies' continued refusal to recognize CBI's status will perpetuate irreparable harm on CBI (and the Bank).

## CAUSES OF ACTION

### Count 1: Declaratory Judgment

58.     CBI realleges and reasserts the allegations contained in the preceding paragraphs of this Verified Complaint.

59. Pursuant to the United States Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, CBI seeks this Court's declaration that (i) the Partnership is dissolved, (ii) CBI owns the Bank.

60. This is an active and justiciable controversy because CBI has sought to act as the Bank's owner before the Agencies and the Agencies have refused to recognize CBI's status.

61. Worse yet, the Agencies have refused to recognize anyone's status as the Bank's owner.

62. The FDIC and the State Regulator asserted, in writing, that the Bank's ownership *"remains a private legal issue that [they] have no jurisdiction over."*

63. Although the Board has not put it in writing, the Board has expressed the same opinion verbally during meetings over the Bank's ownership.

64. There is uncertainty regarding the parties' legal relations in this instance.

### NATURE OF RELIEF SOUGHT

65. CBI requests that this Court award it the following relief:

    a. Declare that (i) the Partnership is dissolved, and (ii) CBI is the sole holding company with control over the Bank;

    b. Pursuant to Fed. R. Civ. P. 65, preliminarily and permanently enjoin the Agencies to recognize CBI's status as the Bank's owner;

    c. All other relief that this Court deems just and proper.

WHEREFORE, Plaintiff Canada Bancshares, Inc. respectfully requests that this Court enter judgment in its favor against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department; enjoin the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation,

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department as requested herein; and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

## VERIFICATION

I, Gary Canada, Sr., state on oath that the foregoing facts set forth in this Verified Complaint are true and correct to the best of my knowledge, information, and belief.

*Gary Canada Sr.*

Gary Canada, Sr.

Dated ___3-9-26___, 2026

STATE OF _Arkansas_    )

                             ) ss.

COUNTY OF _____    )

SUBSCRIBED and SWORN to before me, the undersigned duly commissioned, qualified, and acting Notary Public this _09_ day of _March_ 2026.

In witness whereof I hereunto set my hand and official seal

_____

Notary Public

My Commission Expires: _12-19-2034_



13

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

**EXHIBIT**

**1**

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
# AGREEMENT OF LIMITED PARTNERSHIP
## (As Amended and Restated)

**ARTICLE I**

**FORMATION AND ORGANIZATION** .............................. -1-

Section 1.1    Formation of Partnership ........................... -1-

Section 1.2    Organization Certificates; Filings ........................... -2-

Section 1.3    Partnership Name ........................... -2-

Section 1.4    Principal Office and Agent ........................... -2-

Section 1.5    Term of Partnership ........................... -2-

Section 1.6    Copies to Partners ........................... -2-

**ARTICLE II**

**DEFINITIONS** ........................... -3-

**ARTICLE III**

**PURPOSES AND POWERS** ........................... -5-

Section 3.1    Purposes of the Partnership ........................... -5-

Section 3.2    Powers of the Partnership ........................... -5-

**ARTICLE IV**

**ADMISSION OF LIMITED PARTNERS** ........................... -6-

Section 4.1    Admission of Limited Partners ........................... -6-

Section 4.2    Completion of Admission ........................... -6-

**ARTICLE V**

**CONTRIBUTIONS OF THE PARTNERS** ........................... -7-

**ARTICLE VI**

**RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS**
........................... -7-

Section 6.1    Rights and Powers of the General Partners as Managers ......... -7-

Section 6.2    Limitations on General Partners' Authority ................... -7-

Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance ....... -8-

Section 6.4    Third Parties ........................... -8-

Section 6.5    Duties of the General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.6    Obligations not Exclusive  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.7    Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.8    Admission of Additional General Partner . . . . . . . . . . . . . . . . . . -10-
Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General
             Partners  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
Section 6.10   Indemnification of the General Partners  . . . . . . . . . . . . . . . . . . . -10-
Section 6.11.  Limited Liability of the General Partners  . . . . . . . . . . . . . . . . . . . -11-

ARTICLE VII
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS . . . . . . . . . . . . . -11-
Section 7.1    Rights of a Limited Partner  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
Section 7.2    Assignments of Limited Partnership Interests . . . . . . . . . . . . . . . -12-
Section 7.3    Assignments of Distributive Rights . . . . . . . . . . . . . . . . . . . . . . . -12-
Section 7.4    Partnership Option to Purchase a Limited Partner's Interest . . . . . -13-
Section 7.5    Limited Partner's Status Upon Death or Incompetency . . . . . . . . . -14-
Section 7.6    Limited Put Option of Certain Permitted Transferees . . . . . . . . . . -14-

ARTICLE VIII
COMPENSATION OF THE GENERAL PARTNERS . . . . . . . . . . . . . . . . . . -15-
Section 8.1    Compensation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 8.2    Expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

ARTICLE IX
DISTRIBUTIONS AND
ALLOCATIONS OF INCOME AND LOSS . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.1    Distributions of Distributable Cash . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.2    Allocation of Certain Income and Losses for Tax Purposes . . . . . -15-
Section 9.3    Allocations Upon Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

ARTICLE X
DISSOLUTION AND PRIORITY ON DISTRIBUTION . . . . . . . . . . . . . . . -16-
Section 10.1   Dissolution and Termination of the Partnership . . . . . . . . . . . . . . -16-
Section 10.2   Liquidation and Priorities on Distribution . . . . . . . . . . . . . . . . . . -16-

**ARTICLE XI**

**ACCOUNTING AND BUSINESS MATTERS** . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.1   Books of Accounts and Records   . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.2   Accounting Method   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.3   Financial Statements and Reports   . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.4   Fiscal Year   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 11.5   Bank Accounts   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

**ARTICLE XII**

**ELECTIONS**   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.1   Adjustment Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.2   Depreciation Elections   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.3   Election with Respect to Taxation as Partnership   . . . . . . . . . . . . . -18-

Section 12.4   Other Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

**ARTICLE XIII**

**AMENDMENTS**   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

**ARTICLE XIV**

**MISCELLANEOUS**   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.1   Notices   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.2   Further Acts   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.3   Paragraph Headings   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.4   Severability   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.5   Application of Arkansas Law   . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.6   Survival of Rights   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.7   Interpretation   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.8   Execution in Counterparts   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.9   Waiver of Action for Partition   . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.10  Tax Matters Partner   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.11  Entire Agreement   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.12  Arbitration   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.13  Confidentiality   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (hereinafter referred to as the "Agreement"), is entered into effective as of the __1__ day of __April__, 2004, by and among MARY HANNA BOLES CANADA, and any other parties who may be admitted to the Partnership as General Partners pursuant to the provisions of Section 6.8 herein (hereinafter collectively referred to as the "General Partners" or individually as "General Partner"), and MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR., Trustee of the GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA, Trustee of the BRADLEY SETH CANADA TRUST I, and HANNA NICOLE CANADA, Trustee of the HANNA NICOLE CANADA STEWART TRUST I, and any other parties who may be admitted to the Partnership as Limited Partners pursuant to the provisions of Sections 4.1 and 7.2 herein below (hereinafter referred to collectively as the "Limited Partners" and individually as "Limited Partner").

WHEREAS, on July 21, 1997, MARY HANNA BOLES CANADA, the General Partner and the Limited Partners entered into the Agreement of Limited Partnership pursuant to which the Partnership was formed under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I.

WHEREAS, effective as of the date aforesaid, the Agreement of Limited Partnership was amended and restated as a limited liability limited partnership (as defined in Section 1.1 hereinbelow) under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinbelow contained, the adequacy of which consideration is hereby acknowledged, the parties agree as follows:

## ARTICLE I
## FORMATION AND ORGANIZATION

Section 1.1    Formation of Partnership.    Pursuant to the Arkansas Revised Limited Partnership Act of 1991, A.C.A. § 4-43-101 *et seq.*, as from time to time amended, including Act 912 of the 1997 Acts of Arkansas, hereinafter collectively referred to as the "Act," the parties hereto hereby form a registered limited liability limited partnership, which organization is hereinafter referred to as the "Partnership." The rights and liabilities of the Partners (as "Partners" is defined in Article II hereinbelow) shall, except as hereinafter expressly stated to the contrary, be as provided for in the Act.

P:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -1-

Section 1.2   Organization Certificates; Filings.   The General Partners hereto shall immediately execute, file, record and/or publish the Application and the Certificate (as "Application" and "Certificate" are defined in Article II hereinbelow) and other documents conforming hereto, and take all other appropriate action to comply with all legal requirements for the formation of a registered limited liability limited partnership under the Act and its operation in the State of Arkansas.  The General Partners shall file and publish any other notices, certificates, statements or other instruments required or permitted by any provision of any law in the United States or any state or other jurisdiction which may govern the formation of this Partnership or the conduct of its business from time to time.  The General Partners shall cause the Partnership to file any further amendments to the Application and/or Certificate or such other documents as shall be required by A.C.A. §§ 4-43-202, 4-43-1110 and 4-42-703 in order to preserve the valid existence of the Partnership as a registered limited liability limited partnership and the limited liability of the Partners.

Section 1.3   Partnership Name.  The business of the Partnership shall be conducted under the name of the MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP, an Arkansas registered limited liability limited partnership, and under such name or variations thereof in the other jurisdictions as the General Partners deem appropriate.

Section 1.4   Principal Office and Agent.  The principal place of business and physical address of the Partnership shall be located at: 105 Cherry St., England, AR 72046, and the mailing address of the Partnership shall be: 105 Cherry St., England, AR 72046.  The agent for service of process shall be MARY HANNA BOLES CANADA at the above business address.

Section 1.5   Term of Partnership.  The Partnership shall become effective upon the filing of the Application and the Certificate and the payment of the filing fee therefor, in the office of the Arkansas Secretary of State, Little Rock, Arkansas, as required by the Act and shall remain effective until the earlier to occur of:

 (a) December 31, 2046; or

 (b) The date the Partnership is dissolved pursuant to the Act or any provisions of this Agreement.

The period of time between the date the Partnership becomes effective and the date it ceases to be effective shall be referred to herein as "Partnership Term."

Section 1.6   Copies to Partners.  The General Partners shall promptly deliver or mail a filed copy of the Certificate and any amendment thereto to each of the Limited Partners.

## ARTICLE II
## DEFINITIONS

Whenever used in this Agreement the terms set forth below shall be defined as follows:

(a)  The "Application" shall mean the Application for Registration of a Limited Liability Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-1110, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(b)  The "Certificate" shall mean the Certificate of Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-206, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(c)  "Code" shall mean the Internal Revenue Code of 1986, as amended.

(d)  "Distributable Cash" shall mean, at the time of determination for any period (on the cash receipts and disbursements method of accounting), the net cash derived from the conduct of the Partnership's business and operations, from its investments (including distributions from entities owned by the Partnership) and (except as limited below) cash proceeds from the sale or other disposition of Partnership Properties, but only after reasonable reserves of cash have been set aside by the General Partners for working capital, capital improvements and replacements, debt service, current and reasonably projected expenses, and other cash requirements, including current and reasonably projected investment opportunities, all in keeping with the Partnership purposes. For purposes of this subsection, all capital contributions, any borrowed funds, and cash proceeds attributable to the sale or other disposition of any of the Partnership Properties which were contributed to the Partnership or which were purchased with borrowed funds, shall be considered necessary for business and investment purposes and shall be excluded from Distributable Cash. In determining Distributable Cash the General Partners shall be subject to the duties imposed by Section 6.5 and shall have the duty to take into account the cash needs of the Partnership in its business, the funds necessary in the operation of its business until the income from further operations is available, the amounts of its debts, the necessity or advisability of paying its debts, or at least reducing them within the limits of the Partnership's credit, and the character of its surplus cash.

(e)  "Fair Market Value" shall be the price at which a willing seller and willing buyer, neither under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, would pay and accept in an arm's length transaction for such interest in the Partnership or any Partnership Property. The Fair Market Value of an interest in the Partnership shall be determined taking into account all factors relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held partnership interests having the rights and restrictions provided

under this Agreement and applicable Arkansas law including, but not limited to, the restrictions upon withdrawal before the end of the term of the Partnership. In the event it becomes necessary to value any interest in the Partnership or any Partnership Property, the Fair Market Value of the property shall be determined by agreement of the parties involved, or in the absence of such agreement, by an individual appraiser or appraisal firm mutually acceptable to such parties. In the event the parties involved are unable to agree on the individual appraiser or firm to perform the valuation, each party shall select an appraiser, and such appraisers shall first attempt to jointly determine the Fair Market Value of the Partnership interest or Partnership Property by mutual agreement, but if they are unable to agree on such valuation, such appraisers shall select a third appraiser, and the fair market value shall be determined by the average of the two (2) closest appraisals. Any valuation so determined shall be binding and conclusive on the parties absent manifest error. The cost of any such appraisal(s) shall be borne, in the case of a valuation of a Partnership interest, equally by the seller and the purchaser, and in the case of a valuation of any Partnership Property, equally by each individual Partner or group of Partners having conflicting interests in such appraisal.

(f)    "General Partners" shall mean MARY HANNA BOLES CANADA, and/or any other person or entity appointed in accordance with the provisions of this Agreement to replace, or in addition to, the aforesaid persons. "General Partner" shall mean, and refer to, any of the General Partners individually.

(g)    "Limited Partners" shall mean MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA TRUST I and HANNA NICOLE CANADA STEWART TRUST I, and any other person or entity who or which shall be admitted to the Partnership, pursuant to Section 4.1 or Section 7.2, and thereby becomes an owner of an interest in the Partnership. "Limited Partner" shall mean, and refer to, any of the Limited Partners individually.

(h)    "Partners" shall mean the General Partners and all Limited Partners.

(i)    "Partnership Properties" shall mean all properties (real, personal and mixed), and all rights, titles, interests and estates of every nature whatsoever incident thereto, owned by the Partnership. "Partnership Property" shall mean any one of the Partnership Properties.

(j)    The "Sharing Ratio" of a Partner shall be the ratio of the Partner's Units to the total Units outstanding.

(k)    A "Unit" shall represent a 0.1 percent interest of capital and profits in the Partnership, and the Partnership shall be authorized to issue one thousand (1,000) Units. Each Partner shall be entitled to cast one (1) vote per Unit on all matters in which all Partners are herein given the right to vote.

(l)    "Permitted Transferee" shall mean the initial Limited Partners named above, all of their lineal descendants, and trusts for the exclusive benefit of any of them.

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                -4-

## ARTICLE III
## PURPOSES AND POWERS

Section 3.1    Purposes of the Partnership. The Partnership shall not be deemed to exist for a specific purpose; rather, the purpose of the Partnership is to manage the Partnership Properties by conducting any business which lawfully may be conducted in limited partnership form. Some of the more particular purposes of the Partnership are as follows:

(a)    To operate as a one bank holding company owning a controlling interest in the common stock of the Bank of England, a state chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies;

(b)    To provide flexibility in the management of Partnership Properties not available through the use of trusts, corporations and business entities; and

(c)    To identify the nature of the partners's partnership interests as separate property rather than marital property or community property.

(d)    To avoid the fractionalization of the ownership of certain Partnership Properties of various family members in order to receive a higher price in the event of a sale of any of the Partnership Properties.

Section 3.2    Powers of the Partnership. The specific purposes of the Partnership may, in instances where the Partners deem such action appropriate and to the extent Partnership funds are available therefor, be accomplished by:

(a)    Acquiring and disposing of Partnership Properties for cash, securities, other property, or any combination thereof upon such terms and conditions as the General Partners may from time to time determine (including, in instances where the property is encumbered, on either an assumption or a "subject to" basis);

(b)    Acquiring, owning, holding, improving, managing and leasing properties used in investment operations, and reinvesting the income and proceeds thereof, either alone or in conjunction with others, through partnerships, limited partnerships (or other partnerships in which certain partners have limited liability), joint ventures, or other business associations or entities;

(c)    Investing and reinvesting any of the Partnership Property or income of the Partnership, whether or not the original purpose for the investment has been accomplished, it being understood by the Partners that the investment objectives of the Partnership are to continue until the end of the Partnership Term and until the Partnership is dissolved and its affairs wound up.

(d)    Financing its activities by commercially reasonable methods on such terms and conditions as the General Partners deem appropriate. In instances where money is borrowed for Partnership purposes, the General Partners shall be and hereby are authorized to pledge, mortgage, encumber and grant security interests in Partnership Properties for the repayment of such loans;

(e)    Employing, retaining or otherwise securing, or entering into other contracts with persons or firms to assist in the acquisition, developing, improving, managing, and general operation of the Partnership Properties, all on such terms and for such consideration as the General Partners deem reasonably advisable;

(f)    Depositing Partnership funds in an account or accounts to be established at such time or times in such financial institutions (including any state or federally chartered bank or savings and loan association) and authorizing withdrawals of such funds by such persons at such times, and in such amount, as the General Partners may designate;

(g)    As to those Partnership funds which are not then required for Partnership purposes yet which the General Partners deem untimely to be distributed to the Partners, purchasing U. S. Treasury Bills, certificates of deposit, bonds, other certificates or evidences of indebtedness, stocks, real property, or other investment securities or property as the General Partners reasonably deem appropriate;

(h)    Taking any and all other action which is permitted under the Act and which is customary or reasonably related to the real, personal or mixed property incidental thereto; and

(i)    Taking any other action which is legally permissible.

## ARTICLE IV
## ADMISSION OF LIMITED PARTNERS

Section 4.1    Admission of Limited Partners.  No additional Limited Partners shall be admitted except by affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.  As distinguished from the admission of additional Limited Partners, no assignee of all or part of a Limited Partner's Units shall be substituted as a Limited Partner except under the conditions and restrictions and upon completion of all of the requirements of Article VII of this Agreement.

Section 4.2    Completion of Admission.  Subject to the other terms of this Agreement, a person shall become a Limited Partner when he or she shall have completed all of the following:

(a)    Executed a counterpart of this Agreement; and

(b)    Executed any other document, certificate or instrument, and taken such other action as the General Partners may reasonably request to evidence and perfect such person's admission as a Limited Partner.

## ARTICLE V
## CONTRIBUTIONS OF THE PARTNERS

The Partners shall initially contribute to the Partnership the property described on Exhibit A attached hereto in exchange for all of the outstanding Units. The general partnership interests of each General Partner shall be maintained separately from any limited partnership interests of the General Partners. The number of Units owned by each of the Partners is reflected on Exhibit B attached hereto. The Partners may make additional contributions to the Partnership, provided that the Sharing Ratios of all the General Partners, taken together, shall be equal to at least one percent (1%) at all times during the Partnership Term. No Partner shall be entitled to interest on capital contributions to the Partnership, or to withdraw any part of such Partner's capital account, except as specifically provided herein.

## ARTICLE VI
## RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS

Section 6.1    Rights and Powers of the General Partners as Managers. Each General Partner shall be entitled to cast one (1) vote per Unit of general partnership interest in all matters in which the General Partners are herein given the right to vote as a class or individually as a Partner. A majority vote shall be required to take any action by the General Partners. Subject to the limitations of this Agreement, and to the limitations imposed upon them by law, the General Partners shall have full, exclusive and complete discretion to manage and control, and shall make all decisions affecting, the Partnership business. The General Partners shall have full authority to take any action described by Article III hereof and to exercise all rights and powers generally conferred by law in connection therewith. The rights and powers of the General Partners described in this Section 6.1 shall be in addition to and not in limitation of any other rights and powers of the General Partners described in this Agreement or provided by law.

Section 6.2    Limitations on General Partners' Authority. The General Partners shall not have authority to:

(a)    Do any act in contravention of this Agreement without the written consent of all the Partners.

(b)    Do any act which would make it impossible to carry on the ordinary business of the Partnership, or which may make it impossible to carry on the ordinary business of the Partnership, without the written consent of all the Partners.

(c)    Admit a person as a General Partner, except as provided in this Agreement and the Act.

   (d) Admit a person as a Limited Partner, except as provided in this Agreement and the Act.

   (e) Cause the Partnership to make any loan to any of the General Partners or any of their affiliates without the written consent of the Partners owning a majority-in-interest of the outstanding Partnership Units.

   (f) Commingle the Partnership's funds with those of any other person, except with respect to (1) joint ventures or other joint investments permitted by this Agreement and (2) general disbursement accounts controlled by the General Partners, without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

   (g) Knowingly perform any act that would subject any Limited Partner to liability as a general partner in any jurisdiction.

   (h) Sell, assign, exchange, lease, or otherwise dispose of, or mortgage, pledge, or otherwise encumber all or substantially all of the real or personal property of the Partnership without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

   (i) Enter into agreements with a General Partner or any affiliate of a General Partner without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

   (j) Terminate a contract, agreement, or compensation to a Partner, or an affiliate of a Partner, without the approval of Partners owning a majority-in-interest of the outstanding Partnership Units.

   (k) For purposes of this Section 6.2 the term "affiliate" of a General Partner shall mean any person that directly or indirectly controls, or is controlled by or is under common control with, the General Partner, and shall include the family members of the General Partner and any officer or director of the General Partner and the family members of any such officer or director.

  <u>Section 6.3</u> <u>Limitation on Exercise of Rights Regarding Life Insurance</u>.  Any provision of this Agreement to the contrary notwithstanding, if at any time the Partnership possesses any incidents of ownership (as that term is defined under § 2042 of the Code and the Treasury Regulations thereunder) in any policy or policies of life insurance upon the life of any General Partner (the "Insured General Partner"), then the Insured General Partner shall be prohibited and excluded from voting upon or otherwise participating in the exercise of any such rights with respect to any policies of insurance upon the life of that Insured General Partner, including without limitation, the right to borrow from the cash value of the policy and the right to control the application of policy dividends.

  <u>Section 6.4</u> <u>Third Parties</u>.  Any Person dealing with the Partnership or the General Partners may rely upon a certificate signed by the General Partners, or any of them, as to the accuracy

of the statements therein or as to the authority of the General Partners to make any commitment or undertaking on behalf of the Partnership, including certificates as to (1) the identity of any General Partner or Limited Partner hereof, (2) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the General Partners or in any other manner are germane to the affairs of the Partnership, (3) the persons who are authorized to execute and deliver any instrument or document of the Partnership, or (4) any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

Section 6.5    Duties of the General Partners. The General Partners shall discharge their duties to the Partners and the Partnership, and shall exercise their powers under the Act and under this Agreement, consistent with the duty of loyalty and the duty of care set forth in A.C.A. §4-46-404 and consistent with the obligation of good faith and fair dealing therein. The General Partners do not guarantee the return of any Partner's capital contributions. Under no circumstances shall the General Partners be personally liable to a Limited Partner for any deficit in a Limited Partner's capital account.

Section 6.6    Obligations not Exclusive. The General Partners shall be responsible for the management of the Partnership's business, it being understood that the General Partners may be fairly compensated for services rendered. The General Partners may delegate such portion of the managerial responsibilities as is reasonably deemed necessary to any other party at the Partnership's expense.

Section 6.7    Power of Attorney. By the execution of this Agreement, or a counterpart hereof, a Limited Partner does irrevocably constitute and appoint the General Partners (or any successor General Partner) his or her true and lawful attorneys-in-fact and agents to effectuate, with full power and authority to act in the name, place and stead in effectuating, the purposes of the Partnership, including the execution, acknowledgment, delivering, filing and recording of all ·Certificates, documents, deeds,· bills of sale, assignments and other instruments of conveyance, leases, contracts, loan documents and/or counterparts hereof, and all other documents which the General Partners may deem necessary or reasonably appropriate:

(a)    To qualify or continue the Partnership as a limited partnership (or a partnership in which certain partners have limited liability) in all jurisdictions in which the Partnership conducts business;

(b)    To reflect a modification of the Partnership, or an amendment of this Agreement and/or the Certificate;

(c)    To accomplish the purposes and carry out the powers of the Partnership as set forth in Article III and in this Article VI; or

(d)    To reflect the dissolution and termination of the Partnership.

The power of attorney granted herein:

(1)      Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, incompetency or legal disability of any Limited Partner;

(2)      May be exercised by the General Partners, or any of them, for each Limited Partner (or any of them) by listing all (or any) of the Limited Partners required to execute any such instrument and executing such instrument in such manner as the General Partners may reasonably deem appropriate; and

(3)      Shall be binding on any assignee or vendee of a Limited Partnership interest hereunder or any portion thereof, including an assignee of only the distributive rights relating thereto.

Section 6.8      Admission of Additional General Partner. The General Partners shall not, without the written consent of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, admit any additional or substitute General Partner to the Partnership.

Section 6.9      Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be; provided, however, the death, withdrawal, adjudication of bankruptcy, incompetency or removal with respect to one (1) General Partner, but not all General Partners, shall not cause the Partnership to be dissolved. In the event the Partnership is continued, the Agreement of Limited Partnership shall be properly amended and the new General Partner(s) shall succeed to all rights, duties and responsibilities of the General Partners. By affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, a General Partner may be removed for breach of any fiduciary duty and for any breach of this Agreement in any material respect. Furthermore, in the event of a General Partner's death, resignation, removal, or adjudication of bankruptcy or incompetency, then the General Partner shall become a Limited Partner and a successor General Partner may then be appointed pursuant to the terms set forth herein.

Section 6.10      Indemnification of the General Partners. The General Partners shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, arising out of or incidental to the General Partners' management of the Partnership affairs while the General Partners were in the course of managing the Partnership affairs; provided, however, a General Partner shall not be entitled to indemnification hereunder where the claim at issue is based upon:

(a)      The proven gross negligence or willful misconduct of the General Partner; or,

(b)      The proven breach by the General Partner of any provision of this Agreement.

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the General Partners shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 6.11. Limited Liability of the General Partners. The General Partners' liability for the obligations of the Partnership and certain acts of other Partners, employees, agents, or representatives of the Partnership is limited to the extent provided in A.C.A. §§ 4-43-1110 and 4-42-307.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 7.1    Rights of a Limited Partner. Each Limited Partner shall be entitled to cast one (1) vote per Unit of ownership on all matters in which the Limited Partners are herein given the right to vote as a class or individually as a Partner.  A Limited Partner shall not be:

(a)    Personally liable for any of the debts or other liabilities of the Partnership (except to the extent expressly set forth in A.C.A. § 4-43-303);

(b)    Personally liable, merely because of his or her interest in the Partnership, for any losses or liabilities of any other Limited Partner;

(c)    Allowed to take part in the management or control of the Partnership business, or to sign for or to bind the Partnership, such power to remain vested solely and exclusively in the General Partners; or

(d)    Entitled to be paid any salary or to have a Partnership drawing account; provided, however, the General Partners have the power to employ one or more Limited Partners at a salary commensurate with services actually rendered to the Partnership.

No Limited Partner shall have the right to withdraw from the Partnership or to receive a return of any of his or her contributions to the Partnership until the Partnership is terminated and its affairs wound up in accordance with § 801, et seq. of the Act and this Agreement. A Limited Partner shall be in breach of this Agreement if the Limited Partner (1) attempts to withdraw from the Partnership, (2) interferes in the management of the Partnership affairs, (3) engages in conduct which could result in the Partnership losing its tax status as a partnership, (4) engages in conduct that tends to bring the Partnership into disrepute, (5) owns Partnership Units which become subject to a charging order, attachment, garnishment, or similar legal proceeding, (6) breaches any confidentiality provisions of this Agreement, (7) fails to meet any legally binding commitment to the Partnership, or (8) otherwise breaches any other term or condition contained herein.  A Limited Partner who is in breach of this Agreement shall be liable to the Partnership for damages caused by the breach. The Partnership may offset any such damages against any distributions or return of capital to the Limited

Partner who has breached this Agreement. No Limited Partner shall have the right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise.

Section 7.2    Assignments of Limited Partnership Interests. A Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner (as defined in A.C.A. § 4-43-101(6)) only after all of the following steps have first been completed:

(a)    The written approval of the General Partners and of the Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall have been given to the specific person or entity proposed to be substituted;

(b)    The vendee(s) or assignee(s) to be substituted, the General Partners, and all Limited Partners (either individually or by virtue of the General Partners' powers of attorney set forth in this Agreement) shall have executed an appropriate amendment to all certificates, instruments and documents, and taken all such additional action as the General Partners may deem appropriate to the completion of such sale or assignment; and

(c)    If requested by the General Partners, legal counsel for the Partnership has rendered an opinion that the transfer is not in violation of any provisions of this Agreement or any other representations made by the Limited Partner to the Partnership regarding the Limited Partner's investment intent.

Within thirty (30) days after the completion of the above required steps, the General Partners shall forward documents to the substituted Limited Partner indicating such Partner's participation in the Partnership, on such form as the General Partners may adopt and, from time to time, revise or amend. Any purported sale or assignment consummated without first complying with Section 7.2 shall, as between the General Partners, on the one hand, and the assignor/vendor and assignee/vendee, on the other hand, be null and void.

The foregoing provisions of Section 7.2 to the contrary notwithstanding, a Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner without the consent of the Partners if the transferee is a Permitted Transferee.

Section 7.3    Assignments of Distributive Rights. A Limited Partner may not assign all or any portion (in whole or fractional Units) of his or her right to receive distributions hereunder without the prior written consent of the General Partners and of Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units. In addition, no such assignment shall be effective as to the General Partners until the General Partners have first received a copy of the instrument of assignment, executed by both the assignor and the assignee of such distributive right. Once the assignment has been received by the General Partners, the General Partners may (but shall not be obligated to), without requesting further documentation from either the assignor or the

assignee, remit directly to the named assignee all distributions to which the assignee may be entitled pursuant to the provisions of this Agreement and the assignment. So long as the party to whom such distributive share was remitted was either the assignor Limited Partner or the assignee named in the instrument of assignment, the General Partners shall be free from liability to any person if such distribution is received by a person not entitled thereto.

Section 7.4    Partnership Option to Purchase a Limited Partner's Interest. Notwithstanding any of the foregoing provisions of this Agreement to the contrary, in the event a Limited Partner desires to transfer or sell any part of his or her interest in the Partnership (other than to a Permitted Transferee), the Limited Partner shall first offer to sell such interest to the other Partners. The other Partners who desire to purchase said interest shall have the right for a period of thirty (30) days after written notice of such offer to purchase such Limited Partner's interest in the Partnership at Fair Market Value on a pro rata basis. In addition, the Partnership, by vote of a majority of the General Partners, or failing such vote, each of the other Partners desiring to purchase, on a pro rata basis, shall have the option to purchase, at Fair Market Value, all or part of a Limited Partner's Units in the Partnership upon the occurrence of any of the following events:

(a)    The Limited Partner dies;

(b)    The Limited Partner files for protection under any federal or state bankruptcy laws, makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for such Limited Partner or for substantially all of such Limited Partner's properties or assets, or bankruptcy, reorganization arrangement or similar proceedings are instituted by or against such Limited Partner under federal or state law and the same are not dismissed within forty-five (45) days after filing; or,

(c)    The Limited Partner is divorced and in connection therewith all or any portion of such Limited Partner's Units are to be awarded to such Limited Partner's former spouse (in such event the purchase option shall apply only to those Units which are to be so awarded).

Such option shall be exercisable at any time following the happening of any of the foregoing events and shall expire ninety (90) days following receipt by any General Partner of written notice of the happening of such events. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option. With respect to any exercise of an option under this Section, the purchaser(s) shall have the right to pay for such interest in cash or by delivery of a promissory note in ordinary and customary form, payable with interest at the rate of the lesser of (i) eight percent (8%) per annum, or (ii) the maximum rate allowed by Arkansas law, payable in sixty (60) equal monthly installments of principal and interest. Such promissory note may be prepaid at any time without consent or penalty and shall be secured by the Partnership interest so acquired. The holder of any such promissory note shall have all of the rights and remedies of a secured creditor under the Arkansas Uniform Commercial Code. If the Partnership and the Partners do not fully exercise their option, and any portion of such Limited

Partner's Units are assigned to a beneficiary, a creditor, or a spouse, then the assignee shall have the right only as an assignee to receive distributions to which such Partnership interest is entitled to receive hereunder, subject to the terms and conditions contained herein, and such assignee shall only become a Limited Partner upon the satisfaction of the conditions set forth in Section 7.2 of this Agreement.

The foregoing provisions of Section 7.4 to the contrary notwithstanding, a deceased Limited Partner, or such deceased Limited Partner's personal representative, may transfer to one or more Permitted Transferees, by legacy, devise, bequest, or other testamentary transfer, without consideration, all or part of his or her interest in the Partnership and thereby constitute his or her transferee a Limited Partner without the consent of the General Partners or of the Partners.

Section 7.5    Limited Partner's Status Upon Death or Incompetency. If a court of competent jurisdiction adjudges a Limited Partner to be incompetent to manage his or her person or his or her property, then in accordance with § 705 of the Act and this Agreement, the guardian, conservator, or other legal representative may exercise all the incompetent Limited Partner's rights for the purpose of administering his or her property, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement. If a Limited Partner dies and the Partnership and Partners do not fully exercise any option arising under Section 7.4 of this Agreement to purchase all of the deceased Limited Partner's Units, then in accordance with § 705 of the Act and this Agreement, the executor, administrator, or other legal representative may exercise all the deceased Limited Partner's rights for the purpose of settling his or her estate, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement.

Section 7.6    Limited Put Option of Certain Permitted Transferees. In the case of a transfer during the lifetime of a Partner, for less than full and adequate consideration, of a Unit or Units, or portion thereof (that portion of such transfer for less than full and adequate consideration shall be a "Donative Transfer" and the Partner making such a transfer shall be the "Transferor"), to a Permitted Transferee (the "Donee"), for a period of sixty (60) days after the date of the Donative Transfer, the Donee shall have the right to require the Partnership to purchase from the Donee that number of whole Units which has a Fair Market Value closest to the Option Amount (defined below) as follows:

(a)    The Donee desiring to exercise this put option shall provide written notice thereof to the General Partners within sixty (60) days of the date of the Donative Transfer.

(b)    Upon exercise of any such option, the Partnership shall purchase the Units subject to the option for a price equal to their Fair Market Value, and the payment of the purchase

price shall be made in cash or in kind, as determined by the General Partners, provided that any Partnership Properties distributed to the Donee in payment of the purchase price shall be valued at Fair Market Value for the purposes hereof. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option.

(c)     The "Option Amount" shall be equal to the lesser of: (1) the Fair Market Value of the Donative Transfer; or (2) the total amount allowable with respect to such Donative Transfer to the Donee as an annual exclusion for federal gift tax purposes under §2503(b) of the Code, taking into account the annual exclusion available to the Transferor and the Transferor's spouse, if any, at the time of the Donative Transfer; provided, however, if the Transferor's spouse made no independent transfer to such Donee on the same date as the Donative Transfer, then such annual exclusion of the Transferor's spouse shall not be taken into account unless the Transferor's spouse consents thereto by a signed written statement at the time of the Donative Transfer.

(d)     To be consistent with the hypothetical willing buyer-willing seller standard, Fair Market Value shall be determined without regard to this limited put option.

## ARTICLE VIII
## COMPENSATION OF THE GENERAL PARTNERS

Section 8.1     Compensation. With the approval of Partners owning a majority-in-interest of the Partnership Units, the General Partners may receive reasonable compensation for serving as the General Partners and for managing the Partnership Properties.

Section 8.2     Expenses. Any costs and expenses incurred by the General Partners for the Partnership's benefit shall be billed directly to the Partnership, and the General Partners shall be entitled to be paid, as reimbursement, for all costs and expenses billed to and paid by the General Partners.

## ARTICLE IX
## DISTRIBUTIONS AND
## ALLOCATIONS OF INCOME AND LOSS

Section 9.1     Distributions of Distributable Cash. From time to time during each fiscal year the General Partners may distribute all or any part of the Distributable Cash, and the General Partners shall distribute all remaining Distributable Cash not later than April 15 following the end of each fiscal year. All such distributions shall be made in accordance with this Agreement and the Sharing Ratios of the Partners.

Section 9.2     Allocation of Certain Income and Losses for Tax Purposes. For federal

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                -15-

income tax purposes, the net income and net losses of the Partnership for any taxable year (or portion thereof) shall be allocated (subject to the requirements of § 704(c) of the Code) to the Partners in proportion to their Sharing Ratios.

Section 9.3     Allocations Upon Liquidation. For federal income tax purposes, income (including gain) or loss of the Partnership resulting from the sale or disposition of all or substantially all of the Partnership Properties, or the dissolution of the Partnership pursuant to Article X without an election to continue the Partnership in accordance with Section 10.1, shall be allocated to the Partners in proportion to their Sharing Ratios.

## ARTICLE X
## DISSOLUTION AND PRIORITY ON DISTRIBUTION

Section 10.1     Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:

(a)     Upon the expiration of the term set forth in Section 1.5 hereinabove;

(b)     Upon a unanimous vote of all the Partners;

(c)     Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units;

(d)     Within a reasonable period of time after the sale, condemnation, foreclosure or other similar disposition of all or substantially all of the Partnership Properties; provided, however, the Partnership may be continued by any or all of the Partners wishing to reinvest the sales proceeds; or

(e)     Upon the occurrence of any other circumstances which, by law, would require the Partnership to be dissolved.

The death, legal disability, or dissolution of any Limited Partner shall not result in the dissolution of the Partnership. Upon the death or legal disability of a Limited Partner, the legal representative of such Limited Partner or of his or her estate shall have the status described in Section 7.5 of this Agreement and the rights and liabilities as set forth in the Act.

Section 10.2     Liquidation and Priorities on Distribution. Upon the occurrence of any event which causes the dissolution of the Partnership, as set forth in Section 10.1 hereinabove, the General Partners or, if there is no General Partner, such person as may be designated by the Partners owning a majority-in-interest of the outstanding Partnership Units to act as liquidating trustee (the "Trustee")

shall immediately proceed to terminate the business of the Partnership. The General Partners or Trustee shall first determine the Fair Market Value of each Partnership Property (except cash) and then attempt to sell such portion (or all) of the Partnership Properties (except cash) at such prices and on such terms as the General Partners or Trustee, in the exercise of the General Partners' or Trustee's best business judgment under the circumstances then presented, deems to be necessary to provide for the liquidation priorities described below and to be in the best interests of all the Partners. The proceeds of any such sale, all Partnership cash, and undivided interests in Partnership Properties, shall be distributed in the following manner:

(a)    To creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of debts and liabilities of the Partnership, other than liabilities for distributions to Partners under A.C.A. § 4-43-601 or § 4-43-604;

(b)    To the creation of any reserves which the General Partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partners, arising out of or in connection with the Partnership;

(c)    To Partners and former Partners in satisfaction of liabilities for distributions under A.C.A. § 4-43-601 or § 4-43-604;

(d)    To Partners for the return of their capital account balances; and

(e)    The remainder, if any, shall be distributed to the Partners in accordance with their Sharing Ratios.

## ARTICLE XI
## ACCOUNTING AND BUSINESS MATTERS

Section 11.1    Books of Accounts and Records. The Partnership's books and records, this Agreement and any other records required by law to be maintained by the Partnership shall be maintained at the principal office of the Partnership. The books and records shall reflect all transactions and be appropriate and adequate for the business of the Partnership. Each Partner shall have access to and the right to copy at his or her own expense the Partnership's books and records at all reasonable times.

Section 11.2    Accounting Method. The Partnership books shall be kept on an accounting basis determined by the General Partners in accordance with usual and customary accounting practices.

Section 11.3    Financial Statements and Reports. Upon request by any Limited Partner, the General Partners shall cause the Partnership to provide the following reports and financial statements to the Partners:

(a)    Annual Report. Within one hundred twenty (120) days after the end of each

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -17-

fiscal year, the Partnership shall provide to the Partners (1) financial statements prepared by an independent certified public accountant, including a balance sheet as of the end of such fiscal year, together with statements of income, Partners' equity, changes in financial position and funds from operations for such year; the balance sheet and such statements (other than the funds from operations statement) shall be prepared in accordance with generally accepted accounting principles and shall be accompanied by a report of the activities of the Partnership for such year; and (2) a report on distributions to the Limited Partners for such period.

(b)    Tax Information. No later than March 15 of each year, the Partnership shall provide to each Partner all information relating to the Partnership necessary for the preparation of the Partners' federal income tax returns.

(c)    Other Federal and State Reporting Requirements. The General Partners shall cause to be delivered to the Limited Partners all other reports and information as may be required by law to be delivered to such Limited Partners.

Section 11.4    Fiscal Year. The fiscal year of the Limited Partnership shall be the calendar year.

Section 11.5    Bank Accounts. Except as may be otherwise specifically provided herein, all funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partners. Such account or accounts shall be in the name of the Partnership. All withdrawals therefrom shall be made upon checks signed by the General Partners, or any person authorized to do so by the General Partners.

## ARTICLE XII
## ELECTIONS

Section 12.1    Adjustment Election. In the event of the transfer of a Partner's Units or upon the death of any individual Partner, or in the event of the distribution of Partnership Property to any person, the General Partners, in their sole discretion, may, but shall not be obligated to, file an election as provided by Code § 754 and the Treasury regulations thereunder, to cause the Partner's basis in the Partnership Property to be adjusted for federal income tax purposes as provided by Code Sections 734 and 743. Any cost incurred in making such elections shall be charged to the Partner or Partners benefitting therefrom.

Section 12.2    Depreciation Elections. With respect to all depreciable assets of the Partnership, the General Partners may elect to use, to the extent allowed by the Code, accelerated depreciation methods; however, the General Partners may change or elect some other method which is, in their opinion, most advantageous to the Partners.

Section 12.3    Election with Respect to Taxation as Partnership. No election shall be made

by the Partnership, the General Partners or any Limited Partner to exclude the Partnership from the application of any of the provisions of Subchapter K, chapter 1 of subtitle A of the Code, or from any similar provisions of any state tax laws. The foregoing shall not prohibit such an election by the Partnership and any person other than in the capacity of a Partner hereunder.

Section 12.4    Other Elections.    In addition to the elections stated in this Article XII, the General Partners shall make all other elections which in their reasonable sole discretion are necessary for the proper operation and accounting of the Partnership.

## ARTICLE XIII
## AMENDMENTS

Subject to the provisions of the laws of the State of Arkansas, amendments to this Agreement which do not substantially affect the rights of the Limited Partners, or which are required or contemplated by this Agreement, may be made by the General Partners through use of the powers of attorney herein and hereby granted.   Any other amendment must be agreed to in writing by all of the Partners.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1    Notices.    All notices under this Agreement shall be in writing and shall be given to the Partners at each Partner's last known address and to the Partnership at its principal office or at such other address as any of the parties may hereafter specify in the same manner.

Section 14.2    Further Acts.    Each Partner hereby agrees to execute and deliver to the General Partners, within fifteen (15) days after receipt of the General Partners' written request therefor, such other and further statements of interest and holdings, designations, powers of attorney or other instruments as the General Partners reasonably deem necessary.

Section 14.3    Paragraph Headings.    The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provisions hereof.

Section 14.4    Severability.    Every portion of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 14.5    Application of Arkansas Law.    This Agreement, and the application or interpretation thereof, shall be governed by its terms and by the laws of the state of Arkansas.

Section 14.6    Survival of Rights.    This Agreement and all of the terms, provisions, and

agreements herein contained shall be binding upon and inure to the benefit of the Partners and their respective legal representatives, heirs, successors and assigns.

Section 14.7    Interpretation. As used herein, the masculine includes the feminine and the neuter and the singular includes the plural, as the context may require.

Section 14.8    Execution in Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had all signed the same document. All counterparts shall be construed together and shall constitute one (1) agreement.

Section 14.9    Waiver of Action for Partition. Each of the parties irrevocably waives during the term of the Partnership any right that he or she may have to maintain any action for partition with respect to the Partnership Properties.

Section 14.10    Tax Matters Partner. Pursuant to Code § 6231, the Partners hereby designate MARY HANNA BOLES CANADA as the tax matters partner ("TMP") for the Partnership. The TMP shall have all of the power and responsibilities imposed by the Code. Notwithstanding the designation, the Partners may participate in any inquiry by the Internal Revenue Service to the extent not inconsistent with this provision or the provisions contained in the Code relating to treatment of Partnership items at the Partnership level, at the Partner's sole expense.

Section 14.11    Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

Section 14.12    Arbitration. Any dispute or controversy arising out of or relating to this Agreement or any document or instrument delivered in connection with this Agreement shall be settled by arbitration to be held in England, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the parties irrevocably consent to the jurisdiction of the state courts of Arkansas for this purpose. The losing party in such arbitration shall pay all the costs and expenses of such arbitration and all the reasonable attorneys' fees and expenses of the other party thereto.

Section 14.13    Confidentiality. Each of the Partners, and any other person who shall become a Partner, agrees to keep confidential all information pertaining to the Partnership, its business, its management, and the arbitration of any dispute among the Partners, and agrees to refrain from disclosing such information to anyone who is not a Partner or a Partner's attorney or agent.

IN WITNESS WHEREOF, this Amended and Restated Agreement of Limited Partnership has been duly executed by the parties effective on the __1__ day of ___April___, 2004.

GENERAL PARTNERS:

_Mary Hanna Boles Canada_
MARY HANNA BOLES CANADA

LIMITED PARTNERS:

_Mary Hanna Boles Canada_
MARY HANNA BOLES CANADA

_Gary Canada_
GARY RECTOR CANADA

GARY RECTOR CANADA, JR. TRUST I

BY: _Gary Canada_
GARY RECTOR CANADA, JR., Trustee

BRADLEY SETH CANADA TRUST I

BY: _Bradley Seth Canada_
BRADLEY SETH CANADA, Trustee

HANNA NICOLE CANADA STEWART TRUST I

BY: _Hanna Nicole Canada_
HANNA NICOLE CANADA, Trustee

# EXHIBIT A
## (As Amended and Restated)

## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## PARTNERSHIP PROPERTY

**[insert description]**

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd

**EXHIBIT B**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**OWNERSHIP OF PARTNERSHIP UNITS**

| GENERAL PARTNERS: | UNITS: |
|---|---|
| Mary Hanna Boles Canada | 10 |
| | |
| **LIMITED PARTNERS:** | |
| Mary Hanna Boles Canada | 409 |
| Gary Rector Canada | 419 |
| Gary Rector Canada, Jr. Trust I | 54 |
| Bradley Seth Canada Trust I | 54 |
| Hanna Nicole Canada Stewart Trust I | 54 |
| | |
| TOTAL: | 1,000 |

EXHIBIT

2

## SHAREHOLDERS AGREEMENT

### *Canada Bancshares, Inc.*

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is executed effective as of the date set forth below (the "Effective Date"), by and among Canada Bancshares, Inc., an Arkansas corporation (the "Corporation"), and the undersigned Shareholders of the Corporation (all hereinafter collectively referred to as the "Shareholders" and individually as the "Shareholder").

### RECITALS:

WHEREAS, the Shareholders and the Corporation desire to promote their mutual interests by imposing certain restrictions and obligations upon the shares of capital stock of the Corporation in order to preserve and maintain a continuity of shareholder relationships and in order to promote sound and harmonious management of the Corporation; and

WHEREAS, it is the intention of the parties to place such restrictions on the sale, transfer, pledge, encumbrance or other disposition of all shares of the capital stock of the Corporation.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.      REGULATORY REQUIREMENTS.  Notwithstanding any other provision herein, no transfer pursuant to Section 2 or Section 3, below, no pledge pursuant to Section 4, below, nor any other Disposition (as defined below) of shares of capital stock of the Corporation including, without limitation, any Disposition involving a redemption of shares, shall occur except in compliance with all applicable legal and regulatory requirements.  This shall include, without limitation, (a) the submission of all required applications and notices to the Board of Governors of the Federal Reserve, the Arkansas State Bank Department and any other applicable governmental entity (collectively, the "Governmental Entity(ies)"), (b) all required approvals from applicable Governmental Entities having been obtained in such form as is satisfactory to the Board of Directors of the Corporation in its sole discretion, and (c) any Disposition being completed in compliance with the requirements of all applicable approvals granted by the Governmental Entities. The terms of any Disposition shall comply with the requirements of all applicable approvals given by the Governmental Entities. All time periods relating to any exercise and/or closing of any purchase option hereunder shall be extended as necessary to accommodate the requirements of this Section 1.

2.      FAMILY TRANSFERS.  Any Shareholder may transfer all or part of the Shareholder's shares of capital stock in the Corporation by sale or gift (including by testamentary transfer upon death) to one or more trusts established for the benefit of such Shareholder, his/her spouse and/or lineal descendants (collectively, "Family Member(s)"), and/or to an entity wholly-owned by such persons (referred to as a "Family Entity"), (collectively referred to as a "Family

1

5203889.4

Transferee"). In such cases, the transferee shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors, in its sole discretion.

3.    TRANSFERS BY ENTITY SHAREHOLDERS. Any Shareholder that is a corporation, partnership or limited liability company (collectively, an "Entity") may, upon notice to the Corporation, transfer all or part of the Entity's shares of capital stock in the Corporation to (i) the shareholders, partners or members, respectively, of that Entity, or (ii) any other corporation, partnership or limited liability company wholly-owned by that Entity. In such cases, the transferee(s) shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the other terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors.

4.    PLEDGE OR OTHER ENCUMBRANCE. No Shareholder shall pledge, encumber, grant a security interest in, or otherwise cause or permit any lien to be placed upon all or any part of the shares of capital stock of the Corporation owned by such Shareholder, without first providing written notice thereof to the Corporation; and provided further, as a condition thereto, the Shareholder shall require the lender, secured party, or other lienholder to execute an estoppel agreement (as approved by the Board of Directors) for the benefit of the Corporation and the other Shareholders which provides that any foreclosure, sale, transfer, or other disposition of the stock so pledged or encumbered shall be subject to the terms and conditions of this Agreement.

5.    RESTRICTIONS ON TRANSFER.

(a)    Except as provided in Sections 2, 3 and 4, no Shareholder shall sell, contract to sell, convey, hypothecate, assign, pledge, encumber, or otherwise transfer (collectively, a "Disposition") any or all of its shares of capital stock of the Corporation, now owned or hereinafter acquired, or any interest or right therein, without the prior written consent of all the other Shareholders, or in the absence of said written consent, without first providing the Corporation and each of the other Shareholders the right of first refusal option to purchase such stock as provided herein.

(b)    Except as otherwise provided in Sections 2, 3, and 4, a Shareholder proposing a Disposition (the "Transferor") shall provide written notice of the intended Disposition to the Corporation's Board of Directors (the "Disposition Notice"). The Disposition Notice shall set forth all of the terms of the proposed Disposition, including price and payment terms for any sale, the name and address of the proposed transferee, the number of shares involved in the proposed Disposition, and the date on which the transaction is to occur, which date shall not be less than thirty (30) days from the date on which said notice is given.

2

5203889.4

(c)    For a period of fifteen (15) days after the date on which the Disposition Notice is given, the Corporation shall have the right of first refusal option to purchase the stock of the Transferor identified in the notice, which option shall lapse and expire if not exercised in writing within said 15-day period by majority vote of the Board of Directors of the Corporation (without participation by the Transferor). The Corporation's option to purchase may be exercised in whole or in part. In the event said option is exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(d)    In the event that all of the shares of the Transferor subject to the foregoing option are not redeemed and purchased by the Corporation as provided above, then (i) the Corporation shall delivery a copy of the Disposition Notice to each Shareholder, and (ii) the shares not so purchased and redeemed by the Corporation shall become subject to a second option on the part of each of the other Shareholders to purchase a "proportionate share" of such stock, which option shall lapse and expire if not exercised in writing by notice to the Transferor within thirty (30) days after the date on which the Disposition Notice is mailed to each Shareholder by the Corporation. The Shareholders' option may also be exercised in whole or in part. In the event any or all of said options are exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(e)    The term "proportionate share" shall mean the ratio expressed as a percentage of (i) the number of shares of the Corporation's capital stock owned by the Shareholder to (ii) the total number of shares of capital stock of the Corporation owned by all Shareholders other than the Transferor. In addition, if any stock of the Corporation offered for sale is not purchased by the Shareholder first entitled thereto, the term "proportionate share" shall include that portion of the stock of the Corporation not purchased by the Shareholder first entitled thereto which the number of shares of capital stock of the Corporation owned by a Shareholder bears to the total number of shares of capital stock of the Corporation owned by Shareholders electing to exercise this option to purchase the Transferor's stock.

(f)    In the event the Corporation and the other Shareholders do not exercise their respective options as hereinbefore provided, the Transferor may make a bona fide Disposition to the prospective purchaser, or other transferee, of any remaining stock not so purchased by the Corporation or other Shareholders. The Disposition shall be made only to the transferee identified in the Disposition Notice and shall be made only in strict accordance with the terms stated in such notice. However, if the Transferor shall fail to make such Disposition within one hundred twenty (120) days following the date on which the Disposition Notice is given, such shares shall again become subject to all of the restrictions contained in this agreement. Any purchaser or other transferee acquiring the offered shares shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, and deliver a counterpart of this Agreement as a condition to the issuance of a stock certificate in such person's name.

(g)    During any period in which the Corporation is a "small business corporation," as defined in sections 1361(a) and (b) of the Internal Revenue Code of 1986, as

3

5203889.4

amended (the "Code") (referred to herein as an "S Corporation") then, in the case of shares held by a trust, any change in the status or circumstances of the trust or its beneficiaries that either (i) causes or will reasonably be expected to cause the trust to cease to be a trust that is permitted to hold shares in an S Corporation, or (ii) results in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any trustee or beneficiary of the trust in question, if such person is also serving as a director).

(h)    With respect to any Family Entity that was a transferee under Section 2, any event resulting in that Family Entity having any owner, officer or director (or any similar positions) that is not a Family Member of the original transferor, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any person affiliated with the Family Entity in question, if such person is also serving as a director).

(i)    Notwithstanding any other provision herein, unless first approved by the Board of Directors in writing, in its sole exercise of discretion, no Shareholder shall complete a Disposition of any shares of the Corporation's capital stock to any of the following (each referred to as a "Competitor"): (1) any other state or federally chartered financial institution or financial institution holding company, (2) any individual(s) or entities that in the aggregate own ten percent (10.00%) or more of any other state or federally chartered financial institution or financial institution holding company, or (3) any other individual or entity that the Board of Directors of the Corporation has, in its sole discretion, designated as a "Competitor" for purposes of this Section 5(i).

(j)    In the event the options specified herein are exercised, the purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

(k)    For all purposes of this Section 5, the date on which the Disposition Notice is given shall be the date such notice is deemed made pursuant to Section 24(d).

6.    DIVORCE. If an individual Shareholder shall become a party to a divorce proceeding and pursuant to the final decree in that proceeding all or any portion of the Shareholder's stock in the Corporation is awarded to the Shareholder's former spouse (who is not also then a shareholder), the stock so awarded shall immediately become subject to an option to purchase on the part of the Corporation first, and the other Shareholders second for a period of ninety (90) days after written notice of such award as provided to the Corporation and each of the other Shareholders, in the manner provided in Section 5 as in the case of a proposed Disposition except that for purposes of Section 5, the date on which the notice is made to the Corporation and the other Shareholders of the final divorce decree shall be deemed the date of the Disposition Notice. If all of the shares of stock so awarded are not purchased by the Corporation, the Shareholders (other than the divorced Shareholder and his or her spouse) shall

4

5203889.4

have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

7.      BANKRUPTCY OR INSOLVENCY. If any Shareholder makes an assignment for the benefit of creditors, or if any petition shall be filed in any federal or state court alleging that a Shareholder is insolvent, or requesting the appointment of a receiver for all or substantially all of a Shareholder's property, or if any petition in bankruptcy is filed by or against a Shareholder in a court of competent jurisdiction and if such petition or petitions are not dismissed within ninety (90) days from the date of filing, all of such Shareholder's shares of stock in the Corporation (including any shares transferred pursuant to Section 2) shall immediately become subject to an option to purchase such stock in favor of the Corporation first and the other Shareholders second, for a period of one hundred twenty (120) days after written notice of such event. If all of the shares of stock in the Corporation owned by such Shareholder are not purchased by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and term of payment shall be determined pursuant to Sections 10 and 11.

8.      DEATH. Subject to a Shareholder's ability to transfer shares of stock to a Family Transferee at such Shareholder's death as provided in Section 2, upon the death of an individual Shareholder (the "Decedent") all of the shares of stock in the Corporation owned by the Decedent (including shares transferred pursuant to Section 2) or to which the Decedent or his or her personal representative shall be entitled, shall become subject to an option to purchase on the part of the Corporation, first and the other Shareholders, second for a period of one hundred twenty (120) days following the date of the Decedent's death. If all of the Decedent's shares of stock in the Corporation are not purchased and redeemed by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11. Notwithstanding the provisions of Section 11 to the contrary, if the Corporation shall receive any proceeds from any policy of insurance on the life of the Decedent, such proceeds shall be paid by the Corporation to the Decedent's personal representative to the extent of the purchase price of the Decedent's stock, and such payment shall be deemed to have been made on account of such purchase price. The balance of the purchase price remaining after credit for such insurance proceeds shall be paid pursuant to Section 11.

9.      S CORPORATION PURCHASE OPTION.

(a)      In the event that the holders of a majority of the outstanding shares of capital stock of the Corporation provide written notice to the Board of Directors of the Corporation that they desire to cause the Corporation to make an election to be treated as an S Corporation (defined herein) for federal and state income tax purposes (the "Election Notice"), then the Board shall take the following actions:

(i)      the Board shall promptly provide the Election Notice to each Shareholder;

(ii)      the communication containing the Election Notice shall inform

5

5203889.4

each Shareholder that it has a period of not less than 45-days as established by the Board (the "Notice Period") in which to:

(A)    deliver to the Corporation a signed consent (in a form approved by the Board) to the S Corporation election pursuant to which such Shareholder consents to the Corporation making an S Corporation election, along with such other documents as the Board may require; and

(B)    if applicable, with respect to any Shareholder that is not eligible to own shares of stock in an S Corporation, to take such actions as may be necessary to cause the Shareholder to become eligible (including any Disposition of shares permitted by and completed in accordance with Section 2 and/or Section 3 herein).

(b)    Any Disposition of shares proposed by a Shareholder in order for the Shareholder (or its transferee(s)) to be an eligible S Corporation shareholder shall (i) be subject to the review and approval of the Board of Directors of the Corporation, and (ii) if approved by the Board, be subject only to those restrictions and requirements imposed by the Board and permitted to occur without any requirement of compliance with the provisions of Section 5, if applicable.

(c)    In the event a Shareholder fails to provide the consent (and other required documentation) described in Section 9(a)(ii)(A), above, within the Notice Period, or is otherwise not an eligible S Corporation shareholder as of the expiration of the Notice Period (as determined by the Board), then, without any additional action, all of such Shareholder's shares of stock in the Corporation shall be subject to a purchase option in favor of the Corporation to repurchase and redeem such shares. The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

10.    PURCHASE PRICE.  The purchase price for each share of stock purchased pursuant to this Agreement shall be equal to the purchase price contained in any bona fide offer to purchase such shares which the Transferor proposes to accept (in the case of any proposed Disposition by sale or exchange), or in the absence of such bona fide offer or in situations other than proposed Dispositions involving a sale or exchange, the purchase price for such stock shall equal the Book Value of such shares of stock. "Book Value", as used in this Agreement, shall be the net book value of the Corporation as of the end of the month preceding the date of occurrence of the event giving rise to any right to purchase shares hereunder, computed in accordance with generally accepted accounting principles applied in a consistent manner with prior periods, by a Certified Public Accountant selected by the Board of Directors. The determination by such accountant shall, for purposes of this Agreement, be final, conclusive and binding upon each of the parties hereto.  The purchase price per share shall equal the Book Value divided by the number of shares of capital stock outstanding.

11.    PAYMENT OF PURCHASE PRICE.  The purchase price for any shares of stock purchased pursuant to this Agreement, in situations involving proposed dispositions by sale or exchange, shall be paid upon the same terms and conditions (including, as near as possible, security terms) as contained in the bona fide offer to purchase such shares received by the

6

5203889.4

Transferor; or in the absence of any such bona fide offer, or in situations other than proposed Dispositions involving a sale or exchange, the purchase price shall be paid in sixty (60) equal monthly installments of principal and interest at a rate equal to the lesser of (1) the prime rate at Bank of England, in England, Arkansas, or its successor, on the date of the closing, or (2) 5.00% per annum (provided that any purchaser may elect to pay the purchase price in cash at any time). The first such payment shall be due and payable thirty (30) days from the closing date of such sale and purchase. Such obligation shall be represented by a promissory note in customary form as approved by the Board of Directors.

12.   CORPORATE GOVERNANCE MATTERS.   Neither the Board, nor any Shareholder, officer or agent of the Corporation, shall take or permit to be taken any of the following actions by or on behalf of the Corporation, without the prior written authorization of MHBC Investments Limited Partnership I, LLLP (or its successor), in each case:

(a)   the amendment, modification, or restatement of this Agreement, the Corporation's Articles of Incorporation or Bylaws;

(b)   the amendment, modification, or restatement of the charter, bylaws or other governing documents of any entity in which the Corporation owns an interest, or any entity owned by any entity in which the Corporation owns an interest, (each, referred to as a "Subsidiary") including, without limitation, Bank of England (the "Bank"), or any successor thereof;

(c)   the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect the election or appointment of any person to, and/or removal of any person from, the Board of Directors (or similar position) of the Bank or any other Subsidiary;

(d)   the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect (i) any merger, consolidation or similar transaction involving a Subsidiary, (ii) the sale of all or substantially all of a Subsidiary's assets, (iii) the liquidation or dissolution of a Subsidiary (or entering into any license, pledge, encumbrance or other transaction with similar economic effect), or (iv) the liquidation, dissolution or other termination of the existence and/or business of any Subsidiary;

(e)   causing a reclassification, reorganization, or recapitalization of any shares of the outstanding capital stock (or other equity interests) of any Subsidiary.

7

5203889.4

13.     SECURITY FOR PAYMENT OF THE PURCHASE PRICE.  Whenever the Corporation redeems, or remaining Shareholders purchase, stock pursuant to this Agreement, and the purchase price is to be paid in installments, the shares of stock so purchased or redeemed shall be pledged to the selling Shareholder as security for the payment of the purchase price and all certificates representing such stock shall be delivered to the selling Shareholder, or his or her personal representative, as the case may be, to hold as such security.  The selling Shareholder and/or his or her personal representative, as the case may be, shall have all the rights and remedies of a secured creditor under the Uniform Commercial Code as adopted under the laws of the State of Arkansas.

14.     INSUFFICIENT SURPLUS.     If the Corporation elects to purchase a Shareholder's stock but does not have sufficient surplus to permit it to lawfully purchase all of the shares of stock to be purchased, the Shareholders shall promptly take such measures to vote their respective shares to reduce the capital of the Corporation or to take such other and further steps as may be appropriate or necessary (excluding making additional capital contributions) in order to enable the Corporation to lawfully purchase all of the shares of stock to be purchased, including without limitation, an up-to-date appraisal of the assets of the Corporation, or a recapitalization of the Corporation so as to reduce its stated capital and increase its surplus.

15.     ADDITIONAL ACTION.  Whenever the Corporation or other Shareholders shall, pursuant to this Agreement, redeem or purchase shares of the Corporation's stock from the Transferor, the Transferor shall do all things necessary to execute, deliver, and endorse all papers and certificates as may be required to consummate said purchase and transfer of stock.

16.     RESTRICTIVE LEGEND.  Each certificate representing shares of stock in the Corporation shall be stamped or otherwise imprinted with the following restrictive legend:

<div align="center">

RESTRICTIVE LEGEND FOR COMMON STOCK
OF CANADA BANCSHARES, INC.

</div>

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE ARKANSAS SECURITIES ACT, AS AMENDED.  THE SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF REGISTRATION OR THE AVAILABILITY OF EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND THE ARKANSAS SECURITIES ACT.  NO RESALE, PLEDGE, HYPOTHECATION, OR OTHER TRANSFER OR DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL OCCUR EXCEPT IN COMPLIANCE WITH THE PROVISIONS OF A SHAREHOLDERS AGREEMENT BY AND AMONG THE CORPORATION AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION.  AT ANY TIME DURING WHICH THE CORPORATION IS AN ELECTING SMALL BUSINESS CORPORATION UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS CERTIFICATE SHALL NOT BE

<div align="center">8</div>

5203889.4

TRANSFERABLE IF SUCH TRANSFER WOULD CAUSE REVOCATION OF THE CORPORATION'S "S" CORPORATION ELECTION.  ANY TRANSFER CONTRARY TO THE ABOVE INSTRUCTIONS IS VOID.

17.   ADDITIONAL STOCK OR SECURITIES; TRANSFEREE TO BE MADE A PARTY.  Before any additional shares of stock or any other securities convertible into stock of the Corporation are issued in the future to shareholder or other security holder (other than a signatory to this Agreement), such person or entity shall be required to become a party to and execute and deliver a counterpart of this Agreement prior to the issuance of such shares or other securities and the certificates therefor shall be legended as provided in Section 16. Further, whenever any Shareholder acquires any additional shares of stock of the Corporation or any other securities of the Corporation convertible into stock other than the shares of stock owned at the time of the execution of this Agreement, such shares of stock or such other securities so acquired shall be subject to all of the terms of this Agreement, and the certificates therefor shall be stamped with the legend described in Section 16. In addition, each Disposition (of any type) to any transferee is hereby expressly conditioned upon such transferee first being made a party to and bound by the terms of this Agreement.

18.   TERMINATION.  This Agreement shall terminate and all rights and obligations of the parties hereto shall cease (i) upon the written agreement of all Shareholders, (ii) upon the voluntary dissolution of the Corporation, or (iii) in the event there shall be only one (1) owner of the issued and outstanding shares of common stock of the Corporation.

19.   PRESERVING "S CORPORATION" STATUS.  Notwithstanding anything herein to the contrary, at any time during which the Corporation is an S Corporation, (i) no shares of stock of the Corporation shall be transferable to any transferee if such transfer would cause a revocation of the Corporation's S Corporation status, and (ii) unless approved by the Board of Directors in writing, no shares of stock of the Corporation shall be transferable if the proposed transfer would result in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on the number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code. Any purported Disposition in violation of this Agreement shall be null and void and the purported transferee shall have no interest in any of the shares of stock of the Corporation purported to be transferred.

20.   SHAREHOLDERS' REPRESENTATIONS AND WARRANTIES.  Each of the Shareholders represent and warrant that (i) it is the sole owner of the number of shares of common stock set forth opposite its signature hereto, (ii) except as approved in writing by the Corporation, that all of such shares are free and clear of all liens, claims, charges, security interests, or encumbrances of any kind, and (iii) that it has the right and lawful authority to enter into this Agreement.

21.   DRAG-ALONG SALE.

(a)   If the holder(s) of a majority of the outstanding shares of capital stock of the Corporation (collectively, the "Drag Initiating Shareholder(s)"), acting individually or together, receive a bona fide offer, or otherwise agree, to make a transfer, sale or disposition of

9

5203889.4

all of their shares of stock in the Corporation in a single transaction or series of related transactions (a "Drag Along Sale"), then the Drag Initiating Shareholders shall have the right to require that each other Shareholder of the Corporation sell all of its shares of stock in the Corporation in the same transaction.  In the event a conflict shall exist between a Drag Along Sale and any other option or purchase right in this Agreement, the provisions of this Section 20 shall control.

(b)     Not less than 30-days prior to the proposed closing date of the Drag Along Sale, the Drag Initiating Shareholders shall provide to each Director and each Shareholder (i) a written notice identifying the proposed transferee, the consideration to be paid, and all other material terms and conditions of a Drag Along Sale (the "Drag Along Notice"), and a copy of the written agreements and documents pursuant to which a Drag Along Sale will be conducted and closed (the "Drag Along Agreement").  Each other Shareholder shall be required to participate in the Drag Along Sale on the terms and conditions set forth in the Drag Along Notice and in accordance with the Drag Along Agreement.  Within 15-days following the date the Drag Along Notice is given (the "Drag Along Notice Period"), each Shareholder of the Corporation shall execute and deliver in escrow to the Chairman of the Corporation all documents reasonably required to be executed in connection with the closing of such Drag Along Sale.  The Chairman shall be authorized to release such documents upon the closing of the Drag Along Sale.

(c)     If the Drag Along Sale has not been completed within 120-days following expiration of the Drag Along Notice Period, then the Chairman shall return to each Shareholder any documents in his possession executed by such Shareholders in connection with the proposed Drag Along Sale, and all restrictions on transfer contained in this Agreement or otherwise applicable at such time shall again be in effect.  Notwithstanding anything contained in this Section 20, there shall be no liability on the part of any Drag Initiating Shareholder to any other Shareholder if a proposed Drag Along Sale is not consummated for whatever reason.  Any decision as to whether to consummate a transfer of any portion of its Shares shall be at the sole discretion of each Drag Initiating Shareholder.

22.     GRANT OF PROXY.  To insure the performance by each Shareholder with the agreements set forth herein, each Shareholder hereby appoints the Chairman of the Corporation or its designee (the "Proxy Holder"), as his, her or its true and lawful proxy and attorney in fact, with full power of substitution and resubstitution, to vote all Shares owned or held by such Shareholder, subject to the provisions of this Agreement, upon any matter presented to the Shareholders of the Corporation, if (and only if) such Shareholder fails to comply with such provisions within 5-days following written request.  The proxies and powers granted by each Shareholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Shareholder's commitments under this Agreement.  Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Shareholder.

23.     TERM.  The term of this Agreement shall be 24-years and 364-days following the Effective Date, unless extended by the vote or written consent of the holders of a majority of the Corporation's issued and outstanding shares of voting common stock. Each Shareholder hereby irrevocably supports and authorizes each person who may from time to time serve as President,

10

5203889.4

Chief Executive Officer or Treasurer of the Corporation to act as his attorney-in-fact with specific authority to execute, acknowledge, swear to, file, and deliver, an amendment to this Agreement which extends the term of this Agreement for any length of time provided that the Corporation's Board of Directors makes a determination that the extension of such term of this Agreement will not be treated as a separate Bank Holding Company under the rules and regulations of the Board of Governors of the Federal Reserve and any other applicable law, rule or regulations.

24.    MISCELLANEOUS.

(a)    Governing Law. This Agreement shall be subject to and governed by the laws of the State of Arkansas.

(b)    Partial Invalidation. In the event that one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(c)    Specific Performance. The parties hereto recognize that the Corporation's stock is a unique asset. Accordingly, in the event of a breach of this Agreement, any non-breaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached their contractual obligations described herein. Each party hereto agrees that he will make no objection to the form of action in any such proceeding for specific performance of this Agreement. Anything contained herein to the contrary notwithstanding, this Section shall not be construed to limit in any manner whatsoever any other rights and remedies an aggrieved party may have by virtue of any breach of this Agreement.

(d)    Notices. Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing either in person or by registered, certified or private express mail, which shall be addressed, in the case of the Corporation, to its principal office to the attention of the President and Secretary, and in the case of any Shareholder, to the address appearing by the Shareholder's signature hereto, or such other address as may be designated by a Shareholder in writing to all parties to this Agreement. If mailed, such notice or other communication shall be deemed made when properly deposited in the mail addressed as provided herein, with postage prepaid.

(e)    Fees of Legal Counsel. In the event any party to this Agreement shall employ legal counsel to protect his rights hereunder or to enforce any term or provision herein, then the party prevailing in any such action shall have the right to recover from the other party all of his reasonable attorneys' fees and expenses incurred in relation to such claims.

(f)    Further Assurances. The parties agree that from time to time hereafter, and upon request, each of them will execute, acknowledge and deliver such other instruments and documents and take such further action as may be reasonably necessary to carry out the intent of this Agreement.

11

5203889.4

(g)    Modification. No provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

(h)    Binding Effect and Benefit. This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto, their heirs, executors, administrators, personal representatives, successors and permitted assigns.

(i)    Headings and Captions. Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Agreement.

(j)    Waiver. No waiver of a breach or violation of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or limit or restrict any right or remedy otherwise available.

(k)    Rights and Remedies Cumulative. The rights and remedies expressed herein are cumulative and not exclusive of any rights and remedies otherwise available.

(l)    Gender and Pronouns. Throughout this Agreement, the masculine shall include the feminine and neuter and the singular shall include the plural and vice versa as the context requires.

(m)    Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

(n)    Time for Performance. Time is of the essence in this Agreement.

(o)    Counterparts. This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart. Copies of signatures shall be accepted as originals. Additional signature pages shall be attached hereto as necessary.

(p)    Tax Matters. The initial signatories to this Agreement acknowledge and confirm their mutual intention and expectation that (i) all current shareholders of the Bank shall transfer their respective shares of the Bank's common stock in exchange for shares of stock of the Corporation and that each such transfer is made in connection with the formation and initial capitalization of the Corporation following its qualification as a "bank holding company" pursuant to the Bank Holding Company Act of 1956, as amended, and applicable provisions of Arkansas law, and (ii) each transferor shall be treated as part of the same control group pursuant to Section 351 of the Internal Revenue Code of 1986, as amended.

*[Signature page(s) to follow.]*

12

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement of Canada Bancshares, Inc. effective as of the Effective Date set forth below.

**Effective Date:**   April 1, 2017

CORPORATION:

CANADA BANCSHARES, INC.

By: _____
     Gary R. Canada, Sr., Chairman

*[Shareholder signature page(s) to be attached.]*

13

5203889 4

IN WITNESS WHEREOF, the undersigned has executed this Shareholders Agreement of Canada Bancshares, Inc. effective as to the undersigned as of the date set forth below.

*Effective Date:* April 1, 2017

MHBC INVESTMENTS LIMITED
PARTNERSHIP I, LLLP

By: _____
Mary Hanna Boles Canada,
General Partner

_____
Bradley S. Canada

_____
Gary R. Canada, Jr.

_____
Hanna Nicole Luebke

*[Shareholder Signature Page]*

*Canada Bancshares, Inc.*

14



**EXHIBIT**

3









**EXHIBIT**

4





# STATE OF ARKANSAS



## SECRETARY OF STATE

### Cole Jester
ARKANSAS SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Cole Jester, Arkansas Secretary of State, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

### Dissociation/Dissolution of LLLP

of

### MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

effective this day
December 12, 2025.



**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 5th day of February, 2026.

Arkansas Secretary of State

EXHIBIT

5

 FILED - Arkansas Secretary of State - Cole Jester - Doc#: 20524565001 - Filing#: 800031290 - Filed On: 12/12/2025 - Page(s): 3

## AMENDEDMENT TO
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

Pursuant to the Arkansas Uniform Limited Partnership Act (2001), more specifically stated as Ark. Code Ann. § 4-47-101, *et seq.*, and Act 15 of the 2007 Acts of Arkansas, the undersigned does hereby certify that the following information is true and correct:

### RECITALS

WHEREAS, a guardian of the person and estate of Mary Hanna Boles Canada ("Mrs. Canada"), the sole general partner of MHBC Investments Limited Partnership I, LLLP (the "Partnership"), was appointed on September 12, 2025 by the Circuit Court of Lonoke County, Arkansas, causing the immediate and automatic dissociation of Mrs. Canada pursuant to Ark. Code Ann. § 4-47-603(7)(B);

WHEREAS, the limited partners of the Partnership did not admit another general partner within 90 days of Mrs. Canada's dissociation, as required to avoid dissolution of the Partnership pursuant to Ark. Code Ann. § 4-47-801(3) and Sections 6.9 and 10.1(c) of the Amended and Restated Limited Partnership Agreement of the Partnership (the "Partnership Agreement"); and

WHEREAS, pursuant to Section 10.2 of the Partnership Agreement, and consistent with Ark. Code Ann. § 4-47-803(c), limited partners owning a majority-in-interest of the outstanding Partnership Units designated Gary Rector Canada, Sr. as "Liquidating Trustee."

NOW, THEREFORE, the Certificate of Limited Partnership of MHBC Investments Limited Partnership I, LLLP is hereby amended as follows:

### AMENDMENT

1.      Name. The name of the registered limited liability limited partnership is MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

2.      Original Filing Date. The original certificate of limited partnership for the Partnership was filed in this office on July 21, 1997. The Partnership converted to a limited liability limited partnership on April 6, 2004.

3.      Amendment. The Certificate of Limited Partnership of the Partnership is hereby amended as follows:

(a)      Dissociation of Mrs. Canada. Pursuant to Ark. Code Ann. § 4-47-603(7)(B), Mary Hanna Boles Canada ("Mrs. Canada"), the sole General Partner of the Partnership, disassociated on September 12, 2025. The Partnership does not have a general partner.

Error! Unknown document property name.

(b)    Dissolution of the Partnership. The Partnership dissolved, effective December 12, 2025, pursuant to Section 10.1(c) of the Partnership Agreement and Ark. Code Ann. § 4-47-801(1) & (3)(B).

(c)    Liquidating Trustee. Gary R. Canada was duly appointed by the partners as Liquidating Trustee, to conduct the winding up and termination of the Partnership's business in accordance with Section 10.2 of the Partnership Agreement. The street and mailing address of Gary R. Canada, Sr. is 123 S. Main Street, England, Arkansas 72046.

[*Signature Page Follows*]

2

Error! Unknown document property name.

IN WITNESS WHEREOF, this Amendment to Certificate of Limited Partnership has been duly executed by the liquidating trustee of the Partnership this 5ᵗʰ day of February, 2026.

**LIQUIDATING TRUSTEE:**

_____
GARY R. CANADA, Sr.

3

Error! Unknown document property name.

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
                    DEP CLERK

CANADA BANCSHARES, INC.

PLAINTIFF

v.                          Case No. __4:26-cv-267-KGB__

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Motion for Preliminary Injunction against the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill, and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the Federal Regulators, the "Agencies"), states:

1.      CBI recently became the sole holding company of the Bank of England (the "Bank") upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I, LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of ownership, including, for example, (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's

strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

2.      The Agencies, however, refuse to recognize CBI's status as the Bank's owner— or *anyone's* status as the Bank's owner— simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business.

3.      Specifically, the Agencies have asserted that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."**

4.      Without this Court's entering immediate injunctive relief ordering the Agencies to recognize CBI as the Bank's owner, the Bank will operate like a headless hydra— no clear managerial oversight, no ability to respond to crises, and no strategic direction whatsoever.

5.      For the reasons set forth in the accompanying Brief in Support, (i) CBI is likely to succeed on the merits of its claim that it is the sole holding company of the Bank, thereby entitling it to the accoutrements of Bank ownership, (ii) CBI, the Bank, and the Bank's customers are likely to suffer continued irreparable harm absent a preliminary injunction, and (iii) the balance of the equities and the public interest favor injunctive relief as the Agencies are uninterested in who owns the Bank, they simply need this Court's direction as to who that person is.

6.      CBI respectfully requests that this Court waive the security requirement in Rule 65(c) as there is no risk that the Agencies will suffer financial harm.

WHEREFORE, CBI respectfully requests that this Court (i) grant its Motion for Preliminary Injunction, (ii) order the Agencies to recognize CBI's status as the Bank's owner, and (iii) grant it all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201

2

Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.                                            PLAINTIFF

v.                          Case No. ___4:26-cv-267-KGB___

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

---

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Brief in Support of its Motion for Preliminary Injunction against the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill, and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the Federal Regulators, the "Agencies"), states:

### INTRODUCTION

CBI recently became the sole holding company of the Bank of England (the "Bank") upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I, LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of Bank ownership, including, for example, setting the Bank's strategy and governance, managing the Bank's capital and funding, and

interacting directly with the Agencies. But the Agencies are preventing CBI from doing so. More specifically, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business. Indeed, the FDIC and the State Regulator have asserted in writing that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** The Board has expressed the same opinion verbally during meetings over the Bank's ownership.

Without a preliminary injunction from this Court ordering the Agencies to immediately recognize CBI as the Bank's owner, the Bank will suffer governance paralysis, capital and liquidity crises, and severe operational disruption. Worse yet, the Agencies' continued refusal to recognize CBI as the Bank's owner interferes with CBI's due-process rights. To preserve the status quo, to ensure CBI's and the Bank's survival, and to protect the Bank's customers, this Court should enter a preliminary injunction ordering the Agencies to recognize CBI's status as the Bank's owner.

## BACKGROUND

CBI hereby incorporates the factual allegations contained in its Verified Complaint by reference pursuant to Federal Rule of Civil Procedure 10(c).

## ARGUMENT

A preliminary injunction is warranted when (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities favors the movant; and (4) an injunction is in the public interest. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam). Though no single factor is "dispositive," *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), likelihood of success is "the most significant" factor, *Missouri*, 112 F.4th at 536. When the federal government is the party opposing a preliminary injunction, the balance of the equities and the public interest "merge" into a single factor. *See, e.g., Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Here, each factor supports a preliminary injunction.

I.    **CBI is likely to succeed on the merits because CBI is the Bank's sole holding company.**

As for this initial, most crucial factor, CBI is likely to succeed on the merits because, following the Partnership's dissolution, CBI became the Bank's sole holding company. More specifically, Mary Hanna Boles Canada has always been the Partnership's only legally recognized General Partner. Immediately upon the Lonoke County Circuit Court's appointing Gary Canada, Sr. as Mrs. Canada's emergency guardian on September 12, 2025, Mrs. Canada was dissociated from the Partnership by operation of law. Ark. Code Ann. § 4-47-603(7)(B) ("A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.").

As such, the Partnership had 90 days— up and until December 12, 2025[1]— to either (i) admit a new General Partner, or (ii) consent to continue the activities of the limited partnership and admit a new General Partner in accordance with that consent. Ark. Code Ann. § 4-47-801(3)(B); **Ex. 1** to Compl., at §§ 6.9, 10.1(c). However, the Partnership failed to do either, and the Arkansas Secretary of State accordingly certified the Partnership's dissolution. **Ex. 5** to Compl. Upon the Partnership's dissolution, CBI became the Bank's sole holding company. As the Bank's sole holding company, CBI is entitled to, among other things: (i) the Agencies' recognition, (ii) the right to set the Bank's strategy and governance, and (iii) the ability to manage the Bank's capital and funding. Therefore, CBI is likely to succeed on the merits, and this most important factor weighs heavily in CBI's favor.

II.   **CBI, the Bank, and the Bank's customers have suffered and will suffer irreparable harm absent injunctive relief.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). For this requirement, a plaintiff need not prove with absolute certainty

---

[1] The Lonoke County Circuit Court later appointed Nicole Canada Luebke and Mr. Canada, Sr. as Mrs. Canada's co-guardians, but Mrs. Canada's guardianship has continued uninterrupted from September 12, 2025, to the date and time of this filing.

that injury will occur, but, instead, need merely show that irreparable harm is "likely" absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Here, the Agencies' refusal to recognize CBI as the Bank's owner has caused and will continue to cause CBI, the Bank, and the Bank's customers to suffer irreparable harm because such a refusal produces: (i) governance paralysis— the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption— vendors, other banks, and market participants could freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

Indeed, the Agencies' unlawful refusal to recognize CBI as the Bank's owner is substantially likely to result in (i) CBI's and the Bank's terminations as ongoing business enterprises, and (ii) loss of customer goodwill, both of which constitute irreparable harm under Eighth Circuit precedent. *See, e.g., Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (explaining that "[i]rreparable harm has been found when one's allegedly unlawful actions . . . will cause another's ongoing business to terminate absent an injunction"); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[T]he petitioners' potential loss of consumer goodwill qualifies as irreparable harm.").

4

Worse yet, as the Bank's sole holding company, CBI has a recognized property interest in its ownership of the Bank. *Cf. FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("[A]ppellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."); *Kaufman v. Societe Internationale Pour Participations Industrielles Et Commerciales, S.A.*, 343 U.S. 156, 159–60 (1952) (holding that "the rights of innocent stockholders . . . must be fully protected"). The Agencies' unlawful refusal to recognize that interest or give it any meaningful legal effect without due process of law or adequate compensation threatens violations of CBI's constitutional rights, independently constituting irreparable harm warranting injunctive relief. *See, e.g., Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 935 (E.D. Ark. 2021) ("The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, CBI has suffered and will continue to suffer irreparable harm absent immediate injunctive relief.

III.    **The balance of the equities and the public interest support a preliminary injunction both because (i) the Agencies are uninterested in who owns the Bank, they simply need Court direction, and (ii) customers' interests and the public's faith in the banking regulatory regime are in peril absent injunctive relief.**

The balance of the equities and public interest, which "merge" in suits against the government, also decisively favor preliminary relief. *Missouri*, 128 F.4th at 996–97. At the outset, the Agencies have no interest in this case warranting protection because they are uninterested in which entity ultimately owns the Bank. After all, their stated position is that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** Stated differently, the Agencies will treat whomever this Court determines to be the Bank's owner as such.

Moreover, "it is always in the public interest to protect constitutional rights" like CBI's due-process entitlements. *Phelps-Roper v. Nixon*, 59 F.3d 480, 485 (8th Cir. 2007). And, even better, entering a preliminary injunction in CBI's favor would mean that the Bank once again has stable management

and oversight— thereby protecting customers' interests and the public's faith in the regulatory regime underlying the banking system. Thus, this final factor weighs heavily in CBI's favor, too.

### CONCLUSION

Following the Partnership's dissolution, CBI became the Bank's sole holding company. As such, it is constitutionally entitled to the accoutrements of ownership, including but not limited to: (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

Because CBI is (i) likely to succeed on the merits, (ii) has suffered and will continue to suffer irreparable harm absent immediate injunctive relief, and (iii) the balance of the equities and the public interest favor such relief, this Court should enter a preliminary injunction ordering the Agencies to immediately recognize CBI's status as the Bank's owner. Doing so preserves the status quo, ensures CBI's and the Bank's survival, and protects the Bank's customers from peril. Accordingly, CBI respectfully requests that this Court grant its Motion for Preliminary Injunction and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association

6

809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Arkansas  ☒

| | |
|---|---|
| CANADA BANCSHARES, INC. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v | ) |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; | ) |
| JEROME H. POWELL, in his Official Capacity as Chair of the Board of | |
| Governors; TRAVIS HILL, in his Official Capacity as Chair of the Federal | ) |
| Deposit Insurance Corporation; and SUSANNAH MARSHALL, in her | ) |
| Official Capacity as Commissioner of the Arkansas State Bank Department | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No. 4:26-cv-267-KGB

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David S. Mitchell, Jr., 120 East Fourth Street, Little Rock, Arkansas 72201

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**TAMMY H. DOWNS**
*CLERK OF COURT*

Date:  03/13/2026

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                        *Server's signature*


                                             _____
                                                        *Printed name and title*


                                             _____
                                                        *Server's address*

Additional information regarding attempted service, etc:

AO 85 (Rev. 01/09) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
for the
Eastern District of Arkansas

|  |  |  |
|---|---|---|
| Canada Bancshares Inc | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  4:26-cv-267-KGB |
| Board of Governors of the Federal Reserve System et al | ) | |
| *Defendant* | ) | |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____                    _____
                                                        *District Judge's signature*

                                                        _____
                                                        *Printed name and title*

Note:   Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Honorable Jerome H. Powell
20th St. and Constitution Ave. NW
Washington, DC 20551

9590 9402 7936 2305 5851 62

2. Article Number (Transfer from service label)

9589 0710 5270 0162 0912 95

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

---

**CERTIFIED MAIL**

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

9589 0710 5270 0162 0912 95

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☑ Return Receipt (hardcopy)    $ _____
☑ Return Receipt (electronic)    $ _____
☐ Certified Mail Restricted Delivery    $ _____
☐ Adult Signature Required    $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$    DSm/SB

Sent To    The Honorable Jerome H. Powell
Street and Apt. No., or PO Box No.    20th St. and Constitution Ave, NW
City, State, ZIP+4®    Washington, DC 20551

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

---

**EXHIBIT**

V
_____

exhibitsticker.com

USPS TRACKING #

9590 9402 7936 2305 5851 62

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

**R**

**ROSE LAW FIRM**

A Professional Association

120 E. Fourth Street  Little Rock AR  72201-2893

DSm/SB

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☑ Return Receipt (hardcopy)        $ _____
☑ Return Receipt (electronic)      $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required          $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage

$

**Total Postage and Fees**

$                                        DSm/SB

Sent To  The Honorable Jerome H. Powell

Street and Apt. No., or PO Box No.  20th St. and Constitution Ave, NW

City, State, ZIP+4®  Washington, DC 20551

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

CERTIFIED MAIL®

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

9589 0710 5270 0162 0912 95



## ROSE LAW FIRM

March 16, 2026

**VIA CERTIFIED MAIL**
The Honorable Jerome H. Powell
Chair of the Board of Governors
of the Federal Reserve System
20th St. and Constitution Ave., NW
Washington, DC 20551
**Tracking #**: 9589 0710 5270 0162 0912 95

**Re:**   *Canada Bancshares, Inc. v. Board of Governors of Federal Reserve System, et al.*
U.S. District Court for the Eastern District of Arkansas
Case No. 4:26-cv-00267-KGB
**Service of Process Pursuant to Fed. R. Civ. P. 4(i)(2)**

Dear Chairman Powell:

I represent the Plaintiff, Canada Bancshares, Inc. ("CBI") in connection with the above-referenced litigation against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department. In accordance with Federal Rule of Civil Procedure 4(i)(2), please find accompanying this letter (i) CBI's Verified Complaint and its associated exhibits, and (ii) a Summons to Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors of the Federal Reserve System.

Additionally, CBI filed a Motion for Preliminary Injunction and Brief in Support. I have enclosed copies of those documents as well. CBI intends to pursue the relief requested therein with all deliberate haste. Please do not hesitate to reach out to my office in connection with this matter should you deem that necessary.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*
David S. Mitchell, Jr.

**A Professional Association**
120 E. Fourth St., Little Rock, AR 72201 | roselawfirm.com | (501) 375-9131 | (501) 375-1309 (fax)
dmitchell@roselawfirm.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Arkansas  ⊡

| | |
|---|---|
| CANADA BANCSHARES, INC. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; | ) |
| JEROME H. POWELL, in his Official | ) |
| Capacity as Chair of the Board of Governors; TRAVIS HILL, in his Official | ) |
| Capacity as Chair of the Federal Deposit Insurance Corporation; and | ) |
| SUSANNAH MARSHALL, in her Official Capacity | ) |
| as Commissioner of the Arkansas State Bank Department | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No. 4:26-cv-267-KGB

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors of the
Federal Reserve System
20th Street and Constitution Avenue NW
Washington, DC 20551


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David S. Mitchell, Jr., 120 East Fourth Street, Little Rock, Arkansas 72201


If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

TAMMY H. DOWNS
*CLERK OF COURT*

Date: _____03/13/2026_____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 85 (Rev. 01/09) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Arkansas

| | | |
|---|---|---|
| Canada Bancshares Inc | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  4:26-cv-267-KGB |
| Board of Governors of the Federal Reserve System et al | ) | |
| *Defendant* | ) | |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____

_____
*District Judge's signature*

_____
*Printed name and title*

Note:   Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**CANADA BANCSHARES, INC.**

PLAINTIFF

v.                          Case No. ___4:26-cv-267-KGB___

**BOARD OF GOVERNORS OF THE**
**FEDERAL RESERVE SYSTEM;**
**JEROME H. POWELL, in his Official**
**Capacity as Chair of the Board of Governors;**
**TRAVIS HILL, in his Official Capacity as Chair**
**of the Federal Deposit Insurance Corporation; and**
**SUSANNAH MARSHALL, in her Official Capacity**
**as Commissioner of the Arkansas State Bank Department**

This case assigned to District Judge ___Baker___
and to Magistrate Judge ___Ervin___

DEFENDANTS

---

### VERIFIED COMPLAINT

---

Plaintiff, Canada Bancshares, Inc., for its Verified Complaint against the Board of Governors

of the Federal Reserve System; Jerome H. Powell, in his Official Capacity as Chair of the Board of

Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation;

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department, states:

#### PARTIES

1.      Canada Bancshares, Inc., ("CBI") is an Arkansas corporation with its principal place

of business in England, Arkansas. CBI is the sole holding company of the Bank of England, an

Arkansas state-chartered bank (the "Bank"). CBI owns all issued and outstanding shares of the Bank's

stock.

2.      The Board of Governors of the Federal Reserve System (the "Board") is a federal

agency established by the Federal Reserve Act, 12 U.S.C. §§ 221 *et seq.*, charged with the administration

and enforcement of the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* Among other responsibilities, the Board determines whether an entity qualifies as a bank holding company, and the Board engages in a variety of oversight activities.

3.      Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, oversees the Board's actions and is responsible for, among other things, ensuring the Board's compliance with its statutory duties.

4.      Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, oversees the Federal Deposit Insurance Corporation (alone, the "FDIC," and, together with the Board, Mr. Powell, and Mr. Hill, the "Federal Regulators") and ensures the FDIC's compliance with its statutory duties. The FDIC exercises certain regulatory authority over bank holding companies under the Federal Deposit Insurance Act. *See* 12 U.S.C. §§ 1811 *et seq.*

5.      Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, oversees the Arkansas State Bank Department (alone, the "State Regulator," and, together with the Federal Regulators, the "Agencies"), an entity charged with regulating state-chartered commercial banks and their holding companies. *See, e.g.,* Ark. Code Ann. § 23-46-205.

6.      The State Regulator's duties include review and approval processes that overlap significantly with the Federal Regulators'.

<div align="center">

**JURISDICTION AND VENUE**

</div>

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 in that it is a civil action or proceeding arising under the laws of the United States. More specifically, this is a civil action or proceeding arising under Acts of Congress regulating commerce, namely, the Bank Holding Company Act and the Federal Deposit Insurance Act.

<div align="center">2</div>

8.    This Court has supplemental jurisdiction over CBI's claims against the State Regulator because they are "so related to [CBI's] claims" against the Federal Regulators that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

9.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) as this is "a civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity[,]" and the Central Division of the Eastern District of Arkansas is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred . . . ."

## BACKGROUND

10.    Founded in 1898 with a capital stock of just $10,000, the Bank has survived two world wars, the Great Depression, and even the Great Recession.

11.    For most of its existence, the Bank has been a family-run operation, as the same family has controlled the Bank for more than a half century.

12.    Seth Boles—the progenitor of the Bank family—started working at the Bank as a cashier as long ago as 1946. Slowly but surely, Mr. Boles worked his way up to the Bank's presidency in the early 1960s. He maintained that position until 1989 when his son-in-law, Gary Canada, Sr., took the helm as the Bank's new president.

13.    Over the decades, the Bank's ownership structure has shifted a handful of times.

14.    This lawsuit is about the most recent shift in the Bank's ownership structure and the Agencies' reaction to it.

### The Partnership.

15.    In the late 1990s, several members of the Bank family formed MHBC Investments Limited Partnership I as a holding company for the Bank.

16.    At that time, Mary Hanna Boles Canada was MHBC Investments Limited Partnership I's only General Partner.

17.    Mrs. Canada, Mr. Canada, Sr., Gary Canada, Jr. (as trustee), Bradley Canada (as trustee), and Hanna Nicole Canada Luebke (as trustee) were MHBC Investments Limited Partnership I's Limited Partners.

18.    In the early 2000s, MHBC Investments Limited Partnership I's partners voted to convert the entity to an Arkansas limited liability limited partnership, thereby creating MHBC Investments Limited Partnership I, LLLP (the "Partnership"), an entity governed by an April 1, 2004 Partnership Agreement[1] and the Uniform Limited Partnership Act (2001), Ark. Code Ann. §§ 4-47-101 *et seq.*

19.    Pursuant to Section 3.1 of the Partnership Agreement, one of the entity's core purposes was to "operate as a one bank holding company owning a controlling interest in the common stock of Bank of England, a state-chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies."

20.    As before, upon its conversion, the Partnership had only one General Partner: Mrs. Canada.

21.    Mrs. Canada has always been the Partnership's only legally recognized General Partner.

**Formation of CBI.**

22.    In the mid-2010s, the Bank family also established CBI as a holding company of the Bank.

23.    Over time, through a handful of transactions, CBI became the Bank's sole shareholder.

24.    Several months after the formation of CBI, its shareholders entered into a Shareholders Agreement.[2]

---

[1] A true and correct copy of the Partnership Agreement is attached as **Exhibit 1.**

[2] A true and correct copy of the Shareholders Agreement is attached hereto as **Exhibit 2.**

4

25.    The Shareholders Agreement restricts CBI's shareholders, officers, directors, and other agents from effecting any change to the Bank's Board of Directors without the Partnership's prior written authorization. **Ex. 2** § 12(c).

26.    Since CBI's original issuance of shares of its stock, the Partnership has always owned well in excess of a majority of the total issued and outstanding shares of CBI stock.

27.    As long as CBI has been the sole shareholder of the Bank, it has served as the intermediate holding company situated between the Bank and the Partnership, the Bank has served as the operating company, and the Partnership (until its recent dissolution) has served as the ultimate parent entity and holding company with supreme authority and control over the Bank.

**The Partnership's Dissolution.**

28.    After serving as the Partnership's General Partner for decades, Mrs. Canada was sadly diagnosed with Alzheimer's disease at the Mayo Clinic in Rochester, Minnesota in 2020.

29.    Since that time, Mrs. Canada's cognitive abilities have deteriorated steadily.

30.    More recently, third-parties began taking advantage of Mrs. Canada's cognitive decline to their benefit and to Mrs. Canada's detriment.

31.    Seeking to protect his wife's well-being, Mr. Canada, Sr. initiated a guardianship action on September 12, 2025, in the Circuit Court of Lonoke County, Arkansas.

32.    On September 12, 2025, the Lonoke County Circuit Court appointed Mr. Canada, Sr. as Mrs. Canada's emergency guardian. A true and correct copy of the Lonoke County Circuit Court's Order appointing Mr. Canada, Sr. as his wife's emergency guardian is attached hereto as **Exhibit 3**.[3]

---

[3] Exhibit 3 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Order. Accordingly, CBI will file a Motion for Leave to File Exhibit 3 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

5

33.    A month later, the Lonoke County Circuit Court issued Letters of Temporary Guardianship to Mr. Canada, Sr. and Mrs. Canada Luebke, as co-guardians of Mrs. Canada's person and estate (the "Letters"). A true and correct copy of the Letters is attached hereto as **Exhibit 4.**[4]

34.    The Letters operated as an extension of Mrs. Canada's guardianship. Stated differently, although the terms of Mrs. Canada's guardianship have changed, there has been no interruption in Mrs. Canada's guardianship since September 12, 2025.

35.    As of the date and time of this filing, Mr. Canada, Sr. and Mrs. Canada Luebke are still serving as co-guardians of Mrs. Canada's person and estate.

36.    Arkansas's Limited Partnership Act provides that a general partner is dissociated automatically by operation of law upon the appointment of a guardian for such general partner:

> A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.

Ark. Code Ann. § 4-47-603(7)(B).

37.    Accordingly, Mrs. Canada was dissociated as General Partner of the Partnership by operation of law upon the Lonoke County Circuit Court's appointment of Mr. Canada, Sr. as her guardian on September 12, 2025.

38.    Arkansas's Limited Partnership Act further provides that a limited partnership is automatically dissolved by operation of law after the dissociation of a general partner if the partnership does not have a remaining general partner and the limited partners fail to admit a general partner within 90 days:

> A limited partnership is *dissolved*, and its activities *must be* wound up, only upon the occurrence of any of the following:
>
> . . .
>
> (3) after the dissociation of a person as general partner:

---

[4] Exhibit 4 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Letters. Accordingly, CBI will file a Motion for Leave to File Exhibit 4 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

6

(B) if the limited partnership does not have a remaining general partner, the passage of 90 days after the dissociation, unless before the end of the period:

(i) consent to continue the activities of the limited partnership and admit at least one general partner is given by the limited partners owning a majority of the rights to receive distributions as limited partners at the time the consent is to be effective; and

(ii) at least one person is admitted as a general partner in accordance with the consent . . . .

Ark. Code Ann. § 4-47-801(3)(B) (emphasis added).

39.     The Partnership Agreement, too, requires immediate dissolution of the Partnership following the dissociation of all general partners if a successor general partner is not admitted within 90 days:

> Section 6.9   Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners.  In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be.
>
> . . .
>
> Section 10.1   Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:
>
> (c) Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.

**Ex. 1**, §§ 6.9, 10.1(c) (emphasis added).

40.     The Partnership's Limited Partners did not admit a General Partner to replace Mrs. Canada within 90 days of her dissociation on September 12, 2025.

41.    The Limited Partners did not consent to continue the activities of the Partnership at any time following Mrs. Canada's dissociation on September 12, 2025, at least up until the date and time of this filing.

42.    Both the Partnership Agreement and Arkansas's Limited Partnership Act require the dissolution of the Partnership following the dissociation of all general partners if one or more substitute general partners are not appointed within ninety (90) days. **Ex. 1**, §§ 6.9 and 10.1(c); Ark. Code Ann. § 4-47-801(3)(B).

43.    The Partnership was without a General Partner for the 90-day period that ended on December 11, 2025.

44.    Thus, on December 12, 2025, the Partnership dissolved immediately and automatically by operation of law and the Partnership Agreement.

45.    Accordingly, the Arkansas Secretary of State certified the Partnership's dissolution, effective December 12, 2025. A true and correct copy of the Secretary of State's certification is attached hereto as **Exhibit 5**.

**CBI Takes Over.**

46.    Following the Partnership's dissolution, the Partnership's control over the Bank terminated, and CBI became the Bank's sole holding company.

47.    Accordingly, CBI no longer defers to the Partnership in the election or removal of directors of the Bank.

48.    As the Bank's sole holding company, CBI is entitled to, among other things, set strategy and governance (i.e., by appointing Bank leadership and board members as well as setting growth plans and direction), manage capital and funding, and interact directly with the Agencies.

**The Agencies Abdicate.**

8

49.     Federal law grants the Federal Regulators tremendous regulatory oversight over bank holding companies, largely through the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.*, and the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*

50.     Bank holding companies' actions and omissions are meticulously scrutinized by the Federal Regulators, and bank holding companies must frequently seek Federal Regulators' approval to take certain actions. *See, e.g.*, 12 U.S.C. § 1842(a) (requiring the Board's approval for a litany of transactions involving bank holding companies); 12 C.F.R. § 225.72 (requiring certain regulated institutions to provide the Board with written notice of changes in leadership or board membership); 12 U.S.C. § 1831i (requiring certain regulated institutions to provide the FDIC with written notice of changes in leadership or board membership and an opportunity to disapprove them).

51.     If the holding company owns a state-chartered bank, like the Bank here, then the holding company must also contend with government entities like the State Regulator.

52.     Often, the Agencies' regulatory duties overlap significantly. *See, e.g.*, 12 U.S.C. § 1842(b)(1) (requiring the Board to solicit and consider the "views and recommendations" of the State Regulator in certain transaction-approval decisions); *see also* Ark. Code Ann. § 23-46-205 ("The Bank Commissioner shall be charged with the general supervision of financial institutions, the execution of all laws passed by the State of Arkansas relating to the organization, operations, inspection, supervision, control, liquidation, and dissolution of banks, bank holding companies, subsidiary trust companies, and the general commercial banking business of Arkansas, and such other duties as prescribed by law.").

53.     Part and parcel of the Agencies' duties is (i) recognizing the proper owner of a regulated institution, and (ii) interacting with that owner to ensure regulatory compliance.

54.     Although (i) CBI owns all issued and outstanding shares of the Bank's stock, and (ii) the Partnership is dissolved, the Agencies refuse to recognize CBI's status as the Bank's owner.

9

55.     Worse yet, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among members of the Bank family over the winding up of the Partnership's business.

56.     The Agencies refusal to recognize CBI as the Bank's owner has caused and will cause catastrophic consequences, among others: (i) governance paralysis—the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises—if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption—vendors, other banks, and market participants will freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

57.     In short, the Agencies' conduct has caused CBI (and the Bank) to suffer irreparable harm and the Agencies' continued refusal to recognize CBI's status will perpetuate irreparable harm on CBI (and the Bank).

## CAUSES OF ACTION

### Count 1: Declaratory Judgment

58.     CBI realleges and reasserts the allegations contained in the preceding paragraphs of this Verified Complaint.

59. Pursuant to the United States Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, CBI seeks this Court's declaration that (i) the Partnership is dissolved, (ii) CBI owns the Bank.

60. This is an active and justiciable controversy because CBI has sought to act as the Bank's owner before the Agencies and the Agencies have refused to recognize CBI's status.

61. Worse yet, the Agencies have refused to recognize anyone's status as the Bank's owner.

62. The FDIC and the State Regulator asserted, in writing, that the Bank's ownership *"remains a private legal issue that [they] have no jurisdiction over."*

63. Although the Board has not put it in writing, the Board has expressed the same opinion verbally during meetings over the Bank's ownership.

64. There is uncertainty regarding the parties' legal relations in this instance.

### NATURE OF RELIEF SOUGHT

65. CBI requests that this Court award it the following relief:

    a. Declare that (i) the Partnership is dissolved, and (ii) CBI is the sole holding company with control over the Bank;

    b. Pursuant to Fed. R. Civ. P. 65, preliminarily and permanently enjoin the Agencies to recognize CBI's status as the Bank's owner;

    c. All other relief that this Court deems just and proper.

WHEREFORE, Plaintiff Canada Bancshares, Inc. respectfully requests that this Court enter judgment in its favor against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department; enjoin the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation,

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department as requested herein; and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

12

## VERIFICATION

I, Gary Canada, Sr., state on oath that the foregoing facts set forth in this Verified Complaint are true and correct to the best of my knowledge, information, and belief.

*Gary Canada Sr.*

Gary Canada, Sr.

Dated ___3-9-26___, 2026

STATE OF __Arkansas__ )

) ss.

COUNTY OF _____ )

SUBSCRIBED and SWORN to before me, the undersigned duly commissioned, qualified, and acting Notary Public this __09__ day of __March__ 2026.

In witness whereof I hereunto set my hand and official seal

_____
Notary Public

My Commission Expires: __12-19-2034__



13

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

**EXHIBIT**

1

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
# AGREEMENT OF LIMITED PARTNERSHIP
## (As Amended and Restated)

**ARTICLE I**
**FORMATION AND ORGANIZATION** ............................... -1-
Section 1.1    Formation of Partnership ........................... -1-
Section 1.2    Organization Certificates; Filings ........................ -2-
Section 1.3    Partnership Name ........................... -2-
Section 1.4    Principal Office and Agent ........................... -2-
Section 1.5    Term of Partnership ........................... -2-
Section 1.6    Copies to Partners ........................... -2-

**ARTICLE II**
**DEFINITIONS** ............................................. -3-

**ARTICLE III**
**PURPOSES AND POWERS** ...................................... -5-
Section 3.1    Purposes of the Partnership ........................... -5-
Section 3.2    Powers of the Partnership ........................... -5-

**ARTICLE IV**
**ADMISSION OF LIMITED PARTNERS** ............................ -6-
Section 4.1    Admission of Limited Partners ........................... -6-
Section 4.2    Completion of Admission ........................... -6-

**ARTICLE V**
**CONTRIBUTIONS OF THE PARTNERS** ............................ -7-

**ARTICLE VI**
**RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS**
............................................................... -7-
Section 6.1    Rights and Powers of the General Partners as Managers ......... -7-
Section 6.2    Limitations on General Partners' Authority .................. -7-
Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance ...... -8-
Section 6.4    Third Parties ........................................... -8-

Section 6.5    Duties of the General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.6    Obligations not Exclusive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.7    Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
Section 6.8    Admission of Additional General Partner . . . . . . . . . . . . . . . . . . . -10-
Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General
        Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
Section 6.10    Indemnification of the General Partners . . . . . . . . . . . . . . . . . . . . -10-
Section 6.11.    Limited Liability of the General Partners . . . . . . . . . . . . . . . . . . . . -11-

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS . . . . . . . . . . . . . . -11-
Section 7.1    Rights of a Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
Section 7.2    Assignments of Limited Partnership Interests . . . . . . . . . . . . . . . . -12-
Section 7.3    Assignments of Distributive Rights . . . . . . . . . . . . . . . . . . . . . . . . -12-
Section 7.4    Partnership Option to Purchase a Limited Partner's Interest . . . . . -13-
Section 7.5    Limited Partner's Status Upon Death or Incompetency . . . . . . . . . -14-
Section 7.6    Limited Put Option of Certain Permitted Transferees . . . . . . . . . . -14-

## ARTICLE VIII
## COMPENSATION OF THE GENERAL PARTNERS . . . . . . . . . . . . . . . . . . -15-
Section 8.1    Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 8.2    Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

## ARTICLE IX
## DISTRIBUTIONS AND
## ALLOCATIONS OF INCOME AND LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.1    Distributions of Distributable Cash . . . . . . . . . . . . . . . . . . . . . . . . -15-
Section 9.2    Allocation of Certain Income and Losses for Tax Purposes . . . . . . -15-
Section 9.3    Allocations Upon Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

## ARTICLE X
## DISSOLUTION AND PRIORITY ON DISTRIBUTION . . . . . . . . . . . . . . . . -16-
Section 10.1    Dissolution and Termination of the Partnership . . . . . . . . . . . . . . -16-
Section 10.2    Liquidation and Priorities on Distribution . . . . . . . . . . . . . . . . . . -16-

**ARTICLE XI**

**ACCOUNTING AND BUSINESS MATTERS** . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.1   Books of Accounts and Records . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.2   Accounting Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.3   Financial Statements and Reports . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.4   Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 11.5   Bank Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-


**ARTICLE XII**

**ELECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.1   Adjustment Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.2   Depreciation Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.3   Election with Respect to Taxation as Partnership . . . . . . . . . . . . -18-

Section 12.4   Other Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-


**ARTICLE XIII**

**AMENDMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-


**ARTICLE XIV**

**MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.1   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.2   Further Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.3   Paragraph Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.4   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.5   Application of Arkansas Law . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.6   Survival of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.7   Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.8   Execution in Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.9   Waiver of Action for Partition . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.10  Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.11  Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.12  Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.13  Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (hereinafter referred to as the "Agreement"), is entered into effective as of the __1__ day of ___April___, 2004, by and among MARY HANNA BOLES CANADA, and any other parties who may be admitted to the Partnership as General Partners pursuant to the provisions of Section 6.8 herein (hereinafter collectively referred to as the "General Partners" or individually as "General Partner"), and MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR., Trustee of the GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA, Trustee of the BRADLEY SETH CANADA TRUST I, and HANNA NICOLE CANADA, Trustee of the HANNA NICOLE CANADA STEWART TRUST I, and any other parties who may be admitted to the Partnership as Limited Partners pursuant to the provisions of Sections 4.1 and 7.2 herein below (hereinafter referred to collectively as the "Limited Partners" and individually as "Limited Partner").

WHEREAS, on July 21, 1997, MARY HANNA BOLES CANADA, the General Partner and the Limited Partners entered into the Agreement of Limited Partnership pursuant to which the Partnership was formed under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I.

WHEREAS, effective as of the date aforesaid, the Agreement of Limited Partnership was amended and restated as a limited liability limited partnership (as defined in Section 1.1 hereinbelow) under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinbelow contained, the adequacy of which consideration is hereby acknowledged, the parties agree as follows:

## ARTICLE I
## FORMATION AND ORGANIZATION

Section 1.1     Formation of Partnership.     Pursuant to the Arkansas Revised Limited Partnership Act of 1991, A.C.A. § 4-43-101 *et seq.*, as from time to time amended, including Act 912 of the 1997 Acts of Arkansas, hereinafter collectively referred to as the "Act," the parties hereto hereby form a registered limited liability limited partnership, which organization is hereinafter referred to as the "Partnership." The rights and liabilities of the Partners (as "Partners" is defined in Article II hereinbelow) shall, except as hereinafter expressly stated to the contrary, be as provided for in the Act.

Section 1.2    Organization Certificates; Filings.    The General Partners hereto shall immediately execute, file, record and/or publish the Application and the Certificate (as "Application" and "Certificate" are defined in Article II hereinbelow) and other documents conforming hereto, and take all other appropriate action to comply with all legal requirements for the formation of a registered limited liability limited partnership under the Act and its operation in the State of Arkansas. The General Partners shall file and publish any other notices, certificates, statements or other instruments required or permitted by any provision of any law in the United States or any state or other jurisdiction which may govern the formation of this Partnership or the conduct of its business from time to time. The General Partners shall cause the Partnership to file any further amendments to the Application and/or Certificate or such other documents as shall be required by A.C.A. §§ 4-43-202, 4-43-1110 and 4-42-703 in order to preserve the valid existence of the Partnership as a registered limited liability limited partnership and the limited liability of the Partners.

Section 1.3    Partnership Name. The business of the Partnership shall be conducted under the name of the MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP, an Arkansas registered limited liability limited partnership, and under such name or variations thereof in the other jurisdictions as the General Partners deem appropriate.

Section 1.4    Principal Office and Agent. The principal place of business and physical address of the Partnership shall be located at: 105 Cherry St., England, AR 72046, and the mailing address of the Partnership shall be: 105 Cherry St., England, AR 72046. The agent for service of process shall be MARY HANNA BOLES CANADA at the above business address.

Section 1.5    Term of Partnership. The Partnership shall become effective upon the filing of the Application and the Certificate and the payment of the filing fee therefor, in the office of the Arkansas Secretary of State, Little Rock, Arkansas, as required by the Act and shall remain effective until the earlier to occur of:

(a)    December 31, 2046; or

(b)    The date the Partnership is dissolved pursuant to the Act or any provisions of this Agreement.

The period of time between the date the Partnership becomes effective and the date it ceases to be effective shall be referred to herein as "Partnership Term."

Section 1.6    Copies to Partners. The General Partners shall promptly deliver or mail a filed copy of the Certificate and any amendment thereto to each of the Limited Partners.

## ARTICLE II
## DEFINITIONS

Whenever used in this Agreement the terms set forth below shall be defined as follows:

(a)    The "Application" shall mean the Application for Registration of a Limited Liability Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-1110, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(b)    The "Certificate" shall mean the Certificate of Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-206, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(c)    "Code" shall mean the Internal Revenue Code of 1986, as amended.

(d)    "Distributable Cash" shall mean, at the time of determination for any period (on the cash receipts and disbursements method of accounting), the net cash derived from the conduct of the Partnership's business and operations, from its investments (including distributions from entities owned by the Partnership) and (except as limited below) cash proceeds from the sale or other disposition of Partnership Properties, but only after reasonable reserves of cash have been set aside by the General Partners for working capital, capital improvements and replacements, debt service, current and reasonably projected expenses, and other cash requirements, including current and reasonably projected investment opportunities, all in keeping with the Partnership purposes. For purposes of this subsection, all capital contributions, any borrowed funds, and cash proceeds attributable to the sale or other disposition of any of the Partnership Properties which were contributed to the Partnership or which were purchased with borrowed funds, shall be considered necessary for business and investment purposes and shall be excluded from Distributable Cash. In determining Distributable Cash the General Partners shall be subject to the duties imposed by Section 6.5 and shall have the duty to take into account the cash needs of the Partnership in its business, the funds necessary in the operation of its business until the income from further operations is available, the amounts of its debts, the necessity or advisability of paying its debts, or at least reducing them within the limits of the Partnership's credit, and the character of its surplus cash.

(e)    "Fair Market Value" shall be the price at which a willing seller and willing buyer, neither under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, would pay and accept in an arm's length transaction for such interest in the Partnership or any Partnership Property. The Fair Market Value of an interest in the Partnership shall be determined taking into account all factors relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held partnership interests having the rights and restrictions provided

under this Agreement and applicable Arkansas law including, but not limited to, the restrictions upon withdrawal before the end of the term of the Partnership. In the event it becomes necessary to value any interest in the Partnership or any Partnership Property, the Fair Market Value of the property shall be determined by agreement of the parties involved, or in the absence of such agreement, by an individual appraiser or appraisal firm mutually acceptable to such parties. In the event the parties involved are unable to agree on the individual appraiser or firm to perform the valuation, each party shall select an appraiser, and such appraisers shall first attempt to jointly determine the Fair Market Value of the Partnership interest or Partnership Property by mutual agreement, but if they are unable to agree on such valuation, such appraisers shall select a third appraiser, and the fair market value shall be determined by the average of the two (2) closest appraisals. Any valuation so determined shall be binding and conclusive on the parties absent manifest error. The cost of any such appraisal(s) shall be borne, in the case of a valuation of a Partnership interest, equally by the seller and the purchaser, and in the case of a valuation of any Partnership Property, equally by each individual Partner or group of Partners having conflicting interests in such appraisal.

(f)     "General Partners" shall mean MARY HANNA BOLES CANADA, and/or any other person or entity appointed in accordance with the provisions of this Agreement to replace, or in addition to, the aforesaid persons. "General Partner" shall mean, and refer to, any of the General Partners individually.

(g)     "Limited Partners" shall mean MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA TRUST I and HANNA NICOLE CANADA STEWART TRUST I, and any other person or entity who or which shall be admitted to the Partnership, pursuant to Section 4.1 or Section 7.2, and thereby becomes an owner of an interest in the Partnership. "Limited Partner" shall mean, and refer to, any of the Limited Partners individually.

(h)     "Partners" shall mean the General Partners and all Limited Partners.

(i)     "Partnership Properties" shall mean all properties (real, personal and mixed), and all rights, titles, interests and estates of every nature whatsoever incident thereto, owned by the Partnership. "Partnership Property" shall mean any one of the Partnership Properties.

(j)     The "Sharing Ratio" of a Partner shall be the ratio of the Partner's Units to the total Units outstanding.

(k)     A "Unit" shall represent a 0.1 percent interest of capital and profits in the Partnership, and the Partnership shall be authorized to issue one thousand (1,000) Units. Each Partner shall be entitled to cast one (1) vote per Unit on all matters in which all Partners are herein given the right to vote.

(l)     "Permitted Transferee" shall mean the initial Limited Partners named above, all of their lineal descendants, and trusts for the exclusive benefit of any of them.

## ARTICLE III
## PURPOSES AND POWERS

Section 3.1   Purposes of the Partnership. The Partnership shall not be deemed to exist for a specific purpose; rather, the purpose of the Partnership is to manage the Partnership Properties by conducting any business which lawfully may be conducted in limited partnership form. Some of the more particular purposes of the Partnership are as follows:

(a)   To operate as a one bank holding company owning a controlling interest in the common stock of the Bank of England, a state chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies;

(b)   To provide flexibility in the management of Partnership Properties not available through the use of trusts, corporations and business entities; and

(c)   To identify the nature of the partners's partnership interests as separate property rather than marital property or community property.

(d)   To avoid the fractionalization of the ownership of certain Partnership Properties of various family members in order to receive a higher price in the event of a sale of any of the Partnership Properties.

Section 3.2   Powers of the Partnership. The specific purposes of the Partnership may, in instances where the Partners deem such action appropriate and to the extent Partnership funds are available therefor, be accomplished by:

(a)   Acquiring and disposing of Partnership Properties for cash, securities, other property, or any combination thereof upon such terms and conditions as the General Partners may from time to time determine (including, in instances where the property is encumbered, on either an assumption or a "subject to" basis);

(b)   Acquiring, owning, holding, improving, managing and leasing properties used in investment operations, and reinvesting the income and proceeds thereof, either alone or in conjunction with others, through partnerships, limited partnerships (or other partnerships in which certain partners have limited liability), joint ventures, or other business associations or entities;

(c)   Investing and reinvesting any of the Partnership Property or income of the Partnership, whether or not the original purpose for the investment has been accomplished, it being understood by the Partners that the investment objectives of the Partnership are to continue until the end of the Partnership Term and until the Partnership is dissolved and its affairs wound up.

(d)   Financing its activities by commercially reasonable methods on such terms and conditions as the General Partners deem appropriate. In instances where money is borrowed for Partnership purposes, the General Partners shall be and hereby are authorized to pledge, mortgage, encumber and grant security interests in Partnership Properties for the repayment of such loans;

(e)     Employing, retaining or otherwise securing, or entering into other contracts with persons or firms to assist in the acquisition, developing, improving, managing, and general operation of the Partnership Properties, all on such terms and for such consideration as the General Partners deem reasonably advisable;

(f)     Depositing Partnership funds in an account or accounts to be established at such time or times in such financial institutions (including any state or federally chartered bank or savings and loan association) and authorizing withdrawals of such funds by such persons at such times, and in such amount, as the General Partners may designate;

(g)     As to those Partnership funds which are not then required for Partnership purposes yet which the General Partners deem untimely to be distributed to the Partners, purchasing U. S. Treasury Bills, certificates of deposit, bonds, other certificates or evidences of indebtedness, stocks, real property, or other investment securities or property as the General Partners reasonably deem appropriate;

(h)     Taking any and all other action which is permitted under the Act and which is customary or reasonably related to the real, personal or mixed property incidental thereto; and

(i)     Taking any other action which is legally permissible.

## ARTICLE IV
## ADMISSION OF LIMITED PARTNERS

Section 4.1     Admission of Limited Partners.  No additional Limited Partners shall be admitted except by affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.  As distinguished from the admission of additional Limited Partners, no assignee of all or part of a Limited Partner's Units shall be substituted as a Limited Partner except under the conditions and restrictions and upon completion of all of the requirements of Article VII of this Agreement.

Section 4.2     Completion of Admission.  Subject to the other terms of this Agreement, a person shall become a Limited Partner when he or she shall have completed all of the following:

(a)     Executed a counterpart of this Agreement; and

(b)     Executed any other document, certificate or instrument, and taken such other action as the General Partners may reasonably request to evidence and perfect such person's admission as a Limited Partner.

## ARTICLE V
## CONTRIBUTIONS OF THE PARTNERS

The Partners shall initially contribute to the Partnership the property described on Exhibit A attached hereto in exchange for all of the outstanding Units. The general partnership interests of each General Partner shall be maintained separately from any limited partnership interests of the General Partners. The number of Units owned by each of the Partners is reflected on Exhibit B attached hereto. The Partners may make additional contributions to the Partnership, provided that the Sharing Ratios of all the General Partners, taken together, shall be equal to at least one percent (1%) at all times during the Partnership Term. No Partner shall be entitled to interest on capital contributions to the Partnership, or to withdraw any part of such Partner's capital account, except as specifically provided herein.

## ARTICLE VI
## RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS

Section 6.1    Rights and Powers of the General Partners as Managers. Each General Partner shall be entitled to cast one (1) vote per Unit of general partnership interest in all matters in which the General Partners are herein given the right to vote as a class or individually as a Partner. A majority vote shall be required to take any action by the General Partners. Subject to the limitations of this Agreement, and to the limitations imposed upon them by law, the General Partners shall have full, exclusive and complete discretion to manage and control, and shall make all decisions affecting, the Partnership business. The General Partners shall have full authority to take any action described by Article III hereof and to exercise all rights and powers generally conferred by law in connection therewith. The rights and powers of the General Partners described in this Section 6.1 shall be in addition to and not in limitation of any other rights and powers of the General Partners described in this Agreement or provided by law.

Section 6.2    Limitations on General Partners' Authority. The General Partners shall not have authority to:

(a)    Do any act in contravention of this Agreement without the written consent of all the Partners.

(b)    Do any act which would make it impossible to carry on the ordinary business of the Partnership, or which may make it impossible to carry on the ordinary business of the Partnership, without the written consent of all the Partners.

(c)    Admit a person as a General Partner, except as provided in this Agreement and the Act.

(d)     Admit a person as a Limited Partner, except as provided in this Agreement and the Act.

(e)     Cause the Partnership to make any loan to any of the General Partners or any of their affiliates without the written consent of the Partners owning a majority-in-interest of the outstanding Partnership Units.

(f)     Commingle the Partnership's funds with those of any other person, except with respect to (1) joint ventures or other joint investments permitted by this Agreement and (2) general disbursement accounts controlled by the General Partners, without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(g)     Knowingly perform any act that would subject any Limited Partner to liability as a general partner in any jurisdiction.

(h)     Sell, assign, exchange, lease, or otherwise dispose of, or mortgage, pledge, or otherwise encumber all or substantially all of the real or personal property of the Partnership without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(i)     Enter into agreements with a General Partner or any affiliate of a General Partner without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(j)     Terminate a contract, agreement, or compensation to a Partner, or an affiliate of a Partner, without the approval of Partners owning a majority-in-interest of the outstanding Partnership Units.

(k)     For purposes of this Section 6.2 the term "affiliate" of a General Partner shall mean any person that directly or indirectly controls, or is controlled by or is under common control with, the General Partner, and shall include the family members of the General Partner and any officer or director of the General Partner and the family members of any such officer or director.

Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance.  Any provision of this Agreement to the contrary notwithstanding, if at any time the Partnership possesses any incidents of ownership (as that term is defined under § 2042 of the Code and the Treasury Regulations thereunder) in any policy or policies of life insurance upon the life of any General Partner (the "Insured General Partner"), then the Insured General Partner shall be prohibited and excluded from voting upon or otherwise participating in the exercise of any such rights with respect to any policies of insurance upon the life of that Insured General Partner, including without limitation, the right to borrow from the cash value of the policy and the right to control the application of policy dividends.

Section 6.4    Third Parties.  Any Person dealing with the Partnership or the General Partners may rely upon a certificate signed by the General Partners, or any of them, as to the accuracy

of the statements therein or as to the authority of the General Partners to make any commitment or undertaking on behalf of the Partnership, including certificates as to (1) the identity of any General Partner or Limited Partner hereof, (2) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the General Partners or in any other manner are germane to the affairs of the Partnership, (3) the persons who are authorized to execute and deliver any instrument or document of the Partnership, or (4) any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

Section 6.5    Duties of the General Partners. The General Partners shall discharge their duties to the Partners and the Partnership, and shall exercise their powers under the Act and under this Agreement, consistent with the duty of loyalty and the duty of care set forth in A.C.A. §4-46-404 and consistent with the obligation of good faith and fair dealing therein. The General Partners do not guarantee the return of any Partner's capital contributions. Under no circumstances shall the General Partners be personally liable to a Limited Partner for any deficit in a Limited Partner's capital account.

Section 6.6    Obligations not Exclusive. The General Partners shall be responsible for the management of the Partnership's business, it being understood that the General Partners may be fairly compensated for services rendered. The General Partners may delegate such portion of the managerial responsibilities as is reasonably deemed necessary to any other party at the Partnership's expense.

Section 6.7    Power of Attorney. By the execution of this Agreement, or a counterpart hereof, a Limited Partner does irrevocably constitute and appoint the General Partners (or any successor General Partner) his or her true and lawful attorneys-in-fact and agents to effectuate, with full power and authority to act in the name, place and stead in effectuating, the purposes of the Partnership, including the execution, acknowledgment, delivering, filing and recording of all Certificates, documents, deeds, bills of sale, assignments and other instruments of conveyance, leases, contracts, loan documents and/or counterparts hereof, and all other documents which the General Partners may deem necessary or reasonably appropriate:

(a)    To qualify or continue the Partnership as a limited partnership (or a partnership in which certain partners have limited liability) in all jurisdictions in which the Partnership conducts business;

(b)    To reflect a modification of the Partnership, or an amendment of this Agreement and/or the Certificate;

(c)    To accomplish the purposes and carry out the powers of the Partnership as set forth in Article III and in this Article VI; or

(d)    To reflect the dissolution and termination of the Partnership.
The power of attorney granted herein:

(1)     Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, incompetency or legal disability of any Limited Partner;

(2)     May be exercised by the General Partners, or any of them, for each Limited Partner (or any of them) by listing all (or any) of the Limited Partners required to execute any such instrument and executing such instrument in such manner as the General Partners may reasonably deem appropriate; and

(3)     Shall be binding on any assignee or vendee of a Limited Partnership interest hereunder or any portion thereof, including an assignee of only the distributive rights relating thereto.

Section 6.8     Admission of Additional General Partner. The General Partners shall not, without the written consent of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, admit any additional or substitute General Partner to the Partnership.

Section 6.9     Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be; provided, however, the death, withdrawal, adjudication of bankruptcy, incompetency or removal with respect to one (1) General Partner, but not all General Partners, shall not cause the Partnership to be dissolved. In the event the Partnership is continued, the Agreement of Limited Partnership shall be properly amended and the new General Partner(s) shall succeed to all rights, duties and responsibilities of the General Partners. By affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, a General Partner may be removed for breach of any fiduciary duty and for any breach of this Agreement in any material respect. Furthermore, in the event of a General Partner's death, resignation, removal, or adjudication of bankruptcy or incompetency, then the General Partner shall become a Limited Partner and a successor General Partner may then be appointed pursuant to the terms set forth herein.

Section 6.10     Indemnification of the General Partners. The General Partners shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, arising out of or incidental to the General Partners' management of the Partnership affairs while the General Partners were in the course of managing the Partnership affairs; provided, however, a General Partner shall not be entitled to indemnification hereunder where the claim at issue is based upon:

(a)     The proven gross negligence or willful misconduct of the General Partner; or,

(b)     The proven breach by the General Partner of any provision of this Agreement.

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the General Partners shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 6.11. Limited Liability of the General Partners. The General Partners' liability for the obligations of the Partnership and certain acts of other Partners, employees, agents, or representatives of the Partnership is limited to the extent provided in A.C.A. §§ 4-43-1110 and 4-42-307.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 7.1    Rights of a Limited Partner. Each Limited Partner shall be entitled to cast one (1) vote per Unit of ownership on all matters in which the Limited Partners are herein given the right to vote as a class or individually as a Partner. A Limited Partner shall not be:

(a)    Personally liable for any of the debts or other liabilities of the Partnership (except to the extent expressly set forth in A.C.A. § 4-43-303);

(b)    Personally liable, merely because of his or her interest in the Partnership, for any losses or liabilities of any other Limited Partner;

(c)    Allowed to take part in the management or control of the Partnership business, or to sign for or to bind the Partnership, such power to remain vested solely and exclusively in the General Partners; or

(d)    Entitled to be paid any salary or to have a Partnership drawing account; provided, however, the General Partners have the power to employ one or more Limited Partners at a salary commensurate with services actually rendered to the Partnership.

No Limited Partner shall have the right to withdraw from the Partnership or to receive a return of any of his or her contributions to the Partnership until the Partnership is terminated and its affairs wound up in accordance with § 801, et seq. of the Act and this Agreement. A Limited Partner shall be in breach of this Agreement if the Limited Partner (1) attempts to withdraw from the Partnership, (2) interferes in the management of the Partnership affairs, (3) engages in conduct which could result in the Partnership losing its tax status as a partnership, (4) engages in conduct that tends to bring the Partnership into disrepute, (5) owns Partnership Units which become subject to a charging order, attachment, garnishment, or similar legal proceeding, (6) breaches any confidentiality provisions of this Agreement, (7) fails to meet any legally binding commitment to the Partnership, or (8) otherwise breaches any other term or condition contained herein. A Limited Partner who is in breach of this Agreement shall be liable to the Partnership for damages caused by the breach. The Partnership may offset any such damages against any distributions or return of capital to the Limited

Partner who has breached this Agreement. No Limited Partner shall have the right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise.

Section 7.2    Assignments of Limited Partnership Interests. A Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner (as defined in A.C.A. § 4-43-101(6)) only after all of the following steps have first been completed:

(a)    The written approval of the General Partners and of the Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall have been given to the specific person or entity proposed to be substituted;

(b)    The vendee(s) or assignee(s) to be substituted, the General Partners, and all Limited Partners (either individually or by virtue of the General Partners' powers of attorney set forth in this Agreement) shall have executed an appropriate amendment to all certificates, instruments and documents, and taken all such additional action as the General Partners may deem appropriate to the completion of such sale or assignment; and

(c)    If requested by the General Partners, legal counsel for the Partnership has rendered an opinion that the transfer is not in violation of any provisions of this Agreement or any other representations made by the Limited Partner to the Partnership regarding the Limited Partner's investment intent.

Within thirty (30) days after the completion of the above required steps, the General Partners shall forward documents to the substituted Limited Partner indicating such Partner's participation in the Partnership, on such form as the General Partners may adopt and, from time to time, revise or amend. Any purported sale or assignment consummated without first complying with Section 7.2 shall, as between the General Partners, on the one hand, and the assignor/vendor and assignee/vendee, on the other hand, be null and void.

The foregoing provisions of Section 7.2 to the contrary notwithstanding, a Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner without the consent of the Partners if the transferee is a Permitted Transferee.

Section 7.3    Assignments of Distributive Rights. A Limited Partner may not assign all or any portion (in whole or fractional Units) of his or her right to receive distributions hereunder without the prior written consent of the General Partners and of Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units. In addition, no such assignment shall be effective as to the General Partners until the General Partners have first received a copy of the instrument of assignment, executed by both the assignor and the assignee of such distributive right. Once the assignment has been received by the General Partners, the General Partners may (but shall not be obligated to), without requesting further documentation from either the assignor or the

assignee, remit directly to the named assignee all distributions to which the assignee may be entitled pursuant to the provisions of this Agreement and the assignment. So long as the party to whom such distributive share was remitted was either the assignor Limited Partner or the assignee named in the instrument of assignment, the General Partners shall be free from liability to any person if such distribution is received by a person not entitled thereto.

Section 7.4    Partnership Option to Purchase a Limited Partner's Interest. Notwithstanding any of the foregoing provisions of this Agreement to the contrary, in the event a Limited Partner desires to transfer or sell any part of his or her interest in the Partnership (other than to a Permitted Transferee), the Limited Partner shall first offer to sell such interest to the other Partners. The other Partners who desire to purchase said interest shall have the right for a period of thirty (30) days after written notice of such offer to purchase such Limited Partner's interest in the Partnership at Fair Market Value on a pro rata basis. In addition, the Partnership, by vote of a majority of the General Partners, or failing such vote, each of the other Partners desiring to purchase, on a pro rata basis, shall have the option to purchase, at Fair Market Value, all or part of a Limited Partner's Units in the Partnership upon the occurrence of any of the following events:

(a)    The Limited Partner dies;

(b)    The Limited Partner files for protection under any federal or state bankruptcy laws, makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for such Limited Partner or for substantially all of such Limited Partner's properties or assets, or bankruptcy, reorganization arrangement or similar proceedings are instituted by or against such Limited Partner under federal or state law and the same are not dismissed within forty-five (45) days after filing; or,

(c)    The Limited Partner is divorced and in connection therewith all or any portion of such Limited Partner's Units are to be awarded to such Limited Partner's former spouse (in such event the purchase option shall apply only to those Units which are to be so awarded).

Such option shall be exercisable at any time following the happening of any of the foregoing events and shall expire ninety (90) days following receipt by any General Partner of written notice of the happening of such events. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option. With respect to any exercise of an option under this Section, the purchaser(s) shall have the right to pay for such interest in cash or by delivery of a promissory note in ordinary and customary form, payable with interest at the rate of the lesser of (i) eight percent (8%) per annum, or (ii) the maximum rate allowed by Arkansas law, payable in sixty (60) equal monthly installments of principal and interest. Such promissory note may be prepaid at any time without consent or penalty and shall be secured by the Partnership interest so acquired. The holder of any such promissory note shall have all of the rights and remedies of a secured creditor under the Arkansas Uniform Commercial Code. If the Partnership and the Partners do not fully exercise their option, and any portion of such Limited

Partner's Units are assigned to a beneficiary, a creditor, or a spouse, then the assignee shall have the right only as an assignee to receive distributions to which such Partnership interest is entitled to receive hereunder, subject to the terms and conditions contained herein, and such assignee shall only become a Limited Partner upon the satisfaction of the conditions set forth in Section 7.2 of this Agreement.

The foregoing provisions of Section 7.4 to the contrary notwithstanding, a deceased Limited Partner, or such deceased Limited Partner's personal representative, may transfer to one or more Permitted Transferees, by legacy, devise, bequest, or other testamentary transfer, without consideration, all or part of his or her interest in the Partnership and thereby constitute his or her transferee a Limited Partner without the consent of the General Partners or of the Partners.

Section 7.5    Limited Partner's Status Upon Death or Incompetency. If a court of competent jurisdiction adjudges a Limited Partner to be incompetent to manage his or her person or his or her property, then in accordance with § 705 of the Act and this Agreement, the guardian, conservator, or other legal representative may exercise all the incompetent Limited Partner's rights for the purpose of administering his or her property, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement. If a Limited Partner dies and the Partnership and Partners do not fully exercise any option arising under Section 7.4 of this Agreement to purchase all of the deceased Limited Partner's Units, then in accordance with § 705 of the Act and this Agreement, the executor, administrator, or other legal representative may exercise all the deceased Limited Partner's rights for the purpose of settling his or her estate, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement.

Section 7.6    Limited Put Option of Certain Permitted Transferees. In the case of a transfer during the lifetime of a Partner, for less than full and adequate consideration, of a Unit or Units, or portion thereof (that portion of such transfer for less than full and adequate consideration shall be a "Donative Transfer" and the Partner making such a transfer shall be the "Transferor"), to a Permitted Transferee (the "Donee"), for a period of sixty (60) days after the date of the Donative Transfer, the Donee shall have the right to require the Partnership to purchase from the Donee that number of whole Units which has a Fair Market Value closest to the Option Amount (defined below) as follows:

(a)    The Donee desiring to exercise this put option shall provide written notice thereof to the General Partners within sixty (60) days of the date of the Donative Transfer.

(b)    Upon exercise of any such option, the Partnership shall purchase the Units subject to the option for a price equal to their Fair Market Value, and the payment of the purchase

price shall be made in cash or in kind, as determined by the General Partners, provided that any Partnership Properties distributed to the Donee in payment of the purchase price shall be valued at Fair Market Value for the purposes hereof. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option.

(c)     The "Option Amount" shall be equal to the lesser of: (1) the Fair Market Value of the Donative Transfer; or (2) the total amount allowable with respect to such Donative Transfer to the Donee as an annual exclusion for federal gift tax purposes under §2503(b) of the Code, taking into account the annual exclusion available to the Transferor and the Transferor's spouse, if any, at the time of the Donative Transfer; provided, however, if the Transferor's spouse made no independent transfer to such Donee on the same date as the Donative Transfer, then such annual exclusion of the Transferor's spouse shall not be taken into account unless the Transferor's spouse consents thereto by a signed written statement at the time of the Donative Transfer.

(d)     To be consistent with the hypothetical willing buyer-willing seller standard, Fair Market Value shall be determined without regard to this limited put option.

## ARTICLE VIII
## COMPENSATION OF THE GENERAL PARTNERS

Section 8.1     Compensation. With the approval of Partners owning a majority-in-interest of the Partnership Units, the General Partners may receive reasonable compensation for serving as the General Partners and for managing the Partnership Properties.

Section 8.2     Expenses. Any costs and expenses incurred by the General Partners for the Partnership's benefit shall be billed directly to the Partnership, and the General Partners shall be entitled to be paid, as reimbursement, for all costs and expenses billed to and paid by the General Partners.

## ARTICLE IX
## DISTRIBUTIONS AND
## ALLOCATIONS OF INCOME AND LOSS

Section 9.1     Distributions of Distributable Cash. From time to time during each fiscal year the General Partners may distribute all or any part of the Distributable Cash, and the General Partners shall distribute all remaining Distributable Cash not later than April 15 following the end of each fiscal year. All such distributions shall be made in accordance with this Agreement and the Sharing Ratios of the Partners.

Section 9.2     Allocation of Certain Income and Losses for Tax Purposes. For federal

P:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -15-

income tax purposes, the net income and net losses of the Partnership for any taxable year (or portion thereof) shall be allocated (subject to the requirements of § 704(c) of the Code) to the Partners in proportion to their Sharing Ratios.

Section 9.3   Allocations Upon Liquidation.  For federal income tax purposes, income (including gain) or loss of the Partnership resulting from the sale or disposition of all or substantially all of the Partnership Properties, or the dissolution of the Partnership pursuant to Article X without an election to continue the Partnership in accordance with Section 10.1, shall be allocated to the Partners in proportion to their Sharing Ratios.

## ARTICLE X
## DISSOLUTION AND PRIORITY ON DISTRIBUTION

Section 10.1   Dissolution and Termination of the Partnership.  The Partnership shall be immediately dissolved:

      (a)     Upon the expiration of the term set forth in Section 1.5 hereinabove;

      (b)     Upon a unanimous vote of all the Partners;

      (c)     Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units;

      (d)     Within a reasonable period of time after the sale, condemnation, foreclosure or other similar disposition of all or substantially all of the Partnership Properties; provided, however, the Partnership may be continued by any or all of the Partners wishing to reinvest the sales proceeds; or

      (e)     Upon the occurrence of any other circumstances which, by law, would require the Partnership to be dissolved.

The death, legal disability, or dissolution of any Limited Partner shall not result in the dissolution of the Partnership. Upon the death or legal disability of a Limited Partner, the legal representative of such Limited Partner or of his or her estate shall have the status described in Section 7.5 of this Agreement and the rights and liabilities as set forth in the Act.

Section 10.2   Liquidation and Priorities on Distribution.  Upon the occurrence of any event which causes the dissolution of the Partnership, as set forth in Section 10.1 hereinabove, the General Partners or, if there is no General Partner, such person as may be designated by the Partners owning a majority-in-interest of the outstanding Partnership Units to act as liquidating trustee (the "Trustee")

shall immediately proceed to terminate the business of the Partnership. The General Partners or Trustee shall first determine the Fair Market Value of each Partnership Property (except cash) and then attempt to sell such portion (or all) of the Partnership Properties (except cash) at such prices and on such terms as the General Partners or Trustee, in the exercise of the General Partners' or Trustee's best business judgment under the circumstances then presented, deems to be necessary to provide for the liquidation priorities described below and to be in the best interests of all the Partners. The proceeds of any such sale, all Partnership cash, and undivided interests in Partnership Properties, shall be distributed in the following manner:

(a)    To creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of debts and liabilities of the Partnership, other than liabilities for distributions to Partners under A.C.A. § 4-43-601 or § 4-43-604;

(b)    To the creation of any reserves which the General Partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partners, arising out of or in connection with the Partnership;

(c)    To Partners and former Partners in satisfaction of liabilities for distributions under A.C.A. § 4-43-601 or § 4-43-604;

(d)    To Partners for the return of their capital account balances; and

(e)    The remainder, if any, shall be distributed to the Partners in accordance with their Sharing Ratios.

<div align="center">

## ARTICLE XI
## ACCOUNTING AND BUSINESS MATTERS

</div>

Section 11.1    Books of Accounts and Records. The Partnership's books and records, this Agreement and any other records required by law to be maintained by the Partnership shall be maintained at the principal office of the Partnership. The books and records shall reflect all transactions and be appropriate and adequate for the business of the Partnership. Each Partner shall have access to and the right to copy at his or her own expense the Partnership's books and records at all reasonable times.

Section 11.2    Accounting Method. The Partnership books shall be kept on an accounting basis determined by the General Partners in accordance with usual and customary accounting practices.

Section 11.3    Financial Statements and Reports. Upon request by any Limited Partner, the General Partners shall cause the Partnership to provide the following reports and financial statements to the Partners:

(a)    Annual Report. Within one hundred twenty (120) days after the end of each

fiscal year, the Partnership shall provide to the Partners (1) financial statements prepared by an independent certified public accountant, including a balance sheet as of the end of such fiscal year, together with statements of income, Partners' equity, changes in financial position and funds from operations for such year; the balance sheet and such statements (other than the funds from operations statement) shall be prepared in accordance with generally accepted accounting principles and shall be accompanied by a report of the activities of the Partnership for such year; and (2) a report on distributions to the Limited Partners for such period.

(b)    Tax Information. No later than March 15 of each year, the Partnership shall provide to each Partner all information relating to the Partnership necessary for the preparation of the Partners' federal income tax returns.

(c)    Other Federal and State Reporting Requirements. The General Partners shall cause to be delivered to the Limited Partners all other reports and information as may be required by law to be delivered to such Limited Partners.

Section 11.4    Fiscal Year. The fiscal year of the Limited Partnership shall be the calendar year.

Section 11.5    Bank Accounts. Except as may be otherwise specifically provided herein, all funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partners. Such account or accounts shall be in the name of the Partnership. All withdrawals therefrom shall be made upon checks signed by the General Partners, or any person authorized to do so by the General Partners.

## ARTICLE XII
## ELECTIONS

Section 12.1    Adjustment Election. In the event of the transfer of a Partner's Units or upon the death of any individual Partner, or in the event of the distribution of Partnership Property to any person, the General Partners, in their sole discretion, may, but shall not be obligated to, file an election as provided by Code § 754 and the Treasury regulations thereunder, to cause the Partner's basis in the Partnership Property to be adjusted for federal income tax purposes as provided by Code Sections 734 and 743. Any cost incurred in making such elections shall be charged to the Partner or Partners benefitting therefrom.

Section 12.2    Depreciation Elections. With respect to all depreciable assets of the Partnership, the General Partners may elect to use, to the extent allowed by the Code, accelerated depreciation methods; however, the General Partners may change or elect some other method which is, in their opinion, most advantageous to the Partners.

Section 12.3    Election with Respect to Taxation as Partnership. No election shall be made

by the Partnership, the General Partners or any Limited Partner to exclude the Partnership from the application of any of the provisions of Subchapter K, chapter 1 of subtitle A of the Code, or from any similar provisions of any state tax laws. The foregoing shall not prohibit such an election by the Partnership and any person other than in the capacity of a Partner hereunder.

Section 12.4   Other Elections. In addition to the elections stated in this Article XII, the General Partners shall make all other elections which in their reasonable sole discretion are necessary for the proper operation and accounting of the Partnership.

## ARTICLE XIII
## AMENDMENTS

Subject to the provisions of the laws of the State of Arkansas, amendments to this Agreement which do not substantially affect the rights of the Limited Partners, or which are required or contemplated by this Agreement, may be made by the General Partners through use of the powers of attorney herein and hereby granted. Any other amendment must be agreed to in writing by all of the Partners.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1   Notices. All notices under this Agreement shall be in writing and shall be given to the Partners at each Partner's last known address and to the Partnership at its principal office or at such other address as any of the parties may hereafter specify in the same manner.

Section 14.2   Further Acts. Each Partner hereby agrees to execute and deliver to the General Partners, within fifteen (15) days after receipt of the General Partners' written request therefor, such other and further statements of interest and holdings, designations, powers of attorney or other instruments as the General Partners reasonably deem necessary.

Section 14.3   Paragraph Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provisions hereof.

Section 14.4   Severability. Every portion of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 14.5   Application of Arkansas Law. This Agreement, and the application or interpretation thereof, shall be governed by its terms and by the laws of the state of Arkansas.

Section 14.6   Survival of Rights. This Agreement and all of the terms, provisions, and

agreements herein contained shall be binding upon and inure to the benefit of the Partners and their respective legal representatives, heirs, successors and assigns.

Section 14.7    Interpretation. As used herein, the masculine includes the feminine and the neuter and the singular includes the plural, as the context may require.

Section 14.8    Execution in Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had all signed the same document. All counterparts shall be construed together and shall constitute one (1) agreement.

Section 14.9    Waiver of Action for Partition. Each of the parties irrevocably waives during the term of the Partnership any right that he or she may have to maintain any action for partition with respect to the Partnership Properties.

Section 14.10    Tax Matters Partner. Pursuant to Code § 6231, the Partners hereby designate MARY HANNA BOLES CANADA as the tax matters partner ("TMP") for the Partnership. The TMP shall have all of the power and responsibilities imposed by the Code. Notwithstanding the designation, the Partners may participate in any inquiry by the Internal Revenue Service to the extent not inconsistent with this provision or the provisions contained in the Code relating to treatment of Partnership items at the Partnership level, at the Partner's sole expense.

Section 14.11    Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

Section 14.12    Arbitration. Any dispute or controversy arising out of or relating to this Agreement or any document or instrument delivered in connection with this Agreement shall be settled by arbitration to be held in England, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the parties irrevocably consent to the jurisdiction of the state courts of Arkansas for this purpose. The losing party in such arbitration shall pay all the costs and expenses of such arbitration and all the reasonable attorneys' fees and expenses of the other party thereto.

Section 14.13    Confidentiality. Each of the Partners, and any other person who shall become a Partner, agrees to keep confidential all information pertaining to the Partnership, its business, its management, and the arbitration of any dispute among the Partners, and agrees to refrain from disclosing such information to anyone who is not a Partner or a Partner's attorney or agent.

IN WITNESS WHEREOF, this Amended and Restated Agreement of Limited Partnership has been duly executed by the parties effective on the ___1___ day of ___April___, 2004.

GENERAL PARTNERS:

_____
MARY HANNA BOLES CANADA

LIMITED PARTNERS:

_____
MARY HANNA BOLES CANADA

_____
GARY RECTOR CANADA

GARY RECTOR CANADA, JR. TRUST I

BY: _____
GARY RECTOR CANADA, JR., Trustee

BRADLEY SETH CANADA TRUST I

BY: _____
BRADLEY SETH CANADA, Trustee

HANNA NICOLE CANADA STEWART TRUST I

BY: _____
HANNA NICOLE CANADA, Trustee

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -21-

**EXHIBIT A**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**PARTNERSHIP PROPERTY**

**[insert description]**

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd

**EXHIBIT B**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**OWNERSHIP OF PARTNERSHIP UNITS**

| GENERAL PARTNERS: | UNITS: |
|---|---|
| Mary Hanna Boles Canada | 10 |

| LIMITED PARTNERS: | |
|---|---|
| Mary Hanna Boles Canada | 409 |
| Gary Rector Canada | 419 |
| Gary Rector Canada, Jr. Trust I | 54 |
| Bradley Seth Canada Trust I | 54 |
| Hanna Nicole Canada Stewart Trust I | 54 |

| TOTAL: | 1,000 |
|---|---|

<div style="border:1px solid black; text-align:center">

**EXHIBIT**

**2**

</div>

## SHAREHOLDERS AGREEMENT

### *Canada Bancshares, Inc.*

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is executed effective as of the date set forth below (the "Effective Date"), by and among Canada Bancshares, Inc., an Arkansas corporation (the "Corporation"), and the undersigned Shareholders of the Corporation (all hereinafter collectively referred to as the "Shareholders" and individually as the "Shareholder").

### RECITALS:

WHEREAS, the Shareholders and the Corporation desire to promote their mutual interests by imposing certain restrictions and obligations upon the shares of capital stock of the Corporation in order to preserve and maintain a continuity of shareholder relationships and in order to promote sound and harmonious management of the Corporation; and

WHEREAS, it is the intention of the parties to place such restrictions on the sale, transfer, pledge, encumbrance or other disposition of all shares of the capital stock of the Corporation.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.      **REGULATORY REQUIREMENTS.** Notwithstanding any other provision herein, no transfer pursuant to Section 2 or Section 3, below, no pledge pursuant to Section 4, below, nor any other Disposition (as defined below) of shares of capital stock of the Corporation including, without limitation, any Disposition involving a redemption of shares, shall occur except in compliance with all applicable legal and regulatory requirements. This shall include, without limitation, (a) the submission of all required applications and notices to the Board of Governors of the Federal Reserve, the Arkansas State Bank Department and any other applicable governmental entity (collectively, the "Governmental Entity(ies)"), (b) all required approvals from applicable Governmental Entities having been obtained in such form as is satisfactory to the Board of Directors of the Corporation in its sole discretion, and (c) any Disposition being completed in compliance with the requirements of all applicable approvals granted by the Governmental Entities. The terms of any Disposition shall comply with the requirements of all applicable approvals given by the Governmental Entities. All time periods relating to any exercise and/or closing of any purchase option hereunder shall be extended as necessary to accommodate the requirements of this Section 1.

2.      **FAMILY TRANSFERS.** Any Shareholder may transfer all or part of the Shareholder's shares of capital stock in the Corporation by sale or gift (including by testamentary transfer upon death) to one or more trusts established for the benefit of such Shareholder, his/her spouse and/or lineal descendants (collectively, "Family Member(s)"), and/or to an entity wholly-owned by such persons (referred to as a "Family Entity"), (collectively referred to as a "Family

1

5203889.4

Transferee"). In such cases, the transferee shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors, in its sole discretion.

3.    **TRANSFERS BY ENTITY SHAREHOLDERS.** Any Shareholder that is a corporation, partnership or limited liability company (collectively, an "Entity") may, upon notice to the Corporation, transfer all or part of the Entity's shares of capital stock in the Corporation to (i) the shareholders, partners or members, respectively, of that Entity, or (ii) any other corporation, partnership or limited liability company wholly-owned by that Entity. In such cases, the transferee(s) shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the other terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors.

4.    **PLEDGE OR OTHER ENCUMBRANCE.** No Shareholder shall pledge, encumber, grant a security interest in, or otherwise cause or permit any lien to be placed upon all or any part of the shares of capital stock of the Corporation owned by such Shareholder, without first providing written notice thereof to the Corporation; and *provided further*, as a condition thereto, the Shareholder shall require the lender, secured party, or other lienholder to execute an estoppel agreement (as approved by the Board of Directors) for the benefit of the Corporation and the other Shareholders which provides that any foreclosure, sale, transfer, or other disposition of the stock so pledged or encumbered shall be subject to the terms and conditions of this Agreement.

5.    **RESTRICTIONS ON TRANSFER.**

(a)    Except as provided in Sections 2, 3 and 4, no Shareholder shall sell, contract to sell, convey, hypothecate, assign, pledge, encumber, or otherwise transfer (collectively, a "Disposition") any or all of its shares of capital stock of the Corporation, now owned or hereinafter acquired, or any interest or right therein, without the prior written consent of all the other Shareholders, or in the absence of said written consent, without first providing the Corporation and each of the other Shareholders the right of first refusal option to purchase such stock as provided herein.

(b)    Except as otherwise provided in Sections 2, 3, and 4, a Shareholder proposing a Disposition (the "Transferor") shall provide written notice of the intended Disposition to the Corporation's Board of Directors (the "Disposition Notice"). The Disposition Notice shall set forth all of the terms of the proposed Disposition, including price and payment terms for any sale, the name and address of the proposed transferee, the number of shares involved in the proposed Disposition, and the date on which the transaction is to occur, which date shall not be less than thirty (30) days from the date on which said notice is given.

2

5203889.4

(c)     For a period of fifteen (15) days after the date on which the Disposition Notice is given, the Corporation shall have the right of first refusal option to purchase the stock of the Transferor identified in the notice, which option shall lapse and expire if not exercised in writing within said 15-day period by majority vote of the Board of Directors of the Corporation (without participation by the Transferor). The Corporation's option to purchase may be exercised in whole or in part. In the event said option is exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(d)     In the event that all of the shares of the Transferor subject to the foregoing option are not redeemed and purchased by the Corporation as provided above, then (i) the Corporation shall delivery a copy of the Disposition Notice to each Shareholder, and (ii) the shares not so purchased and redeemed by the Corporation shall become subject to a second option on the part of each of the other Shareholders to purchase a "proportionate share" of such stock, which option shall lapse and expire if not exercised in writing by notice to the Transferor within thirty (30) days after the date on which the Disposition Notice is mailed to each Shareholder by the Corporation. The Shareholders' option may also be exercised in whole or in part. In the event any or all of said options are exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(e)     The term "proportionate share" shall mean the ratio expressed as a percentage of (i) the number of shares of the Corporation's capital stock owned by the Shareholder to (ii) the total number of shares of capital stock of the Corporation owned by all Shareholders other than the Transferor. In addition, if any stock of the Corporation offered for sale is not purchased by the Shareholder first entitled thereto, the term "proportionate share" shall include that portion of the stock of the Corporation not purchased by the Shareholder first entitled thereto which the number of shares of capital stock of the Corporation owned by a Shareholder bears to the total number of shares of capital stock of the Corporation owned by Shareholders electing to exercise this option to purchase the Transferor's stock.

(f)     In the event the Corporation and the other Shareholders do not exercise their respective options as hereinbefore provided, the Transferor may make a bona fide Disposition to the prospective purchaser, or other transferee, of any remaining stock not so purchased by the Corporation or other Shareholders. The Disposition shall be made only to the transferee identified in the Disposition Notice and shall be made only in strict accordance with the terms stated in such notice. However, if the Transferor shall fail to make such Disposition within one hundred twenty (120) days following the date on which the Disposition Notice is given, such shares shall again become subject to all of the restrictions contained in this agreement. Any purchaser or other transferee acquiring the offered shares shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, and deliver a counterpart of this Agreement as a condition to the issuance of a stock certificate in such person's name.

(g)     During any period in which the Corporation is a "small business corporation," as defined in sections 1361(a) and (b) of the Internal Revenue Code of 1986, as

3

amended (the "Code") (referred to herein as an "S Corporation") then, in the case of shares held by a trust, any change in the status or circumstances of the trust or its beneficiaries that either (i) causes or will reasonably be expected to cause the trust to cease to be a trust that is permitted to hold shares in an S Corporation, or (ii) results in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any trustee or beneficiary of the trust in question, if such person is also serving as a director).

(h)    With respect to any Family Entity that was a transferee under Section 2, any event resulting in that Family Entity having any owner, officer or director (or any similar positions) that is not a Family Member of the original transferor, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any person affiliated with the Family Entity in question, if such person is also serving as a director).

(i)    Notwithstanding any other provision herein, unless first approved by the Board of Directors in writing, in its sole exercise of discretion, no Shareholder shall complete a Disposition of any shares of the Corporation's capital stock to any of the following (each referred to as a "Competitor"): (1) any other state or federally chartered financial institution or financial institution holding company, (2) any individual(s) or entities that in the aggregate own ten percent (10.00%) or more of any other state or federally chartered financial institution or financial institution holding company, or (3) any other individual or entity that the Board of Directors of the Corporation has, in its sole discretion, designated as a "Competitor" for purposes of this Section 5(i).

(j)    In the event the options specified herein are exercised, the purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

(k)    For all purposes of this Section 5, the date on which the Disposition Notice is given shall be the date such notice is deemed made pursuant to Section 24(d).

6.    DIVORCE. If an individual Shareholder shall become a party to a divorce proceeding and pursuant to the final decree in that proceeding all or any portion of the Shareholder's stock in the Corporation is awarded to the Shareholder's former spouse (who is not also then a shareholder), the stock so awarded shall immediately become subject to an option to purchase on the part of the Corporation first, and the other Shareholders second for a period of ninety (90) days after written notice of such award as provided to the Corporation and each of the other Shareholders, in the manner provided in Section 5 as in the case of a proposed Disposition except that for purposes of Section 5, the date on which the notice is made to the Corporation and the other Shareholders of the final divorce decree shall be deemed the date of the Disposition Notice. If all of the shares of stock so awarded are not purchased by the Corporation, the Shareholders (other than the divorced Shareholder and his or her spouse) shall

4

5203889.4

have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

7.    BANKRUPTCY OR INSOLVENCY. If any Shareholder makes an assignment for the benefit of creditors, or if any petition shall be filed in any federal or state court alleging that a Shareholder is insolvent, or requesting the appointment of a receiver for all or substantially all of a Shareholder's property, or if any petition in bankruptcy is filed by or against a Shareholder in a court of competent jurisdiction and if such petition or petitions are not dismissed within ninety (90) days from the date of filing, all of such Shareholder's shares of stock in the Corporation (including any shares transferred pursuant to Section 2) shall immediately become subject to an option to purchase such stock in favor of the Corporation first and the other Shareholders second, for a period of one hundred twenty (120) days after written notice of such event. If all of the shares of stock in the Corporation owned by such Shareholder are not purchased by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and term of payment shall be determined pursuant to Sections 10 and 11.

8.    DEATH. Subject to a Shareholder's ability to transfer shares of stock to a Family Transferee at such Shareholder's death as provided in Section 2, upon the death of an individual Shareholder (the "Decedent") all of the shares of stock in the Corporation owned by the Decedent (including shares transferred pursuant to Section 2) or to which the Decedent or his or her personal representative shall be entitled, shall become subject to an option to purchase on the part of the Corporation, first and the other Shareholders, second for a period of one hundred twenty (120) days following the date of the Decedent's death. If all of the Decedent's shares of stock in the Corporation are not purchased and redeemed by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11. Notwithstanding the provisions of Section 11 to the contrary, if the Corporation shall receive any proceeds from any policy of insurance on the life of the Decedent, such proceeds shall be paid by the Corporation to the Decedent's personal representative to the extent of the purchase price of the Decedent's stock, and such payment shall be deemed to have been made on account of such purchase price. The balance of the purchase price remaining after credit for such insurance proceeds shall be paid pursuant to Section 11.

9.    S CORPORATION PURCHASE OPTION.

(a)    In the event that the holders of a majority of the outstanding shares of capital stock of the Corporation provide written notice to the Board of Directors of the Corporation that they desire to cause the Corporation to make an election to be treated as an S Corporation (defined herein) for federal and state income tax purposes (the "Election Notice"), then the Board shall take the following actions:

(i)    the Board shall promptly provide the Election Notice to each Shareholder;

(ii)    the communication containing the Election Notice shall inform

5

each Shareholder that it has a period of not less than 45-days as established by the Board (the "Notice Period") in which to:

> (A)    deliver to the Corporation a signed consent (in a form approved by the Board) to the S Corporation election pursuant to which such Shareholder consents to the Corporation making an S Corporation election, along with such other documents as the Board may require; and

> (B)    if applicable, with respect to any Shareholder that is not eligible to own shares of stock in an S Corporation, to take such actions as may be necessary to cause the Shareholder to become eligible (including any Disposition of shares permitted by and completed in accordance with Section 2 and/or Section 3 herein).

(b)    Any Disposition of shares proposed by a Shareholder in order for the Shareholder (or its transferee(s)) to be an eligible S Corporation shareholder shall (i) be subject to the review and approval of the Board of Directors of the Corporation, and (ii) if approved by the Board, be subject only to those restrictions and requirements imposed by the Board and permitted to occur without any requirement of compliance with the provisions of Section 5, if applicable.

(c)    In the event a Shareholder fails to provide the consent (and other required documentation) described in Section 9(a)(ii)(A), above, within the Notice Period, or is otherwise not an eligible S Corporation shareholder as of the expiration of the Notice Period (as determined by the Board), then, without any additional action, all of such Shareholder's shares of stock in the Corporation shall be subject to a purchase option in favor of the Corporation to repurchase and redeem such shares. The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

10.    PURCHASE PRICE. The purchase price for each share of stock purchased pursuant to this Agreement shall be equal to the purchase price contained in any bona fide offer to purchase such shares which the Transferor proposes to accept (in the case of any proposed Disposition by sale or exchange), or in the absence of such bona fide offer or in situations other than proposed Dispositions involving a sale or exchange, the purchase price for such stock shall equal the Book Value of such shares of stock. "Book Value", as used in this Agreement, shall be the net book value of the Corporation as of the end of the month preceding the date of occurrence of the event giving rise to any right to purchase shares hereunder, computed in accordance with generally accepted accounting principles applied in a consistent manner with prior periods, by a Certified Public Accountant selected by the Board of Directors. The determination by such accountant shall, for purposes of this Agreement, be final, conclusive and binding upon each of the parties hereto. The purchase price per share shall equal the Book Value divided by the number of shares of capital stock outstanding.

11.    PAYMENT OF PURCHASE PRICE. The purchase price for any shares of stock purchased pursuant to this Agreement, in situations involving proposed dispositions by sale or exchange, shall be paid upon the same terms and conditions (including, as near as possible, security terms) as contained in the bona fide offer to purchase such shares received by the

6

Transferor; or in the absence of any such bona fide offer, or in situations other than proposed Dispositions involving a sale or exchange, the purchase price shall be paid in sixty (60) equal monthly installments of principal and interest at a rate equal to the lesser of (1) the prime rate at Bank of England, in England, Arkansas, or its successor, on the date of the closing, or (2) 5.00% per annum (provided that any purchaser may elect to pay the purchase price in cash at any time). The first such payment shall be due and payable thirty (30) days from the closing date of such sale and purchase. Such obligation shall be represented by a promissory note in customary form as approved by the Board of Directors.

12.   CORPORATE GOVERNANCE MATTERS.   Neither the Board, nor any Shareholder, officer or agent of the Corporation, shall take or permit to be taken any of the following actions by or on behalf of the Corporation, without the prior written authorization of MHBC Investments Limited Partnership I, LLLP (or its successor), in each case:

(a)   the amendment, modification, or restatement of this Agreement, the Corporation's Articles of Incorporation or Bylaws;

(b)   the amendment, modification, or restatement of the charter, bylaws or other governing documents of any entity in which the Corporation owns an interest, or any entity owned by any entity in which the Corporation owns an interest, (each, referred to as a "Subsidiary") including, without limitation, Bank of England (the "Bank"), or any successor thereof;

(c)   the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect the election or appointment of any person to, and/or removal of any person from, the Board of Directors (or similar position) of the Bank or any other Subsidiary;

(d)   the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect (i) any merger, consolidation or similar transaction involving a Subsidiary, (ii) the sale of all or substantially all of a Subsidiary's assets, (iii) the liquidation or dissolution of a Subsidiary (or entering into any license, pledge, encumbrance or other transaction with similar economic effect), or (iv) the liquidation, dissolution or other termination of the existence and/or business of any Subsidiary;

(e)   causing a reclassification, reorganization, or recapitalization of any shares of the outstanding capital stock (or other equity interests) of any Subsidiary.

7

13.    SECURITY FOR PAYMENT OF THE PURCHASE PRICE.  Whenever the Corporation redeems, or remaining Shareholders purchase, stock pursuant to this Agreement, and the purchase price is to be paid in installments, the shares of stock so purchased or redeemed shall be pledged to the selling Shareholder as security for the payment of the purchase price and all certificates representing such stock shall be delivered to the selling Shareholder, or his or her personal representative, as the case may be, to hold as such security.  The selling Shareholder and/or his or her personal representative, as the case may be, shall have all the rights and remedies of a secured creditor under the Uniform Commercial Code as adopted under the laws of the State of Arkansas.

14.    INSUFFICIENT SURPLUS.    If the Corporation elects to purchase a Shareholder's stock but does not have sufficient surplus to permit it to lawfully purchase all of the shares of stock to be purchased, the Shareholders shall promptly take such measures to vote their respective shares to reduce the capital of the Corporation or to take such other and further steps as may be appropriate or necessary (excluding making additional capital contributions) in order to enable the Corporation to lawfully purchase all of the shares of stock to be purchased, including without limitation, an up-to-date appraisal of the assets of the Corporation, or a recapitalization of the Corporation so as to reduce its stated capital and increase its surplus.

15.    ADDITIONAL ACTION.  Whenever the Corporation or other Shareholders shall, pursuant to this Agreement, redeem or purchase shares of the Corporation's stock from the Transferor, the Transferor shall do all things necessary to execute, deliver, and endorse all papers and certificates as may be required to consummate said purchase and transfer of stock.

16.    RESTRICTIVE LEGEND.  Each certificate representing shares of stock in the Corporation shall be stamped or otherwise imprinted with the following restrictive legend:

<div align="center">

RESTRICTIVE LEGEND FOR COMMON STOCK
OF CANADA BANCSHARES, INC.

</div>

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE ARKANSAS SECURITIES ACT, AS AMENDED.  THE SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF REGISTRATION OR THE AVAILABILITY OF EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND THE ARKANSAS SECURITIES ACT.  NO RESALE, PLEDGE, HYPOTHECATION, OR OTHER TRANSFER OR DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL OCCUR EXCEPT IN COMPLIANCE WITH THE PROVISIONS OF A SHAREHOLDERS AGREEMENT BY AND AMONG THE CORPORATION AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION.  AT ANY TIME DURING WHICH THE CORPORATION IS AN ELECTING SMALL BUSINESS CORPORATION UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS CERTIFICATE SHALL NOT BE

<div align="center">

8

</div>

5203889.4

TRANSFERABLE IF SUCH TRANSFER WOULD CAUSE REVOCATION OF THE CORPORATION'S "S" CORPORATION ELECTION. ANY TRANSFER CONTRARY TO THE ABOVE INSTRUCTIONS IS VOID.

17.     ADDITIONAL STOCK OR SECURITIES; TRANSFEREE TO BE MADE A PARTY. Before any additional shares of stock or any other securities convertible into stock of the Corporation are issued in the future to shareholder or other security holder (other than a signatory to this Agreement), such person or entity shall be required to become a party to and execute and deliver a counterpart of this Agreement prior to the issuance of such shares or other securities and the certificates therefor shall be legended as provided in Section 16. Further, whenever any Shareholder acquires any additional shares of stock of the Corporation or any other securities of the Corporation convertible into stock other than the shares of stock owned at the time of the execution of this Agreement, such shares of stock or such other securities so acquired shall be subject to all of the terms of this Agreement, and the certificates therefor shall be stamped with the legend described in Section 16. In addition, each Disposition (of any type) to any transferee is hereby expressly conditioned upon such transferee first being made a party to and bound by the terms of this Agreement.

18.     TERMINATION. This Agreement shall terminate and all rights and obligations of the parties hereto shall cease (i) upon the written agreement of all Shareholders, (ii) upon the voluntary dissolution of the Corporation, or (iii) in the event there shall be only one (1) owner of the issued and outstanding shares of common stock of the Corporation.

19.     PRESERVING "S CORPORATION" STATUS. Notwithstanding anything herein to the contrary, at any time during which the Corporation is an S Corporation, (i) no shares of stock of the Corporation shall be transferable to any transferee if such transfer would cause a revocation of the Corporation's S Corporation status, and (ii) unless approved by the Board of Directors in writing, no shares of stock of the Corporation shall be transferable if the proposed transfer would result in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on the number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code. Any purported Disposition in violation of this Agreement shall be null and void and the purported transferee shall have no interest in any of the shares of stock of the Corporation purported to be transferred.

20.     SHAREHOLDERS' REPRESENTATIONS AND WARRANTIES. Each of the Shareholders represent and warrant that (i) it is the sole owner of the number of shares of common stock set forth opposite its signature hereto, (ii) except as approved in writing by the Corporation, that all of such shares are free and clear of all liens, claims, charges, security interests, or encumbrances of any kind, and (iii) that it has the right and lawful authority to enter into this Agreement.

21.     DRAG-ALONG SALE.

        (a)     If the holder(s) of a majority of the outstanding shares of capital stock of the Corporation (collectively, the "Drag Initiating Shareholder(s)"), acting individually or together, receive a bona fide offer, or otherwise agree, to make a transfer, sale or disposition of

9

5203889.4

all of their shares of stock in the Corporation in a single transaction or series of related transactions (a "Drag Along Sale"), then the Drag Initiating Shareholders shall have the right to require that each other Shareholder of the Corporation sell all of its shares of stock in the Corporation in the same transaction.  In the event a conflict shall exist between a Drag Along Sale and any other option or purchase right in this Agreement, the provisions of this Section 20 shall control.

(b)     Not less than 30-days prior to the proposed closing date of the Drag Along Sale, the Drag Initiating Shareholders shall provide to each Director and each Shareholder (i) a written notice identifying the proposed transferee, the consideration to be paid, and all other material terms and conditions of a Drag Along Sale (the "Drag Along Notice"), and a copy of the written agreements and documents pursuant to which a Drag Along Sale will be conducted and closed (the "Drag Along Agreement").  Each other Shareholder shall be required to participate in the Drag Along Sale on the terms and conditions set forth in the Drag Along Notice and in accordance with the Drag Along Agreement.  Within 15-days following the date the Drag Along Notice is given (the "Drag Along Notice Period"), each Shareholder of the Corporation shall execute and deliver in escrow to the Chairman of the Corporation all documents reasonably required to be executed in connection with the closing of such Drag Along Sale.  The Chairman shall be authorized to release such documents upon the closing of the Drag Along Sale.

(c)     If the Drag Along Sale has not been completed within 120-days following expiration of the Drag Along Notice Period, then the Chairman shall return to each Shareholder any documents in his possession executed by such Shareholders in connection with the proposed Drag Along Sale, and all restrictions on transfer contained in this Agreement or otherwise applicable at such time shall again be in effect.  Notwithstanding anything contained in this Section 20, there shall be no liability on the part of any Drag Initiating Shareholder to any other Shareholder if a proposed Drag Along Sale is not consummated for whatever reason.  Any decision as to whether to consummate a transfer of any portion of its Shares shall be at the sole discretion of each Drag Initiating Shareholder.

22.     GRANT OF PROXY.  To insure the performance by each Shareholder with the agreements set forth herein, each Shareholder hereby appoints the Chairman of the Corporation or its designee (the "Proxy Holder"), as his, her or its true and lawful proxy and attorney in fact, with full power of substitution and resubstitution, to vote all Shares owned or held by such Shareholder, subject to the provisions of this Agreement, upon any matter presented to the Shareholders of the Corporation, if (and only if) such Shareholder fails to comply with such provisions within 5-days following written request.  The proxies and powers granted by each Shareholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Shareholder's commitments under this Agreement.  Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Shareholder.

23.     TERM.  The term of this Agreement shall be 24-years and 364-days following the Effective Date, unless extended by the vote or written consent of the holders of a majority of the Corporation's issued and outstanding shares of voting common stock. Each Shareholder hereby irrevocably supports and authorizes each person who may from time to time serve as President,

10

Chief Executive Officer or Treasurer of the Corporation to act as his attorney-in-fact with specific authority to execute, acknowledge, swear to, file, and deliver, an amendment to this Agreement which extends the term of this Agreement for any length of time provided that the Corporation's Board of Directors makes a determination that the extension of such term of this Agreement will not be treated as a separate Bank Holding Company under the rules and regulations of the Board of Governors of the Federal Reserve and any other applicable law, rule or regulations.

24.    MISCELLANEOUS.

(a)    Governing Law. This Agreement shall be subject to and governed by the laws of the State of Arkansas.

(b)    Partial Invalidation. In the event that one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(c)    Specific Performance. The parties hereto recognize that the Corporation's stock is a unique asset. Accordingly, in the event of a breach of this Agreement, any non-breaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached their contractual obligations described herein. Each party hereto agrees that he will make no objection to the form of action in any such proceeding for specific performance of this Agreement. Anything contained herein to the contrary notwithstanding, this Section shall not be construed to limit in any manner whatsoever any other rights and remedies an aggrieved party may have by virtue of any breach of this Agreement.

(d)    Notices. Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing either in person or by registered, certified or private express mail, which shall be addressed, in the case of the Corporation, to its principal office to the attention of the President and Secretary, and in the case of any Shareholder, to the address appearing by the Shareholder's signature hereto, or such other address as may be designated by a Shareholder in writing to all parties to this Agreement. If mailed, such notice or other communication shall be deemed made when properly deposited in the mail addressed as provided herein, with postage prepaid.

(e)    Fees of Legal Counsel. In the event any party to this Agreement shall employ legal counsel to protect his rights hereunder or to enforce any term or provision herein, then the party prevailing in any such action shall have the right to recover from the other party all of his reasonable attorneys' fees and expenses incurred in relation to such claims.

(f)    Further Assurances. The parties agree that from time to time hereafter, and upon request, each of them will execute, acknowledge and deliver such other instruments and documents and take such further action as may be reasonably necessary to carry out the intent of this Agreement.

11

(g)    Modification.  No provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

(h)    Binding Effect and Benefit.  This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto, their heirs, executors, administrators, personal representatives, successors and permitted assigns.

(i)    Headings and Captions.  Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Agreement.

(j)    Waiver.  No waiver of a breach or violation of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or limit or restrict any right or remedy otherwise available.

(k)    Rights and Remedies Cumulative.  The rights and remedies expressed herein are cumulative and not exclusive of any rights and remedies otherwise available.

(l)    Gender and Pronouns.  Throughout this Agreement, the masculine shall include the feminine and neuter and the singular shall include the plural and vice versa as the context requires.

(m)    Entire Agreement.  This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

(n)    Time for Performance.  Time is of the essence in this Agreement.

(o)    Counterparts.    This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart. Copies of signatures shall be accepted as originals. Additional signature pages shall be attached hereto as necessary.

(p)    Tax Matters.  The initial signatories to this Agreement acknowledge and confirm their mutual intention and expectation that (i) all current shareholders of the Bank shall transfer their respective shares of the Bank's common stock in exchange for shares of stock of the Corporation and that each such transfer is made in connection with the formation and initial capitalization of the Corporation following its qualification as a "bank holding company" pursuant to the Bank Holding Company Act of 1956, as amended, and applicable provisions of Arkansas law, and (ii) each transferor shall be treated as part of the same control group pursuant to Section 351 of the Internal Revenue Code of 1986, as amended.

*[Signature page(s) to follow.]*

12

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement of Canada Bancshares, Inc. effective as of the Effective Date set forth below.

**Effective Date**:   April 1, 2017

CORPORATION:

CANADA BANCSHARES, INC.

By: _____
       Gary R. Canada, Sr., Chairman

*[Shareholder signature page(s) to be attached.]*

13

52038894

IN WITNESS WHEREOF, the undersigned has executed this Shareholders Agreement of Canada Bancshares, Inc. effective as to the undersigned as of the date set forth below.

*Effective Date:* April 1, 2017

MHBC INVESTMENTS LIMITED
PARTNERSHIP I, LLLP

By: _____
Mary Hanna Boles Canada,
General Partner

_____
Bradley S. Canada

_____
Gary R. Canada, Jr.

_____
Hanna Nicole Luebke

*[Shareholder Signature Page]*

*Canada Bancshares, Inc.*

14

5203889.4



**EXHIBIT**

3













**EXHIBIT**

4







# STATE OF ARKANSAS

## SECRETARY OF STATE

**Cole Jester**
ARKANSAS SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Cole Jester, Arkansas Secretary of State, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

## Dissociation/Dissolution of LLLP

of

## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

effective this day
December 12, 2025.



**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 5th day of February, 2026.

Arkansas Secretary of State

| EXHIBIT |
| :---: |
| 5 |

FILED - Arkansas Secretary of State - Cole Jester - Doc#: 20524565001 - Filing#: 800031290 - Filed On: 12/12/2025 - Page(s): 3

# AMENDEDMENT TO
## CERTIFICATE OF LIMITED PARTNERSHIP
### OF
## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

Pursuant to the Arkansas Uniform Limited Partnership Act (2001), more specifically stated as Ark. Code Ann. § 4-47-101, *et seq.*, and Act 15 of the 2007 Acts of Arkansas, the undersigned does hereby certify that the following information is true and correct:

## RECITALS

WHEREAS, a guardian of the person and estate of Mary Hanna Boles Canada ("Mrs. Canada"), the sole general partner of MHBC Investments Limited Partnership I, LLLP (the "Partnership"), was appointed on September 12, 2025 by the Circuit Court of Lonoke County, Arkansas, causing the immediate and automatic dissociation of Mrs. Canada pursuant to Ark. Code Ann. § 4-47-603(7)(B);

WHEREAS, the limited partners of the Partnership did not admit another general partner within 90 days of Mrs. Canada's dissociation, as required to avoid dissolution of the Partnership pursuant to Ark. Code Ann. § 4-47-801(3) and Sections 6.9 and 10.1(c) of the Amended and Restated Limited Partnership Agreement of the Partnership (the "Partnership Agreement"); and

WHEREAS, pursuant to Section 10.2 of the Partnership Agreement, and consistent with Ark. Code Ann. § 4-47-803(c), limited partners owning a majority-in-interest of the outstanding Partnership Units designated Gary Rector Canada, Sr. as "Liquidating Trustee."

NOW, THEREFORE, the Certificate of Limited Partnership of MHBC Investments Limited Partnership I, LLLP is hereby amended as follows:

## AMENDMENT

1.    Name. The name of the registered limited liability limited partnership is MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

2.    Original Filing Date. The original certificate of limited partnership for the Partnership was filed in this office on July 21, 1997. The Partnership converted to a limited liability limited partnership on April 6, 2004.

3.    Amendment. The Certificate of Limited Partnership of the Partnership is hereby amended as follows:

(a)    Dissociation of Mrs. Canada. Pursuant to Ark. Code Ann. § 4-47-603(7)(B), Mary Hanna Boles Canada ("Mrs. Canada"), the sole General Partner of the Partnership, disassociated on September 12, 2025. The Partnership does not have a general partner.

Error! Unknown document property name.

(b)    <u>Dissolution of the Partnership</u>. The Partnership dissolved, effective December 12, 2025, pursuant to Section 10.1(c) of the Partnership Agreement and Ark. Code Ann. § 4-47-801(1) & (3)(B).

(c)    <u>Liquidating Trustee</u>. Gary R. Canada was duly appointed by the partners as Liquidating Trustee, to conduct the winding up and termination of the Partnership's business in accordance with Section 10.2 of the Partnership Agreement. The street and mailing address of Gary R. Canada, Sr. is 123 S. Main Street, England, Arkansas 72046.

*[Signature Page Follows]*

2

Error! Unknown document property name.

IN WITNESS WHEREOF, this Amendment to Certificate of Limited Partnership has been duly executed by the liquidating trustee of the Partnership this 5ᵗʰ day of February, 2026.

LIQUIDATING TRUSTEE:

GARY R. CANADA, Sr.

Error! Unknown document property name.

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.

PLAINTIFF

v.                          Case No. __4:26-cv-267-KGB__

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Motion for Preliminary Injunction against

the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official

Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the

Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill,

and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as

Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the

Federal Regulators, the "Agencies"), states:

1.      CBI recently became the sole holding company of the Bank of England (the "Bank")

upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I,

LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of ownership, including, for

example, (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's

strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

2.      The Agencies, however, refuse to recognize CBI's status as the Bank's owner— or *anyone's* status as the Bank's owner— simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business.

3.      Specifically, the Agencies have asserted that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."**

4.      Without this Court's entering immediate injunctive relief ordering the Agencies to recognize CBI as the Bank's owner, the Bank will operate like a headless hydra— no clear managerial oversight, no ability to respond to crises, and no strategic direction whatsoever.

5.      For the reasons set forth in the accompanying Brief in Support, (i) CBI is likely to succeed on the merits of its claim that it is the sole holding company of the Bank, thereby entitling it to the accoutrements of Bank ownership, (ii) CBI, the Bank, and the Bank's customers are likely to suffer continued irreparable harm absent a preliminary injunction, and (iii) the balance of the equities and the public interest favor injunctive relief as the Agencies are uninterested in who owns the Bank, they simply need this Court's direction as to who that person is.

6.      CBI respectfully requests that this Court waive the security requirement in Rule 65(c) as there is no risk that the Agencies will suffer financial harm.

WHEREFORE, CBI respectfully requests that this Court (i) grant its Motion for Preliminary Injunction, (ii) order the Agencies to recognize CBI's status as the Bank's owner, and (iii) grant it all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201

2

Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com


*Attorneys for Plaintiff Canada Bancshares, Inc.*

3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

**TAMMY H. DOWNS, CLERK**

By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.

PLAINTIFF

v.                              Case No. __4:26-cv-267-KGB__

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department               DEFENDANTS

---

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Brief in Support of its Motion for Preliminary Injunction against the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill, and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the Federal Regulators, the "Agencies"), states:

### INTRODUCTION

CBI recently became the sole holding company of the Bank of England (the "Bank") upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I, LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of Bank ownership, including, for example, setting the Bank's strategy and governance, managing the Bank's capital and funding, and

interacting directly with the Agencies. But the Agencies are preventing CBI from doing so. More specifically, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business. Indeed, the FDIC and the State Regulator have asserted in writing that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** The Board has expressed the same opinion verbally during meetings over the Bank's ownership.

Without a preliminary injunction from this Court ordering the Agencies to immediately recognize CBI as the Bank's owner, the Bank will suffer governance paralysis, capital and liquidity crises, and severe operational disruption. Worse yet, the Agencies' continued refusal to recognize CBI as the Bank's owner interferes with CBI's due-process rights. To preserve the status quo, to ensure CBI's and the Bank's survival, and to protect the Bank's customers, this Court should enter a preliminary injunction ordering the Agencies to recognize CBI's status as the Bank's owner.

## BACKGROUND

CBI hereby incorporates the factual allegations contained in its Verified Complaint by reference pursuant to Federal Rule of Civil Procedure 10(c).

## ARGUMENT

A preliminary injunction is warranted when (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities favors the movant; and (4) an injunction is in the public interest. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam). Though no single factor is "dispositive," *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), likelihood of success is "the most significant" factor, *Missouri*, 112 F.4th at 536. When the federal government is the party opposing a preliminary injunction, the balance of the equities and the public interest "merge" into a single factor. *See, e.g., Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Here, each factor supports a preliminary injunction.

2

I. **CBI is likely to succeed on the merits because CBI is the Bank's sole holding company.**

As for this initial, most crucial factor, CBI is likely to succeed on the merits because, following the Partnership's dissolution, CBI became the Bank's sole holding company. More specifically, Mary Hanna Boles Canada has always been the Partnership's only legally recognized General Partner. Immediately upon the Lonoke County Circuit Court's appointing Gary Canada, Sr. as Mrs. Canada's emergency guardian on September 12, 2025, Mrs. Canada was dissociated from the Partnership by operation of law. Ark. Code Ann. § 4-47-603(7)(B) ("A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.").

As such, the Partnership had 90 days— up and until December 12, 2025[1]— to either (i) admit a new General Partner, or (ii) consent to continue the activities of the limited partnership and admit a new General Partner in accordance with that consent. Ark. Code Ann. § 4-47-801(3)(B); **Ex. 1** to Compl., at §§ 6.9, 10.1(c). However, the Partnership failed to do either, and the Arkansas Secretary of State accordingly certified the Partnership's dissolution. **Ex. 5** to Compl. Upon the Partnership's dissolution, CBI became the Bank's sole holding company. As the Bank's sole holding company, CBI is entitled to, among other things: (i) the Agencies' recognition, (ii) the right to set the Bank's strategy and governance, and (iii) the ability to manage the Bank's capital and funding. Therefore, CBI is likely to succeed on the merits, and this most important factor weighs heavily in CBI's favor.

II. **CBI, the Bank, and the Bank's customers have suffered and will suffer irreparable harm absent injunctive relief.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). For this requirement, a plaintiff need not prove with absolute certainty

---

[1] The Lonoke County Circuit Court later appointed Nicole Canada Luebke and Mr. Canada, Sr. as Mrs. Canada's co-guardians, but Mrs. Canada's guardianship has continued uninterrupted from September 12, 2025, to the date and time of this filing.

3

that injury will occur, but, instead, need merely show that irreparable harm is "likely" absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Here, the Agencies' refusal to recognize CBI as the Bank's owner has caused and will continue to cause CBI, the Bank, and the Bank's customers to suffer irreparable harm because such a refusal produces: (i) governance paralysis— the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption— vendors, other banks, and market participants could freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

Indeed, the Agencies' unlawful refusal to recognize CBI as the Bank's owner is substantially likely to result in (i) CBI's and the Bank's terminations as ongoing business enterprises, and (ii) loss of customer goodwill, both of which constitute irreparable harm under Eighth Circuit precedent. *See, e.g.,* *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (explaining that "[i]rreparable harm has been found when one's allegedly unlawful actions . . . will cause another's ongoing business to terminate absent an injunction"); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[T]he petitioners' potential loss of consumer goodwill qualifies as irreparable harm.").

4

Worse yet, as the Bank's sole holding company, CBI has a recognized property interest in its ownership of the Bank. *Cf. FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("[A]ppellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."); *Kaufman v. Societe Internationale Pour Participations Industrielles Et Commerciales, S.A.*, 343 U.S. 156, 159–60 (1952) (holding that "the rights of innocent stockholders . . . must be fully protected"). The Agencies' unlawful refusal to recognize that interest or give it any meaningful legal effect without due process of law or adequate compensation threatens violations of CBI's constitutional rights, independently constituting irreparable harm warranting injunctive relief. *See, e.g., Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 935 (E.D. Ark. 2021) ("The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, CBI has suffered and will continue to suffer irreparable harm absent immediate injunctive relief.

**III.   The balance of the equities and the public interest support a preliminary injunction both because (i) the Agencies are uninterested in who owns the Bank, they simply need Court direction, and (ii) customers' interests and the public's faith in the banking regulatory regime are in peril absent injunctive relief.**

The balance of the equities and public interest, which "merge" in suits against the government, also decisively favor preliminary relief. *Missouri*, 128 F.4th at 996–97. At the outset, the Agencies have no interest in this case warranting protection because they are uninterested in which entity ultimately owns the Bank. After all, their stated position is that the Bank's ownership "**remains a private legal issue that [they] have no jurisdiction over.**" Stated differently, the Agencies will treat whomever this Court determines to be the Bank's owner as such.

Moreover, "it is always in the public interest to protect constitutional rights" like CBI's due-process entitlements. *Phelps-Roper v. Nixon*, 59 F.3d 480, 485 (8th Cir. 2007). And, even better, entering a preliminary injunction in CBI's favor would mean that the Bank once again has stable management

and oversight— thereby protecting customers' interests and the public's faith in the regulatory regime underlying the banking system. Thus, this final factor weighs heavily in CBI's favor, too.

<div align="center">CONCLUSION</div>

Following the Partnership's dissolution, CBI became the Bank's sole holding company. As such, it is constitutionally entitled to the accoutrements of ownership, including but not limited to: (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

Because CBI is (i) likely to succeed on the merits, (ii) has suffered and will continue to suffer irreparable harm absent immediate injunctive relief, and (iii) the balance of the equities and the public interest favor such relief, this Court should enter a preliminary injunction ordering the Agencies to immediately recognize CBI's status as the Bank's owner. Doing so preserves the status quo, ensures CBI's and the Bank's survival, and protects the Bank's customers from peril. Accordingly, CBI respectfully requests that this Court grant its Motion for Preliminary Injunction and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association

809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*



**EXHIBIT**

**VI**

exhibitsticker.com



## CERTIFIED MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

### U.S. Postal Service™
### CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
- ☑ Return Receipt (hardcopy)        $ _____
- ☑ Return Receipt (electronic)      $ _____
- ☐ Certified Mail Restricted Delivery  $ _____
- ☐ Adult Signature Required         $ _____
- ☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage

$

**Total Postage and Fees**

$

DSm/SB

Sent To: The Honorable Travis Hill

Street and Apt. No., or PO Box No.: 550 17th Street, NW

City, State, ZIP+4®: Washington, DC 20429

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions



USPS TRACKING #

9590 9402 7936 2305 5851 86

**United States Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**R**
**ROSE LAW FIRM**
**A Professional Association**
**120 E. Fourth Street  Little Rock AR 72201-2893**

DSm/SB



## ROSE LAW FIRM

March 16, 2026

**VIA CERTIFIED MAIL**
The Honorable Travis Hill
Chair of the Federal Deposit Insurance Corporation
550 17th Street, NW
Washington, DC 20429
<u>Tracking #</u>: 9589 0710 5270 0162 0913 01

      **Re:**    *Canada Bancshares, Inc. v. Board of Governors of Federal Reserve System, et al.*
               U.S. District Court for the Eastern District of Arkansas
               Case No. 4:26-cv-00267-KGB
               **Service of Process Pursuant to Fed. R. Civ. P. 4(i)(2)**

Dear Chairman Hill:

      I represent the Plaintiff, Canada Bancshares, Inc. ("CBI") in connection with the above-referenced litigation against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department. In accordance with Federal Rule of Civil Procedure 4(i)(2), please find accompanying this letter (i) CBI's Verified Complaint and its associated exhibits, and (ii) a Summons to Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation.

      Additionally, CBI filed a Motion for Preliminary Injunction and Brief in Support. I have enclosed copies of those documents as well. CBI intends to pursue the relief requested therein with all deliberate haste. Please do not hesitate to reach out to my office in connection with this matter should you deem that necessary.

                            Respectfully submitted,

                            */s/ David S. Mitchell, Jr.*
                            David S. Mitchell, Jr.

**A Professional Association**
120 E. Fourth St., Little Rock, AR 72201 | roselawfirm.com | (501) 375-9131 | (501) 375-1309 (fax)
dmitchell@roselawfirm.com

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**CANADA BANCSHARES, INC.**                                              PLAINTIFF

v.                            Case No. __4:26-cv-267-KGB__

**BOARD OF GOVERNORS OF THE**              This case assigned to District Judge __Baker__
**FEDERAL RESERVE SYSTEM;**                and to Magistrate Judge __Ervin__
**JEROME H. POWELL, in his Official**
**Capacity as Chair of the Board of Governors;**
**TRAVIS HILL, in his Official Capacity as Chair**
**of the Federal Deposit Insurance Corporation; and**
**SUSANNAH MARSHALL, in her Official Capacity**
**as Commissioner of the Arkansas State Bank Department**          **DEFENDANTS**

---

### VERIFIED COMPLAINT

---

Plaintiff, Canada Bancshares, Inc., for its Verified Complaint against the Board of Governors of the Federal Reserve System; Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation; and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, states:

#### PARTIES

1.     Canada Bancshares, Inc., ("CBI") is an Arkansas corporation with its principal place of business in England, Arkansas. CBI is the sole holding company of the Bank of England, an Arkansas state-chartered bank (the "Bank"). CBI owns all issued and outstanding shares of the Bank's stock.

2.     The Board of Governors of the Federal Reserve System (the "Board") is a federal agency established by the Federal Reserve Act, 12 U.S.C. §§ 221 *et seq.*, charged with the administration

and enforcement of the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* Among other responsibilities, the Board determines whether an entity qualifies as a bank holding company, and the Board engages in a variety of oversight activities.

3. Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, oversees the Board's actions and is responsible for, among other things, ensuring the Board's compliance with its statutory duties.

4. Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, oversees the Federal Deposit Insurance Corporation (alone, the "FDIC," and, together with the Board, Mr. Powell, and Mr. Hill, the "Federal Regulators") and ensures the FDIC's compliance with its statutory duties. The FDIC exercises certain regulatory authority over bank holding companies under the Federal Deposit Insurance Act. *See* 12 U.S.C. §§ 1811 *et seq.*

5. Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department, oversees the Arkansas State Bank Department (alone, the "State Regulator," and, together with the Federal Regulators, the "Agencies"), an entity charged with regulating state-chartered commercial banks and their holding companies. *See, e.g.,* Ark. Code Ann. § 23-46-205.

6. The State Regulator's duties include review and approval processes that overlap significantly with the Federal Regulators'.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 in that it is a civil action or proceeding arising under the laws of the United States. More specifically, this is a civil action or proceeding arising under Acts of Congress regulating commerce, namely, the Bank Holding Company Act and the Federal Deposit Insurance Act.

8.      This Court has supplemental jurisdiction over CBI's claims against the State Regulator because they are "so related to [CBI's] claims" against the Federal Regulators that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) as this is "a civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity[,]" and the Central Division of the Eastern District of Arkansas is the judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred . . . ."

<u>**BACKGROUND**</u>

10.     Founded in 1898 with a capital stock of just $10,000, the Bank has survived two world wars, the Great Depression, and even the Great Recession.

11.     For most of its existence, the Bank has been a family-run operation, as the same family has controlled the Bank for more than a half century.

12.     Seth Boles—the progenitor of the Bank family—started working at the Bank as a cashier as long ago as 1946. Slowly but surely, Mr. Boles worked his way up to the Bank's presidency in the early 1960s. He maintained that position until 1989 when his son-in-law, Gary Canada, Sr., took the helm as the Bank's new president.

13.     Over the decades, the Bank's ownership structure has shifted a handful of times.

14.     This lawsuit is about the most recent shift in the Bank's ownership structure and the Agencies' reaction to it.

**The Partnership.**

15.     In the late 1990s, several members of the Bank family formed MHBC Investments Limited Partnership I as a holding company for the Bank.

16.     At that time, Mary Hanna Boles Canada was MHBC Investments Limited Partnership I's only General Partner.

17.     Mrs. Canada, Mr. Canada, Sr., Gary Canada, Jr. (as trustee), Bradley Canada (as trustee), and Hanna Nicole Canada Luebke (as trustee) were MHBC Investments Limited Partnership I's Limited Partners.

18.     In the early 2000s, MHBC Investments Limited Partnership I's partners voted to convert the entity to an Arkansas limited liability limited partnership, thereby creating MHBC Investments Limited Partnership I, LLLP (the "Partnership"), an entity governed by an April 1, 2004 Partnership Agreement[1] and the Uniform Limited Partnership Act (2001), Ark. Code Ann. §§ 4-47-101 *et seq.*

19.     Pursuant to Section 3.1 of the Partnership Agreement, one of the entity's core purposes was to "operate as a one bank holding company owning a controlling interest in the common stock of Bank of England, a state-chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies."

20.     As before, upon its conversion, the Partnership had only one General Partner: Mrs. Canada.

21.     Mrs. Canada has always been the Partnership's only legally recognized General Partner.

**Formation of CBI.**

22.     In the mid-2010s, the Bank family also established CBI as a holding company of the Bank.

23.     Over time, through a handful of transactions, CBI became the Bank's sole shareholder.

24.     Several months after the formation of CBI, its shareholders entered into a Shareholders Agreement.[2]

---

[1] A true and correct copy of the Partnership Agreement is attached as **Exhibit 1**.

[2] A true and correct copy of the Shareholders Agreement is attached hereto as **Exhibit 2**.

25.     The Shareholders Agreement restricts CBI's shareholders, officers, directors, and other agents from effecting any change to the Bank's Board of Directors without the Partnership's prior written authorization. **Ex. 2** § 12(c).

26.     Since CBI's original issuance of shares of its stock, the Partnership has always owned well in excess of a majority of the total issued and outstanding shares of CBI stock.

27.     As long as CBI has been the sole shareholder of the Bank, it has served as the intermediate holding company situated between the Bank and the Partnership, the Bank has served as the operating company, and the Partnership (until its recent dissolution) has served as the ultimate parent entity and holding company with supreme authority and control over the Bank.

### The Partnership's Dissolution.

28.     After serving as the Partnership's General Partner for decades, Mrs. Canada was sadly diagnosed with Alzheimer's disease at the Mayo Clinic in Rochester, Minnesota in 2020.

29.     Since that time, Mrs. Canada's cognitive abilities have deteriorated steadily.

30.     More recently, third-parties began taking advantage of Mrs. Canada's cognitive decline to their benefit and to Mrs. Canada's detriment.

31.     Seeking to protect his wife's well-being, Mr. Canada, Sr. initiated a guardianship action on September 12, 2025, in the Circuit Court of Lonoke County, Arkansas.

32.     On September 12, 2025, the Lonoke County Circuit Court appointed Mr. Canada, Sr. as Mrs. Canada's emergency guardian. A true and correct copy of the Lonoke County Circuit Court's Order appointing Mr. Canada, Sr. as his wife's emergency guardian is attached hereto as **Exhibit 3**.[3]

---

[3] Exhibit 3 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Order. Accordingly, CBI will file a Motion for Leave to File Exhibit 3 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

5

33.    A month later, the Lonoke County Circuit Court issued Letters of Temporary Guardianship to Mr. Canada, Sr. and Mrs. Canada Luebke, as co-guardians of Mrs. Canada's person and estate (the "Letters"). A true and correct copy of the Letters is attached hereto as **Exhibit 4**.[4]

34.    The Letters operated as an extension of Mrs. Canada's guardianship. Stated differently, although the terms of Mrs. Canada's guardianship have changed, there has been no interruption in Mrs. Canada's guardianship since September 12, 2025.

35.    As of the date and time of this filing, Mr. Canada, Sr. and Mrs. Canada Luebke are still serving as co-guardians of Mrs. Canada's person and estate.

36.    Arkansas's Limited Partnership Act provides that a general partner is dissociated automatically by operation of law upon the appointment of a guardian for such general partner:

> A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.

Ark. Code Ann. § 4-47-603(7)(B).

37.    Accordingly, Mrs. Canada was dissociated as General Partner of the Partnership by operation of law upon the Lonoke County Circuit Court's appointment of Mr. Canada, Sr. as her guardian on September 12, 2025.

38.    Arkansas's Limited Partnership Act further provides that a limited partnership is automatically dissolved by operation of law after the dissociation of a general partner if the partnership does not have a remaining general partner and the limited partners fail to admit a general partner within 90 days:

> A limited partnership is *dissolved*, and its activities *must be* wound up, only upon the occurrence of any of the following:
>
> . . .
>
> (3) after the dissociation of a person as general partner:

---

[4] Exhibit 4 is redacted because the Lonoke County Circuit Court sealed the lion's share of the guardianship proceedings, including the Letters. Accordingly, CBI will file a Motion for Leave to File Exhibit 4 under seal and file an unredacted copy of the exhibit under seal following this Court's entering an Order granting such relief.

(B) if the limited partnership does not have a remaining general partner, the passage of 90 days after the dissociation, unless before the end of the period:

(i) consent to continue the activities of the limited partnership and admit at least one general partner is given by the limited partners owning a majority of the rights to receive distributions as limited partners at the time the consent is to be effective; and

(ii) at least one person is admitted as a general partner in accordance with the consent . . . .

Ark. Code Ann. § 4-47-801(3)(B) (emphasis added).

39. The Partnership Agreement, too, requires immediate dissolution of the Partnership following the dissociation of all general partners if a successor general partner is not admitted within 90 days:

Section 6.9   Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be.

. . .

Section 10.1   Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:

(c) Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.

Ex. 1, §§ 6.9, 10.1(c) (emphasis added).

40. The Partnership's Limited Partners did not admit a General Partner to replace Mrs. Canada within 90 days of her dissociation on September 12, 2025.

7

41. The Limited Partners did not consent to continue the activities of the Partnership at any time following Mrs. Canada's dissociation on September 12, 2025, at least up until the date and time of this filing.

42. Both the Partnership Agreement and Arkansas's Limited Partnership Act require the dissolution of the Partnership following the dissociation of all general partners if one or more substitute general partners are not appointed within ninety (90) days. **Ex. 1,** §§ 6.9 and 10.1(c); Ark. Code Ann. § 4-47-801(3)(B).

43. The Partnership was without a General Partner for the 90-day period that ended on December 11, 2025.

44. Thus, on December 12, 2025, the Partnership dissolved immediately and automatically by operation of law and the Partnership Agreement.

45. Accordingly, the Arkansas Secretary of State certified the Partnership's dissolution, effective December 12, 2025. A true and correct copy of the Secretary of State's certification is attached hereto as **Exhibit 5.**

**CBI Takes Over.**

46. Following the Partnership's dissolution, the Partnership's control over the Bank terminated, and CBI became the Bank's sole holding company.

47. Accordingly, CBI no longer defers to the Partnership in the election or removal of directors of the Bank.

48. As the Bank's sole holding company, CBI is entitled to, among other things, set strategy and governance (i.e., by appointing Bank leadership and board members as well as setting growth plans and direction), manage capital and funding, and interact directly with the Agencies.

**The Agencies Abdicate.**

49.     Federal law grants the Federal Regulators tremendous regulatory oversight over bank holding companies, largely through the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.*, and the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*

50.     Bank holding companies' actions and omissions are meticulously scrutinized by the Federal Regulators, and bank holding companies must frequently seek Federal Regulators' approval to take certain actions. *See, e.g.*, 12 U.S.C. § 1842(a) (requiring the Board's approval for a litany of transactions involving bank holding companies); 12 C.F.R. § 225.72 (requiring certain regulated institutions to provide the Board with written notice of changes in leadership or board membership); 12 U.S.C. § 1831i (requiring certain regulated institutions to provide the FDIC with written notice of changes in leadership or board membership and an opportunity to disapprove them).

51.     If the holding company owns a state-chartered bank, like the Bank here, then the holding company must also contend with government entities like the State Regulator.

52.     Often, the Agencies' regulatory duties overlap significantly. *See, e.g.*, 12 U.S.C. § 1842(b)(1) (requiring the Board to solicit and consider the "views and recommendations" of the State Regulator in certain transaction-approval decisions); *see also* Ark. Code Ann. § 23-46-205 ("The Bank Commissioner shall be charged with the general supervision of financial institutions, the execution of all laws passed by the State of Arkansas relating to the organization, operations, inspection, supervision, control, liquidation, and dissolution of banks, bank holding companies, subsidiary trust companies, and the general commercial banking business of Arkansas, and such other duties as prescribed by law.").

53.     Part and parcel of the Agencies' duties is (i) recognizing the proper owner of a regulated institution, and (ii) interacting with that owner to ensure regulatory compliance.

54.     Although (i) CBI owns all issued and outstanding shares of the Bank's stock, and (ii) the Partnership is dissolved, the Agencies refuse to recognize CBI's status as the Bank's owner.

9

55. Worse yet, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among members of the Bank family over the winding up of the Partnership's business.

56. The Agencies refusal to recognize CBI as the Bank's owner has caused and will cause catastrophic consequences, among others: (i) governance paralysis—the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption—vendors, other banks, and market participants will freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

57. In short, the Agencies' conduct has caused CBI (and the Bank) to suffer irreparable harm and the Agencies' continued refusal to recognize CBI's status will perpetuate irreparable harm on CBI (and the Bank).

## CAUSES OF ACTION

### Count 1: Declaratory Judgment

58. CBI realleges and reasserts the allegations contained in the preceding paragraphs of this Verified Complaint.

59. Pursuant to the United States Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, CBI seeks this Court's declaration that (i) the Partnership is dissolved, (ii) CBI owns the Bank.

60. This is an active and justiciable controversy because CBI has sought to act as the Bank's owner before the Agencies and the Agencies have refused to recognize CBI's status.

61. Worse yet, the Agencies have refused to recognize anyone's status as the Bank's owner.

62. The FDIC and the State Regulator asserted, in writing, that the Bank's ownership *"remains a private legal issue that [they] have no jurisdiction over."*

63. Although the Board has not put it in writing, the Board has expressed the same opinion verbally during meetings over the Bank's ownership.

64. There is uncertainty regarding the parties' legal relations in this instance.

### NATURE OF RELIEF SOUGHT

65. CBI requests that this Court award it the following relief:

    a. Declare that (i) the Partnership is dissolved, and (ii) CBI is the sole holding company with control over the Bank;

    b. Pursuant to Fed. R. Civ. P. 65, preliminarily and permanently enjoin the Agencies to recognize CBI's status as the Bank's owner;

    c. All other relief that this Court deems just and proper.

WHEREFORE, Plaintiff Canada Bancshares, Inc. respectfully requests that this Court enter judgment in its favor against the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation, and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department; enjoin the Board of Governors of the Federal Reserve System, Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors, Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation,

11

and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank

Department as requested herein; and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ David S. Mitchell, Jr.*

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

## <u>VERIFICATION</u>

I, Gary Canada, Sr., state on oath that the foregoing facts set forth in this Verified Complaint are true and correct to the best of my knowledge, information, and belief.

_Gary Canada Sr._

Gary Canada, Sr.

Dated __3-9-2.6__, 2026

STATE OF __Arkansas__       )

                            ) ss.

COUNTY OF _____      )

SUBSCRIBED and SWORN to before me, the undersigned duly commissioned, qualified, and acting Notary Public this __09__ day of __March__ 2026.

In witness whereof I hereunto set my hand and official seal

_Sharon Broderick_

Notary Public

My Commission Expires: __12-19-2034__



# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

**EXHIBIT**

**1**

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
# AGREEMENT OF LIMITED PARTNERSHIP
## (As Amended and Restated)

**ARTICLE I**
**FORMATION AND ORGANIZATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
Section 1.1     Formation of Partnership . . . . . . . . . . . . . . . . . . . . . . . . -1-
Section 1.2     Organization Certificates; Filings . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.3     Partnership Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.4     Principal Office and Agent . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.5     Term of Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-
Section 1.6     Copies to Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

**ARTICLE II**
**DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

**ARTICLE III**
**PURPOSES AND POWERS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
Section 3.1     Purposes of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . -5-
Section 3.2     Powers of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . -5-

**ARTICLE IV**
**ADMISSION OF LIMITED PARTNERS** . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
Section 4.1     Admission of Limited Partners . . . . . . . . . . . . . . . . . . . . . . -6-
Section 4.2     Completion of Admission . . . . . . . . . . . . . . . . . . . . . . . . . -6-

**ARTICLE V**
**CONTRIBUTIONS OF THE PARTNERS** . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

**ARTICLE VI**
**RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
Section 6.1     Rights and Powers of the General Partners as Managers . . . . . . . . . -7-
Section 6.2     Limitations on General Partners' Authority . . . . . . . . . . . . . . . . . . -7-
Section 6.3     Limitation on Exercise of Rights Regarding Life Insurance . . . . . . -8-
Section 6.4     Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

Section 6.5    Duties of the General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Section 6.6    Obligations not Exclusive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Section 6.7    Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

Section 6.8    Admission of Additional General Partner . . . . . . . . . . . . . . . . . . . -10-

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General
    Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

Section 6.10   Indemnification of the General Partners . . . . . . . . . . . . . . . . . . . . -10-

Section 6.11.  Limited Liability of the General Partners . . . . . . . . . . . . . . . . . . . -11-


ARTICLE VII
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS . . . . . . . . . . . . . . -11-

Section 7.1    Rights of a Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

Section 7.2    Assignments of Limited Partnership Interests . . . . . . . . . . . . . . . . -12-

Section 7.3    Assignments of Distributive Rights . . . . . . . . . . . . . . . . . . . . . . . . -12-

Section 7.4    Partnership Option to Purchase a Limited Partner's Interest . . . . . -13-

Section 7.5    Limited Partner's Status Upon Death or Incompetency . . . . . . . . . -14-

Section 7.6    Limited Put Option of Certain Permitted Transferees . . . . . . . . . . -14-


ARTICLE VIII
COMPENSATION OF THE GENERAL PARTNERS . . . . . . . . . . . . . . . . . . -15-

Section 8.1    Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

Section 8.2    Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-


ARTICLE IX
DISTRIBUTIONS AND
ALLOCATIONS OF INCOME AND LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

Section 9.1    Distributions of Distributable Cash . . . . . . . . . . . . . . . . . . . . . . . . -15-

Section 9.2    Allocation of Certain Income and Losses for Tax Purposes . . . . . -15-

Section 9.3    Allocations Upon Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-


ARTICLE X
DISSOLUTION AND PRIORITY ON DISTRIBUTION . . . . . . . . . . . . . . . . -16-

Section 10.1   Dissolution and Termination of the Partnership . . . . . . . . . . . . . . -16-

Section 10.2   Liquidation and Priorities on Distribution . . . . . . . . . . . . . . . . . . -16-

**ARTICLE XI**

**ACCOUNTING AND BUSINESS MATTERS** . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.1   Books of Accounts and Records   . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.2   Accounting Method   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.3   Financial Statements and Reports   . . . . . . . . . . . . . . . . . . . . . -17-

Section 11.4   Fiscal Year   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 11.5   Bank Accounts   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

**ARTICLE XII**

**ELECTIONS**   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.1   Adjustment Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.2   Depreciation Elections   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

Section 12.3   Election with Respect to Taxation as Partnership   . . . . . . . . . . . . -18-

Section 12.4   Other Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

**ARTICLE XIII**

**AMENDMENTS**   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

**ARTICLE XIV**

**MISCELLANEOUS**   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.1   Notices   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.2   Further Acts   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.3   Paragraph Headings   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.4   Severability   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.5   Application of Arkansas Law   . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.6   Survival of Rights   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

Section 14.7   Interpretation   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.8   Execution in Counterparts   . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.9   Waiver of Action for Partition . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.10  Tax Matters Partner   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.11  Entire Agreement   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.12  Arbitration   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

Section 14.13  Confidentiality   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -iii-

# MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP
## AGREEMENT OF LIMITED PARTNERSHIP
### (As Amended and Restated)

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (hereinafter referred to as the "Agreement"), is entered into effective as of the __1__ day of _____April_____, 2004, by and among MARY HANNA BOLES CANADA, and any other parties who may be admitted to the Partnership as General Partners pursuant to the provisions of Section 6.8 herein (hereinafter collectively referred to as the "General Partners" or individually as "General Partner"), and MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR., Trustee of the GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA, Trustee of the BRADLEY SETH CANADA TRUST I, and HANNA NICOLE CANADA, Trustee of the HANNA NICOLE CANADA STEWART TRUST I, and any other parties who may be admitted to the Partnership as Limited Partners pursuant to the provisions of Sections 4.1 and 7.2 herein below (hereinafter referred to collectively as the "Limited Partners" and individually as "Limited Partner").

WHEREAS, on July 21, 1997, MARY HANNA BOLES CANADA, the General Partner and the Limited Partners entered into the Agreement of Limited Partnership pursuant to which the Partnership was formed under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I.

WHEREAS, effective as of the date aforesaid, the Agreement of Limited Partnership was amended and restated as a limited liability limited partnership (as defined in Section 1.1 hereinbelow) under the name MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinbelow contained, the adequacy of which consideration is hereby acknowledged, the parties agree as follows:

## ARTICLE I
## FORMATION AND ORGANIZATION

Section 1.1    Formation of Partnership.    Pursuant to the Arkansas Revised Limited Partnership Act of 1991, A.C.A. § 4-43-101 *et seq.*, as from time to time amended, including Act 912 of the 1997 Acts of Arkansas, hereinafter collectively referred to as the "Act," the parties hereto hereby form a registered limited liability limited partnership, which organization is hereinafter referred to as the "Partnership." The rights and liabilities of the Partners (as "Partners" is defined in Article II hereinbelow) shall, except as hereinafter expressly stated to the contrary, be as provided for in the Act.

Section 1.2    Organization Certificates: Filings.    The General Partners hereto shall immediately execute, file, record and/or publish the Application and the Certificate (as "Application" and "Certificate" are defined in Article II hereinbelow) and other documents conforming hereto, and take all other appropriate action to comply with all legal requirements for the formation of a registered limited liability limited partnership under the Act and its operation in the State of Arkansas. The General Partners shall file and publish any other notices, certificates, statements or other instruments required or permitted by any provision of any law in the United States or any state or other jurisdiction which may govern the formation of this Partnership or the conduct of its business from time to time. The General Partners shall cause the Partnership to file any further amendments to the Application and/or Certificate or such other documents as shall be required by A.C.A. §§ 4-43-202, 4-43-1110 and 4-42-703 in order to preserve the valid existence of the Partnership as a registered limited liability limited partnership and the limited liability of the Partners.

Section 1.3    Partnership Name. The business of the Partnership shall be conducted under the name of the MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP, an Arkansas registered limited liability limited partnership, and under such name or variations thereof in the other jurisdictions as the General Partners deem appropriate.

Section 1.4    Principal Office and Agent. The principal place of business and physical address of the Partnership shall be located at: 105 Cherry St., England, AR 72046, and the mailing address of the Partnership shall be: 105 Cherry St., England, AR 72046. The agent for service of process shall be MARY HANNA BOLES CANADA at the above business address.

Section 1.5    Term of Partnership. The Partnership shall become effective upon the filing of the Application and the Certificate and the payment of the filing fee therefor, in the office of the Arkansas Secretary of State, Little Rock, Arkansas, as required by the Act and shall remain effective until the earlier to occur of:

(a)    December 31, 2046; or

(b)    The date the Partnership is dissolved pursuant to the Act or any provisions of this Agreement.

The period of time between the date the Partnership becomes effective and the date it ceases to be effective shall be referred to herein as "Partnership Term."

Section 1.6    Copies to Partners. The General Partners shall promptly deliver or mail a filed copy of the Certificate and any amendment thereto to each of the Limited Partners.

## ARTICLE II
## DEFINITIONS

Whenever used in this Agreement the terms set forth below shall be defined as follows:

(a)     The "Application" shall mean the Application for Registration of a Limited Liability Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-1110, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(b)     The "Certificate" shall mean the Certificate of Limited Partnership to be filed on behalf of the Partnership as required by A.C.A. § 4-43-206, all similar certificates required by the laws of other jurisdictions in which the Partnership does business, and all amendments thereto and substitutions thereof.

(c)     "Code" shall mean the Internal Revenue Code of 1986, as amended.

(d)     "Distributable Cash" shall mean, at the time of determination for any period (on the cash receipts and disbursements method of accounting), the net cash derived from the conduct of the Partnership's business and operations, from its investments (including distributions from entities owned by the Partnership) and (except as limited below) cash proceeds from the sale or other disposition of Partnership Properties, but only after reasonable reserves of cash have been set aside by the General Partners for working capital, capital improvements and replacements, debt service, current and reasonably projected expenses, and other cash requirements, including current and reasonably projected investment opportunities, all in keeping with the Partnership purposes. For purposes of this subsection, all capital contributions, any borrowed funds, and cash proceeds attributable to the sale or other disposition of any of the Partnership Properties which were contributed to the Partnership or which were purchased with borrowed funds, shall be considered necessary for business and investment purposes and shall be excluded from Distributable Cash. In determining Distributable Cash the General Partners shall be subject to the duties imposed by Section 6.5 and shall have the duty to take into account the cash needs of the Partnership in its business, the funds necessary in the operation of its business until the income from further operations is available, the amounts of its debts, the necessity or advisability of paying its debts, or at least reducing them within the limits of the Partnership's credit, and the character of its surplus cash.

(e)     "Fair Market Value" shall be the price at which a willing seller and willing buyer, neither under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, would pay and accept in an arm's length transaction for such interest in the Partnership or any Partnership Property. The Fair Market Value of an interest in the Partnership shall be determined taking into account all factors relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held partnership interests having the rights and restrictions provided

F:\HOME\HARRIS\MHBC-amd-rest.mgr.wpd                    -3-

under this Agreement and applicable Arkansas law including, but not limited to, the restrictions upon withdrawal before the end of the term of the Partnership. In the event it becomes necessary to value any interest in the Partnership or any Partnership Property, the Fair Market Value of the property shall be determined by agreement of the parties involved, or in the absence of such agreement, by an individual appraiser or appraisal firm mutually acceptable to such parties. In the event the parties involved are unable to agree on the individual appraiser or firm to perform the valuation, each party shall select an appraiser, and such appraisers shall first attempt to jointly determine the Fair Market Value of the Partnership interest or Partnership Property by mutual agreement, but if they are unable to agree on such valuation, such appraisers shall select a third appraiser, and the fair market value shall be determined by the average of the two (2) closest appraisals. Any valuation so determined shall be binding and conclusive on the parties absent manifest error. The cost of any such appraisal(s) shall be borne, in the case of a valuation of a Partnership interest, equally by the seller and the purchaser, and in the case of a valuation of any Partnership Property, equally by each individual Partner or group of Partners having conflicting interests in such appraisal.

(f)    "General Partners" shall mean MARY HANNA BOLES CANADA, and/or any other person or entity appointed in accordance with the provisions of this Agreement to replace, or in addition to, the aforesaid persons. "General Partner" shall mean, and refer to, any of the General Partners individually.

(g)    "Limited Partners" shall mean MARY HANNA BOLES CANADA, GARY RECTOR CANADA, GARY RECTOR CANADA, JR. TRUST I, BRADLEY SETH CANADA TRUST I and HANNA NICOLE CANADA STEWART TRUST I, and any other person or entity who or which shall be admitted to the Partnership, pursuant to Section 4.1 or Section 7.2, and thereby becomes an owner of an interest in the Partnership. "Limited Partner" shall mean, and refer to, any of the Limited Partners individually.

(h)    "Partners" shall mean the General Partners and all Limited Partners.

(i)    "Partnership Properties" shall mean all properties (real, personal and mixed), and all rights, titles, interests and estates of every nature whatsoever incident thereto, owned by the Partnership. "Partnership Property" shall mean any one of the Partnership Properties.

(j)    The "Sharing Ratio" of a Partner shall be the ratio of the Partner's Units to the total Units outstanding.

(k)    A "Unit" shall represent a 0.1 percent interest of capital and profits in the Partnership, and the Partnership shall be authorized to issue one thousand (1,000) Units. Each Partner shall be entitled to cast one (1) vote per Unit on all matters in which all Partners are herein given the right to vote.

(l)    "Permitted Transferee" shall mean the initial Limited Partners named above, all of their lineal descendants, and trusts for the exclusive benefit of any of them.

## ARTICLE III
## PURPOSES AND POWERS

Section 3.1    Purposes of the Partnership. The Partnership shall not be deemed to exist for a specific purpose; rather, the purpose of the Partnership is to manage the Partnership Properties by conducting any business which lawfully may be conducted in limited partnership form. Some of the more particular purposes of the Partnership are as follows:

(a)    To operate as a one bank holding company owning a controlling interest in the common stock of the Bank of England, a state chartered bank, and to engage in all other lawful activities permitted to state chartered bank holding companies;

(b)    To provide flexibility in the management of Partnership Properties not available through the use of trusts, corporations and business entities; and

(c)    To identify the nature of the partners's partnership interests as separate property rather than marital property or community property.

(d)    To avoid the fractionalization of the ownership of certain Partnership Properties of various family members in order to receive a higher price in the event of a sale of any of the Partnership Properties.

Section 3.2    Powers of the Partnership. The specific purposes of the Partnership may, in instances where the Partners deem such action appropriate and to the extent Partnership funds are available therefor, be accomplished by:

(a)    Acquiring and disposing of Partnership Properties for cash, securities, other property, or any combination thereof upon such terms and conditions as the General Partners may from time to time determine (including, in instances where the property is encumbered, on either an assumption or a "subject to" basis);

(b)    Acquiring, owning, holding, improving, managing and leasing properties used in investment operations, and reinvesting the income and proceeds thereof, either alone or in conjunction with others, through partnerships, limited partnerships (or other partnerships in which certain partners have limited liability), joint ventures, or other business associations or entities;

(c)    Investing and reinvesting any of the Partnership Property or income of the Partnership, whether or not the original purpose for the investment has been accomplished, it being understood by the Partners that the investment objectives of the Partnership are to continue until the end of the Partnership Term and until the Partnership is dissolved and its affairs wound up.

(d)    Financing its activities by commercially reasonable methods on such terms and conditions as the General Partners deem appropriate. In instances where money is borrowed for Partnership purposes, the General Partners shall be and hereby are authorized to pledge, mortgage, encumber and grant security interests in Partnership Properties for the repayment of such loans;

(e)    Employing, retaining or otherwise securing, or entering into other contracts with persons or firms to assist in the acquisition, developing, improving, managing, and general operation of the Partnership Properties, all on such terms and for such consideration as the General Partners deem reasonably advisable;

(f)    Depositing Partnership funds in an account or accounts to be established at such time or times in such financial institutions (including any state or federally chartered bank or savings and loan association) and authorizing withdrawals of such funds by such persons at such times, and in such amount, as the General Partners may designate;

(g)    As to those Partnership funds which are not then required for Partnership purposes yet which the General Partners deem untimely to be distributed to the Partners, purchasing U. S. Treasury Bills, certificates of deposit, bonds, other certificates or evidences of indebtedness, stocks, real property, or other investment securities or property as the General Partners reasonably deem appropriate;

(h)    Taking any and all other action which is permitted under the Act and which is customary or reasonably related to the real, personal or mixed property incidental thereto; and

(i)    Taking any other action which is legally permissible.

## ARTICLE IV
## ADMISSION OF LIMITED PARTNERS

Section 4.1    Admission of Limited Partners.  No additional Limited Partners shall be admitted except by affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units.  As distinguished from the admission of additional Limited Partners, no assignee of all or part of a Limited Partner's Units shall be substituted as a Limited Partner except under the conditions and restrictions and upon completion of all of the requirements of Article VII of this Agreement.

Section 4.2    Completion of Admission.  Subject to the other terms of this Agreement, a person shall become a Limited Partner when he or she shall have completed all of the following:

(a)    Executed a counterpart of this Agreement; and

(b)    Executed any other document, certificate or instrument, and taken such other action as the General Partners may reasonably request to evidence and perfect such person's admission as a Limited Partner.

## ARTICLE V
## CONTRIBUTIONS OF THE PARTNERS

The Partners shall initially contribute to the Partnership the property described on Exhibit A attached hereto in exchange for all of the outstanding Units. The general partnership interests of each General Partner shall be maintained separately from any limited partnership interests of the General Partners. The number of Units owned by each of the Partners is reflected on Exhibit B attached hereto. The Partners may make additional contributions to the Partnership, provided that the Sharing Ratios of all the General Partners, taken together, shall be equal to at least one percent (1%) at all times during the Partnership Term. No Partner shall be entitled to interest on capital contributions to the Partnership, or to withdraw any part of such Partner's capital account, except as specifically provided herein.

## ARTICLE VI
## RIGHTS, POWERS AND OBLIGATIONS OF THE GENERAL PARTNERS

Section 6.1    Rights and Powers of the General Partners as Managers. Each General Partner shall be entitled to cast one (1) vote per Unit of general partnership interest in all matters in which the General Partners are herein given the right to vote as a class or individually as a Partner. A majority vote shall be required to take any action by the General Partners. Subject to the limitations of this Agreement, and to the limitations imposed upon them by law, the General Partners shall have full, exclusive and complete discretion to manage and control, and shall make all decisions affecting, the Partnership business. The General Partners shall have full authority to take any action described by Article III hereof and to exercise all rights and powers generally conferred by law in connection therewith. The rights and powers of the General Partners described in this Section 6.1 shall be in addition to and not in limitation of any other rights and powers of the General Partners described in this Agreement or provided by law.

Section 6.2    Limitations on General Partners' Authority. The General Partners shall not have authority to:

(a)    Do any act in contravention of this Agreement without the written consent of all the Partners.

(b)    Do any act which would make it impossible to carry on the ordinary business of the Partnership, or which may make it impossible to carry on the ordinary business of the Partnership, without the written consent of all the Partners.

(c)    Admit a person as a General Partner, except as provided in this Agreement and the Act.

(d)    Admit a person as a Limited Partner, except as provided in this Agreement and the Act.

(e)    Cause the Partnership to make any loan to any of the General Partners or any of their affiliates without the written consent of the Partners owning a majority-in-interest of the outstanding Partnership Units.

(f)    Commingle the Partnership's funds with those of any other person, except with respect to (1) joint ventures or other joint investments permitted by this Agreement and (2) general disbursement accounts controlled by the General Partners, without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(g)    Knowingly perform any act that would subject any Limited Partner to liability as a general partner in any jurisdiction.

(h)    Sell, assign, exchange, lease, or otherwise dispose of, or mortgage, pledge, or otherwise encumber all or substantially all of the real or personal property of the Partnership without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(i)    Enter into agreements with a General Partner or any affiliate of a General Partner without the written consent of Partners owning a majority-in-interest of the outstanding Partnership Units.

(j)    Terminate a contract, agreement, or compensation to a Partner, or an affiliate of a Partner, without the approval of Partners owning a majority-in-interest of the outstanding Partnership Units.

(k)    For purposes of this Section 6.2 the term "affiliate" of a General Partner shall mean any person that directly or indirectly controls, or is controlled by or is under common control with, the General Partner, and shall include the family members of the General Partner and any officer or director of the General Partner and the family members of any such officer or director.

Section 6.3    Limitation on Exercise of Rights Regarding Life Insurance. Any provision of this Agreement to the contrary notwithstanding, if at any time the Partnership possesses any incidents of ownership (as that term is defined under § 2042 of the Code and the Treasury Regulations thereunder) in any policy or policies of life insurance upon the life of any General Partner (the "Insured General Partner"), then the Insured General Partner shall be prohibited and excluded from voting upon or otherwise participating in the exercise of any such rights with respect to any policies of insurance upon the life of that Insured General Partner, including without limitation, the right to borrow from the cash value of the policy and the right to control the application of policy dividends.

Section 6.4    Third Parties. Any Person dealing with the Partnership or the General Partners may rely upon a certificate signed by the General Partners, or any of them, as to the accuracy

of the statements therein or as to the authority of the General Partners to make any commitment or undertaking on behalf of the Partnership, including certificates as to (1) the identity of any General Partner or Limited Partner hereof, (2) the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the General Partners or in any other manner are germane to the affairs of the Partnership, (3) the persons who are authorized to execute and deliver any instrument or document of the Partnership, or (4) any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

Section 6.5    Duties of the General Partners. The General Partners shall discharge their duties to the Partners and the Partnership, and shall exercise their powers under the Act and under this Agreement, consistent with the duty of loyalty and the duty of care set forth in A.C.A. §4-46-404 and consistent with the obligation of good faith and fair dealing therein. The General Partners do not guarantee the return of any Partner's capital contributions. Under no circumstances shall the General Partners be personally liable to a Limited Partner for any deficit in a Limited Partner's capital account.

Section 6.6    Obligations not Exclusive. The General Partners shall be responsible for the management of the Partnership's business, it being understood that the General Partners may be fairly compensated for services rendered. The General Partners may delegate such portion of the managerial responsibilities as is reasonably deemed necessary to any other party at the Partnership's expense.

Section 6.7    Power of Attorney. By the execution of this Agreement, or a counterpart hereof, a Limited Partner does irrevocably constitute and appoint the General Partners (or any successor General Partner) his or her true and lawful attorneys-in-fact and agents to effectuate, with full power and authority to act in the name, place and stead in effectuating, the purposes of the Partnership, including the execution, acknowledgment, delivering, filing and recording of all Certificates, documents, deeds, bills of sale, assignments and other instruments of conveyance, leases, contracts, loan documents and/or counterparts hereof, and all other documents which the General Partners may deem necessary or reasonably appropriate:

(a)    To qualify or continue the Partnership as a limited partnership (or a partnership in which certain partners have limited liability) in all jurisdictions in which the Partnership conducts business;

(b)    To reflect a modification of the Partnership, or an amendment of this Agreement and/or the Certificate;

(c)    To accomplish the purposes and carry out the powers of the Partnership as set forth in Article III and in this Article VI; or

(d)    To reflect the dissolution and termination of the Partnership.
The power of attorney granted herein:

(1)    Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, incompetency or legal disability of any Limited Partner;

(2)    May be exercised by the General Partners, or any of them, for each Limited Partner (or any of them) by listing all (or any) of the Limited Partners required to execute any such instrument and executing such instrument in such manner as the General Partners may reasonably deem appropriate; and

(3)    Shall be binding on any assignee or vendee of a Limited Partnership interest hereunder or any portion thereof, including an assignee of only the distributive rights relating thereto.

Section 6.8    Admission of Additional General Partner. The General Partners shall not, without the written consent of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, admit any additional or substitute General Partner to the Partnership.

Section 6.9    Death, Withdrawal, Bankruptcy, Incompetency, or Removal of the General Partners. In the event of the death, withdrawal, adjudication of bankruptcy, incompetency or removal of all General Partners, the Partnership shall be dissolved within ninety (90) days unless the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall agree to continue the Partnership with another person or persons to serve as General Partner or General Partners, as the case may be; provided, however, the death, withdrawal, adjudication of bankruptcy, incompetency or removal with respect to one (1) General Partner, but not all General Partners, shall not cause the Partnership to be dissolved. In the event the Partnership is continued, the Agreement of Limited Partnership shall be properly amended and the new General Partner(s) shall succeed to all rights, duties and responsibilities of the General Partners. By affirmative vote of the owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units, a General Partner may be removed for breach of any fiduciary duty and for any breach of this Agreement in any material respect. Furthermore, in the event of a General Partner's death, resignation, removal, or adjudication of bankruptcy or incompetency, then the General Partner shall become a Limited Partner and a successor General Partner may then be appointed pursuant to the terms set forth herein.

Section 6.10    Indemnification of the General Partners. The General Partners shall be indemnified and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, arising out of or incidental to the General Partners' management of the Partnership affairs while the General Partners were in the course of managing the Partnership affairs; provided, however, a General Partner shall not be entitled to indemnification hereunder where the claim at issue is based upon:

(a)    The proven gross negligence or willful misconduct of the General Partner; or,

(b)    The proven breach by the General Partner of any provision of this Agreement.

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -10-

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the General Partners shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 6.11. Limited Liability of the General Partners. The General Partners' liability for the obligations of the Partnership and certain acts of other Partners, employees, agents, or representatives of the Partnership is limited to the extent provided in A.C.A. §§ 4-43-1110 and 4-42-307.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 7.1   Rights of a Limited Partner. Each Limited Partner shall be entitled to cast one (1) vote per Unit of ownership on all matters in which the Limited Partners are herein given the right to vote as a class or individually as a Partner.  A Limited Partner shall not be:

(a)   Personally liable for any of the debts or other liabilities of the Partnership (except to the extent expressly set forth in A.C.A. § 4-43-303);

(b)   Personally liable, merely because of his or her interest in the Partnership, for any losses or liabilities of any other Limited Partner;

(c)   Allowed to take part in the management or control of the Partnership business, or to sign for or to bind the Partnership, such power to remain vested solely and exclusively in the General Partners; or

(d)   Entitled to be paid any salary or to have a Partnership drawing account; provided, however, the General Partners have the power to employ one or more Limited Partners at a salary commensurate with services actually rendered to the Partnership.

No Limited Partner shall have the right to withdraw from the Partnership or to receive a return of any of his or her contributions to the Partnership until the Partnership is terminated and its affairs wound up in accordance with § 801, *et seq*. of the Act and this Agreement.  A Limited Partner shall be in breach of this Agreement if the Limited Partner (1) attempts to withdraw from the Partnership, (2) interferes in the management of the Partnership affairs, (3) engages in conduct which could result in the Partnership losing its tax status as a partnership, (4) engages in conduct that tends to bring the Partnership into disrepute, (5) owns Partnership Units which become subject to a charging order, attachment, garnishment, or similar legal proceeding, (6) breaches any confidentiality provisions of this Agreement, (7) fails to meet any legally binding commitment to the Partnership, or (8) otherwise breaches any other term or condition contained herein.  A Limited Partner who is in breach of this Agreement shall be liable to the Partnership for damages caused by the breach.  The Partnership may offset any such damages against any distributions or return of capital to the Limited

Partner who has breached this Agreement. No Limited Partner shall have the right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise.

Section 7.2    Assignments of Limited Partnership Interests. A Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner (as defined in A.C.A. § 4-43-101(6)) only after all of the following steps have first been completed:

(a)    The written approval of the General Partners and of the Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units shall have been given to the specific person or entity proposed to be substituted;

(b)    The vendee(s) or assignee(s) to be substituted, the General Partners, and all Limited Partners (either individually or by virtue of the General Partners' powers of attorney set forth in this Agreement) shall have executed an appropriate amendment to all certificates, instruments and documents, and taken all such additional action as the General Partners may deem appropriate to the completion of such sale or assignment; and

(c)    If requested by the General Partners, legal counsel for the Partnership has rendered an opinion that the transfer is not in violation of any provisions of this Agreement or any other representations made by the Limited Partner to the Partnership regarding the Limited Partner's investment intent.

Within thirty (30) days after the completion of the above required steps, the General Partners shall forward documents to the substituted Limited Partner indicating such Partner's participation in the Partnership, on such form as the General Partners may adopt and, from time to time, revise or amend. Any purported sale or assignment consummated without first complying with Section 7.2 shall, as between the General Partners, on the one hand, and the assignor/vendor and assignee/vendee, on the other hand, be null and void.

The foregoing provisions of Section 7.2 to the contrary notwithstanding, a Limited Partner may sell or assign all or part of his or her interest in the Partnership and thereby constitute his or her vendee or assignee a Limited Partner without the consent of the Partners if the transferee is a Permitted Transferee.

Section 7.3    Assignments of Distributive Rights. A Limited Partner may not assign all or any portion (in whole or fractional Units) of his or her right to receive distributions hereunder without the prior written consent of the General Partners and of Partners owning at least seventy-five percent (75%) in interest of the outstanding Partnership Units. In addition, no such assignment shall be effective as to the General Partners until the General Partners have first received a copy of the instrument of assignment, executed by both the assignor and the assignee of such distributive right. Once the assignment has been received by the General Partners, the General Partners may (but shall not be obligated to), without requesting further documentation from either the assignor or the

assignee, remit directly to the named assignee all distributions to which the assignee may be entitled pursuant to the provisions of this Agreement and the assignment. So long as the party to whom such distributive share was remitted was either the assignor Limited Partner or the assignee named in the instrument of assignment, the General Partners shall be free from liability to any person if such distribution is received by a person not entitled thereto.

Section 7.4    Partnership Option to Purchase a Limited Partner's Interest. Notwithstanding any of the foregoing provisions of this Agreement to the contrary, in the event a Limited Partner desires to transfer or sell any part of his or her interest in the Partnership (other than to a Permitted Transferee), the Limited Partner shall first offer to sell such interest to the other Partners. The other Partners who desire to purchase said interest shall have the right for a period of thirty (30) days after written notice of such offer to purchase such Limited Partner's interest in the Partnership at Fair Market Value on a pro rata basis. In addition, the Partnership, by vote of a majority of the General Partners, or failing such vote, each of the other Partners desiring to purchase, on a pro rata basis, shall have the option to purchase, at Fair Market Value, all or part of a Limited Partner's Units in the Partnership upon the occurrence of any of the following events:

(a)    The Limited Partner dies;

(b)    The Limited Partner files for protection under any federal or state bankruptcy laws, makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for such Limited Partner or for substantially all of such Limited Partner's properties or assets, or bankruptcy, reorganization arrangement or similar proceedings are instituted by or against such Limited Partner under federal or state law and the same are not dismissed within forty-five (45) days after filing; or,

(c)    The Limited Partner is divorced and in connection therewith all or any portion of such Limited Partner's Units are to be awarded to such Limited Partner's former spouse (in such event the purchase option shall apply only to those Units which are to be so awarded).

Such option shall be exercisable at any time following the happening of any of the foregoing events and shall expire ninety (90) days following receipt by any General Partner of written notice of the happening of such events. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option. With respect to any exercise of an option under this Section, the purchaser(s) shall have the right to pay for such interest in cash or by delivery of a promissory note in ordinary and customary form, payable with interest at the rate of the lesser of (i) eight percent (8%) per annum, or (ii) the maximum rate allowed by Arkansas law, payable in sixty (60) equal monthly installments of principal and interest. Such promissory note may be prepaid at any time without consent or penalty and shall be secured by the Partnership interest so acquired. The holder of any such promissory note shall have all of the rights and remedies of a secured creditor under the Arkansas Uniform Commercial Code. If the Partnership and the Partners do not fully exercise their option, and any portion of such Limited

Partner's Units are assigned to a beneficiary, a creditor, or a spouse, then the assignee shall have the right only as an assignee to receive distributions to which such Partnership interest is entitled to receive hereunder, subject to the terms and conditions contained herein, and such assignee shall only become a Limited Partner upon the satisfaction of the conditions set forth in Section 7.2 of this Agreement.

The foregoing provisions of Section 7.4 to the contrary notwithstanding, a deceased Limited Partner, or such deceased Limited Partner's personal representative, may transfer to one or more Permitted Transferees, by legacy, devise, bequest, or other testamentary transfer, without consideration, all or part of his or her interest in the Partnership and thereby constitute his or her transferee a Limited Partner without the consent of the General Partners or of the Partners.

Section 7.5     Limited Partner's Status Upon Death or Incompetency. If a court of competent jurisdiction adjudges a Limited Partner to be incompetent to manage his or her person or his or her property, then in accordance with § 705 of the Act and this Agreement, the guardian, conservator, or other legal representative may exercise all the incompetent Limited Partner's rights for the purpose of administering his or her property, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement. If a Limited Partner dies and the Partnership and Partners do not fully exercise any option arising under Section 7.4 of this Agreement to purchase all of the deceased Limited Partner's Units, then in accordance with § 705 of the Act and this Agreement, the executor, administrator, or other legal representative may exercise all the deceased Limited Partner's rights for the purpose of settling his or her estate, including, but not limited to, the right to make transfers to Permitted Transferees without consent of the Partners and the power to give an assignee the right to become a Limited Partner with the consent of the Partners under Section 7.2 of this Agreement.

Section 7.6     Limited Put Option of Certain Permitted Transferees. In the case of a transfer during the lifetime of a Partner, for less than full and adequate consideration, of a Unit or Units, or portion thereof (that portion of such transfer for less than full and adequate consideration shall be a "Donative Transfer" and the Partner making such a transfer shall be the "Transferor"), to a Permitted Transferee (the "Donee"), for a period of sixty (60) days after the date of the Donative Transfer, the Donee shall have the right to require the Partnership to purchase from the Donee that number of whole Units which has a Fair Market Value closest to the Option Amount (defined below) as follows:

(a)     The Donee desiring to exercise this put option shall provide written notice thereof to the General Partners within sixty (60) days of the date of the Donative Transfer.

(b)     Upon exercise of any such option, the Partnership shall purchase the Units subject to the option for a price equal to their Fair Market Value, and the payment of the purchase

price shall be made in cash or in kind, as determined by the General Partners, provided that any Partnership Properties distributed to the Donee in payment of the purchase price shall be valued at Fair Market Value for the purposes hereof. The closing of such sale shall take place at the principal office of the Partnership within sixty (60) days from the date of exercise of the option.

(c)     The "Option Amount" shall be equal to the lesser of: (1) the Fair Market Value of the Donative Transfer; or (2) the total amount allowable with respect to such Donative Transfer to the Donee as an annual exclusion for federal gift tax purposes under §2503(b) of the Code, taking into account the annual exclusion available to the Transferor and the Transferor's spouse, if any, at the time of the Donative Transfer; provided, however, if the Transferor's spouse made no independent transfer to such Donee on the same date as the Donative Transfer, then such annual exclusion of the Transferor's spouse shall not be taken into account unless the Transferor's spouse consents thereto by a signed written statement at the time of the Donative Transfer.

(d)     To be consistent with the hypothetical willing buyer-willing seller standard, Fair Market Value shall be determined without regard to this limited put option.

## ARTICLE VIII
## COMPENSATION OF THE GENERAL PARTNERS

Section 8.1     Compensation. With the approval of Partners owning a majority-in-interest of the Partnership Units, the General Partners may receive reasonable compensation for serving as the General Partners and for managing the Partnership Properties.

Section 8.2     Expenses. Any costs and expenses incurred by the General Partners for the Partnership's benefit shall be billed directly to the Partnership, and the General Partners shall be entitled to be paid, as reimbursement, for all costs and expenses billed to and paid by the General Partners.

## ARTICLE IX
## DISTRIBUTIONS AND
## ALLOCATIONS OF INCOME AND LOSS

Section 9.1     Distributions of Distributable Cash. From time to time during each fiscal year the General Partners may distribute all or any part of the Distributable Cash, and the General Partners shall distribute all remaining Distributable Cash not later than April 15 following the end of each fiscal year. All such distributions shall be made in accordance with this Agreement and the Sharing Ratios of the Partners.

Section 9.2     Allocation of Certain Income and Losses for Tax Purposes. For federal

income tax purposes, the net income and net losses of the Partnership for any taxable year (or portion thereof) shall be allocated (subject to the requirements of § 704(c) of the Code) to the Partners in proportion to their Sharing Ratios.

Section 9.3    Allocations Upon Liquidation. For federal income tax purposes, income (including gain) or loss of the Partnership resulting from the sale or disposition of all or substantially all of the Partnership Properties, or the dissolution of the Partnership pursuant to Article X without an election to continue the Partnership in accordance with Section 10.1, shall be allocated to the Partners in proportion to their Sharing Ratios.

## ARTICLE X
## DISSOLUTION AND PRIORITY ON DISTRIBUTION

Section 10.1    Dissolution and Termination of the Partnership. The Partnership shall be immediately dissolved:

(a)    Upon the expiration of the term set forth in Section 1.5 hereinabove;

(b)    Upon a unanimous vote of all the Partners;

(c)    Upon the withdrawal, dissolution, death, dismissal or bankruptcy of all General Partners or the occurrence of any other act which would legally disqualify or impede all General Partners from acting hereunder, unless, within ninety (90) days after the effective date of such withdrawal, dissolution, bankruptcy, death, dismissal or occurrence, a successor General Partner(s) is agreed to and appointed by vote of owners of at least seventy-five percent (75%) in interest of the outstanding Partnership Units;

(d)    Within a reasonable period of time after the sale, condemnation, foreclosure or other similar disposition of all or substantially all of the Partnership Properties; provided, however, the Partnership may be continued by any or all of the Partners wishing to reinvest the sales proceeds; or

(e)    Upon the occurrence of any other circumstances which, by law, would require the Partnership to be dissolved.

The death, legal disability, or dissolution of any Limited Partner shall not result in the dissolution of the Partnership. Upon the death or legal disability of a Limited Partner, the legal representative of such Limited Partner or of his or her estate shall have the status described in Section 7.5 of this Agreement and the rights and liabilities as set forth in the Act.

Section 10.2    Liquidation and Priorities on Distribution. Upon the occurrence of any event which causes the dissolution of the Partnership, as set forth in Section 10.1 hereinabove, the General Partners or, if there is no General Partner, such person as may be designated by the Partners owning a majority-in-interest of the outstanding Partnership Units to act as liquidating trustee (the "Trustee")

shall immediately proceed to terminate the business of the Partnership. The General Partners or Trustee shall first determine the Fair Market Value of each Partnership Property (except cash) and then attempt to sell such portion (or all) of the Partnership Properties (except cash) at such prices and on such terms as the General Partners or Trustee, in the exercise of the General Partners' or Trustee's best business judgment under the circumstances then presented, deems to be necessary to provide for the liquidation priorities described below and to be in the best interests of all the Partners. The proceeds of any such sale, all Partnership cash, and undivided interests in Partnership Properties, shall be distributed in the following manner:

(a)    To creditors, including Partners who are creditors, to the extent permitted by law, in satisfaction of debts and liabilities of the Partnership, other than liabilities for distributions to Partners under A.C.A. § 4-43-601 or § 4-43-604;

(b)    To the creation of any reserves which the General Partners may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partners, arising out of or in connection with the Partnership;

(c)    To Partners and former Partners in satisfaction of liabilities for distributions under A.C.A. § 4-43-601 or § 4-43-604;

(d)    To Partners for the return of their capital account balances; and

(e)    The remainder, if any, shall be distributed to the Partners in accordance with their Sharing Ratios.

## ARTICLE XI
## ACCOUNTING AND BUSINESS MATTERS

Section 11.1    Books of Accounts and Records. The Partnership's books and records, this Agreement and any other records required by law to be maintained by the Partnership shall be maintained at the principal office of the Partnership. The books and records shall reflect all transactions and be appropriate and adequate for the business of the Partnership. Each Partner shall have access to and the right to copy at his or her own expense the Partnership's books and records at all reasonable times.

Section 11.2    Accounting Method. The Partnership books shall be kept on an accounting basis determined by the General Partners in accordance with usual and customary accounting practices.

Section 11.3    Financial Statements and Reports. Upon request by any Limited Partner, the General Partners shall cause the Partnership to provide the following reports and financial statements to the Partners:

(a)    Annual Report. Within one hundred twenty (120) days after the end of each

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -17-

fiscal year, the Partnership shall provide to the Partners (1) financial statements prepared by an independent certified public accountant, including a balance sheet as of the end of such fiscal year, together with statements of income, Partners' equity, changes in financial position and funds from operations for such year; the balance sheet and such statements (other than the funds from operations statement) shall be prepared in accordance with generally accepted accounting principles and shall be accompanied by a report of the activities of the Partnership for such year; and (2) a report on distributions to the Limited Partners for such period.

(b)    Tax Information. No later than March 15 of each year, the Partnership shall provide to each Partner all information relating to the Partnership necessary for the preparation of the Partners' federal income tax returns.

(c)    Other Federal and State Reporting Requirements. The General Partners shall cause to be delivered to the Limited Partners all other reports and information as may be required by law to be delivered to such Limited Partners.

Section 11.4    Fiscal Year. The fiscal year of the Limited Partnership shall be the calendar year.

Section 11.5    Bank Accounts. Except as may be otherwise specifically provided herein, all funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partners. Such account or accounts shall be in the name of the Partnership. All withdrawals therefrom shall be made upon checks signed by the General Partners, or any person authorized to do so by the General Partners.

<div align="center">

**ARTICLE XII**
**ELECTIONS**

</div>

Section 12.1    Adjustment Election. In the event of the transfer of a Partner's Units or upon the death of any individual Partner, or in the event of the distribution of Partnership Property to any person, the General Partners, in their sole discretion, may, but shall not be obligated to, file an election as provided by Code § 754 and the Treasury regulations thereunder, to cause the Partner's basis in the Partnership Property to be adjusted for federal income tax purposes as provided by Code Sections 734 and 743. Any cost incurred in making such elections shall be charged to the Partner or Partners benefitting therefrom.

Section 12.2    Depreciation Elections. With respect to all depreciable assets of the Partnership, the General Partners may elect to use, to the extent allowed by the Code, accelerated depreciation methods; however, the General Partners may change or elect some other method which is, in their opinion, most advantageous to the Partners.

Section 12.3    Election with Respect to Taxation as Partnership. No election shall be made

by the Partnership, the General Partners or any Limited Partner to exclude the Partnership from the application of any of the provisions of Subchapter K, chapter 1 of subtitle A of the Code, or from any similar provisions of any state tax laws. The foregoing shall not prohibit such an election by the Partnership and any person other than in the capacity of a Partner hereunder.

Section 12.4    Other Elections. In addition to the elections stated in this Article XII, the General Partners shall make all other elections which in their reasonable sole discretion are necessary for the proper operation and accounting of the Partnership.

## ARTICLE XIII
## AMENDMENTS

Subject to the provisions of the laws of the State of Arkansas, amendments to this Agreement which do not substantially affect the rights of the Limited Partners, or which are required or contemplated by this Agreement, may be made by the General Partners through use of the powers of attorney herein and hereby granted. Any other amendment must be agreed to in writing by all of the Partners.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1    Notices. All notices under this Agreement shall be in writing and shall be given to the Partners at each Partner's last known address and to the Partnership at its principal office or at such other address as any of the parties may hereafter specify in the same manner.

Section 14.2    Further Acts. Each Partner hereby agrees to execute and deliver to the General Partners, within fifteen (15) days after receipt of the General Partners' written request therefor, such other and further statements of interest and holdings, designations, powers of attorney or other instruments as the General Partners reasonably deem necessary.

Section 14.3    Paragraph Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provisions hereof.

Section 14.4    Severability. Every portion of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 14.5    Application of Arkansas Law. This Agreement, and the application or interpretation thereof, shall be governed by its terms and by the laws of the state of Arkansas.

Section 14.6    Survival of Rights. This Agreement and all of the terms, provisions, and

agreements herein contained shall be binding upon and inure to the benefit of the Partners and their respective legal representatives, heirs, successors and assigns.

Section 14.7   Interpretation. As used herein, the masculine includes the feminine and the neuter and the singular includes the plural, as the context may require.

Section 14.8   Execution in Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had all signed the same document. All counterparts shall be construed together and shall constitute one (1) agreement.

Section 14.9   Waiver of Action for Partition. Each of the parties irrevocably waives during the term of the Partnership any right that he or she may have to maintain any action for partition with respect to the Partnership Properties.

Section 14.10   Tax Matters Partner. Pursuant to Code § 6231, the Partners hereby designate MARY HANNA BOLES CANADA as the tax matters partner ("TMP") for the Partnership. The TMP shall have all of the power and responsibilities imposed by the Code. Notwithstanding the designation, the Partners may participate in any inquiry by the Internal Revenue Service to the extent not inconsistent with this provision or the provisions contained in the Code relating to treatment of Partnership items at the Partnership level, at the Partner's sole expense.

Section 14.11   Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

Section 14.12   Arbitration. Any dispute or controversy arising out of or relating to this Agreement or any document or instrument delivered in connection with this Agreement shall be settled by arbitration to be held in England, Arkansas, in accordance with the rules then in effect of the American Arbitration Association or its successor. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the parties irrevocably consent to the jurisdiction of the state courts of Arkansas for this purpose. The losing party in such arbitration shall pay all the costs and expenses of such arbitration and all the reasonable attorneys' fees and expenses of the other party thereto.

Section 14.13   Confidentiality. Each of the Partners, and any other person who shall become a Partner, agrees to keep confidential all information pertaining to the Partnership, its business, its management, and the arbitration of any dispute among the Partners, and agrees to refrain from disclosing such information to anyone who is not a Partner or a Partner's attorney or agent.

IN WITNESS WHEREOF, this Amended and Restated Agreement of Limited Partnership has been duly executed by the parties effective on the __1__ day of __April__, 2004.

GENERAL PARTNERS:

_____
MARY HANNA BOLES CANADA

LIMITED PARTNERS:

_____
MARY HANNA BOLES CANADA

_____
GARY RECTOR CANADA

GARY RECTOR CANADA, JR. TRUST I

BY: _____
GARY RECTOR CANADA, JR., Trustee

BRADLEY SETH CANADA TRUST I

BY: _____
BRADLEY SETH CANADA, Trustee

HANNA NICOLE CANADA STEWART TRUST I

BY: _____
HANNA NICOLE CANADA, Trustee

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd                    -21-

**EXHIBIT A**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**PARTNERSHIP PROPERTY**

**[insert description]**

F:\HOME\HARRIS\MHBC-amd-rest.agr.wpd

**EXHIBIT B**
**(As Amended and Restated)**

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**
**OWNERSHIP OF PARTNERSHIP UNITS**

| GENERAL PARTNERS: | UNITS: |
|---|---|
| Mary Hanna Boles Canada | 10 |
| | |
| **LIMITED PARTNERS:** | |
| Mary Hanna Boles Canada | 409 |
| Gary Rector Canada | 419 |
| Gary Rector Canada, Jr. Trust I | 54 |
| Bradley Seth Canada Trust I | 54 |
| Hanna Nicole Canada Stewart Trust I | 54 |
| | |
| TOTAL: | 1,000 |

EXHIBIT

2

## SHAREHOLDERS AGREEMENT

### *Canada Bancshares, Inc.*

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is executed effective as of the date set forth below (the "Effective Date"), by and among Canada Bancshares, Inc., an Arkansas corporation (the "Corporation"), and the undersigned Shareholders of the Corporation (all hereinafter collectively referred to as the "Shareholders" and individually as the "Shareholder").

### RECITALS:

WHEREAS, the Shareholders and the Corporation desire to promote their mutual interests by imposing certain restrictions and obligations upon the shares of capital stock of the Corporation in order to preserve and maintain a continuity of shareholder relationships and in order to promote sound and harmonious management of the Corporation; and

WHEREAS, it is the intention of the parties to place such restrictions on the sale, transfer, pledge, encumbrance or other disposition of all shares of the capital stock of the Corporation.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.    REGULATORY REQUIREMENTS. Notwithstanding any other provision herein, no transfer pursuant to Section 2 or Section 3, below, no pledge pursuant to Section 4, below, nor any other Disposition (as defined below) of shares of capital stock of the Corporation including, without limitation, any Disposition involving a redemption of shares, shall occur except in compliance with all applicable legal and regulatory requirements. This shall include, without limitation, (a) the submission of all required applications and notices to the Board of Governors of the Federal Reserve, the Arkansas State Bank Department and any other applicable governmental entity (collectively, the "Governmental Entity(ies)"), (b) all required approvals from applicable Governmental Entities having been obtained in such form as is satisfactory to the Board of Directors of the Corporation in its sole discretion, and (c) any Disposition being completed in compliance with the requirements of all applicable approvals granted by the Governmental Entities. The terms of any Disposition shall comply with the requirements of all applicable approvals given by the Governmental Entities. All time periods relating to any exercise and/or closing of any purchase option hereunder shall be extended as necessary to accommodate the requirements of this Section 1.

2.    FAMILY TRANSFERS. Any Shareholder may transfer all or part of the Shareholder's shares of capital stock in the Corporation by sale or gift (including by testamentary transfer upon death) to one or more trusts established for the benefit of such Shareholder, his/her spouse and/or lineal descendants (collectively, "Family Member(s)"), and/or to an entity wholly-owned by such persons (referred to as a "Family Entity"), (collectively referred to as a "Family

1

5203889.4

Transferee"). In such cases, the transferee shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors, in its sole discretion.

3.    TRANSFERS BY ENTITY SHAREHOLDERS. Any Shareholder that is a corporation, partnership or limited liability company (collectively, an "Entity") may, upon notice to the Corporation, transfer all or part of the Entity's shares of capital stock in the Corporation to (i) the shareholders, partners or members, respectively, of that Entity, or (ii) any other corporation, partnership or limited liability company wholly-owned by that Entity. In such cases, the transferee(s) shall receive and hold such stock subject to the terms of this Agreement and the obligations of the transferor hereunder (which shall be documented in writing signed by such transferee(s)), and there shall be no further transfer of such stock except in accordance with the other terms of this Agreement. No transfer pursuant to this Section shall occur until all requested documents, agreements and information have been provided to and approved by the Board of Directors.

4.    PLEDGE OR OTHER ENCUMBRANCE. No Shareholder shall pledge, encumber, grant a security interest in, or otherwise cause or permit any lien to be placed upon all or any part of the shares of capital stock of the Corporation owned by such Shareholder, without first providing written notice thereof to the Corporation; and provided further, as a condition thereto, the Shareholder shall require the lender, secured party, or other lienholder to execute an estoppel agreement (as approved by the Board of Directors) for the benefit of the Corporation and the other Shareholders which provides that any foreclosure, sale, transfer, or other disposition of the stock so pledged or encumbered shall be subject to the terms and conditions of this Agreement.

5.    RESTRICTIONS ON TRANSFER.

(a)    Except as provided in Sections 2, 3 and 4, no Shareholder shall sell, contract to sell, convey, hypothecate, assign, pledge, encumber, or otherwise transfer (collectively, a "Disposition") any or all of its shares of capital stock of the Corporation, now owned or hereinafter acquired, or any interest or right therein, without the prior written consent of all the other Shareholders, or in the absence of said written consent, without first providing the Corporation and each of the other Shareholders the right of first refusal option to purchase such stock as provided herein.

(b)    Except as otherwise provided in Sections 2, 3, and 4, a Shareholder proposing a Disposition (the "Transferor") shall provide written notice of the intended Disposition to the Corporation's Board of Directors (the "Disposition Notice"). The Disposition Notice shall set forth all of the terms of the proposed Disposition, including price and payment terms for any sale, the name and address of the proposed transferee, the number of shares involved in the proposed Disposition, and the date on which the transaction is to occur, which date shall not be less than thirty (30) days from the date on which said notice is given.

2

5203889.4

(c)    For a period of fifteen (15) days after the date on which the Disposition Notice is given, the Corporation shall have the right of first refusal option to purchase the stock of the Transferor identified in the notice, which option shall lapse and expire if not exercised in writing within said 15-day period by majority vote of the Board of Directors of the Corporation (without participation by the Transferor). The Corporation's option to purchase may be exercised in whole or in part. In the event said option is exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(d)    In the event that all of the shares of the Transferor subject to the foregoing option are not redeemed and purchased by the Corporation as provided above, then (i) the Corporation shall delivery a copy of the Disposition Notice to each Shareholder, and (ii) the shares not so purchased and redeemed by the Corporation shall become subject to a second option on the part of each of the other Shareholders to purchase a "proportionate share" of such stock, which option shall lapse and expire if not exercised in writing by notice to the Transferor within thirty (30) days after the date on which the Disposition Notice is mailed to each Shareholder by the Corporation. The Shareholders' option may also be exercised in whole or in part. In the event any or all of said options are exercised, the closing shall take place at the principal office of the Corporation not more than 90-days after the date on which the Disposition Notice is given.

(e)    The term "proportionate share" shall mean the ratio expressed as a percentage of (i) the number of shares of the Corporation's capital stock owned by the Shareholder to (ii) the total number of shares of capital stock of the Corporation owned by all Shareholders other than the Transferor. In addition, if any stock of the Corporation offered for sale is not purchased by the Shareholder first entitled thereto, the term "proportionate share" shall include that portion of the stock of the Corporation not purchased by the Shareholder first entitled thereto which the number of shares of capital stock of the Corporation owned by a Shareholder bears to the total number of shares of capital stock of the Corporation owned by Shareholders electing to exercise this option to purchase the Transferor's stock.

(f)    In the event the Corporation and the other Shareholders do not exercise their respective options as hereinbefore provided, the Transferor may make a bona fide Disposition to the prospective purchaser, or other transferee, of any remaining stock not so purchased by the Corporation or other Shareholders. The Disposition shall be made only to the transferee identified in the Disposition Notice and shall be made only in strict accordance with the terms stated in such notice. However, if the Transferor shall fail to make such Disposition within one hundred twenty (120) days following the date on which the Disposition Notice is given, such shares shall again become subject to all of the restrictions contained in this agreement. Any purchaser or other transferee acquiring the offered shares shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, and deliver a counterpart of this Agreement as a condition to the issuance of a stock certificate in such person's name.

(g)    During any period in which the Corporation is a "small business corporation," as defined in sections 1361(a) and (b) of the Internal Revenue Code of 1986, as

3

amended (the "Code") (referred to herein as an "S Corporation") then, in the case of shares held by a trust, any change in the status or circumstances of the trust or its beneficiaries that either (i) causes or will reasonably be expected to cause the trust to cease to be a trust that is permitted to hold shares in an S Corporation, or (ii) results in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any trustee or beneficiary of the trust in question, if such person is also serving as a director).

(h)     With respect to any Family Entity that was a transferee under Section 2, any event resulting in that Family Entity having any owner, officer or director (or any similar positions) that is not a Family Member of the original transferor, shall be considered a Disposition for purposes of this Section 5. The Corporation's right of first refusal purchase option as described in this Section 5 may be waived by majority vote of the Corporation's Board of Directors (excluding participation by any person affiliated with the Family Entity in question, if such person is also serving as a director).

(i)     Notwithstanding any other provision herein, unless first approved by the Board of Directors in writing, in its sole exercise of discretion, no Shareholder shall complete a Disposition of any shares of the Corporation's capital stock to any of the following (each referred to as a "Competitor"): (1) any other state or federally chartered financial institution or financial institution holding company, (2) any individual(s) or entities that in the aggregate own ten percent (10.00%) or more of any other state or federally chartered financial institution or financial institution holding company, or (3) any other individual or entity that the Board of Directors of the Corporation has, in its sole discretion, designated as a "Competitor" for purposes of this Section 5(i).

(j)     In the event the options specified herein are exercised, the purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

(k)     For all purposes of this Section 5, the date on which the Disposition Notice is given shall be the date such notice is deemed made pursuant to Section 24(d).

6.     DIVORCE. If an individual Shareholder shall become a party to a divorce proceeding and pursuant to the final decree in that proceeding all or any portion of the Shareholder's stock in the Corporation is awarded to the Shareholder's former spouse (who is not also then a shareholder), the stock so awarded shall immediately become subject to an option to purchase on the part of the Corporation first, and the other Shareholders second for a period of ninety (90) days after written notice of such award as provided to the Corporation and each of the other Shareholders, in the manner provided in Section 5 as in the case of a proposed Disposition except that for purposes of Section 5, the date on which the notice is made to the Corporation and the other Shareholders of the final divorce decree shall be deemed the date of the Disposition Notice. If all of the shares of stock so awarded are not purchased by the Corporation, the Shareholders (other than the divorced Shareholder and his or her spouse) shall

4

52038894

have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

7.    BANKRUPTCY OR INSOLVENCY. If any Shareholder makes an assignment for the benefit of creditors, or if any petition shall be filed in any federal or state court alleging that a Shareholder is insolvent, or requesting the appointment of a receiver for all or substantially all of a Shareholder's property, or if any petition in bankruptcy is filed by or against a Shareholder in a court of competent jurisdiction and if such petition or petitions are not dismissed within ninety (90) days from the date of filing, all of such Shareholder's shares of stock in the Corporation (including any shares transferred pursuant to Section 2) shall immediately become subject to an option to purchase such stock in favor of the Corporation first and the other Shareholders second, for a period of one hundred twenty (120) days after written notice of such event. If all of the shares of stock in the Corporation owned by such Shareholder are not purchased by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and term of payment shall be determined pursuant to Sections 10 and 11.

8.    DEATH. Subject to a Shareholder's ability to transfer shares of stock to a Family Transferee at such Shareholder's death as provided in Section 2, upon the death of an individual Shareholder (the "Decedent") all of the shares of stock in the Corporation owned by the Decedent (including shares transferred pursuant to Section 2) or to which the Decedent or his or her personal representative shall be entitled, shall become subject to an option to purchase on the part of the Corporation, first and the other Shareholders, second for a period of one hundred twenty (120) days following the date of the Decedent's death. If all of the Decedent's shares of stock in the Corporation are not purchased and redeemed by the Corporation, the other Shareholders shall have the right to purchase a "proportionate share" of such stock (as defined in Section 5(e)). The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11. Notwithstanding the provisions of Section 11 to the contrary, if the Corporation shall receive any proceeds from any policy of insurance on the life of the Decedent, such proceeds shall be paid by the Corporation to the Decedent's personal representative to the extent of the purchase price of the Decedent's stock, and such payment shall be deemed to have been made on account of such purchase price. The balance of the purchase price remaining after credit for such insurance proceeds shall be paid pursuant to Section 11.

9.    S CORPORATION PURCHASE OPTION.

(a)    In the event that the holders of a majority of the outstanding shares of capital stock of the Corporation provide written notice to the Board of Directors of the Corporation that they desire to cause the Corporation to make an election to be treated as an S Corporation (defined herein) for federal and state income tax purposes (the "Election Notice"), then the Board shall take the following actions:

(i)    the Board shall promptly provide the Election Notice to each Shareholder;

(ii)    the communication containing the Election Notice shall inform

5

each Shareholder that it has a period of not less than 45-days as established by the Board (the "Notice Period") in which to:

(A)    deliver to the Corporation a signed consent (in a form approved by the Board) to the S Corporation election pursuant to which such Shareholder consents to the Corporation making an S Corporation election, along with such other documents as the Board may require; and

(B)    if applicable, with respect to any Shareholder that is not eligible to own shares of stock in an S Corporation, to take such actions as may be necessary to cause the Shareholder to become eligible (including any Disposition of shares permitted by and completed in accordance with Section 2 and/or Section 3 herein).

(b)    Any Disposition of shares proposed by a Shareholder in order for the Shareholder (or its transferee(s)) to be an eligible S Corporation shareholder shall (i) be subject to the review and approval of the Board of Directors of the Corporation, and (ii) if approved by the Board, be subject only to those restrictions and requirements imposed by the Board and permitted to occur without any requirement of compliance with the provisions of Section 5, if applicable.

(c)    In the event a Shareholder fails to provide the consent (and other required documentation) described in Section 9(a)(ii)(A), above, within the Notice Period, or is otherwise not an eligible S Corporation shareholder as of the expiration of the Notice Period (as determined by the Board), then, without any additional action, all of such Shareholder's shares of stock in the Corporation shall be subject to a purchase option in favor of the Corporation to repurchase and redeem such shares. The purchase price and terms of payment shall be determined pursuant to Sections 10 and 11.

10.    PURCHASE PRICE.  The purchase price for each share of stock purchased pursuant to this Agreement shall be equal to the purchase price contained in any bona fide offer to purchase such shares which the Transferor proposes to accept (in the case of any proposed Disposition by sale or exchange), or in the absence of such bona fide offer or in situations other than proposed Dispositions involving a sale or exchange, the purchase price for such stock shall equal the Book Value of such shares of stock. "Book Value", as used in this Agreement, shall be the net book value of the Corporation as of the end of the month preceding the date of occurrence of the event giving rise to any right to purchase shares hereunder, computed in accordance with generally accepted accounting principles applied in a consistent manner with prior periods, by a Certified Public Accountant selected by the Board of Directors. The determination by such accountant shall, for purposes of this Agreement, be final, conclusive and binding upon each of the parties hereto. The purchase price per share shall equal the Book Value divided by the number of shares of capital stock outstanding.

11.    PAYMENT OF PURCHASE PRICE.  The purchase price for any shares of stock purchased pursuant to this Agreement, in situations involving proposed dispositions by sale or exchange, shall be paid upon the same terms and conditions (including, as near as possible, security terms) as contained in the bona fide offer to purchase such shares received by the

6

Transferor; or in the absence of any such bona fide offer, or in situations other than proposed Dispositions involving a sale or exchange, the purchase price shall be paid in sixty (60) equal monthly installments of principal and interest at a rate equal to the lesser of (1) the prime rate at Bank of England, in England, Arkansas, or its successor, on the date of the closing, or (2) 5.00% per annum (provided that any purchaser may elect to pay the purchase price in cash at any time). The first such payment shall be due and payable thirty (30) days from the closing date of such sale and purchase. Such obligation shall be represented by a promissory note in customary form as approved by the Board of Directors.

12.    CORPORATE GOVERNANCE MATTERS.    Neither the Board, nor any Shareholder, officer or agent of the Corporation, shall take or permit to be taken any of the following actions by or on behalf of the Corporation, without the prior written authorization of MHBC Investments Limited Partnership I, LLLP (or its successor), in each case:

(a)    the amendment, modification, or restatement of this Agreement, the Corporation's Articles of Incorporation or Bylaws;

(b)    the amendment, modification, or restatement of the charter, bylaws or other governing documents of any entity in which the Corporation owns an interest, or any entity owned by any entity in which the Corporation owns an interest, (each, referred to as a "Subsidiary") including, without limitation, Bank of England (the "Bank"), or any successor thereof;

(c)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect the election or appointment of any person to, and/or removal of any person from, the Board of Directors (or similar position) of the Bank or any other Subsidiary;

(d)    the exercise of any voting or consent rights with respect to any securities of any Subsidiary to effect (i) any merger, consolidation or similar transaction involving a Subsidiary, (ii) the sale of all or substantially all of a Subsidiary's assets, (iii) the liquidation or dissolution of a Subsidiary (or entering into any license, pledge, encumbrance or other transaction with similar economic effect), or (iv) the liquidation, dissolution or other termination of the existence and/or business of any Subsidiary;

(e)    causing a reclassification, reorganization, or recapitalization of any shares of the outstanding capital stock (or other equity interests) of any Subsidiary.

7

5203889.4

13.    SECURITY FOR PAYMENT OF THE PURCHASE PRICE.    Whenever the Corporation redeems, or remaining Shareholders purchase, stock pursuant to this Agreement, and the purchase price is to be paid in installments, the shares of stock so purchased or redeemed shall be pledged to the selling Shareholder as security for the payment of the purchase price and all certificates representing such stock shall be delivered to the selling Shareholder, or his or her personal representative, as the case may be, to hold as such security.    The selling Shareholder and/or his or her personal representative, as the case may be, shall have all the rights and remedies of a secured creditor under the Uniform Commercial Code as adopted under the laws of the State of Arkansas.

14.    INSUFFICIENT SURPLUS.    If the Corporation elects to purchase a Shareholder's stock but does not have sufficient surplus to permit it to lawfully purchase all of the shares of stock to be purchased, the Shareholders shall promptly take such measures to vote their respective shares to reduce the capital of the Corporation or to take such other and further steps as may be appropriate or necessary (excluding making additional capital contributions) in order to enable the Corporation to lawfully purchase all of the shares of stock to be purchased, including without limitation, an up-to-date appraisal of the assets of the Corporation, or a recapitalization of the Corporation so as to reduce its stated capital and increase its surplus.

15.    ADDITIONAL ACTION.    Whenever the Corporation or other Shareholders shall, pursuant to this Agreement, redeem or purchase shares of the Corporation's stock from the Transferor, the Transferor shall do all things necessary to execute, deliver, and endorse all papers and certificates as may be required to consummate said purchase and transfer of stock.

16.    RESTRICTIVE LEGEND.    Each certificate representing shares of stock in the Corporation shall be stamped or otherwise imprinted with the following restrictive legend:

RESTRICTIVE LEGEND FOR COMMON STOCK
OF CANADA BANCSHARES, INC.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE ARKANSAS SECURITIES ACT, AS AMENDED.    THE SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF REGISTRATION OR THE AVAILABILITY OF EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND THE ARKANSAS SECURITIES ACT.    NO RESALE, PLEDGE, HYPOTHECATION, OR OTHER TRANSFER OR DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE SHALL OCCUR EXCEPT IN COMPLIANCE WITH THE PROVISIONS OF A SHAREHOLDERS AGREEMENT BY AND AMONG THE CORPORATION AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION.    AT ANY TIME DURING WHICH THE CORPORATION IS AN ELECTING SMALL BUSINESS CORPORATION UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS CERTIFICATE SHALL NOT BE

8

5203889.4

TRANSFERABLE IF SUCH TRANSFER WOULD CAUSE REVOCATION OF THE CORPORATION'S "S" CORPORATION ELECTION. ANY TRANSFER CONTRARY TO THE ABOVE INSTRUCTIONS IS VOID.

17.    ADDITIONAL STOCK OR SECURITIES: TRANSFEREE TO BE MADE A PARTY. Before any additional shares of stock or any other securities convertible into stock of the Corporation are issued in the future to shareholder or other security holder (other than a signatory to this Agreement), such person or entity shall be required to become a party to and execute and deliver a counterpart of this Agreement prior to the issuance of such shares or other securities and the certificates therefor shall be legended as provided in Section 16. Further, whenever any Shareholder acquires any additional shares of stock of the Corporation or any other securities of the Corporation convertible into stock other than the shares of stock owned at the time of the execution of this Agreement, such shares of stock or such other securities so acquired shall be subject to all of the terms of this Agreement, and the certificates therefor shall be stamped with the legend described in Section 16. In addition, each Disposition (of any type) to any transferee is hereby expressly conditioned upon such transferee first being made a party to and bound by the terms of this Agreement.

18.    TERMINATION. This Agreement shall terminate and all rights and obligations of the parties hereto shall cease (i) upon the written agreement of all Shareholders, (ii) upon the voluntary dissolution of the Corporation, or (iii) in the event there shall be only one (1) owner of the issued and outstanding shares of common stock of the Corporation.

19.    PRESERVING "S CORPORATION" STATUS. Notwithstanding anything herein to the contrary, at any time during which the Corporation is an S Corporation, (i) no shares of stock of the Corporation shall be transferable to any transferee if such transfer would cause a revocation of the Corporation's S Corporation status, and (ii) unless approved by the Board of Directors in writing, no shares of stock of the Corporation shall be transferable if the proposed transfer would result in an increase in the then-current number of shareholders of the Corporation for purposes of computing the limitation on the number of shareholders to which S Corporations are subject as set forth in section 1361(b)(1)(A) of the Code. Any purported Disposition in violation of this Agreement shall be null and void and the purported transferee shall have no interest in any of the shares of stock of the Corporation purported to be transferred.

20.    SHAREHOLDERS' REPRESENTATIONS AND WARRANTIES. Each of the Shareholders represent and warrant that (i) it is the sole owner of the number of shares of common stock set forth opposite its signature hereto, (ii) except as approved in writing by the Corporation, that all of such shares are free and clear of all liens, claims, charges, security interests, or encumbrances of any kind, and (iii) that it has the right and lawful authority to enter into this Agreement.

21.    DRAG-ALONG SALE.

(a)    If the holder(s) of a majority of the outstanding shares of capital stock of the Corporation (collectively, the "Drag Initiating Shareholder(s)"), acting individually or together, receive a bona fide offer, or otherwise agree, to make a transfer, sale or disposition of

9

all of their shares of stock in the Corporation in a single transaction or series of related transactions (a "Drag Along Sale"), then the Drag Initiating Shareholders shall have the right to require that each other Shareholder of the Corporation sell all of its shares of stock in the Corporation in the same transaction. In the event a conflict shall exist between a Drag Along Sale and any other option or purchase right in this Agreement, the provisions of this Section 20 shall control.

(b)    Not less than 30-days prior to the proposed closing date of the Drag Along Sale, the Drag Initiating Shareholders shall provide to each Director and each Shareholder (i) a written notice identifying the proposed transferee, the consideration to be paid, and all other material terms and conditions of a Drag Along Sale (the "Drag Along Notice"), and a copy of the written agreements and documents pursuant to which a Drag Along Sale will be conducted and closed (the "Drag Along Agreement"). Each other Shareholder shall be required to participate in the Drag Along Sale on the terms and conditions set forth in the Drag Along Notice and in accordance with the Drag Along Agreement. Within 15-days following the date the Drag Along Notice is given (the "Drag Along Notice Period"), each Shareholder of the Corporation shall execute and deliver in escrow to the Chairman of the Corporation all documents reasonably required to be executed in connection with the closing of such Drag Along Sale. The Chairman shall be authorized to release such documents upon the closing of the Drag Along Sale.

(c)    If the Drag Along Sale has not been completed within 120-days following expiration of the Drag Along Notice Period, then the Chairman shall return to each Shareholder any documents in his possession executed by such Shareholders in connection with the proposed Drag Along Sale, and all restrictions on transfer contained in this Agreement or otherwise applicable at such time shall again be in effect. Notwithstanding anything contained in this Section 20, there shall be no liability on the part of any Drag Initiating Shareholder to any other Shareholder if a proposed Drag Along Sale is not consummated for whatever reason. Any decision as to whether to consummate a transfer of any portion of its Shares shall be at the sole discretion of each Drag Initiating Shareholder.

22.    GRANT OF PROXY. To insure the performance by each Shareholder with the agreements set forth herein, each Shareholder hereby appoints the Chairman of the Corporation or its designee (the "Proxy Holder"), as his, her or its true and lawful proxy and attorney in fact, with full power of substitution and resubstitution, to vote all Shares owned or held by such Shareholder, subject to the provisions of this Agreement, upon any matter presented to the Shareholders of the Corporation, if (and only if) such Shareholder fails to comply with such provisions within 5-days following written request. The proxies and powers granted by each Shareholder pursuant to the preceding sentence are coupled with an interest and are given to secure the performance of such Shareholder's commitments under this Agreement. Such proxies shall be irrevocable for the term of this Agreement and shall survive the death, incompetency, disability, dissolution or winding up of such Shareholder.

23.    TERM. The term of this Agreement shall be 24-years and 364-days following the Effective Date, unless extended by the vote or written consent of the holders of a majority of the Corporation's issued and outstanding shares of voting common stock. Each Shareholder hereby irrevocably supports and authorizes each person who may from time to time serve as President,

10

52038**89**.4

Chief Executive Officer or Treasurer of the Corporation to act as his attorney-in-fact with specific authority to execute, acknowledge, swear to, file, and deliver, an amendment to this Agreement which extends the term of this Agreement for any length of time provided that the Corporation's Board of Directors makes a determination that the extension of such term of this Agreement will not be treated as a separate Bank Holding Company under the rules and regulations of the Board of Governors of the Federal Reserve and any other applicable law, rule or regulations.

24.    MISCELLANEOUS.

(a)    Governing Law. This Agreement shall be subject to and governed by the laws of the State of Arkansas.

(b)    Partial Invalidation. In the event that one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

(c)    Specific Performance. The parties hereto recognize that the Corporation's stock is a unique asset. Accordingly, in the event of a breach of this Agreement, any non-breaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached their contractual obligations described herein. Each party hereto agrees that he will make no objection to the form of action in any such proceeding for specific performance of this Agreement. Anything contained herein to the contrary notwithstanding, this Section shall not be construed to limit in any manner whatsoever any other rights and remedies an aggrieved party may have by virtue of any breach of this Agreement.

(d)    Notices. Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing either in person or by registered, certified or private express mail, which shall be addressed, in the case of the Corporation, to its principal office to the attention of the President and Secretary, and in the case of any Shareholder, to the address appearing by the Shareholder's signature hereto, or such other address as may be designated by a Shareholder in writing to all parties to this Agreement. If mailed, such notice or other communication shall be deemed made when properly deposited in the mail addressed as provided herein, with postage prepaid.

(e)    Fees of Legal Counsel. In the event any party to this Agreement shall employ legal counsel to protect his rights hereunder or to enforce any term or provision herein, then the party prevailing in any such action shall have the right to recover from the other party all of his reasonable attorneys' fees and expenses incurred in relation to such claims.

(f)    Further Assurances. The parties agree that from time to time hereafter, and upon request, each of them will execute, acknowledge and deliver such other instruments and documents and take such further action as may be reasonably necessary to carry out the intent of this Agreement.

11

(g)    Modification. No provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

(h)    Binding Effect and Benefit. This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto, their heirs, executors, administrators, personal representatives, successors and permitted assigns.

(i)    Headings and Captions. Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Agreement.

(j)    Waiver. No waiver of a breach or violation of any provision of this Agreement shall operate or be construed as a waiver of any subsequent breach or limit or restrict any right or remedy otherwise available.

(k)    Rights and Remedies Cumulative. The rights and remedies expressed herein are cumulative and not exclusive of any rights and remedies otherwise available.

(l)    Gender and Pronouns. Throughout this Agreement, the masculine shall include the feminine and neuter and the singular shall include the plural and vice versa as the context requires.

(m)    Entire Agreement. This document constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter contained herein.

(n)    Time for Performance. Time is of the essence in this Agreement.

(o)    Counterparts. This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart. Copies of signatures shall be accepted as originals. Additional signature pages shall be attached hereto as necessary.

(p)    Tax Matters. The initial signatories to this Agreement acknowledge and confirm their mutual intention and expectation that (i) all current shareholders of the Bank shall transfer their respective shares of the Bank's common stock in exchange for shares of stock of the Corporation and that each such transfer is made in connection with the formation and initial capitalization of the Corporation following its qualification as a "bank holding company" pursuant to the Bank Holding Company Act of 1956, as amended, and applicable provisions of Arkansas law, and (ii) each transferor shall be treated as part of the same control group pursuant to Section 351 of the Internal Revenue Code of 1986, as amended.

*[Signature page(s) to follow.]*

12

5203889.4

IN WITNESS WHEREOF, the parties have executed this Shareholders Agreement of Canada Bancshares, Inc. effective as of the Effective Date set forth below.

**Effective Date:**   April 1, 2017

CORPORATION:

CANADA BANCSHARES, INC.

By: _____

Gary R. Canada, Sr., Chairman

*[Shareholder signature page(s) to be attached.]*

13

5203889 4

IN WITNESS WHEREOF, the undersigned has executed this Shareholders Agreement of Canada Bancshares, Inc. effective as to the undersigned as of the date set forth below.

*Effective Date:* April 1, 2017

MHBC INVESTMENTS LIMITED
PARTNERSHIP I, LLLP

By: _____
Mary Hanna Boles Canada,
General Partner

_____
Bradley S. Canada

_____
Gary R. Canada, Jr.

_____
Hanna Nicole Luebke

*[Shareholder Signature Page]*

*Canada Bancshares, Inc.*

14

5203889.4



EXHIBIT

3











**EXHIBIT**

4







# STATE OF ARKANSAS

## SECRETARY OF STATE

**Cole Jester**
ARKANSAS SECRETARY OF STATE

To All to Whom These Presents Shall Come, Greetings:

I, Cole Jester, Arkansas Secretary of State, do hereby certify that the following and hereto attached instrument of writing is a true and perfect copy of

**Dissociation/Dissolution of LLLP**

of

**MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP**

effective this day
December 12, 2025.



**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 5th day of February, 2026.

Arkansas Secretary of State

**EXHIBIT**

5

FILED - Arkansas Secretary of State - Cole Jester - Doc#: 20524565001 - Filing#: 800031290 - Filed On: 12/12/2025 - Page(s): 3

## AMENDEDMENT TO
## CERTIFICATE OF LIMITED PARTNERSHIP
## OF
## MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP

Pursuant to the Arkansas Uniform Limited Partnership Act (2001), more specifically stated as Ark. Code Ann. § 4-47-101, *et seq.*, and Act 15 of the 2007 Acts of Arkansas, the undersigned does hereby certify that the following information is true and correct:

### RECITALS

WHEREAS, a guardian of the person and estate of Mary Hanna Boles Canada ("Mrs. Canada"), the sole general partner of MHBC Investments Limited Partnership I, LLLP (the "Partnership"), was appointed on September 12, 2025 by the Circuit Court of Lonoke County, Arkansas, causing the immediate and automatic dissociation of Mrs. Canada pursuant to Ark. Code Ann. § 4-47-603(7)(B);

WHEREAS, the limited partners of the Partnership did not admit another general partner within 90 days of Mrs. Canada's dissociation, as required to avoid dissolution of the Partnership pursuant to Ark. Code Ann. § 4-47-801(3) and Sections 6.9 and 10.1(c) of the Amended and Restated Limited Partnership Agreement of the Partnership (the "Partnership Agreement"); and

WHEREAS, pursuant to Section 10.2 of the Partnership Agreement, and consistent with Ark. Code Ann. § 4-47-803(c), limited partners owning a majority-in-interest of the outstanding Partnership Units designated Gary Rector Canada, Sr. as "Liquidating Trustee."

NOW, THEREFORE, the Certificate of Limited Partnership of MHBC Investments Limited Partnership I, LLLP is hereby amended as follows:

### AMENDMENT

1.    Name. The name of the registered limited liability limited partnership is MHBC INVESTMENTS LIMITED PARTNERSHIP I, LLLP.

2.    Original Filing Date. The original certificate of limited partnership for the Partnership was filed in this office on July 21, 1997. The Partnership converted to a limited liability limited partnership on April 6, 2004.

3.    Amendment. The Certificate of Limited Partnership of the Partnership is hereby amended as follows:

(a)    Dissociation of Mrs. Canada. Pursuant to Ark. Code Ann. § 4-47-603(7)(B), Mary Hanna Boles Canada ("Mrs. Canada"), the sole General Partner of the Partnership, disassociated on September 12, 2025. The Partnership does not have a general partner.

Error! Unknown document property name.

(b)    <u>Dissolution of the Partnership</u>. The Partnership dissolved, effective December 12, 2025, pursuant to Section 10.1(c) of the Partnership Agreement and Ark. Code Ann. § 4-47-801(1) & (3)(B).

(c)    <u>Liquidating Trustee</u>. Gary R. Canada was duly appointed by the partners as Liquidating Trustee, to conduct the winding up and termination of the Partnership's business in accordance with Section 10.2 of the Partnership Agreement. The street and mailing address of Gary R. Canada, Sr. is 123 S. Main Street, England, Arkansas 72046.

*[Signature Page Follows]*

2

IN WITNESS WHEREOF, this Amendment to Certificate of Limited Partnership has been duly executed by the liquidating trustee of the Partnership this 5ᵗʰ day of February, 2026.

**LIQUIDATING TRUSTEE:**

_Gary R Canada Sr._

GARY R. CANADA, Sr.

Error! Unknown document property name.

3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
            DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.

PLAINTIFF

v.                          Case No. __4:26-cv-267-KGB__

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Motion for Preliminary Injunction against

the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official

Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the

Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill,

and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as

Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the

Federal Regulators, the "Agencies"), states:

1.      CBI recently became the sole holding company of the Bank of England (the "Bank")

upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I,

LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of ownership, including, for

example, (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's

strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

2.    The Agencies, however, refuse to recognize CBI's status as the Bank's owner— or *anyone's* status as the Bank's owner— simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business.

3.    Specifically, the Agencies have asserted that the Bank's ownership "**remains a private legal issue that [they] have no jurisdiction over.**"

4.    Without this Court's entering immediate injunctive relief ordering the Agencies to recognize CBI as the Bank's owner, the Bank will operate like a headless hydra— no clear managerial oversight, no ability to respond to crises, and no strategic direction whatsoever.

5.    For the reasons set forth in the accompanying Brief in Support, (i) CBI is likely to succeed on the merits of its claim that it is the sole holding company of the Bank, thereby entitling it to the accoutrements of Bank ownership, (ii) CBI, the Bank, and the Bank's customers are likely to suffer continued irreparable harm absent a preliminary injunction, and (iii) the balance of the equities and the public interest favor injunctive relief as the Agencies are uninterested in who owns the Bank, they simply need this Court's direction as to who that person is.

6.    CBI respectfully requests that this Court waive the security requirement in Rule 65(c) as there is no risk that the Agencies will suffer financial harm.

WHEREFORE, CBI respectfully requests that this Court (i) grant its Motion for Preliminary Injunction, (ii) order the Agencies to recognize CBI's status as the Bank's owner, and (iii) grant it all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201

2

Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com


*Attorneys for Plaintiff Canada Bancshares, Inc.*

Case 4:26-cv-00267-KGB     Document 2     Filed 03/13/26     Page 1 of 3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____
                    DEP CLERK

CANADA BANCSHARES, INC.                                          PLAINTIFF

v.                          Case No. 4:26-cv-267-KGB

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

---

## MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Motion for Preliminary Injunction against

the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official

Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the

Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill,

and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as

Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the

Federal Regulators, the "Agencies"), states:

1.      CBI recently became the sole holding company of the Bank of England (the "Bank")

upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I,

LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of ownership, including, for

example, (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's

strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

2.     The Agencies, however, refuse to recognize CBI's status as the Bank's owner— or *anyone's* status as the Bank's owner— simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business.

3.     Specifically, the Agencies have asserted that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."**

4.     Without this Court's entering immediate injunctive relief ordering the Agencies to recognize CBI as the Bank's owner, the Bank will operate like a headless hydra— no clear managerial oversight, no ability to respond to crises, and no strategic direction whatsoever.

5.     For the reasons set forth in the accompanying Brief in Support, (i) CBI is likely to succeed on the merits of its claim that it is the sole holding company of the Bank, thereby entitling it to the accoutrements of Bank ownership, (ii) CBI, the Bank, and the Bank's customers are likely to suffer continued irreparable harm absent a preliminary injunction, and (iii) the balance of the equities and the public interest favor injunctive relief as the Agencies are uninterested in who owns the Bank, they simply need this Court's direction as to who that person is.

6.     CBI respectfully requests that this Court waive the security requirement in Rule 65(c) as there is no risk that the Agencies will suffer financial harm.

WHEREFORE, CBI respectfully requests that this Court (i) grant its Motion for Preliminary Injunction, (ii) order the Agencies to recognize CBI's status as the Bank's owner, and (iii) grant it all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201

2

Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association
809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2026

TAMMY H. DOWNS, CLERK

By:_____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CANADA BANCSHARES, INC.                                          PLAINTIFF

v.                          Case No. __4:26-cv-267-KGB__

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM;
JEROME H. POWELL, in his Official
Capacity as Chair of the Board of Governors;
TRAVIS HILL, in his Official Capacity as Chair
of the Federal Deposit Insurance Corporation; and
SUSANNAH MARSHALL, in her Official Capacity
as Commissioner of the Arkansas State Bank Department          DEFENDANTS

---

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff, Canada Bancshares, Inc. ("CBI"), for its Brief in Support of its Motion for Preliminary Injunction against the Board of Governors of the Federal Reserve System (the "Board"); Jerome H. Powell, in his Official Capacity as Chair of the Board of Governors; Travis Hill, in his Official Capacity as Chair of the Federal Deposit Insurance Corporation (the "FDIC") (collectively, the Board, Mr. Powell, Mr. Hill, and the FDIC are the "Federal Regulators"); and Susannah Marshall, in her Official Capacity as Commissioner of the Arkansas State Bank Department (the "State Regulator" and, together with the Federal Regulators, the "Agencies"), states:

### INTRODUCTION

CBI recently became the sole holding company of the Bank of England (the "Bank") upon the dissolution of CBI's parent holding company, MHBC Investments Limited Partnership I, LLLP (the "Partnership"). As such, CBI is entitled to the accoutrements of Bank ownership, including, for example, setting the Bank's strategy and governance, managing the Bank's capital and funding, and

interacting directly with the Agencies. But the Agencies are preventing CBI from doing so. More specifically, the Agencies refuse to recognize *anyone's* status as the Bank's owner simply because there is a legal dispute pending among the Partnership's partners over the winding up of that business. Indeed, the FDIC and the State Regulator have asserted in writing that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** The Board has expressed the same opinion verbally during meetings over the Bank's ownership.

Without a preliminary injunction from this Court ordering the Agencies to immediately recognize CBI as the Bank's owner, the Bank will suffer governance paralysis, capital and liquidity crises, and severe operational disruption. Worse yet, the Agencies' continued refusal to recognize CBI as the Bank's owner interferes with CBI's due-process rights. To preserve the status quo, to ensure CBI's and the Bank's survival, and to protect the Bank's customers, this Court should enter a preliminary injunction ordering the Agencies to recognize CBI's status as the Bank's owner.

## BACKGROUND

CBI hereby incorporates the factual allegations contained in its Verified Complaint by reference pursuant to Federal Rule of Civil Procedure 10(c).

## ARGUMENT

A preliminary injunction is warranted when (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of the equities favors the movant; and (4) an injunction is in the public interest. *Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024) (per curiam). Though no single factor is "dispositive," *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023), likelihood of success is "the most significant" factor, *Missouri*, 112 F.4th at 536. When the federal government is the party opposing a preliminary injunction, the balance of the equities and the public interest "merge" into a single factor. *See, e.g., Missouri v. Trump*, 128 F.4th 979, 996–97 (8th Cir. 2025). Here, each factor supports a preliminary injunction.

2

I.    **CBI is likely to succeed on the merits because CBI is the Bank's sole holding company.**

As for this initial, most crucial factor, CBI is likely to succeed on the merits because, following the Partnership's dissolution, CBI became the Bank's sole holding company. More specifically, Mary Hanna Boles Canada has always been the Partnership's only legally recognized General Partner. Immediately upon the Lonoke County Circuit Court's appointing Gary Canada, Sr. as Mrs. Canada's emergency guardian on September 12, 2025, Mrs. Canada was dissociated from the Partnership by operation of law. Ark. Code Ann. § 4-47-603(7)(B) ("A person is dissociated from a limited partnership as a general partner upon . . . the appointment of a guardian or general conservator for the person.").

As such, the Partnership had 90 days— up and until December 12, 2025[1]— to either (i) admit a new General Partner, or (ii) consent to continue the activities of the limited partnership and admit a new General Partner in accordance with that consent. Ark. Code Ann. § 4-47-801(3)(B); **Ex. 1** to Compl., at §§ 6.9, 10.1(c). However, the Partnership failed to do either, and the Arkansas Secretary of State accordingly certified the Partnership's dissolution. **Ex. 5** to Compl. Upon the Partnership's dissolution, CBI became the Bank's sole holding company. As the Bank's sole holding company, CBI is entitled to, among other things: (i) the Agencies' recognition, (ii) the right to set the Bank's strategy and governance, and (iii) the ability to manage the Bank's capital and funding. Therefore, CBI is likely to succeed on the merits, and this most important factor weighs heavily in CBI's favor.

II.   **CBI, the Bank, and the Bank's customers have suffered and will suffer irreparable harm absent injunctive relief.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). For this requirement, a plaintiff need not prove with absolute certainty

---

[1] The Lonoke County Circuit Court later appointed Nicole Canada Luebke and Mr. Canada, Sr. as Mrs. Canada's co-guardians, but Mrs. Canada's guardianship has continued uninterrupted from September 12, 2025, to the date and time of this filing.

that injury will occur, but, instead, need merely show that irreparable harm is "likely" absent an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Here, the Agencies' refusal to recognize CBI as the Bank's owner has caused and will continue to cause CBI, the Bank, and the Bank's customers to suffer irreparable harm because such a refusal produces: (i) governance paralysis— the Bank's board cannot act effectively because the Agencies refuse to recognize appointments and management is unsure whose instructions to follow, thereby increasing the risk of mismanagement, (ii) capital and liquidity crises— if the Bank needs capital to meet regulatory capital ratios, it may fail to receive it both because (a) possible investors will shirk at investing money given the Agencies' position that no one presently owns the Bank, and (b) the Agencies would not act to either approve or disapprove such a capital injection (if it was a substantial one, for example), because they do not recognize anyone as yet having the authority to seek such approvals, (iii) operational disruption— vendors, other banks, and market participants could freeze activity due to uncertainty about authority and depositors will lose confidence if they perceive that the Bank is powerless, and (iv) ironically, regulatory noncompliance, as, without recognized ownership authority, compliance obligations like reporting to the Agencies, executing risk mitigation, and submitting stress test responses may fall through the cracks.

Indeed, the Agencies' unlawful refusal to recognize CBI as the Bank's owner is substantially likely to result in (i) CBI's and the Bank's terminations as ongoing business enterprises, and (ii) loss of customer goodwill, both of which constitute irreparable harm under Eighth Circuit precedent. *See, e.g.,* *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (explaining that "[i]rreparable harm has been found when one's allegedly unlawful actions . . . will cause another's ongoing business to terminate absent an injunction"); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("[T]he petitioners' potential loss of consumer goodwill qualifies as irreparable harm.").

4

Worse yet, as the Bank's sole holding company, CBI has a recognized property interest in its ownership of the Bank. *Cf. FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("[A]ppellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."); *Kaufman v. Societe Internationale Pour Participations Industrielles Et Commerciales, S.A.*, 343 U.S. 156, 159–60 (1952) (holding that "the rights of innocent stockholders . . . must be fully protected"). The Agencies' unlawful refusal to recognize that interest or give it any meaningful legal effect without due process of law or adequate compensation threatens violations of CBI's constitutional rights, independently constituting irreparable harm warranting injunctive relief. *See, e.g., Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 935 (E.D. Ark. 2021) ("The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, CBI has suffered and will continue to suffer irreparable harm absent immediate injunctive relief.

III.   **The balance of the equities and the public interest support a preliminary injunction both because (i) the Agencies are uninterested in who owns the Bank, they simply need Court direction, and (ii) customers' interests and the public's faith in the banking regulatory regime are in peril absent injunctive relief.**

The balance of the equities and public interest, which "merge" in suits against the government, also decisively favor preliminary relief. *Missouri*, 128 F.4th at 996–97. At the outset, the Agencies have no interest in this case warranting protection because they are uninterested in which entity ultimately owns the Bank. After all, their stated position is that the Bank's ownership **"remains a private legal issue that [they] have no jurisdiction over."** Stated differently, the Agencies will treat whomever this Court determines to be the Bank's owner as such.

Moreover, "it is always in the public interest to protect constitutional rights" like CBI's due-process entitlements. *Phelps-Roper v. Nixon*, 59 F.3d 480, 485 (8th Cir. 2007). And, even better, entering a preliminary injunction in CBI's favor would mean that the Bank once again has stable management

and oversight— thereby protecting customers' interests and the public's faith in the regulatory regime underlying the banking system. Thus, this final factor weighs heavily in CBI's favor, too.

## CONCLUSION

Following the Partnership's dissolution, CBI became the Bank's sole holding company. As such, it is constitutionally entitled to the accoutrements of ownership, including but not limited to: (i) the Agencies' recognition of CBI as the Bank's owner, (ii) the right to set the Bank's strategy and governance (subject to the Agencies' regulatory oversight), and (iii) the ability to manage the Bank's capital and funding (also of course subject to the Agencies' regulatory oversight).

Because CBI is (i) likely to succeed on the merits, (ii) has suffered and will continue to suffer irreparable harm absent immediate injunctive relief, and (iii) the balance of the equities and the public interest favor such relief, this Court should enter a preliminary injunction ordering the Agencies to immediately recognize CBI's status as the Bank's owner. Doing so preserves the status quo, ensures CBI's and the Bank's survival, and protects the Bank's customers from peril. Accordingly, CBI respectfully requests that this Court grant its Motion for Preliminary Injunction and award CBI all other relief that this Court deems just and proper.

Respectfully submitted,

Rose Law Firm,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 375-9131

David S. Mitchell, Jr.
Arkansas Bar No. 2010271
dmitchell@roselawfirm.com

W. Silas Heffley
Arkansas Bar No. 2022179
sheffley@roselawfirm.com

Rose Law Firm,
a Professional Association

6

809 S. 52nd Street, Ste. A
Rogers, Arkansas 72758
Telephone: (479) 301-2444

Ryan J. Smith
Arkansas Bar No. 2018192
rsmith@roselawfirm.com

Tyler D. Mlakar
Arkansas Bar No. 2022150
tmlakar@roselawfirm.com

*Attorneys for Plaintiff Canada Bancshares, Inc.*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Arkansas    ☒

CANADA BANCSHARES, INC.        )
                  )
                  )
                  )
      *Plaintiff(s)*        )
         v       )   Civil Action No.  4:26-cv-267-KGB
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM;  )
JEROME H. POWELL, in his Official  Capacity as Chair of the Board of
Governors; TRAVIS HILL, in his Official Capacity as Chair of the Federal  )
Deposit Insurance Corporation; and SUSANNAH MARSHALL, in her  )
Official Capacity as Commissioner of the Arkansas State Bank Department  )
                  )
      *Defendant(s)*       )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Travis Hill, in his Official Capacity as Chair of the Federal
              Deposit Insurance Corporation
              550 17th Street NW
              Washington, DC 20429

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

      David S. Mitchell, Jr., 120 East Fourth Street, Little Rock, Arkansas 72201

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

                  **TAMMY H. DOWNS**
                  *CLERK OF COURT*

Date: 03/13/2026

                  *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                              *Server's signature*

                                                    _____
                                                              *Printed name and title*


                                                    _____
                                                              *Server's address*

Additional information regarding attempted service, etc:

AO 85 (Rev. 01/09) Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
for the
Eastern District of Arkansas

| | |
|---|---|
| Canada Bancshares Inc | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.  4:26-cv-267-KGB |
| Board of Governors of the Federal Reserve System et al | ) |
| *Defendant* | ) |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a magistrate judge's availability.* A United States magistrate judge of this court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment. The judgment may then be appealed directly to the United States court of appeals like any other judgment of this court. A magistrate judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a magistrate judge, or you may withhold your consent without adverse substantive consequences. The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a magistrate judge's authority.* The following parties consent to have a United States magistrate judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## Reference Order

**IT IS ORDERED:** This case is referred to a United States magistrate judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date: _____          _____
*District Judge's signature*

_____
*Printed name and title*

Note:    Return this form to the clerk of court only if you are consenting to the exercise of jurisdiction by a United States magistrate judge. Do not return this form to a judge.